increase in Fund assets, capturing all benefits from economies of scale and paying no heed to the actual cost of providing those services.

74.     The retention by Defendants of the benefits resulting from economies of scale (benefits that are owned by, and should have been paid to, the Funds) resulted in Portfolio Selection Fees that were (and remain) (a) grossly disproportionate to the Portfolio Selection Services, (b) excessive, (c) could not have been the product of an arms' length bargain, and (d) violate § 36(b).

75.     The retention by Defendants of the benefits resulting from economies of scale (benefits that are owned by, and should have been paid to, the Funds) also resulted in Promotional Distribution Fees that were (and remain) (a) grossly disproportionate to any actual or potential benefit they could have created, (b) excessive, (c) could not have been the product of an arms' length bargain, and (d) violate § 36(b).

76.     Acceptance of the excessive Portfolio Selection Fees and the Promotional Distribution Fees by Defendants was (and remains) a breach of their fiduciary and other duties to the Funds.

### (2)    Comparative Fee Structures

77.     A mutual fund is a single investment portfolio for Defendants, as is any other institutional portfolio. Accordingly, with respect to the Portfolio Selection Services and the Portfolio Selection Fees, a mutual fund is no different than any other institutional investor.

78.     Other institutional investors (including Y Share investors in the Funds) do not pay Promotional Distribution Fees. Instead, the cost of any distribution activities are paid by Defendants from the management fees received from those institutional investor. In contrast, the Defendants receive enormous Promotional Distribution Fees from the Funds. Therefore, the

Word 35015880.1

great discrepancy between the management fees that Defendants receive from other institutional investors as compared to those received from the Funds is actually understated because the management fees received from other institutional investors includes all costs of marketing and distribution.

79.     Defendants and their affiliates provide advisory services to other institutional clients for substantially lower fees. The fees received from other institutional clients are properly compared to those same fees received by Defendants from the Funds for Portfolio Selection Services. The Freeman & Brown Study explains:

> Strong analogies . . . can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower. [Exhibit 6 at 653].

> * * *

> [A] mutual fund, as an entity, actually is an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." [Exhibit 6 at 629 n.93].

80.     The Freeman and Brown study accurately explains the similarity between the provision of Portfolio Selection Services to a mutual fund, like the Funds, and other institutional investors with similar investment objectives.

81.     Similarly, the respected mutual fund analyst firm *Morningstar* has concluded that there should be no difference between management fees charged to mutual funds (retail products) and other institutional clients:

> Fees for a firm's retail products should not be materially different from management fees for a firm's institutional offerings. Though we appreciate the added costs of servicing small accounts, those expenses needn't show up in the management fees.

Kunal Kapoor, *The Standards That We Expect Funds to Meet*, Morningstar, December 8, 2003.

Word 35015880.1

82.      Any additional administrative costs incurred by PIM from servicing small retail mutual fund accounts are recovered through separate administrative fees in addition to the Portfolio Selection Fee.  For example, in addition to the management fee, for fiscal 2003 the Funds paid separately for "investor servicing and custodian fees" (amounting to almost $35 million for the Voyager Fund and over $29 million for the Growth and Income Fund alone), compensation of trustees, other "administration" services and 12b-1 distribution fees, including Promotional Distribution Fees.  Each of the Funds also pays millions in unspecified "other" expenses, a charge that for Voyager and Growth and Income alone amounted to nearly $28 million in fiscal year 2003.  Defendants continue to receive these additional, separate administrative fees at similar (excessive) levels to the present date.

83.      Putnam Advisory Company, LLC ("PAC") is an affiliate of Defendants that enters into management contracts with other institutional clients.  The management fees received by PAC from institutional investors can be properly compared to the fees for pure Portfolio Selection Services received by Defendants from the Funds.  PAC shares office space, resources and advisory personnel with Defendants and provides identical portfolio management services.  PAC reports its securities holdings jointly with Defendants on a form prepared and signed by Defendants.

