UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
STEVEN G. WICKS and GERALD A.
KALBFLEISCH,
                                                          :

                          Plaintiffs,                     :        Civil Action
                                                                   No. 04-10988-GAO
             v.                                           :

PUTNAM INVESTMENT MANAGEMENT,            :
LLC and PUTNAM RETAIL MANAGEMENT,
LLP,                                                      :

                          Defendants.                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


**DEFENDANTS' MEMORANDUM OF LAW IN**
**<u>SUPPORT OF MOTION TO DISMISS THE COMPLAINT</u>**


Of Counsel:                              Dated:  August 13, 2004

Seth M. Schwartz                         James R. Carroll
Elizabeth A. Hellmann                    SKADDEN, ARPS, SLATE,
SKADDEN, ARPS, SLATE                        MEAGHER & FLOM LLP
   MEAGHER & FLOM LLP                     One Beacon Street
Four Times Square                        Boston, Massachusetts 02108-3194
New York, New York 10036-6522            (617) 573-4800
(212) 735-3000

*Attorneys for Putnam Investment Management, LLC*
*and Putnam Retail Management, LP*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    PLAINTIFFS' CLAIMS ARE BARRED BY
      RULE 41(a)(1)'S TWO DISMISSAL RULE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER ICA
      SECTION 36(b) FOR EXCESSIVE PORTFOLIO SELECTION FEES  . . . . . . . . . . . . . . 6

      A.    Applicable Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    Plaintiffs' Allegations Do Not State a Claim Under Section 36(b) . . . . . . . . . . . . . . 8

III.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER ICA
      SECTION 36(b) FOR EXCESSIVE PROMOTIONAL DISTRIBUTION FEES . . . . . . . . . 17

      A.    Applicable Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      B.    Plaintiffs' Allegations Do Not State a Claim Under Section 36(b) . . . . . . . . . . . . . . 18

IV.   AT A MINIMUM, THE COURT SHOULD DISMISS AT LEAST
      THOSE CLAIMS PLAINTIFFS LACK STANDING TO ASSERT  . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

Abreu v. Ramirez, 284 F. Supp. 2d 1250 (C.D. Cal. 2003) ............................................................ 5

In re Bank of Boston Corp. Securities Litigation, 762 F. Supp. 1525 (D. Mass.
    1991) ............................................................................................................................................ 19

Beddall v. State Street Bank & Trust Co., 137 F.3d 12 (1st Cir. 1998) ........................................ 4

In re Eaton Vance Corporation Securities Litigation, 219 F.R.D. 38 (D. Mass.
    2003) ............................................................................................................................................ 19

In re Eaton Vance Corporation Securities Litigation, 220 F.R.D. 162 (D. Mass.
    2004) ............................................................................................................................................ 19

Gartenberg v. Merrill Lynch Asset Management, Inc., 528 F. Supp. 1038
    (S.D.N.Y. 1981), aff'd, 694 F.2d 923 (2d Cir. 1982) .......................................................... 10

Gartenberg v. Merrill Lynch Asset Management, Inc., 694 F.2d 923 (2d Cir.
    1982) ........................................................................................................................ 2, 6, 11, 15, 18

Gooley v. Mobil Oil Corp., 851 F.2d 513 (1st Cir. 1988) ............................................................ 7

Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222 (S.D.N.Y. 1990), aff'd, 928
    F.2d 590 (2d Cir. 1991) ...................................................................................................... 10, 13

Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727 (3d Cir. 1970) .................................................. 19

Krantz v. Prudential Investments Fund Management LLC, 305 F.3d 140 (3d Cir.
    2002), cert. denied, 537 U.S. 1113 (2003) ....................................................................... 6, 16

Krantz v. Prudential Investments Fund Management LLC, 77 F. Supp. 2d 559,
    565 (D.N.J. 1999), aff'd, 305 F.3d 140 (3d Cir. 2002), cert. denied, 537
    U.S. 1113 (2003) ........................................................................................................................ 18

Krantz v. Fidelity Management & Research Co., 98 F. Supp. 2d 150, 159 (D.
    Mass. 2000) ................................................................................................................................ 13

Krinsk v. Fund Asset Management, Inc., 875 F.2d at 411 .................................................. 9, 14, 16

Krinsk v. Fund Asset Management, Inc., 715 F. Supp. 472 (S.D.N.Y. 1988), aff'd,
    875 F.2d 404 (2d Cir. 1989) .................................................................................................... 14

Levy v. Alliance Capital Management L.P., No. 97 Civ. 4672, 1998 WL 744005
(S.D.N.Y. Oct. 26, 1998) ........................................................................ 7, 18

Meyer v. Oppenheimer Management Corp., 707 F. Supp. 1394 (S.D.N.Y. 1988),
aff'd, 895 F.2d 861 (2d Cir. 1990) ........................................................ 18

Meyer v. Oppenheimer Management Corp., 895 F.2d 861 (2d Cir. 1990) .................. 18

Midgal v. Rowe Price-Fleming International, Inc., No. AMD 98-2162, 2000 WL
350400 (D. Md. Mar. 20, 2000), aff'd, 248 F.3d 321 (4th Cir. 2001) ...................... 6, 8, 12

Migdal v. Rowe Price-Fleming International, Inc., 248 F.3d 321, 327 (4th Cir.
2001) ........................................................................................ 7, 13, 16

Nelson v. Aim Advisers, Inc., No. 01-CV-0282-MJR, 2002 WL 442189 (S.D. Ill.
Mar. 8, 2002) ................................................................................ 1

Raines v. Byrd, 521 U.S. 811 (1997) ........................................................ 19

Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962 (S.D.N.Y.),
aff'd, 835 F.2d 45 (2d Cir. 1987) ........................................................ 10, 13

Strougo v. BEA Associates, 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002) ................ 11

In re Thomson McKinnon Securities Inc., 120 B.R. 301 (Bankr. S.D.N.Y. 1990) ...................... 12

United States ex rel. Karvelas v. Melrose-Wakefield Hospital, 360 F.3d 220 (1st
Cir. 2004) .................................................................................... 7

