6 FDMJCFL 259 Page 1
(Cite as: 6 Fordham J. Corp. & Fin. L. 259)
C

Fordham Journal of Corporate and Financial Law
2001

Lecture

**\*259 INAUGURAL ADDRESS: COSTS PAID WITH OTHER PEOPLE'S MONEY [FNa1]**

Arthur Levitt, Jr. [FNaa1]

Copyright Copr. 2001 Fordham Journal of Corporate & Financial Law; Arthur Levitt,

Jr.

Thank you. It's a privilege to be here today to inaugurate the Sommer Lectureship at Fordham Law School, and an even greater pleasure to honor a truly remarkable person, professional, and friend, Al Sommer. I say without reservation that Al is considered one of the finest, most articulate, and most knowledgeable Commissioners the SEC has ever seen. Those of us who treasure the trademark of the Commission--its independence and professionalism--owe a great debt to the conscience and integrity of Al Sommer.

Throughout his career, Al combined public service with the best private practice has to offer. As former Chairman of the Public Oversight Board, the forefather of the ABA's Business Law section, a member of its Board of Governors, a resounding voice for strong corporate governance and the legal sage of the accounting profession, when we talk of the great securities lawyers of our time, more than a few will say that Al Sommer is among the finest. Today, our markets and America's investors continue to benefit from his over three decades of dedicated service to the profession and to the public interest.

As the first of this lecture series, I thought it only fitting to talk about one of the most basic elements of our markets: the costs of investing. Too often it seems that investors are so focused on apparent gains that they fail to recognize how much they are paying to achieve them. I'd like to begin tonight with a concept that embodies the very source of investment costs: "other people's money."

\*260 This phrase, drawn from the title of Louis Brandeis' seminal book, puts in stark relief a simple fact we all know intuitively--people tend to act differently when the money on the table isn't their own, to treat lightly expenses they do not feel. But our markets are essentially built on a system where intermediaries are charged with the care of other people's money--most of the time people they've never met. Despite this tension, this system has served our markets and America's investors extraordinarily well for decades.

The Commission's regulatory approach to this basic and in many respects natural tension of our marketplace is two-fold. First, disclosure. Recognizing that it is impossible to measure and compare what you can't see, whenever practicable, costs should be transparent both to the market professional and to the investing public. Second, duty. Market intermediaries are bound by a fiduciary duty to act in the best interest of their customer. In other words, those who spend other people's money must exercise the same care as they would in spending their own.

### The Stealth Attack Of Compounding Costs

Given the incredible influx of money into mutual funds this past decade, there are no costs worthy of closer scrutiny than the fees associated with these investment vehicles. Simply put, too many investors today focus on a fund's past performance and pay too little attention to how management, sales, and other costs can impact their investment over time. The founder of Vanguard and a true financial visionary, Jack Bogle, has called this concept the tyranny of compounding high costs. Now, for those of you who believe that "tyranny" is too strong a characterization, consider Jack's favorite illustration of what fees can do to your investment over time.

A $1,000 mutual fund investment made in 1950 with returns mirroring the S&P 500 would be worth over half a

million dollars today. But, before you start shopping for the yacht, there's still a bit of math to do. After you figure in the compounding costs of mutual funds, conservatively a little under 2 percent, that figure is reduced to just $230,000. If the fund is not tax efficient, that number drops to--if you can believe it--just $65,000. Without *261 paying attention to costs, an investor stands a better chance of earning a million dollars as a contestant on "Survivor."

I realize that some of the students here today might think that 50 years is a long time to hold an investment. But with people now living well into their 80's, 90's, and beyond, it's simply a fact that they will have to adjust their investment goals as well. One of my staff here tonight is visiting his great- grand-uncle-in-law who is turning 102 this weekend and still teaches law down the street at Baruch College. With a watchful eye on mutual fund costs, can you imagine what a smart investment from the turn of the century would be worth?