84.      PAC manages a stock portfolio for the Pennsylvania Public School Employees' Retirement System (the "Pennsylvania Retirement System").  The Pennsylvania Retirement System portfolio managed by PAC is comparably sized to the smaller Funds but is dwarfed by the larger Funds.  However, the total management fee received by PAC from the Pennsylvania Retirement System is *far lower* (in percentage and dollar terms) than the fee for pure Portfolio Selection Services received by Defendants from any of the Funds.  Further, the Pennsylvania

23

Retirement System fee *includes all administrative and distribution expenses* (the Pennsylvania Retirement System pays no Promotional Distribution Fees or other 12b-1 Distribution Fees). Finally, in what is clearly the result of an arms' length bargain, PAC agreed to dramatically better breakpoints than those agreed to with the Funds. The total management fees charged to the Pennsylvania Retirement System are compared to the Portfolio Selection Fees charged by Defendants to the Funds in Exhibit 9.

85.    PAC also manages a stock portfolio for the State Board of Administration of Florida (the "Florida SBA"). As with the Pennsylvania Retirement System portfolio, the Florida SBA portfolio is significantly smaller than the Funds' portfolios. Once again, despite the Florida SBA's significantly smaller size, the management fee (which includes all administrative and distribution expenses) received by PAC from the Florida SBA is far lower (in percentage and dollar terms) than the fee for just the pure Portfolio Selection Services received by Defendants from the Funds. Again, the Florida SBA pays no Promotional Distribution Fees or other 12b-1 Distribution Fees. Also, like the agreement with the Pennsylvania Retirement System (in what is again clearly the result of an arms' length bargain), PAC agreed to dramatically better breakpoints than those agreed to with the Funds.

86.    Because the fee received from other institutional clients *includes* all administrative and distribution expenses, the portion of the fee received from other institutional clients for pure Portfolio Selection Services is actually *less* than the amounts shown in the tables at Exhibit 9, thereby underscoring Defendants' violation of 36(b). By comparison, the *total* expense burden (*i.e.*, including all administrative and 12b-1 expenses) for the Putnam Voyager Fund's Class A shares is 1.02% (102 basis points) and for the Putnam Fund for Growth and

24

Income A shares is 0.9% (90 basis points).  The total fee burden is even higher for the other Funds.

87.    In short, the Portfolio Selection Fees (as a percentage of assets) received by Defendants are at least *double,* frequently *triple*, and, at certain breakpoints, *quadruple* those received from much *smaller* institutional clients for the very same advisory services.  When considered in dollar terms (rather than as a percentage), the Portfolio Selection Fees received by Defendants from the Funds are up to *hundreds* of times larger than the fees paid by some institutional clients with much smaller portfolios invested in the same securities.

88.    There is no legitimate basis for this marked disparity in fees received by Defendants from the Funds when compared to fees received by them or their affiliates from other institutional clients.  The Defendants recover the additional administrative costs associated with large numbers of shareholders through separate administrative fees received from the Funds, and therefore the different identity of the owner of the pool of funds invested has no impact on Portfolio Selection Services or Fees.  The Freeman and Brown study explains why the identity of the portfolio owner does not justify higher Portfolio Selection Fees:

> The [fund] manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds.  The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower.

Freeman & Brown Study at 627-28 [Exhibit 6].  The "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds." *Id.* at 671-72 [Exhibit 6].

89.    The significant economies of scale created solely by virtue of the Plaintiffs' and other shareholders' investment dollars in the Funds have been unlawfully retained by the

25

Defendants, and Promotional Distribution Fees have been received by Defendants despite a lack of benefit to the Funds or their shareholders, in violation of Section 36(b).

### (3)    Fallout Benefits (Indirect Profits) Attributable to the Funds

90.      Defendants also indirectly profit because of "fallout benefits" attributable to the Funds. These profits are above and beyond those received through Portfolio Selection Fees and other fees.

91.      Fallout benefits include the attraction of new customers for other funds or products offered by Defendants, cross selling Defendants' other funds and services to current Fund shareholders, and other benefits associated generally with the development of goodwill and the creation and growth of a client base for Defendants.

92.      Another profitable fallout benefit received and retained by Defendants is "soft dollar" payments. Essentially, "soft dollars" are credits from broker-dealers and other securities industry firms in exchange for Defendants' routing securities transaction orders and other business to the broker-dealers. While the existence of such arrangements has been known, details of the increased costs to the Funds and the concomitant benefits received and retained by Defendants have not been disclosed.