United States v. AVX Corp., 962 F.2d 108 (1st Cir 1992) ................................ 3

Verkouteren v. Blackrock Financial Management, Inc., No. 98 Civ. 4673, 1999
WL 511411 (S.D.N.Y. July 20, 1999), aff'd, 208 F.3d 204 (2d Cir. 2000) ............... 16, 17

Verkouteren v. BlackRock Financial Management, Inc., 208 F.3d 204 (2d Cir.
2000) ........................................................................................ 6

Verrey v. Ellsworth, 303 F. Supp. 497 (S.D.N.Y. 1969) ................................ 19

Warfield v. AlliedSignal TBS Holdings, Inc., 267 F.3d 538 (6th Cir. 2001) ................ 6

Yampolsky v. Morgan Stanley Investment Advisers Inc., Nos. 03 Civ. 5710,
5896, 2004 WL 1065533 (S.D.N.Y. May 12, 2004) ........................... 7, 8, 10, 12, 14, 16

iii

STATUTES & OTHER AUTHORITIES                                          PAGE(S)

17 C.F.R. § 270.12b-1(b) ............................................................................. 4, 17

Securities; Brokerage and Research Services, Exchange Act Release No. 23,170,
    17 C.F.R. Part 241 (Apr. 23, 1986), available at 1986 WL 630442 ................ 15

Fed. R. Civ. P. 12(b)(6) ................................................................................... 1

Fed. R. Civ. P. 41(a)(1) ............................................................................ 1, 4, 5

15 U.S.C. § 78bb(e)(1) .................................................................................. 15

15 U.S.C. § 80a-35(b) ............................................................................. 2, 6, 9

U.S. Const. art. III, § 2 .................................................................................. 19

1 Thomas P. Lemke et al., Regulation of Investment Companies § 7.05 (1995) ........ 17

The Investment Company Regulation Deskbook, § 7.1, 7.4[1] (Amy L. Goodman
    ed., c. 1997) ........................................................................................... 17

Andy Serwer, Where the Money's Really Made, Fortune, Mar. 31, 2003, at 106 ........ 10

Defendants Putnam Investment Management, LLC ("Putnam" or "Putnam Investment") and Putnam Retail Management Limited Partnership ("Putnam Distribution") (together, "Defendants") respectfully submit this memorandum of law in support of their motion for an Order dismissing plaintiffs' Complaint pursuant to Rules 12(b)(6) and 41(a)(1) of the Federal Rules of Civil Procedure.

## Preliminary Statement

The Court may be surprised to learn that this is the third attempt by plaintiff Steven G. Wicks to challenge the fees earned by Defendants for services rendered to certain of the mutual funds within the Putnam family of funds (the "Funds"). On June 22, 2001, Wicks commenced his first such lawsuit, captioned Nelson v. Aim Advisors, Inc. (Cause No. 01-CV-0282-MJR), in the United States District Court for the Southern District of Illinois claiming, as he does here, that Defendants violated Section 36(b) of the Investment Company Act of 1940 ("the ICA"), purportedly by receiving excessive investment advisory and distribution fees for services rendered. On motion by Defendants, Judge Michael J. Reagan ordered that the claims against Defendants be severed from those against unrelated defendants and, pursuant to 28 U.S.C. § 1404(a), transferred to this District. See Nelson v. Aim Advisors, Inc., No. 01-CV-0282-MJR, 2002 WL 442189, at *5 (S.D. Ill. Mar. 8, 2002). Following Judge Reagan's ruling, plaintiffs voluntarily dismissed the case.

Despite plaintiffs' claim in Nelson that Defendants' fees were "excessive," id. at *1, plaintiff Wicks apparently continued to hold shares of Putnam mutual funds following his voluntary dismissal of the action. Then, after remaining invested with Putnam for an additional two years, Wicks sued Putnam again. On March 2, 2004, he filed a second lawsuit against Defendants in the Southern District of Illinois, this time captioned Wicks v. Putnam Investment Management, LLC (Cause No. 04-CV-145-MJR), again claiming that Defendants had received excessive advisory and distribution fees in violation of Section 36(b). Because he was no longer a resident of Illinois at that point, plaintiff Wicks added an Illinois

resident, Gerald A. Kalbfleisch, as an additional plaintiff to this second suit in an apparent attempt to manufacture a basis for venue in the Southern District of Illinois.

Plaintiffs' second fee case was assigned to Judge Reagan, who <u>sua sponte</u> observed that transfer to this District appeared to be appropriate in light of <u>Nelson</u> and therefore ordered the parties to submit briefs on the issue of venue transfer. In their brief, Defendants once again requested transfer of the case to this District. On May 14, 2004, before Judge Reagan could rule on transfer, plaintiffs, once again, voluntarily dismissed the case.

With their forum-shopping odyssey finally at an end, plaintiffs refiled their complaint in this Court on May 18, 2004. Having voluntarily dismissed their case twice before, however, plaintiffs are now barred from bringing this third lawsuit pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure and the doctrine of res judicata. Accordingly, the Complaint should be dismissed with prejudice.

In the event this Court examines the sufficiency of the Complaint's allegations despite plaintiffs' prior voluntary dismissals, the Complaint nevertheless should be dismissed for failure to state a claim for relief under Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b). To state a claim for return of allegedly excessive fees under that statute, plaintiffs must allege facts sufficient to show for pleading purposes that the fees at issue "bear[] no reasonable relationship to the services rendered" by defendants to the mutual funds in which plaintiffs invested. <u>Gartenberg v. Merrill Lynch Asset Mgmt., Inc.</u>, 694 F.2d 923, 928 (2d Cir. 1982). No such facts have been alleged in the Complaint here. Indeed, the Complaint pleads virtually no facts concerning the nature and value of Defendants' services, preferring instead to repeat the conclusory refrain that Defendants' fees must be deemed to be excessive because (a) "[a]ll mutual funds . . . create economies of scale," but Defendants purportedly did not share those cost savings with fund investors, and (b) institutional investors investing with Putnam in separately managed accounts purportedly pay comparatively lower fees than "retail" investors, such as plaintiffs, who invest in mutual funds. <u>See</u>

2

Compl. ¶¶ 6-7. These generic allegations, which in theory could be made against virtually every open-end mutual fund in America, fall far short of what is required to state a claim under Section 36(b). Accordingly, the Complaint should be dismissed.[1]

## STATEMENT OF FACTS[2]

### A.    Plaintiffs

Plaintiff Steven G. Wicks is a resident of Lee County, Florida, and claims to hold shares of Putnam Discovery Growth Fund, Putnam Fund for Growth and Income, Putnam Growth Opportunities Fund, Putnam Investors Fund, Putnam New Opportunities Fund, Putnam New Value Fund, Putnam Vista Fund and Putnam Voyager Fund. See Compl. ¶ 14. The Complaint does not state how or when plaintiff Wicks purchased his shares in these Funds.