Instinct tells me that many investors would be shocked to know how seemingly small fees can, over time, create such drastic erosion in returns. Meaningful disclosure of these facts, it seems to me, is the clear answer.

The Commission must continue to act on these critical issues for America's investors. In the past, we have refined prospectus disclosure and sharpened disclosure of mutual fund costs. Our website includes a mutual fund cost calculator that allows shareholders to compute the impact costs will have on their investments. The Commission is also considering a rule proposal that would require funds to disclose the impact taxes have on investment returns. While these measures take important steps, we can do more.

Presently, the Commission's Division of Investment Management is completing a comprehensive study of mutual fund fees. The study will recommend, among other things, standardized dollar disclosure of fees. For example, the actual impact of fees on a $10,000 investment will now be more clearly visible--in dollar denomination--to fund shareholders. Investors will be able to quickly and effectively estimate the actual amount they have paid fund managers during a given period. These measures, I believe, will help break the too-little- recognized tyranny of compounding high costs.

"Sticky" Brokerage Commissions

Among the most significant costs of investing today are brokerage commissions. The good news is that retail commissions have dropped to only a fraction of what they were just a few years *262 ago. Faster electronic engines now match buyers and sellers virtually instantaneously. Dramatic increases in bandwidth make the transmission of enormous amounts of data possible. Some mutual fund managers now obtain immediate executions on electronic markets for less than a penny a share. According to data from one fund, such costs were over twice that only four years ago.

But some investors might be stunned to know that "full-service" commissions paid by mutual funds to traditional brokers to fill their orders have remained steady at five to six cents a share for nearly a decade. These facts point to an unavoidable question: Are portfolio managers bringing to bear the pressure they should on brokerage rates today?

Now, I am aware that Congress has granted statutory protection to "soft dollar" arrangements--that is, where fund managers use brokers who charge relatively high commissions but in return provide research and other services for the fund. I also know there is a lot more to execution quality than commissions; the market impact of a poorly executed trade will almost certainly dwarf the commissions charged by most firms.

Yet when I think about today's soft dollar arrangements and their impact for investors, I keep coming back to the notion that fund advisers are paying their expenses with other people's money. Let's face it--extraordinary increases in volume over the last few years have generated revenues that are just as impressive for most brokers. So why haven't these increases produced more competitive full-service commission rates? Why hasn't the emergence of electronic markets--which offer execution five times cheaper--driven these commissions lower?

Part of the reason, I fear, is a perception among portfolio managers and independent directors that six cents is safe-- or rather, fund managers can pay up to six cent commissions and not raise any red flags. But what's "safe" for these market professionals may not be what's best for investors. Managers have a duty to seek best execution and directors

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

6 FDMJCFL 259                                                                                     Page 3
(Cite as: 6 Fordham J. Corp. & Fin. L. 259, *262)

have a duty to inquire about the process.

To this point, a recent Commission examination of independent director oversight of soft dollar arrangements has turned up findings that are troublesome. Some directors, it appears, pay little or no meaningful attention to the brokerage costs of mutual funds. Directors must ask the tough questions of *263 fund advisors. Our study showed that independent directors need to put more pressure on managers to drive hard-bargains with their brokers.

As dramatic changes sweep our markets, managers as well as independent directors simply cannot adopt a static measure of what is merely "good enough." There is no substitute for asking hard questions about order routing arrangements, to ensuring investors reap the full benefits of the dynamic competition unfolding in our markets. As managers and directors, it's your duty because it's other people's money.

### Market Infrastructure: The Cost Of Neglect

There are other costs that employ a more subtle tyranny over investors--the costs of neglecting the infrastructure of our markets. Now, when someone mentions infrastructure to you, I suspect what comes to mind are roads, sewer pipes, electricity lines--maybe even telephone wires. And it's easy to envision the result of neglect. Potholes produce traffic. Broken water mains flood buildings. Power outages virtually paralyze us. Downed phone lines leave us stranded. Each of these exacts a toll. They waste our time. They throw us off schedule. One way or another, they cost us money.