93.      In breach of their fiduciary duties owed to the Funds, Defendants direct the payment of excessive commissions to securities broker-dealers to execute trades for the Funds in exchange for which they receives and retain soft-dollars (a form of rebate or kickback). These soft-dollars are paid for by the Funds and the Plaintiffs in the form of higher commissions (depriving the Funds of the best execution of trades), yet benefit Defendants.

94.      These soft-dollars can amount to payments surpassing the total Portfolio Selection Fees and 12b-1 Distribution Fees paid to the Defendants. From 1995 to 2003, the Funds paid

just under $400 million for executing trades with soft-dollar brokers. If Defendants had sought and obtained the best execution for these trades without the soft-dollar kickbacks, the Funds and the Plaintiffs would have saved approximately $227 million - money that was improperly retained by Defendants at the Funds' expense. Defendants continue to improperly retain the Funds' money in this manner to the present date.

95.      Soft-dollar and other fallout benefits are either not quantified and shared with the Funds' board of trustees (even though the board cannot determine the fairness of any fee without having this information), or the board of trustees fails to properly consider fallout benefits when evaluating the fees paid to Defendants.

96.      According to the SEC, "[s]oft-dollar arrangements create incentives for fund advisers to (i) direct fund brokerage based on the research provided to the adviser rather than the quality of execution provided to the fund, (ii) forego opportunities to recapture brokerage costs for the benefit of the fund, and (iii) cause the fund to overtrade its portfolio to fulfill the adviser's soft-dollar commitments to brokers." Memorandum from Paul F. Roye, director of the SEC Division of Investment Management, June 2003.

97.      As noted by the SEC, institutional investors other than mutual funds that negotiate at arms' length often negotiate "soft dollar" or commission recapture programs and directly participate in the benefits wrongfully retained by Defendants from the Funds and the Plaintiffs. The Funds and their board of trustees could, but do not, negotiate such arrangements and, instead, Defendants have usurped that opportunity for their exclusive benefit.

98.      Defendants and their affiliates also receive other benefits or "kickbacks," either directly or indirectly, such as transfer agency and custodian fees. These fees automatically increase as the assets under management and the number of shareholders in the Funds increase.

Word 35015880.1

For fiscal 2003, transfer and custodian fees alone add up annually to just under 19 basis points (0.19%) for Voyager and 14 basis points (0.14%) for Growth and Income in *additional* revenue for Defendants and their affiliates, Putnam Fiduciary Trust Company and Putnam Investor Services. These affiliates receive similar fees from the other Funds while comparable fees paid by other institutional investors are either included in the overall management fee negotiated at arms' length or cost far less through Defendants or competitive third party providers. Defendants and their affiliates continue to receive these additional fees at similar (excessive) levels to the present date.

99.    Defendants also benefit from securities lending arrangements where they "loan" out securities owned by the Funds (*e.g.*, to short sellers) for a fee. Defendants retain those benefits even though the securities loaned belong not to them but to the Funds.

100.    These and other fallout benefits are required to be disclosed to the Funds' board of trustees as part of the total mix of information necessary to determine the reasonableness of the Portfolio Selection Fee and the reasons for a 12b-1 Distribution Plan and the related Promotional Distribution Fees. Even without considering the fallout benefits, the Portfolio Selection and Promotional Distribution Fees are excessive in both percentage and dollar terms. After considering the fallout benefits, these fees are obscene and their receipt by Defendants violates § 36(b) of the Investment Company Act of 1940.

### (4) The Nature and Quality of the Services Provided to the Funds' Shareholders

101.    The nature of the Portfolio Selection Services provided to the Funds is straightforward: Defendants select (buy, sell or hold) and trade, at its discretion, stocks, bonds, and other securities for the Funds. This is precisely the same service provided to Defendants'

other institutional clients even though the Funds are charged a dramatically higher Portfolio Selection Fee as a percentage of assets under management and in dollar terms.