Plaintiff Gerald A. Kalbfleisch resides in St. Clair County, Illinois, and claims to hold shares of Putnam Classic Equity Fund. See id. ¶ 15. The Complaint provides no indication of how or when plaintiff Kalbfleisch acquired his shares in this Fund.

### B.    Defendants

Putnam Investment is a Delaware limited liability company with its principal place of business in Boston, Massachusetts. See id. ¶ 16. By contract, Putnam Investment acts as investment adviser to the

---

[1]    At a minimum, to the extent plaintiffs purport to assert claims against Putnam in which they own no shares, such claims should be dismissed on the ground that plaintiffs lack standing to assert them.

[2]    This statement is drawn from allegations of the Complaint. For purposes of this motion, all well-pled facts are accepted as true. See United States v. AVX Corp., 962 F.2d 108, 114 (1st Cir 1992). This Court, however, "is obliged neither to 'credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation,' nor to honor subjective characterizations, optimistic predic-tions, or problematic suppositions. '[E]mpirically unverifiable' conclusions, not 'logically compelled, or at least supported, by the stated facts,' deserve no deference." Id. at 115 (alteration in original) (citations omitted).

Putnam Family of Funds, including the Funds in which plaintiffs allegedly have invested. See id. Putnam Investment provides investment advice, administrative assistance, and other support to the Funds and, as is standard practice in the industry, charges the Funds certain advisory and management fees pursuant to contracts with the Funds. See id. ¶¶ 4-5. These contracts must be approved annually by a majority of the independent, disinterested members of the Boards of Trustees (i.e., directors) of each of the Funds. See Ex. A ¶ 5[3]. Plaintiffs claim that Putnam Investment received allegedly excessive "Portfolio Selection Fees" pursuant to these contracts in violation of Section 36(b) of the ICA. Id. ¶¶ 5, 33.

Putnam Distribution is a Massachusetts limited partnership with its principal place of business in Boston, Massachusetts. See id. ¶ 17. As the principal underwriter and distributor of the Putnam Family of Funds, Putnam Distribution markets shares of the Funds through unaffiliated broker-dealers that sell the shares directly to the public. See id. As is standard practice in the industry, Putnam Distribution charges the Funds for certain of the expenses incurred in the distribution process under plans of distribution adopted and approved by the Boards of Trustees (i.e. directors) of each of the Funds pursuant to Securities and Exchange Commission ("SEC") Rule 12b-1, 17 C.F.R. § 270.12b-1 (2004). See id. ¶ 9. Plaintiffs claim that Defendants have received allegedly excessive "Promotional Distribution Fees" pursuant to these distribution plans in violation of Section 36(b). See Compl. ¶¶ 10, 50.

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS ARE BARRED BY RULE 41(a)(1)'S TWO DISMISSAL RULE

Rule 41(a) of the Federal Rules of Civil Procedure provides, in pertinent part that

an action may be dismissed by the plaintiff without order of the court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for

---

[3]    The management agreements are repeatedly referenced in the Complaint and therefore may be considered by the Court in ruling on this motion to dismiss. See Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998).

summary judgment, whichever first occurs, or (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim.

Fed. R. Civ. P. 41(a)(1). As set forth above, plaintiff Wicks first filed suit on June 22, 2001 (the "First Action"), claiming that the same Defendants named in the present action violated Section 36(b) of the ICA, purportedly through receipt of excessive advisory and distribution fees. (A copy of the Nelson complaint is attached hereto as Exhibit B.) After Judge Reagan granted Defendants' motion to sever the claims that had been asserted against them and transferred those claims to the District of Massachusetts, plaintiffs voluntarily dismissed the complaint they had filed in the First Action. (A copy of the stipulation of dismissal in the First Action is attached hereto as Exhibit C.)

On March 2, 2004, plaintiffs filed a second action (the "Second Action") based on the same claims they previously had asserted in the dismissed First Action. (A copy of the Wicks complaint filed in the Second Action is attached hereto as Exhibit D.) Anticipating that Judge Reagan would once again transfer the case for the same reasons he had transferred the First Action, plaintiffs abruptly – and voluntarily – dismissed the complaint filed in the Second Action. (A copy of the notice of dismissal in the Second Action is attached hereto as Exhibit E.)

Because plaintiffs voluntarily dismissed the First Action, the notice of voluntary dismissal subsequently filed in the Second Action operated as an adjudication of the merits of that case. Consequently, plaintiffs are foreclosed from maintaining this action – the Third Action. Because the complaint in the Third Action purports to assert claims identical to those previously asserted in recently dismissed Second Action, the Third Action is barred by the "two dismissal rule" of Rule 41(a)(1) and the doctrine of res judicata. E.g., Abreu v. Ramirez, 284 F. Supp. 2d 1250, 1255 (C.D. Cal. 2003). See also

Warfield v. AlliedSignal TBS Holdings, Inc., 267 F.3d 538, 542 (6th Cir. 2001) ("A voluntary dismissal

with prejudice operates as a final adjudication on the merits and has a res judicata effect.").