The same is true of our markets. Among the most important components of our markets' infrastructure is the system through which quotes and prices are disseminated to the overall market. The public quote stream and the "tape" help bind together many different markets into a single national market system. But if this quote stream goes down, the ability to see prices across the market is virtually eliminated. If it is overloaded, delays ensue and the information we receive is outdated. And any investor knows well that old information is just slightly better than none at all.

Today, a number of our markets are taking important strides to ensure our marketplace remains the most efficient and investor-friendly in the world. They are embracing greater price transparency and building connections that link markets together and create more efficient pricing. Unfortunately, some markets have sorely neglected parts of their infrastructure to the detriment of America's investors.

*264 A disturbing example of this can be seen today in our options markets. For over a year, it's been clear that decimal pricing was imminent. For over a year, they have known that the volume of pricing information would mushroom with the advent of decimal pricing. And for over a year, they've been well aware of clear paths to reduce the volume of pricing data. Despite these early warning signs and signals indicating the way, our options markets have been unable to agree on strategies necessary to pave the way for penny pricing.

Investors unfortunately are bearing the brunt of the options markets' neglect. On the eve of full scale decimal trading in listed equities with penny increments, the options markets will be trading only in five and ten cent increments. More pointedly, investors are being denied the benefit of narrower spreads--and the industry is keeping the difference for itself.

I do not underestimate the technological and regulatory challenges these markets face. Nor do I minimize how sharp the clash of commercial interests is between some of these markets. No one needs reminding that these are intensely competitive times. But it seems clear to me that the reason this untenable situation is upon us has to do with other people's money. These markets knew full well that the cost of artificially large increments will be borne by the public. How much more progress would have been made, I wonder, if the excessive costs that investors will surely be swallowing in the months ahead were borne instead by the markets and their members?

It may very well be that the Commission will soon be forced to set a date beyond which we will no longer permit trading and quoting increments larger than a penny. I see no reason why the goal cannot be accomplished within a year from today and I believe the Commission should press the markets hard toward this objective.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

## Dilution In the Dark

There are few duties more fundamental to the integrity of our capital markets than the obligation of corporate executives to act with scrupulous honor when spending shareholder dollars. Now, to be certain, things get a little complicated when that money *265 is spent by officers and directors for officers and directors--that is, on executive compensation packages.

So, how do corporations ensure that executive compensation is rooted in the best interests of shareholders? Several years ago, the answer was straightforward: executive stock option plans and other equity benefits were simply submitted for a shareholder vote. A clear-cut rule, grounded firmly in both fairness and common sense. Why is this so important for shareholders? Well for one thing, to ensure that executive compensation levels are fair and appropriately tied to corporate performance. For another, to ensure that shareholders favor the "wealth transfer" inherent in these plans. When options are exercised, it dilutes the percentage stake that each shareholder has in the company.

This rule, however, has experienced significant erosion in recent years. Today, our two largest markets permit companies to grant options to executives and other employees in a way that bypasses the shareholder's critical eye. Shareholder approval is not required to adopt certain stock option plans that permit grants to officers and directors, as long as those plans also include other employees. I must say, I am deeply concerned by reports of companies making increasing use of this exception to side-step the cardinal rule of shareholder approval.

Now, in the spirit of full disclosure, the Commission opened up this issue when it eliminated shareholder approval as a condition to exempting option grants to officers and directors from some of our insider trading rules. But whatever the history, the current situation must not be tolerated. Each of our markets should restore promptly the rightful balance between shareholder and management interests, requiring shareholder approval for all plans that grant options or award stock to officers and directors. The New York Stock Exchange is already considering such a change. I urge them to adopt this new standard, and the NASDAQ and the AMEX to quickly follow suit.