102.    The quality of the Portfolio Selection Services provided to the Funds by Defendants is also precisely the same (because the services are the same) as the quality of the Portfolio Selection Services provided to the other institutional clients. However, Plaintiffs pay Defendants dramatically higher fees (in percentage and absolute dollar terms) because the Portfolio Selection Fees are not even close to the range of fees produced by the arms' length negotiations with Defendants' other institutional clients (even before considering the enormous additional fallout benefits received by Defendants).

103.    Furthermore, the Defendants' services to the Funds are even more overpriced when performance is considered. For the three fiscal years ended July 31, 2003, investors paid management and shareholder service fees of $514 million for Voyager and Grown and Income alone, despite a loss of 33% in 2001, a loss of 32% in 2002 and a minimal gain of 1.5% in 2003 (compared to a 2003 gain of over 10% from the S&P 500 index). In fact, over the last decade, Defendants or their affiliates received $1.3 billion in management and 12b-1 Distribution Fees from the Voyager Fund alone, even though that Fund significantly underperformed the Standard & Poor's 500 stock index (performance that can be purchased at a significantly lower cost).

104.    Also, between 1993 and 2002, Defendants liquidated, renamed or merged 44 mutual funds, in large part due to poor performance (liquidation or merger allows Defendants to remove a fund's poor track record from their reported performance). The nature and quality of Portfolio Selection Fees provided to the Funds totally fail to justify the cost.

105.    The nature of services provided for the Promotional Distribution Fee is also straightforward: Defendants take money from current Fund shareholders in an effort to attract

new shareholders to the Funds ostensibly so that all shareholders can enjoy cost savings from economies of scale. The existence of Y Shares tells the story: the use of Promotional Distribution Fees has never achieved the desired (and required) cost savings, should never have been approved or continued by the Funds' board of trustees, and violates Section 36(b) of the ICA.

### (5)    The Profitability of the Fund to the Adviser-Manager

106.     The profitability to Defendants of managing the Funds is a factor that the Court may consider. Intuitively, it is obvious that the fees charged to others in arms' length negotiations is the best indicator of profitability to Defendants; those negotiations must result in profitable relationships or investment managers (such as Defendants) intending to stay in business would be required to charge a higher fee. Therefore, managing the Funds (and receiving much higher Portfolio Selection Fees and Promotional Distribution Fees than from other institutional clients) is highly profitable to Defendants.

107.     For example, Defendants received approximately $84 million in management fees from Voyager Fund during its most recent fiscal year. Of that, at least $66 million is for pure Portfolio Selection Services. In 1990, the *total* management fee, including all expenses and pure Portfolio Selection Services, amounted to less than $5 million. The receipt of such a dramatic increase in fees for pure Portfolio Selection Services (in the face of dramatic economies of scale) while Putnam manages comparable (but much smaller) portfolios for a much smaller fee is in breach of Defendants' fiduciary and other duties to the Funds.

108.     Defendants received almost $85 million in management fees from the Fund for Growth and Income during its most recent fiscal year. Of that, as much as $65 million is for pure Portfolio Selection Services. In 1991, the *total* management fee, including all expenses and

pure Portfolio Selection Services, amounted to just over $11 million. The receipt of such a dramatic increase in fees for pure Portfolio Selection Services (in the face of dramatic economies of scale) while Putnam manages comparable (but much smaller) portfolios for a much smaller fee is a breach of Defendants' fiduciary and other duties to the Funds.

109.    The total Portfolio Selection Fee received by Defendants from each Fund is shown on the attached Exhibit 5.

110.    Furthermore, each dollar of Promotional Distribution Fees received by Defendants directly increases Defendants' profitability in an equal amount. These fees, by definition, are received by Defendants to cover their expenses, not those of the Funds (under the theory that those expenses would ultimately save the Plaintiffs and the Funds money). The amount of these fees has been steadily increasing. For 1991, the Voyager Fund paid less than $2 million in 12b-1 Distribution Fees. For the year ending July 31, 2003, that fund paid 12b-1 Distribution Fees of $65 million. Similarly, in 1991, the Fund for Growth and Income paid $4.5 million in 12b-1 fees. For the year ending October 31, 2003, that fund paid 12b-1 Distribution Fees of over $75 million. The amount of Promotional Distribution Fees increased proportionately with total 12b-1 Distribution Fees for these and all of the Funds.