## II.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER ICA
## SECTION 36(b) FOR EXCESSIVE PORTFOLIO SELECTION FEES

### A.   Applicable Standards

Section 36(b) of the ICA provides in pertinent part that

> the investment adviser of a registered investment company shall be deemed to have a
> fiduciary duty with respect to the receipt of compensation for services, or of payments of
> a material nature, paid by such registered investment company, or by the security holders
> thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).  To state a claim under this statute, plaintiffs must plead facts sufficient to show

that the Portfolio Selection Fees paid to Putnam Investment were "so disproportionately large that [they]

bear[] no reasonable relationship to the services rendered [to the Putnam Funds] and could not have been

the product of arm's-length bargaining." Gartenberg, 694 F.2d at 928.  Accord e.g., Krantz v. Prudential

Invs. Fund Mgmt. LLC, 305 F.3d 140, 143 (3d Cir. 2002) (affirming dismissal of Section 36(b) claim

where, as here, plaintiff "failed to allege any facts indicating that the fees received were disproportionate

to services rendered"), cert. denied, 537 U.S. 1113 (2003); Verkouteren v. BlackRock Fin. Mgmt., Inc.,

No. 98 Civ. 4673, 1999 WL 511411 (S.D.N.Y. July 20, 1999), aff'd, 208 F.3d 204 (2d Cir. 2000)

(affirming dismissal of Section 36(b) claim where, as here, the complaint failed "to plead facts sufficient

to show that the amount of the advisory fee was 'so disproportionately large that it bears no reasonable

relationship to the services rendered and could not have been the product of arm's-length bargaining'"

(quoting Gartenberg, 694 F.2d at 928)); Midgal v. Rowe Price-Fleming Int'l, Inc., No. AMD 98-2162, 2000

WL 350400, at *3 (D. Md. Mar. 20, 2000), aff'd, 248 F.3d 321 (4th Cir. 2001); Levy v. Alliance Capital

Mgmt. L.P., No. 97 Civ. 4672, 1998 WL 744005, at *4 (S.D.N.Y. Oct. 26, 1998), aff'd mem., 189 F.3d

461 (2d Cir. 1999).

6

In evaluating the adequacy of allegations that fees are "disproportionately large," courts consider the extent to which the Complaint adequately pleads facts concerning the so-called "Gartenberg factors," namely: (1) the nature and quality of services provided by an investment adviser to the mutual funds it manages; (2) the profitability of the mutual funds at issue to the adviser; (3) "fall-out benefits," if any, obtained by the adviser in connection with management of the funds; (4) whether economies of scale were realized by the adviser and shared with shareholders of the Funds; (5) comparative fee structures of other, similar, mutual funds; and (6) the independence and conscientiousness of the mutual funds' independent outside directors/trustees. See, e.g., Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 327-28 (4th Cir. 2001), Yampolsky v. Morgan Stanley Inv. Advisers Inc., Nos. 03 Civ. 5710, 5896, 2004 WL 1065533, at *1-2 (S.D.N.Y. May 12, 2004); Levy, 1998 WL 744005, at *2, *4.

To adequately state a claim under Section 36(b), a complaint "may not simply allege in a conclusory manner that advisory fees are 'excessive.'" Migdal, 248 F.3d at 327; Levy, 1998 WL 744005, at *2; see also United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 240 (1st Cir. 2004) (under FRCP 8(a), simply parroting language of statute not sufficient to withstand motion to dismiss); Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988) (under Rule 8, conclusory allegations not sufficient to withstand motion to dismiss). Rather, the complaint must allege facts that, if true, would be sufficient to "support a claim that the fees at issue are excessive." Migdal, 248 F.3d at 327; Levy, 1998 WL 744005, at *2. In the same vein, plaintiffs cannot survive a motion to dismiss where, as here, their complaint does little more than make conclusory mention of the Gartenberg factors without also pleading facts sufficient to show "how or why the fees are 'so disproportionately large that [they] bear[] no reasonable relationship to the services rendered.'" Yampolsky, 2004 WL 1065533, at *2 (alterations in original).

## B.   Plaintiffs' Allegations Do Not State a Claim Under Section 36(b)

Count I of the Complaint alleges that the Portfolio Selection Fees received by Putnam Investment were excessive because of the "extraordinary economies of scale created by Plaintiffs and the Funds." Compl. ¶ 124.  Count II of the Complaint alleges that the Portfolio Selection Fees received by Putnam Investment were excessive because the Funds pay comparatively higher fees than Putnam's institutional clients.  See id. ¶ 128.  While the Complaint pays lip service to the various Gartenberg factors in tandem with these conclusory references to "economies of scale" and institutional fees, the complaint nevertheless is legally defective because "the level of generality [is] too high and (more importantly) because these allegations do not remotely touch on the issue of what, if any, relation exists between the disputed fees on the one hand, and the services provided in consideration for their payment, on the other."  Migdal, 2000 WL 350400, at *3 (emphasis added).

### 1.   Economies of Scale

Most of plaintiffs' allegations regarding economies of scale are based on generalities that purport to apply to the entire mutual fund industry, but are not specific to any of the Putnam funds in which plaintiffs have invested.  For example, plaintiffs allege that "economies of scale exist in the investment advisory industry," Compl. ¶ 56, citing "[n]otable academic research" from 2001, government reports from 2000, and a 2001 court opinion involving a mutual fund unaffiliated with Putnam.  See id. ¶¶ 61-63; see also id. ¶ 25.  These allegations, which are based solely on "speculation, inference and generalized observations about the securities industry" are insufficient to state a claim under Section 36(b).  Yampolsky, 2004 WL 1065533, at *2 (dismissing complaint attached hereto as Exhibit F, which similarly cites in paragraphs 20-22 industry commentary and outdated studies).  Indeed, these generic assertions say nothing about whether the Funds at issue in this case achieved economies of scale in the year preceding

8

the filing of this Complaint,[4] the nature and amount of any such economies of scale, and the extent to which they were or were not shared with Fund shareholders.