But this is not enough. Shareholders should not be diluted in the dark. I hope and expect that the Commission will move forward in the coming weeks to require companies to disclose all option grants that would dilute existing shareholders. And, I believe that the markets should closely scrutinize the dilutive effect of all stock option plans-- not just those that apply to officers and *266 directors. Where shareholders would be diluted to a material degree, plans should be presented to shareholders for their approval. The NYSE has taken a useful first step by developing a proposed dilution cap and I urge the other markets to take a serious look at this proposal. This is not to say that the NYSE test will fit every issuer or that narrow exceptions for special situations will not be necessary. But, if the markets do not act in short order, the Commission should.

## A Conversation With Your Auditor

As Al Sommer knows well, our system of corporate governance does not rely on the duties of officers and directors alone. Rather, the conduct of executives is overseen by independent audit committees who work to preserve the integrity of financial information. Audit committees are the critical link in a chain which helps ensure that corporate spending of shareholder funds, in fact, serves the interests of shareholders.

In my judgment, those of us who care deeply about the quality of financial reporting, and look to the work of America's audit committees to uphold this high-quality standard, can look back with some satisfaction over the last year or two. In particular, the renewed attention that companies have bestowed on audit committees has made these entities even more effective guardians of the public interest. But clearly, audit committee effectiveness is not a finish line to be crossed, but rather, an enduring purpose to be honored with vigilance.

I found the core of that purpose captured in three simple questions that Warren Buffet once suggested every audit committee ask. Imagine if they pointedly asked, "If you were solely responsible for the preparation of the company's financial statements, how would they be different?" Or, "If you were an investor, would you be able to learn from the financial statements information essential to understanding the company's financial performance?" Or even, "Is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

6 FDMJCFL 259                                                                                                                     Page 5
(Cite as: 6 Fordham J. Corp. & Fin. L. 259, *266)

the company following the same internal audit procedures as it would if you were the CEO?" Consider the healthy discipline that fully spelling out the answers to these questions in corporate records would impose on financial reporting. The board room simply cannot be a stage for perfunctory questions and rehearsed answers. The long-term *267 interest of a company and the confidence of its shareholders demands tough questions and honest answers.

Conclusion

Louis Brandeis once said, "In business the earning of profit is something more than an incident of success. It is an essential condition of success; . . .But while loss spells failure, large profits do not connote success. Success must be sought in business also. . .in the improvement of products; in a more perfect organization, eliminating friction as well as waste;. . .and in the establishment of right relations with customers and with the community."

The financial services industry in this country has built a proud record of achievement. While all of us can look back with some satisfaction, there is so much more to be done to ensure this sacred trust between a firm and its customers. A relationship of trust has less to do with gross revenues, profit margins or any other number that goes on the balance sheet. A relationship of trust has everything to do with what your customers say and think about you.

In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees? What will options investors say if they are forced to trade in artificially large increments? What will investors say if they find their stake in a company diluted because of options allocations they were never told about? Perhaps they'll say nothing at all, and take their business--and their trust-- elsewhere.

And that reality should serve as our greatest threat and most compelling motivator--an enduring reminder of what's really at stake when we take "other people's money" in our trust and care. It's a simple and salient truth--markets exist by the grace of investors. And I strongly believe the commitment made by your predecessors and mine to protecting America's investors has been the very cornerstone of our markets for more than half a century. It's what we do today, together, forged through a collective commitment to the public trust, that will determine what the next half-century will bring. And if past is prologue, a remarkable future for our markets, for our market participants, for America's investors, surely awaits.

Thank you.

[FNa1]. The Honorable Arthur Levitt, Jr. delivered this address at Fordham University School of Law on November 3, 2000, to inaugurate the A.A. Sommer, Jr. Annual Lecture in Corporate, Securities & Financial Law. The Editors of the Fordham Journal of Corporate & Financial Law have left the text unedited.

[FNaa1]. Chairman, U.S. Securities and Exchange Commission from 1993 to 2001.

END OF DOCUMENT