111.    As discussed above under "comparative fee structures," Defendants and their affiliates have entered into advisory agreements with other institutional clients where Defendants accept *total* management fees (including both Portfolio Selection Fees and payment of all administrative, distribution and other costs) that quickly step down to as low as 15 basis points (0.15%) to manage portfolios that are typically much smaller than those of the Funds. Even on the conservative assumption that *all* of the other institutional clients' fee was for Portfolio Selection Services, it is still dramatically smaller in percentage terms (and obscenely so in dollar

31

terms) than the same fees received from the comparably sized or significantly larger Funds, and is not within the range established by Defendants with its other customers when negotiating at arms' length. Defendants would not agree to provide advisory services for a fee of as low as 15 basis points (or less) if it were not profitable to do so. Therefore, the immense profitability of the Funds' management for the same services is self-evident.

112.     Furthermore, the availability of Y Shares for institutional clients (shares free from all 12b-1 distribution fees) further establishes that the Promotional Distribution Fees received by PRM constitute pure profit to Defendants.

**(6)    The Independence and Conscientiousness of the Trustees (or Directors)**

113.     As the GAO Report noted, the "external management" structure of most mutual funds (including the Funds) creates a potential conflict of interest between a fund's shareholders and its adviser. [Exhibit 8]. The United States Supreme Court has stated that the disinterested director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest. *Burks v. Lasker*, 441 U.S. 471 (1979).

114.     The disinterested directors (or trustees) are supposed to serve as "watchdogs" for the shareholders of the Funds. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all agreements with Defendants and reviewing the reasonableness of the Portfolio Selection Fees and Promotional Distribution Fees received by Defendants. Accordingly, as noted by the GAO, the directors are expected to review, among other things, the adviser's costs, whether fees have been reduced when the Funds' assets have grown, and the fees charged for similar services. *See* GAO Report at 14 [Exhibit 8]. These responsibilities necessarily require the directors to rely on information provided by

32

Defendants. Defendants, in turn, have a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations.

115.    In considering whether to approve advisory agreements between the Defendants and the Funds, the trustees are required to review and consider specific factors, and to make certain comparisons, to ensure that any agreement is in the best interests of the Fund and its shareholders (rather than just the Defendants). The SEC has recognized that this inquiry includes the following specific factors:

> (1) the nature, extent, and quality of the services to be provided by the investment adviser; (2) the investment performance of the fund and the investment adviser; (3) the costs of the services to be provided and profits to be realized by the investment adviser and its affiliates from the relationship with the fund; (4) the extent to which economies of scale would be realized as the fund grows; and (5) whether fee levels reflect these economies of scale for the benefit of fund investors.

116.    In addition, the SEC has recognized that a fund's trustees must compare the fees and services to be provided by the adviser in any proposed contract with a fund with those in other investment advisory contracts, such as contracts between the same (and other) investment advisers with other investment companies (*i.e.*, mutual funds) or other types of clients (*e.g.*, pension funds and other institutional investors). On information and belief, Defendants failed to provide this information to the Funds' trustees who in turn failed to make or consider this comparison.

117.    A majority of the Funds' directors must be "disinterested" as defined in § 10 of the Investment Company Act. The ICA contains a presumption that the disinterested directors are in fact disinterested. However, even in connection with so-called disinterested directors, the lack of conscientiousness in reviewing the fees paid to the Defendants, and/or lack of adequate information provided by the Defendants to the directors in connection with their approvals of the

advisory agreements, and the control of management over the board in reviewing the fees are *not* presumed. Rather, they are all relevant factors in determining whether the Defendants have breached their fiduciary duties to the Funds and to the Plaintiffs.

118.       Despite the structural protections of independent directors envisioned by the Investment Company Act, the Funds' trustees have been subverted by Defendants and no longer serve in their "watchdog" role.

119.       Either the Defendants have failed to satisfy their fiduciary duty under the Investment Company Act to provide the Funds' directors with all information reasonably necessary for them to do their jobs, including determining the fairness of the Portfolio Selection Fee and the Promotional Distribution Fee, or that information has not been properly considered by the directors.