Undaunted by the absence of any facts identifying any actual economies of scale realized by the Funds, plaintiffs make the self-serving – and entirely speculative – assertion that certain unidentified, albeit presumed, economies of scale were not shared with Putnam Fund shareholders merely because Putnam Investment's fees have increased over a twelve-year period, 1991-2003, as a result of alleged growth in assets under management. See Compl. ¶ 70. Such conclusory claims have long been held inadequate as a matter of law. Indeed, as explained by the Second Circuit Court of Appeals back in 1989, when affirming a district court's rejection of a virtually identical claim:

> [Plaintiff] alleges that Merrill Lynch's expenses, in terms of a percentage of fee-based revenues, have declined as a result of the Fund's asset growth. He argues that the Fund should receive the benefit of this economy of scale. The district court [correctly] noted, however, that the fact that "expenses . . . declined at a time when the Fund size grew . . . does not establish that such decline was necessarily due to economies of scale."

Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404, 411 (2d Cir. 1989) (omissions in original) (emphasis added).

There also is no basis in fact or logic for plaintiffs' conclusory assertion that as "the size of the Funds has grown dramatically, the nature and the quality of the Portfolio Selection Services rendered by Defendants has not changed." Compl. ¶ 72. Plaintiffs attempt to substantiate this baseless contention by alleging that "the number of securities held in each of the Funds' portfolios has remained fairly constant, suggesting that the research associated with providing the [services] was unchanged." Id. (emphasis added). This is a classic non sequitur. Indeed, it is well-established that the number of securities held at any one time in a fund portfolio has nothing to do with the amount or cost of research needed or utilized

---

[4]     Section § 36(b) of the ICA expressly provides that "[n]o award of damages shall be recoverable for any period prior to one year before the action was instituted." 15 U.S.C. § 80a-35(b)(3) (emphasis added).

to select and monitor each of the securities in the portfolio.  See Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222, 1238 (S.D.N.Y. 1990) (courts reject the argument "that since a fund increased dramatically in size, economies in scale must have been realized"), aff'd, 928 F.2d 590 (2d Cir. 1991); Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 528 F. Supp. 1038, 1055 (S.D.N.Y. 1981) (Pollack, J.) ("That [investment] processing costs do not significantly diminish as Fund assets increase accords with logic and common sense."), aff'd, 694 F.2d 923 (2d Cir. 1982).  Regardless of the number of securities held by a fund, as the number of shareholders and assets under management increase, the challenges – and thus the costs – of managing the portfolio become considerably greater.  See, e.g., Andy Serwer, Where the Money's Really Made, Fortune, Mar. 31, 2003, at 106 ("Everybody understands the difficulty that the manager of a big mutual fund . . . has finding enough big ideas to move a multibillion-dollar fund.").

The few Fund-specific facts alleged in the complaint actually show that Putnam Fund shareholders have reaped the benefits of economies of scale.  Indeed, plaintiffs concede, as they must, that the fee agreements between Putnam and the Funds make use of "breakpoints," which operate to reduce fees as assets under management increase, reflecting a sharing of economies of scale.  See Compl. ¶ 25; see also Gartenberg, 528 F. Supp. at 1042-43; Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962, 979 (S.D.N.Y), aff'd, 835 F.2d 45 (2d Cir. 1987).  This is illustrated in part by Exhibit 5 to the Complaint, which purports to show Portfolio Selection Fees for the Funds in the range of .32% to .54% of assets under management ("AUM") for the fiscal year ending 2003, with the lowest fees charged to the Funds with the largest AUM.  See Compl. Ex. 5.  Under the circumstances, the Complaint's allegations concerning "economies of scale" fail to provide a basis for any claim under Section 36(b).

## 2.    Comparative Fee Structures

Another Gartenberg factor considers "comparative fee structures with other similar funds." Yampolsky, 2004 WL 1065533, at *1.  As to this factor, the Complaint alleges that "Defendants and their

affiliates provide advisory services to other institutional clients for substantially lower fees" than those purportedly charged to clients investing in "retail products" such as mutual funds. Compl. ¶¶ 79-81. According to plaintiffs, this purported disparity between "retail" and "institutional" fees supposedly shows that the former are "excessive." But once again, plaintiffs' conclusory assertions are undermined by settled law. Indeed, a virtually identical argument was expressly rejected by the court in Gartenberg, where the Second Circuit ruled as follows:

> Appellants' argument that the lower fees charged by investment advisers to large pension funds should be used as a criterion for determining fair advisory fees for money market [mutual] funds must also be rejected. The nature and extent of the services required by each type of fund differ sharply. As the district court recognized, the pension fund does not face the myriad of daily purchases and redemptions throughout the nation which must be handled by the Fund, in which a purchaser may invest for only a few days.

694 F.2d at 930 n.3 (emphasis added). Accord Strougo v. BEA Assocs., 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002) (rejecting Section 36(b) claim based on allegations of lower fees for institutional clients; the "relevant comparison must be to other mutual funds, not to non-mutual fund institutional clients"). Thus, fees charged by Putnam for services rendered to institutional investors are irrelevant as a matter of law, and plaintiffs' Section 36(b) claim should be dismissed.

### 3.    Nature and Quality of Services

Another Gartenberg factor is the nature and quality of the services provided by Putnam to the Funds it manages. See Gartenberg, 694 F.2d at 930. As to the nature of the services provided by Putnam Investment, plaintiffs refer to them as "Portfolio Selection Services," which plaintiffs define as "select[ing] (buy, sell or hold) and trad[ing], at its discretion, stocks, bonds, and other securities for the Funds." Compl. ¶ 101. While plaintiffs cavalierly allege that Portfolio Selection Services are "straightforward," id., this allegation is preposterous given that investment advisers are members of a highly regulated and specialized profession, in which the "investment advice and management skills of the asset managers are

the primary attractions for the funds." In re Thomson McKinnon Sec., Inc., 120 B.R. 301, 303 (Bankr. S.D.N.Y. 1990). In any event, even if investment advisory services properly could be characterized as "straightforward," which they cannot, it does not follow that these services are unnecessary or without value to mutual fund investors, and plaintiffs allege nothing to the contrary in their Complaint.