120.       Jack Bogle, founder of the Vanguard Group, one of the largest mutual fund complexes in the world, commented during an interview on the failure of mutual fund boards of directors to meet their duties under the Act:

> Q:  We've talked about how the [mutual fund] industry could do a better job.  How about the fund directors?
>
> A:  Well, fund directors are, or at least to a very major extent, sort of a bad joke.  They've watched industry fees go up year after year, they've added 12b-1 fees.  I think they've forgotten, maybe they've never been told, that the law, the Investment Company Act, says they're required to put the interest of the fund shareholders ahead of the interest of the fund adviser.  It's simply impossible for me to see how they could have ever measured up to that mandate, or are measuring up to it.

*Morningstar Interviews...Jack Bogle, Founder of the Vanguard Group*, Kathryn Haines and Russ Kinnel, www.morningstar.net, posted June 5, 1998.

121.    Similarly, a United States District Court Judge recently quoted Warren Buffet, the "legendary investor and chairman of the Berkshire Hathaway Group," on the lack of independence and diligence of mutual fund boards of directors:

> I think independent directors have been anything but independent. The Investment Company Act, in 1940, made these provisions for independent directors on the theory that they would be the watchdogs for all these people pooling their money. The behavior of independent directors in aggregate since 1940 has been to rubber stamp every deal that's come along from management -- whether management was good, bad or indifferent. Not negotiate for fee reductions and so on. A long time ago, an attorney said that in selecting directors, the management companies were looking for Cocker Spaniels and not Dobermans. I'd say they found a lot of Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F.Supp.2d 373, 383 (S.D.N.Y. 2002)(citation omitted).

122.    The dependence of the Funds' disinterested directors on the Defendants, and the domination and undue influence exerted on the directors by the Defendants, is evidenced by the following facts:

a.    Each of the Funds is governed by a common and interlocking board of directors initially selected (and constantly dominated by) the Defendants.

b.    All 101 different Putnam mutual funds are "overseen" by *one common board* of 12 directors, 10 of whom are considered "disinterested." The directors are paid from $203,000 to $388,000 for approximately 24 days of board meetings each year. The Funds have also adopted (and pay for) a non-contributory, defined benefit pension plan for each director serving more than five years. The Defendants have *de facto* control over directors' compensation and the nature and duration of director meetings and other aspects of the Funds' corporate governance, thereby depriving the Funds of the independence owed to them by the trustees.

Word 35015880.1

c.    Each of the Funds, and all funds within the Putnam Fund Complex, share common fiduciary advisers (*i.e.,* the Defendants or their affiliates). The Defendants created these relationships and continue to dominate in their execution.

d.    Each of the Funds, and all funds within the Putnam Fund Complex, share a common distributor affiliated with the Defendants (*i.e.,* the Funds' shares are sold by an affiliate of the Defendants).

e.    Trustees in the mutual fund industry almost without exception rely wholly on the fund manager to provide them with what is known in the industry as a "15c Report" (also called a "Lipper Package"). The 15c Report includes information about what other mutual fund investment advisors charge their mutual fund clients but does not include data about Defendants' or other advisors' other institutional clients (as that data is withheld by fund managers from the trustees). Fund managers use the data in the 15c Report to ensure that their fees fall within the range of fees charged by their "competitors," an industry of price gougers, rather than to ensure that the Portfolio Selection Fees received by Defendants are independently fair to the Funds. Here, either Defendants have followed this industry practice and failed to provide the correct information to the trustees, or the trustees have failed to consider properly the information provided.

f.    Each of the Funds, and all funds within the Putnam Fund Complex, have access to a common line of credit arranged by the Defendants to assist in managing money flows in the Funds (*e.g.,* to meet shareholder redemptions). The fees pertaining to such credit facility are shared equally by the Funds and all other funds within

the Putnam Fund Complex (thereby also again demonstrating benefits from economies of scale).