As for the quality of Putnam's investment advisory services, plaintiffs repeat their allegation that institutional clients pay lower Portfolio Selection Fees than do the Funds. Compl. ¶ 102. But this allegation says nothing about the quality of the services actually provided to the Funds at issue here, much less shows that the fees charged to the Funds bear no reasonable relationship to the quality of the services provided. Thus, once again, fees paid by institutional investors are irrelevant as a matter of law.

For two of the nine Funds at issue in the Complaint, plaintiffs allege that poor performance purportedly makes them "overpriced." Compl. ¶ 103. In that connection, plaintiffs allege that for the three-year period ended July 31, 2003, investors in the Putnam Growth and Income Fund and Putnam Voyager Fund "paid management and shareholder service fees of $514 million . . . , despite a loss of 33% in 2001, a loss of 32% in 2002 and a minimal gain of 1.5% in 2003 (compared to a 2003 gain of over 10% from the S&P 500 index)." Id. Plaintiffs further allege that over the last ten-year period, the Putnam Voyager Fund paid "$1.3 billion in management and 12b-1 Distribution Fees . . . even though that Fund significantly underperformed the Standard & Poor's 500 stock index." Id.

Allegations that two Funds underperformed the S&P 500 index do not address the critical legal issue of the relationship between the Portfolio Selection Fees and the services rendered. Such allegations therefore are insufficient to state a claim under Section 36(b). See Migdal, 2000 WL 350400, at *3 (dismissing complaint, noting that if generalities such as the funds' benchmark performance standard were accepted, it "would make it possible to state a claim in virtually *any* case filed under § 36(b)"); Yampolsky, 2004 WL 1065533, at *2 (dismissing Section 36(b) claims based on allegations that funds underperformed

12

compared to the S&P 500 index). As courts repeatedly have recognized, alleged underperformance relative to the S&P 500 is not, and cannot be, a proxy for the value or quality of the services actually provided by Putnam Investment to the two Funds. Indeed, as the Court of Appeals for the Fourth Circuit has ruled:

> While performance may be marginally helpful in evaluating the services which a fund offers, <u>allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive</u>. Investing is not a risk-free endeavor. Even the most knowledgeable advisers do not always perform up to expectations, and investments themselves involve quite different magnitudes of risk. Furthermore, investment results themselves are cyclical. An under-achieving fund one year may be an over- achieving fund the next. Accepting plaintiffs' invitation to permit discovery here because the funds underperformed would make it possible for other plaintiffs to state a claim in limitless actions filed under Section 36(b).

<u>Migdal</u>, 248 F.3d at 327-28 (emphasis added).[5]

### 4.    **Profitability**

While an adviser's profitability is another <u>Gartenberg</u> factor, <u>see</u> <u>Kalish</u>, 928 F. Supp. at 1231, the Complaint here is devoid of any alleged facts bearing on Putnam Investment's profitability. Indeed, plaintiffs allege only that Portfolio Selection Fees paid by two of the nine Funds underwent a "dramatic increase" in absolute dollar terms between 1990-91 and 2003. <u>See</u> Compl. ¶¶ 107-08. The <u>amount</u> of the fees, however, says nothing, by itself, about Putnam's profits. In this regard, plaintiffs fail to allege any facts regarding Putnam's expenses – the other half of the profitability equation. <u>Kalish</u>, 742 F. Supp. at 1231 ("[P]rofitability and costs are intertwined."); <u>Schuyt</u>, 663 F. Supp. at 977.

Plaintiffs nevertheless claim that Putnam Investment's "immense profitability . . . is self-evident," purportedly because institutional clients pay comparatively less for Portfolio Selection Services than do the Funds. Compl. ¶ 111. This allegation relates, at most, to the Funds' fee structures, <u>not</u> profitability

---

[5]     To the extent the court in <u>Krantz v. Fidelity Management & Research Co.</u>, 98 F. Supp. 2d 150, 159 (D. Mass. 2000), refused to dismiss a Section 36(b) claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure despite the absence of facts alleged in the complaint sufficient to state a claim, it is contrary to the great weight of authority cited above and should not be followed here.

of the adviser, and thus provides no basis for any Section 36(b) claim. See, e.g., Yampolsky, 2004 WL 1065533, at *2 (dismissing complaint attached hereto as Exhibit F which alleged in paragraph 17, as plaintiffs do here, that "sheer enormity of fees" suggests that the fund "must generate significant profits" for the advisor).

### 5.    **Fall-Out Benefits**

"Fall-out benefits are indirect profits to [an adviser] attributable in some way to the existence of [the fund in question]." Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472, 494 (S.D.N.Y. 1988), aff'd, 875 F.2d 404 (2d Cir. 1989). Under Gartenberg, these benefits are relevant only if they are "so substantial that they rendered the Manager's fee so disproportionately large as to label its negotiation a 'breach of fiduciary duty' within the meaning of § 36(b)." Gartenberg, 694 F.2d at 932.

In attempting to plead the existence of "fall-out benefits," plaintiffs allege that Defendants receive "soft dollars," which are "arrangements under which an investment adviser directs client brokerage transactions to a broker and, in exchange, obtains research products or services in addition to brokerage services from or through a broker." Mem. from Paul F. Roye to William H. Donaldson, dated June 9, 2003, cited in Compl. ¶ 96.    Plaintiffs also allege that Putnam Fiduciary Trust Company and Putnam Investor Services, corporate entities separate from Defendants, receive compensation for performing services as transfer agent and custodian. See Compl. ¶ 98. Finally, plaintiffs allege that Defendants receive unspecified benefits for "loaning" out securities owned by the Funds, see id. ¶ 99, and from cross-selling opportunities and the creation of goodwill. See id. ¶ 91.

Fees attributable to transfer and custodial services and loaning securities are generated directly by activities of the Funds, and thus "cannot be characterized as fall-out revenue." Krinsk, 875 F.2d at 411. But even if they properly could be characterized as "fall-out benefits" to Putnam Investment, the complaint nowhere even attempts to describe the magnitude of these purported benefits or to explain, as it must, how

they render the Portfolio Transaction Fees "so disproportionately large as to label its negotiation a 'breach of fiduciary duty' within the meaning of § 36(b)." Gartenberg, 694 F.2d at 932.