## COUNT I
## ICA § 36(b) BREACH OF FIDUCIARY DUTY
### (Excessive Fees from Economies of Scale)

123.     The Plaintiffs repeat and reallege paragraphs 1 through 122, inclusive, of this complaint.

124.     Defendants have received, and continue to receive, excessive Portfolio Selection Fees attributable to the extraordinary economies of scale created by the Plaintiffs and the Funds.

125.     Defendants have breached, and continue to breach, their ICA § 36(b) fiduciary duty to the Funds by receiving and retaining these excessive fees.

126.     Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, including the "amount of compensation or payments received from" the Funds.

## COUNT II
## ICA § 36(b) BREACH OF FIDUCIARY DUTY
### (Excessive Investment Advisory Fees)

127.     Plaintiffs repeat and reallege paragraphs 1 through 122, inclusive, of this complaint.

128.     The Portfolio Selection Fees received by PIM are and continue to be disproportionate to the services rendered and not within the range of what would have been negotiated at arms' length in light of all the surrounding circumstances (or the range of what has been negotiated at arms' length with the Defendants' other institutional clients). Instead, they are dramatically higher than those negotiated or that would be negotiated in any arms' length negotiation.

37

Word 35015880.1

129.    In receiving excessive advisory fees, and failing to put the interests of the Funds, the Plaintiffs, and the Funds' other shareholders ahead of their own interests, PIM breached its statutory fiduciary duties to the Funds and the Plaintiffs.

130.    Defendants have breached, and continue to breach, those statutory ICA § 36(b) fiduciary duties to the Funds by accepting excessive and inappropriate compensation. Plaintiffs and the Funds seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, "the amount of compensation or payments received from" the Funds.

## COUNT III
### ICA § 36(b) BREACH OF FIDUCIARY DUTY
**(Excessive Rule 12b-1 Promotional Distribution Fees and Extraction of Additional Excessive Compensation)**

131.    Plaintiffs repeat and reallege paragraphs 1 through 122, inclusive, of this complaint.

132.    The Promotional Distribution Fee extracts additional compensation for advisory services in violation of Defendants' fiduciary duty under § 36(b). Although the assets of the Funds have grown considerably, the resulting economies of scale benefited only Defendants, and not Plaintiffs or the Funds, precisely as feared by the SEC.

133.    In failing to pass along economy of scale benefits from the Promotional Distribution Fees, and in continuing to authorize, assess and collect Promotional Distribution Fees pursuant to the Funds' 12b-1 Distribution Plan, despite the fact that no benefits inured to Plaintiffs or the Funds, Defendants violated their ICA § 36(b) fiduciary duty by receiving excessive and inappropriate compensation. Plaintiffs seek, pursuant to § 36(b) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, including all Promotional Distribution Fees and any further "amount of payments received from" the Funds.

Word 35015880.1

**WHEREFORE,** Plaintiffs and the Funds demand judgment as follows:

a.   Declaring that the Defendants violated and continue to violate § 36(b) of the ICA and that any advisory agreements and Distribution Plans entered into between them and the Funds are void *ab initio*;

b.   Preliminarily and permanently enjoining the Defendants from further violations of the ICA;

c.   Awarding damages against the Defendants in an amount including all Portfolio Selection Fees and Promotional Distribution Fees paid to them by Plaintiffs and the Funds for all periods not precluded by any applicable statutes of limitation and continuing through the trial of this case;

d.   Awarding any further "actual damages resulting from [Defendants'] breach of fiduciary duty," including any further "amount of payments received from" the Funds;

e.   Awarding interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law;

f.   Awarding prospective relief in the form of reduced Portfolio Selection Fees and Promotional Distribution Fees in the future based not simply upon a percentage of assets formula, but also based upon the reasonableness of those fees in absolute dollar terms when considering the assets under management in the Funds;  and

Word 35015880.1

g.     Such other and further relief as may be proper and just.

Dated: May 17, 2004

                              Respectfully submitted,

                              David E. Marder (BBO #552485)
                              Marc N. Henschke (BBO #636146)
                              Jonathan D. Mutch (BBO #634543)
                              Robins, Kaplan, Miller & Ciresi LLP
                              111 Huntington Ave.
                              Boston, MA   02199
                              (617) 267-2300

Word 35015880.1