As for the so-called "soft dollars," these also are not "fall-out benefits." Soft dollars are credits used to pay for securities research, thereby reducing the amounts Putnam otherwise would have to pay out-of-pocket to obtain the research. In that connection, the cost of such research is a legitimate fund expense because, as the SEC has recognized, it inures to the benefit of Fund shareholders. In light of that benefit, Section 28(e) of the Securities Exchange Act of 1934 creates a safe harbor provision permitting investment advisers to use Fund assets, i.e., brokerage commissions, generated on fund portfolio transactions, to pay for research. As provided in the statute:

> No person . . . shall be deemed to have acted unlawfully or to have breached a fiduciary duty under State or Federal Law . . . solely by reason of his having caused the account to pay a member of an exchange, broker, or dealer an amount of commission for effecting a securities transaction in excess of the amount of commission another member of an exchange, broker, or dealer would have charged for effecting that transaction, if such person determined in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such member, broker, or dealer, viewed in terms of either that particular transaction or his overall responsibilities with respect to the accounts as to which he exercises investment discretion.

15 U.S.C. § 78bb(e)(1). This provision immunizes mutual fund advisers, such as Putnam, from liability under Section 36(b) for conduct within the safe harbor. See Securities; Brokerage and Research Services, Exchange Act Release No. 23,170, 17 C.F.R. Part 241 (Apr. 23, 1986), available at 1986 WL 630442, at *10 ("[N]o violation of Section 36(b) could occur for a soft dollar arrangement falling within the safe harbor of Section 28(e)."). Plaintiffs have not pled that Putnam's "soft dollar" arrangements fall outside of the safe harbor, and therefore, Putnam's alleged use of soft dollars to pay for research provides no basis for any claim under Section 36(b).

15

6.    **Independence and Conscientiousness of Trustees**

"The expertise of the trustees, whether they are fully informed, and the extent of care and conscientiousness with which they perform their duties are among the most important factors to be examined in evaluating the reasonableness of compensation under Section 36(b)." Krinsk, 875 F.2d at 412. Plaintiffs do not claim that the trustees of the Funds lack the requisite expertise to perform their duties. Nor do plaintiffs plead any facts regarding the trustees' negotiation of the disputed fees.

Instead, plaintiffs allege only that "the Funds' trustees have been subverted by Defendants and no longer serve in their 'watchdog' role." Compl. ¶ 118. This supposedly is so because the Funds have trustees in common, the trustees are well compensated, and the Funds all use the Defendants as their adviser and distributor, respectively. See Compl. ¶ 122. The same type of allegation repeatedly has been rejected and held insufficient to state a claim under Section 36(b). See Migdal, 248 F.3d at 330 (dismissing complaint because allegations that trustees served on multiple boards, were well compensated, did not devote enough time to individual funds and were dependent on adviser for information do not support claim that trustees are "interested"); Krantz v. Prudential Invs. Fund Mgmt., LLC, 305 F.3d 140, 143-44 (3d Cir. 2002) (adopting same rationale), cert. denied, 537 U.S. 1113 (2003); Verkouteren v. Blackrock Fin. Mgmt., Inc., No. 98 Civ. 4673, 1999 WL 511411, at *3-4 (S.D.N.Y. July 20, 1999) (dismissing allegations that directors receive substantial compensation, sit on interlocking boards, have significant outside responsibilities, do not request information sufficient to evaluate advisory agreement, and do not oppose adviser in any material way), aff'd, 208 F.3d 204 (2d Cir. 2003); Yampolsky, 2004 WL 1065533, at *2 (rejecting as insufficient conclusory allegations that trustees were poor "watchdogs," and were not "independent" because sat on multiple boards, received substantial compensation, and were involved in other time-consuming activities (see Ex. F, ¶¶ 40, 44-45)).

16

The Complaint's reliance on generalized industry criticism of trustee oversight, see Compl. ¶¶ 120-21, also has been rejected as insufficient to state a claim.  See Yampolsky, 2004 WL 1065533, at *2 (rejecting industry sources cited in paragraphs 32 and 34 of complaint attached hereto as Ex. F).  Indeed, as one court observed in dismissing a Section 36(b) claim based in part on a plaintiff's general attack on the purportedly "inadequate level of oversight" by fund trustees:

> plaintiff's complaints are better posed to Congress or the regulatory bodies supervising the industry -- we are constrained to apply the laws as written and cannot take action where Congress and the SEC have not done so.

Verkouteren, 1999 WL 511411, at *4.  The same observation is fully applicable here, warranting dismissal of the Complaint.

## III.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER ICA SECTION 36(b) FOR EXCESSIVE PROMOTIONAL DISTRIBUTION FEES

### A.    Applicable Standards

By way of background, distribution fees are paid by mutual funds to third-party broker-dealers (unaffiliated with the funds) to compensate them for selling fund shares directly to public investors.[6]  Prior to the SEC's adoption of Rule 12b-1 in 1980, these charges were typically borne by new investors to a mutual fund, and not by all shareholders of the fund.  See 1 Thomas P. Lemke et al., Regulation of Investment Companies § 7.05 (1995); The Investment Company Regulation Deskbook, §§ 7.1, 7.4[1] (Amy L. Goodman ed., c. 1997).  With the adoption of Rule 12b-1, the SEC authorized payment of distribution expenses from existing assets of the funds, i.e., the assets allocable to all fund shareholders, to pay the cost of selling fund shares, thereby potentially reducing the initial cost or "load" to a new investor in the fund.  Id.  In order to provide sufficient safeguards for fund shareholders, Rule 12b-1

---

[6]    Such broker-dealers do not market or sell fund shares to pension funds and other institutional investors, who are serviced solely by Putnam.  It is for this reason that there are no 12b-1 distribution fees associated with the so-called "Y shares" purchased by these institutional investors.  Cf. Compl. ¶ 78.

requires, among other things, that a majority of a mutual fund's shareholders and independent trustees approve a written Rule 12b-1 plan before distribution fees are paid. See 17 C.F.R. § 270.12b-1(b) (2004). Plaintiffs do not allege that the Funds' Rule 12b-1 plans were not approved by the requisite majority of the Funds' trustees and shareholders.

As with advisory fees, the Gartenberg standard is applicable to claims challenging 12b-1 fees pursuant to Section 36(b) of the ICA. Consequently, there is and can be no liability unless the fee "'is so disproportionately large that it bears no reasonable relationship to the services rendered. . . ." Meyer v. Oppenheimer Mgmt. Corp, 895 F.2d 861, 866 (2d Cir. 1990) (quoting Gartenberg, 694 F.2d at 928). Moreover, distribution fees must be analyzed separately from advisory fees "to determine the merits of a Section 36(b) claim." Id. (explaining that "[t]he two kinds of payments are for entirely different services, namely advice on the one hand and sales and distribution on the other").

### B.    Plaintiffs' Allegations Do Not State a Claim Under Section 36(b)

Count III of the Complaint alleges that the Promotional Distribution Fees purportedly are excessive because the Funds have not benefitted from supposed economies of scale. See Compl. ¶¶ 132-33. These conclusory "scale" allegations are legally defective for the same reasons discussed above with respect to Counts I and II of the Complaint.

Plaintiffs also allege that the Promotional Distribution Fees paid by the Funds are excessive because institutional investors do not pay such fees. See Compl. ¶¶ 10, 47. However, Plaintiffs fail to allege, as they must, facts sufficient to show that the Distribution Fees charged to retail investors were excessive in light of the benefits they generated to those Fund shareholders. See Meyer v. Oppenheimer Mgmt. Corp., 707 F. Supp. 1394, 1405 (S.D.N.Y. 1988), aff'd, 895 F.2d 861 (2d Cir. 1990). Accordingly, Count III states no claim under Section 36(b). See Krantz v. Prudential Invs. Fund Mgmt. LLC, 77 F. Supp. 2d 559, 565 (D.N.J. 1999), aff'd, 305 F.3d 140 (3d Cir. 2002), cert. denied, 537 U.S. 1113 (2003);

18

Levy v. Alliance Capital Mgmt., Inc., No. 97 Civ. 4672, 1998 WL 744005, at *4 (S.D.N.Y. Oct. 26, 1998),

aff'd mem., 189 F.3d 461 (2d Cir. 1999).

## IV.    AT A MINIMUM, THE COURT SHOULD DISMISS AT LEAST THOSE CLAIMS PLAINTIFFS LACK STANDING TO ASSERT

Even if plaintiffs had stated a claim under Section 36(b), which they did not, at a minimum, they

lack standing to sue on behalf of shareholders of Putnam mutual funds in which plaintiffs themselves have

never invested.  As a threshold matter, plaintiffs are required under Article III, Section II of the

Constitution to demonstrate standing to bring an action in federal court. See U.S. Const. art. III, § 2. The

task is not a mere formality. See, e.g., Raines v. Byrd, 521 U.S. 811, 818 (1997). Indeed, "[s]trict standing

requirements are particularly important in the area of securities litigation, in order to curb the risks of

vexatious litigation and abuse of discovery." In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. 1525,

1531 (D. Mass. 1991).

Plaintiffs Wicks and Kalbfleisch together purport to bring claims on behalf of nine Funds. See,

e.g., Compl. ¶ 2.  The Funds are registered investment companies that "are each separate corporate entities

and are entitled to the legal protections flowing from their corporate status." In re Eaton Vance Corp. Sec.

Litig., 220 F.R.D. 162, 171 (D. Mass. 2004).  Moreover, all of plaintiffs' claims are asserted under Section

36(b) of the ICA, which expressly limits shareholder standing to "a security holder of such registered

investment company on behalf of such company." 15 U.S.C. § 80a-35(b).  Consequently, to possess the

requisite standing, plaintiffs must own shares in any fund on behalf of which they purport to sue.  Indeed,

without owning shares in a particular fund, plaintiffs cannot possibly have suffered damages in connection

with that fund's payment of fees, and therefore, cannot meet Article III's case or controversy requirement.

See  Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 735 (3d Cir. 1970); In re Eaton Vance Corp. Sec.

Litig., 219 F.R.D. 38, 41 (D. Mass. 2003); Verrey v. Ellsworth, 303 F. Supp. 497, 500 (S.D.N.Y. 1969).

Plaintiff Kalbfleisch claims to own shares only in the Putnam Classic Equity Fund. See Compl. ¶ 15. He therefore lacks standing to maintain any Section 36(b) claims on behalf of any of the other Funds identified in the Complaint. Moreover, plaintiff Wicks does not claim to own any shares in the Putnam Classic Equity Fund (see Compl. ¶ 14), and therefore lacks standing to maintain any Section 36(b) claims on behalf of that fund.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that their motion to dismiss plaintiffs' Complaint should be granted.

Dated: August 13, 2004　　　　　　　　　Respectfully submitted,
　　　　Boston, Massachusetts

Of Counsel:

Seth M. Schwartz　　　　　　　　　　　James R. Carroll (BBO #554426)
Elizabeth A. Hellmann　　　　　　　　　SKADDEN, ARPS, SLATE,
SKADDEN, ARPS, SLATE　　　　　　　　　MEAGHER & FLOM LLP
　MEAGHER & FLOM LLP　　　　　　　　　One Beacon Street
Four Times Square　　　　　　　　　　Boston, Massachusetts 02108-3194
New York, New York 10036-6522　　　　(617) 573-4800
(212) 735-3000

　　　　　　　　　　　　　　　　　　*Attorneys for Putnam Investment Management, LLC*
　　　　　　　　　　　　　　　　　　*and Putnam Retail Management, LP*

## CERTIFICATE OF SERVICE

I, James R. Carroll, hereby certify that on August 13, 2004, I caused a true copy of the foregoing document to be served by first class mail, postage prepaid, upon David E. Marder, Esq., Marc N. Henschke, Esq., Jonathan D. Mutch, Esq., Robins, Kaplan, Miller & Ciresi LLP, 111 Huntington Avenue, Boston, MA 02199.

Dated: August 13, 2004

James R. Carroll

20