

THE JOURNAL OF CORPORATION LAW



VOLUME 26 ♦ NUMBER 3 ♦ SPRING 2001

# MUTUAL FUND ADVISORY FEES: THE COST OF CONFLICTS OF INTEREST

*John P. Freeman*
*Stewart L. Brown*

THE UNIVERSITY OF IOWA COLLEGE OF LAW

# Mutual Fund Advisory Fees: The Cost of Conflicts of Interest

John P. Freeman* & Stewart L. Brown**

I. INTRODUCTION ....... 610
II. FUNDS' UNIQUE MANAGEMENT STRUCTURE ....... 614
*A. Independent Directors' Importance* ....... 616
*B. The Exception to the Rule: Internal Management at the Vanguard Group* ....... 618
III. ECONOMIES OF SCALE FOR ADVISORY SERVICES RENDERED TO EQUITY MUTUAL FUNDS ....... 619
*A. Introduction* ....... 619
*B. Fund Industry Data Demonstrates that Economies of Scale Exist* ....... 621
*C. Testing the ICI's Findings: Verification and Unbundling* ....... 622
*D. Summary* ....... 625
IV. EXPLORING THE TWO-TIERED STRUCTURE FOR PROFESSIONAL ADVISORY SERVICES: MUTUAL FUND FEES VS. PENSIONS FUND FEES ....... 627
*A. Research Shows Fund Shareholders Pay A Premium For Investment Advice* ....... 628
*B. Portfolio Company Size and Investment Advisory Fees* ....... 634
*C. Individual Managers' Pricing: Fund Management vs. Pension Management* ....... 635
*D. Externally Managed Vanguard Equity Fund Advisory Fees vs. the Fund Industry* ....... 637
*E. Further Evidence of Questionable Fund Industry Behavior: Charging High Advisory Fees for Passive Equity Portfolio Management* ....... 639
*F. Analysis of Causes Underlying the Fund Industry's Dysfunctional Competitive System* ....... 641
*1. Introduction* ....... 641
*2. Section 36(b) Case Law Safeguards the Status Quo* ....... 642
*3. Problems With the* Gartenberg *Test As Applied* ....... 651
*4. The Missing Ingredient: Admissible, Compelling Data* ....... 652
*G. Critiquing the Industry's Defense of the Status Quo* ....... 654
*1. The Industry's Position: Rampant Competition* ....... 654
*2. Price Competition is Largely Nonexistent in the Fund Industry* ....... 655
*3. Government Regulation is Not "Stringent" When It Comes to Advisory Fee Levels* ....... 656

---

* Campbell Professor of Legal and Business Ethics, University of South Carolina. B.B.A., 1967; J.D., 1970, University of Notre Dame; LL.M. 1976, University of Pennsylvania. Member, Ohio and South Carolina Bars.

** Professor of Finance, Florida State University. B.S.B.A., 1970; M.B.A. 1971; Ph.D. 1974, University of Florida; CFA.

4. *The Fund Industry Lacks, Above All, "Clear Disclosure"* .......... 662
V. PROPOSALS FOR CHANGE .......... 668
VI. CONCLUSION .......... 671

## I. INTRODUCTION

In the early 1970s, America's mutual fund industry was suffering net redemptions, meaning it was contracting in size.[1] Fund marketing efforts were in disarray, thus prompting the Securities and Exchange Commission (SEC) to embark on a special study analyzing the problems then plaguing the industry. From that starting point, the SEC moved to loosen restrictions on fund marketing in order to foster a "more competitive environment."[2]

---

1. Between February 1972 and July 1974, Investment Company Institute-member (ICI) funds suffered net redemptions in twenty-six out of thirty months. DIVISION OF INVESTMENT MANAGEMENT, SEC, MUTUAL FUND DISTRIBUTION AND SECTION 22(d) OF THE INVESTMENT COMPANY ACT OF 1940 19 (1974).

2. *See id.* at 10-11, 84-135. The SEC's Division of Investment Management Regulation conducted hearings into the state of mutual fund marketing. In its report on mutual fund distribution, the Division observed:

> The hearings confirmed that the mutual fund industry is faced with a disrupted marketing system. Record sales of earlier years have given way to net redemptions; competing products have made substantial inroads; fund managers have diversified into other fields; and the fund industry, which in many cases has operated at a distribution deficit, has allowed its relationship with small broker-dealers to deteriorate, while it has become increasingly dependent for sales upon large broker-dealers to whom mutual fund shares are a relatively unimportant source of income.

*Id.* at 9. The report further noted: "[T]he industry is not prospering with the marketing strategy which was so successful in past years. Hence, changes in the pattern of fund distribution seem inevitable. . . ." *Id.* at 43.

The SEC's analysis was on target. A major factor contributing to the industry's subsequent resurgence was the flood of money into the industry's money market funds as investors chased high yields during the mid-to-late 1970s and into the 1980s. *See* Lisa McCue, *Is Deposit Insurance Necessary*, AM. BANKER, Apr. 15, 1982, at 14 (discussing the success of money market mutual funds). The 1974 SEC staff report observed that cash management funds were a "relatively new phenomenon," accounting "for a significant portion of industry sales and a growing portion of industry assets," and that, "[b]ut for the rapid growth of these funds, the industry as a whole would be in a net redemption position." DIVISION OF INVESTMENT MANAGEMENT, *supra* note 1, at 129 n.1. By 1979, the money market funds alone accounted for $45.2 billion in assets. Terry R. Glenn et al., *Distribution in Mid-Decade: Coping with Success and Other Problems*, *in* INVESTMENT COMPANIES 1986, at 73, 77 (PLI Corp. Law Practice Course, Handbook Series No. B4-6746m 1986). By 1980, the figure was $76 billion, easily surpassing the $58 billion held in equity, bond, and income funds. WILLIAM J. BAUMOL ET AL., THE ECONOMICS OF MUTUAL FUND MARKETS: COMPETITION VERSUS REGULATION 34 (1990).

A second, huge change in fund distribution resulted from the SEC's 1980 promulgation of rule 12b-1, which enabled funds to pass on distribution costs directly to fund shareholders. 17 C.F.R. § 270.12b-1 (1999). Since rule 12b-1's adoption, over 7000 mutual funds have adopted rule 12b-1 plans. Joel H. Goldberg & Gregory N. Bressler, *Revisiting Rule 12b-1 Under the Investment Company Act*, 31 SEC. & COMMODITIES REG. REV. 147 (1998). Rule 12b-1 fees provide a means by which pricing and distribution could be reordered through the imposition of conditional deferred sales loads. Though its rulemaking enabled this change, the SEC never saw the transformation coming. *See* Glenn et al., *supra* at 84. ("[T]he major result of Rule 12b-1, the development of the widespread appearance of contingent deferred sales charges beginning in 1981, was clearly unanticipated by the Commission when it adopted Rule 12b-1.").

By mid-1973, as the SEC's distribution study neared completion, the industry's total assets stood at less than $55 billion,[3] with those assets held by fewer than 800 funds.[4] Today's industry boasts more than 10,000 funds,[5] with assets exceeding $7 trillion,[6] an average annual asset growth rate since 1974 exceeding twenty percent.[7] Over that same time span, fund sponsors have prospered greatly. In 1998, assets held by Merrill Lynch's own family of funds exceeded the fund industry's total net assets twenty-five years earlier.[8] In early 1999, fund sponsors' annual revenue was estimated at $55 billion,[9] equaling the industry's total assets twenty-five years earlier. A consequence of this staggering growth is that fund sponsors, the SEC, fund investors, and the courts must now confront a new wave of challenges. Despite its phenomenal marketing success, the fund industry now finds aspects of its conduct under attack from various quarters.

The popular press is focusing attention on the industry's fee structure and the perceived inadequacy of mutual fund governance.[10] Scholarly articles published by

---

3. BAUMOL ET AL., *supra* note 2, at 19 n.1.

4. *Id.* at 17.

5. *Weiss Ratings Now Available Online*, BUS. WIRE, Jan. 8, 2001, LEXIS, Curnws File (reporting risk-adjusted performance ratings for more than 10,000 mutual funds). The SEC staff has reported that stock and bond funds alone numbered more than 8900 at the end of 1999. DIVISION OF INVESTMENT MANAGEMENT, SEC, REPORT ON MUTUAL FUND FEES AND EXPENSES (Dec. 2000), *at* http://www.sec.gov/studies/feestudy.htm [hereinafter REPORT ON MUTUAL FUND FEES].

6. *Investment Company Institute Reports Trends in Mutual Fund Investing: April 2000*, PR NEWSWIRE, May 31, 2000, LEXIS, Curnws File. As of year-end 2000, gross assets remained around $7 trillion. Aaron Lucchetti, *After Stock Funds' Poor Year, Time for the Damage Report*, WALL ST. J., Jan. 12, 2001, at C1.

7. A quarter century ago, additions to American families' net cash savings were $180 billion, with the fund industry claiming $1 billion of that amount. By 1998, net cash inflows into mutual funds amounted to $401 billion, accounting for nearly all of the $406 billion addition to American families' savings for the year. John C. Bogle, Economics 101 for Mutual Fund Investors . . . for Mutual Fund Managers, Speech Before the Economic Club of Arizona (Apr. 20, 1999), *at* http://www.vanguard.com/educ/lib/bogle/econ.html [hereinafter Bogle, *Economics 101*].

8. MERRILL LYNCH & CO., 10-K, 4 (1998) (reporting 1998 mutual fund sales of $55.5 billion, of which approximately $22.5 billion were funds advised by Merrill Lynch affiliates).

9. John C. Bogle, Investment Management: Business or Profession, Address at the New York University Center for Law and Business (Mar. 10, 1999), *at* http://www.vanguard.com/educ/lib/bogle/ investmanage.html; *see also* John Waggoner & Sandra Block, *High Fund Performance at Low Cost*, USA TODAY, Mar. 26, 1999, at 3B (quoting John Bogle). Bogle estimated that out of the total gross revenue for fund sponsors, less than 10%, "[m]aybe $5 billion" actually goes to paying for management of the funds. *Id.*

10. *See, e.g.*, Tracey Longo, *Days of Reckoning: Congress is Finally Starting to Look Into Why Mutual Fund Fees Keep Rising*, FIN. PLAN., Nov. 1, 1998, at 1 ("Several leading mutual fund analysts and critics are also making the case that not only do higher fees not mean better performance, often the opposite is true."); Robert Barker, *High Fund Fees Have Got to Go*, BUS. WK., Aug. 16, 1999, at 122 ("Since 1984, Morningstar reports, the average cost of actively run no-load U.S. stock funds fell less than 10%, even as their assets multiplied 32 times. Vast economies of scale benefited mutual-fund companies, not investors."); Robert Barker, *Fund Fees Are Rising. Who's to Blame?*, BUS. WK., Oct. 26, 1998, at 162 ("If expenses are too high, it's the independent directors who have failed."); Thomas Easton, *The Fund Industry's Dirty Secret: Big is Not Beautiful*, FORBES, Aug. 24, 1998, at 116, 117 ("The dirty secret of the business is that the more money you manage, the more profit you make—but the less able you are to serve your shareholders. . . . In most businesses size is an advantage. In mutual funds it is an advantage only to the sponsor, not to the customer."); Charles Gasparino, *Some Say More Could be Done to Clarify Fees*, WALL ST. J., May 20, 1998, at C1 ("[I]s the industry rising to the challenge? Is it doing all it can to clearly and simply explain how much investors are paying in fees and expenses?"); Linda Stern, *Watch Those Fees*, NEWSWEEK, Mar. 23, 1998, at 73 ("Today's financial marketplace is a bizarre bazaar: in the flourishing fund industry, the law of supply and demand sometimes

finance academics have ridiculed board-approved 12b-1fees[11] paid by fund shareholders.[12] Law review commentators offer uncomplimentary evaluations of those who control fund management and policies.[13] The SEC has weighed in, questioning "whether changes are needed in the current system."[14] Another federal agency, the

---

works backward, and heightened competition can mean higher prices."); Steven T. Goldberg, *Where Are Fund Directors When We Need Them?*, KIPLINGER'S PERS. FIN. MAG., Apr. 1997, at 111 ("It isn't hard to find examples of fund directors who are tolerant of high fees, bad performance or both."); Jeffrey M. Laderman, *Are Fund Managers Carving Themselves Too Fat a Slice?*, BUS. WK., Mar. 23, 1992, at 78 (discussing the fact that mutual fund advisory "fees are not coming down as they are in the pension-fund business. 'Perhaps that's because pension-plan sponsors pay attention to fees,' notes Charles Trzcinka, a finance professor at the State University of New York at Buffalo."); Ruth Simon, *How Funds Get Rich at Your Expense*, MONEY, Feb. 1995, at 130 (explaining that fund shareholders "pay nearly twice as much as institutional investors for money management. And that calculation doesn't even include any front- or back-end sales charges you may also pony up."); Anne Kates Smith, *Why Those Fund Fees Matter*, U.S. NEWS & WORLD REP., July 8, 1996, at 73 ("[I]magine customers cheerfully swallowing price hikes each year—even though competing products keep flooding the market. Sound ridiculous? That's how the mutual-fund business works."); Geoffrey Smith, *Why Fund Fees Are So High*, BUS. WK., Nov. 30, 1998, at 126 (noting allegations that the amount of assets under management in the Fidelity fund complex jumped from $36 billion to $373 billion from 1985 to 1995 without economies of size being shared with investors; management fees were increased from 1.085% of assets under management to 1.146% of assets, yielding the management company an extra $288 million in revenue); Maggie Topkis, *Getting Wise to Mutual Fund Fees*, FORTUNE, Dec. 23, 1996, at 191 ("Put bluntly, in all but a few cases, fees are the keys to future returns."); Edward Wyatt, *Empty Suits in the Boardroom*, N.Y. TIMES, June 7, 1998, § 3, at 1 ("Rarely, if ever, since the current system of mutual fund oversight was laid out in the Investment Company Act of 1940 have fund directors been under fire on so many fronts at once."); *Industry Doing a Poor Job of Explaining Charges*, USA TODAY, July 8, 1998, at 14A (complaining that "fees are going up" and that they "have become so complicated you need a financial advisor just to wade through them").

11. *See* 17 C.F.R. § 270.12b-1 (1999) (setting forth rules by which a registered open-end management investment company may pay expenses associated with the sale of its shares).

12. *See, e.g.*, Antonio Apap & John M. Griffith, *The Impact of Expenses on Mutual Fund Performance*, 11 J. FIN. PLAN. 76 (1998) (stating that for funds with investment objectives of long-term growth, growth and current income, and equity income, 12b-1 fees do not add to funds' performance); Stephen P. Ferris & Don M. Chance, *The Effect of 12b-1 Plans on Mutual Fund Expense Ratios: A Note*, 42 J. FIN. 1077, 1082 (1987) (describing 12b-1 fees as "a dead-weight cost"); Robert W. McLeod & D.K. Malhotra, *A Re-examination of the Effect of 12b-1 Plans on Mutual Fund Expense Ratios*, J. FIN. RES. 231, 239 (1994) (stating that 12b-1 fees are "a dead weight cost" to shareholders that has been increasing over time). For criticism in fund industry literature see, Amy C. Arnott, *The Rising Tide*, MORNINGSTAR MUTUAL FUNDS, Oct. 11, 1996, at S1-S2; Michael Mulvihill, *A Question of Trust*, MORNINGSTAR MUTUAL FUNDS, Aug. 30, 1996, at 51-52.

The General Accounting Office Report noted that academics have voiced the following concerns about fee levels in the fund industry: "whether competition, fund disclosures, and mutual fund directors are sufficiently affecting the level of fees," GENERAL ACCOUNTING OFFICE, MUTUAL FUND FEES ADDITIONAL DISCLOSURE COULD ENCOURAGE PRICE COMPETITION 4 (2000) [hereinafter "GAO REPORT"]; "that the information currently provided does not sufficiently make investors aware of the level of fees they pay," *id.* at 7; "the directors' activities may be keeping fees at higher levels because of [a] focus on maintaining fees within the range of other funds," *id.* at 8; "some studies or analyses that looked at the trend in mutual fund fees found that fees had been rising," *id.* at 47; "funds do not compete primarily on the basis of their operating expense fees," *id.* at 62; "academic researchers [and others] saw problems with the fee disclosures [made by mutual funds]," GAO REPORT, *supra*, at 76.

13. *See, e.g.*, Samuel S. King, Note, *Mutual Funds: Solving the Shortcomings of the Independent Director Response to Advisory Self-dealing Through Use of the Undue Influence Standard*, 98 COLUM. L. REV. 474 (1998) (discussing various approaches to dealing with conflicts of interests of mutual fund investment advisors).

14. *See* Wyatt, *supra* note 10, at 1 (discussing the SEC's examination of mutual fund governance). Most recently, in January 2001, the SEC amended various exemptive rules in an effort to "enhance director independence and effectiveness." Role of Independent Directors of Investment Companies, Investment

General Accounting Office, recently issued a detailed report finding that mutual funds generally do not attempt to compete on the basis of costs (*i.e.*, price competition is muted).[15] If the SEC's aim a quarter-century ago truly was to spur innovations to "set the stage for retail price competition" within the industry,[16] then, as we shall see, there is still a lot of work to be done. Indisputably, price competition is in investors' best interests. In the absence of competition, costs increase, resulting in a drag on performance.[17]

The absence of price competition within the fund industry is by no means conceded by industry insiders, leaving observers faced with ambiguous and often contradictory data that can lead one to conclude that "competition is up—and so are costs."[18] This strangeness—tremendous popularity, proliferating consumer options, and less than robust price competition—arises in the realm of the most tightly regulated financial product sold in the country today. In the words of a former SEC chairman, "[n]o issuer of securities is subject to more detailed regulation than a mutual fund."[19] Unfortunately, as we shall see, decades of SEC-commissioned studies, rule-making, and jawboning have led to a system that, for the most part, works beautifully for those who sell funds to the public, or sell services to funds, but much less admirably for the industry's investors.

---

Company Act Release No. 24816 (Jan. 2, 2001), 2001 WL 6738 (SEC). The SEC's action is discussed in notes 212-22 *infra* and accompanying text.

15. GAO REPORT, *supra* note 12, at 62-65.

16. DIVISION OF MANAGEMENT REGULATION, *supra* note 1, at v.

17. *See, e.g.*, Jonathan Clements, *Hint: Managers Are Only as Smart As the Expenses They Charge*, WALL. ST. J., July 6, 1999, at R1 ("It's not a hard and fast rule, but the more a fund costs, the less you can expect from your investment."); Ruth Simon, *Avoid Stock and Bond Funds With High Expenses*, BUFFALO NEWS, Mar. 6, 1995, at 10 (according to studies conducted separately by the SEC and Princeton University, "investors lose roughly 2 percentage points in return for every one percentage point they pay in annual expenses").

18.

> "Most fund companies don't even attempt to point to strong performance as a rationale for higher fees," says Amy Arnott, an editor with Morningstar. "Rather, they typically justify increases in their management fees by pointing to the average for similar funds. This argument can only lead to an upward spiral in costs: As more funds raise their fees to bring them in line with the averages, the averages go up, more funds raise their fee and so on."

Stern, *supra* note 10, at 73; *see also* Longo, *supra* note 10; JOHN C. BOGLE, BOGLE ON MUTUAL FUNDS 284 (1994) (observing that most proxies seeking shareholder approval of fee hikes "suggest that, after long consideration, the fund's directors have approved the fee increase requested by the management company, since the fund's rates were below industry norms"). If upward movement in others' fees provides a valid reason for advisory fee rate hikes, then fund revenues can be expected to boom, for fund expense ratios have been rising, at least for the most popular funds. Average annual expense ratios for the 10 best-selling funds are reportedly running at 0.93% of fund assets, up from 0.79% last year and 0.73% in 1998. *See* Christopher Oster, *Fees? You Mean Mutual Funds Have Fees?*, WALL. ST. J., July 14, 2000, at A1. For its part, the ICI understandably takes a dim view of the notion that fund directors increase advisory fees to keep up with rates levied at other funds. *See* Letter from Matthew P. Fink, President, Investment Company Institute, to Thomas J. McCool, Director, Financial Institutions and Market Issues, U.S. General Accounting Office 2 (May 3, 2000), *reprinted in* GAO REPORT, *supra* note 12, at Appendix III (contending that the view that this goes on "is contradicted directly by the applicable legal standards governing the work of directors"). Of course, the fact that applicable legal standards ought to prevent such action does not mean it does not occur, it means only that if the behavior does go on it may well be illegal.

19. DIVISION OF INVESTMENT MANAGEMENT, *supra* note 1, at v.

This Article examines whether the chief product that shareholders buy when they invest in mutual funds—professional investment advice—is being systematically overpriced by fund managers. The emphasis is on advisory fees imposed on equity mutual funds. Part II explains how the industry's unique management structure accounts for the alleged lack of price competition in the delivery of management advice perceived by the industry's detractors. Part III examines two questions related to economies of scale in the fund industry. First, do economies of scale exist for the delivery of investment management services to equity fund shareholders? Second, if so, are those economies being shared fairly with the funds' owners by the funds' agents, the investment advisors? Part IV studies causes for the status quo, including the industry's statutory scheme, the quality of the SEC's regulatory efforts, and the reception given fund critics by the courts. The Article concludes with a set of proposals for changing the present competitive environment in which fund advisory fees are set, disclosed, and evaluated.

## II. FUNDS' UNIQUE MANAGEMENT STRUCTURE

The principal reason mutual funds have won acceptance in the marketplace has little to do with securities law requirements or the SEC's regulatory know-how. Mutual funds have been well received because, in the main, they can be very good products for investors to own. Mutual funds historically have provided their shareholders with the ability to pursue a vast array of different investment objectives as co-owners of an entity offering three main services: diversified investment risk, professional investment management, and a redeemable security.[20] The fact that fund shares are redeemable at net asset value (minus, in some cases, a redemption fee) differentiates mutual funds from their closed-end fund[21] cousins and the rest of the entities populating the investment media universe.[22] Because funds issue a redeemable security, new sales generally are viewed as crucial to a fund's ability to survive and prosper. Absent new investors, funds risk being redeemed out of existence as shareholders cash in their holdings.

The concept of external management is nearly as universal a hallmark of the fund industry as redeemable shares. This characteristic is by no means crucial to a fund's existence, though it is nonetheless ubiquitous. As explained by the Vanguard Group's founder, John C. Bogle, mutual funds almost always

> are operated by external . . . management companies which seek to earn high returns for fund investors, to be sure, but seek at the same time to earn the highest possible returns for themselves. Some of these companies are publicly-held, in which case their shares are held by investors who own their shares for

20. Many other services may also be offered, depending on the fund. Among them are free switching between funds in the same group or complex, automatic dividend reinvestment, telephone or check-writing withdrawal, and various retirement benefit plan options. For a basic introduction to fund operations, see Victoria E. Schonfeld & Thomas M.J. Kerwin, *Organization of a Mutual Fund*, 49 BUS. LAW. 107 (1993).

21. Closed-end investment companies differ from mutual funds because their shares are not redeemable. Thus, closed-end shares are traded in the marketplace at prices that range from premiums with net asset value per share to discounts below net asset value. *See id.* at 112-13.

22. Indeed, a mutual fund's aggregate holdings of illiquid securities may not exceed 15% of the fund's assets. *See* Revisions and Guidelines to Form N-1, Investment Company Act Release No. 18,612, [1991-1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84,930, at 82,479 (Mar. 12, 1992). Closed-end funds have no such liquidity requirement since their shares are not redeemable.

the same reason that investors own Microsoft or General Motors: To make money for themselves.[23]

The external manager typically controls all facets of fund life, from the fund's incorporation through the selection of the initial board. This control tends not to be relinquished over time,[24] or at least until the advisory office subsequently is sold to another external advisor, typically at a very nice profit.[25] Through agreements approved by the fund's board of directors, the external advisor normally contracts with the fund and related sister-funds operating in the advisor's "complex" to supply the investment advisory, marketing, and administrative services required for the funds to operate.[26] In return, the advisor is compensated through fees set in the board-approved management agreement.[27] As the SEC has noted, "Mutual funds are unique . . . in that they are 'organized and operated by people whose primary loyalty and pecuniary interest lie

---

23. John C. Bogle, Honing the Competitive Edge in Mutual Funds, Address Before the Smithsonian Forum, Washington, D.C. 5 (Mar. 23, 1999) (on file with author). Stated differently, "Ordinary corporations do not need to go out and hire other corporations, with separate owners, to manage their affairs. Mutual funds do precisely that today . . . ." BOGLE, *supra* note 18, at 300. As evidence of the cost drag on fund performance flowing from the industry's conflicted management structure, Bogle noted that of actively managed stock funds in existence for the preceding 15 years, only 1 in 24 outpaced the return of the Standard & Poor's 500 Index, John C. Bogle, Honing the Competitive Edge in Mutual Funds, Address Before the Smithsonian Forum, Washington, D.C. (Mar. 23, 1999), at 2 (on file with author). In 1998, bond funds returned to their investors only 86% of the total return offered by the bond market. *Id.* at 4. Money market funds earned only 89% of the money market's returns over the last 15 years. *Id.* at 5.

24. *See* Role of Independent Directors of Investment Companies, Securities Act Release No. 33-7754 [1999-2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 86,212, at n.10 (Oct. 14, 1999). In the words of one of the industry's earliest and most vociferous critics:

> Now, this is about the birds and the bees of the American corporate scene. . . . The fund is conceived by a bunch of people whom we call advisors or managers. . . . This group gives birth to the fund. The fund is manned by the advisors. If I may carry this figure of speech, the umbilical cord is never cut after birth, as would be true in ordinary biological life.

Statement of Abraham Pomerantz, *University of Pennsylvania Law School Conference on Mutual Funds*, 115 U. PA. L. REV. 659, 739 (1967). As former SEC Commissioner Manuel Cohen once remarked when referring to testimony by fund investment advisors:

> They also made the point that the investment advisor creates the fund, and operates it in effect as a business. Many of them stated that "It is our fund, we run it, we manage it, we control it," and I don't think there is anything wrong with them saying it. They were just admitting what is a fact of life. The investment advisor does control the fund.

*Investment Company Act Amendments of 1976: Hearings on H.R. 9510, H.R. 9511 Before the Subcomm. on Commerce and Fin. of the Comm. on Interstate and Foreign Commerce*, 90th Cong. 674 (1967) (statement of Manuel Cohen, Commissioner, SEC).

25. *See, e.g.*, BOGLE, *supra* note 18, at 327-28 (reporting an instance in which, following a successful effort to have fund shareholders raise the advisory fee because, among other things, its rates were about half of all fund advisors,' "below average," the advisor promptly sold itself for "a cool $1 billion"); Saul Hansell, *J.P. Morgan Shifts Strategies to Buy a Stake in Fund Concern*, N.Y. TIMES, July 31, 1997, at D1 (discussing J.P. Morgan's purchase of a 45% stake in a fund manager for $900 million). *See also* note 92 *infra* and accompanying text.

26. BAUMOL ET AL., *supra* note 2, at 22.

27. Board control over advisory fees is mandated by section 15(c) of the Investment Company Act of 1940. 15 U.S.C. §80a-15(c) (1994).

outside the enterprise.'"[28] This Article examines how the cost of that conflict of interest is passed on to fund shareholders.

*A. Independent Directors' Importance*

Aware of the inherent conflict existing between the fund's shareholders and the entity's external advisors, Congress took a position favoring shareholders when it enacted the Investment Company Act of 1940:

> The national public interest and the interest of investors are adversely affected . . . when investment companies are organized, operated and managed in the interest of investment advisors, rather than in the interest of shareholders . . . or when investment companies are not subject to adequate independent scrutiny.[29]

To protect fund shareholders from self-dealing, Congress imposed a requirement that at least forty percent of a fund board needs to be composed of directors ostensibly independent of the investment advisor. The United States Supreme Court has dubbed these special directors "independent watchdogs."[30] The independent directors are charged with protecting against the overreaching of fund shareholders. As the Delaware Supreme Court has pointed out, independent directors can play a pivotal role in American corporate life. Speaking in the context of directors' fiduciary duties when making a decision whether to change control, the court stated:

---

28. Role of Independent Directors of Investment Companies, Securities Act Release No. 33-7754 [1999-2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 86,212, at 82,451 (Oct. 14, 1999), *quoting from* DIVISION OF INVESTMENT MANAGEMENT, SEC, PROTECTING INVESTORS: A HALF CENTURY OF INVESTMENT COMPANY REGULATION 251 (1992) [hereinafter 1992 PROTECTING INVESTORS REPORT].

29. Investment Company Act of 1940 § 1(b)(2), 15 U.S.C. § 80a-1(b)(2) (1994).

30. Burks v. Lasker, 441 U.S. 471, 484 (1979). Warren Buffett has compared independent fund director watchdogs to "Cocker Spaniels and not Dobermans." JOHN C. BOGLE, COMMON SENSE ON MUTUAL FUNDS: NEW PERSPECTIVES FOR THE INTELLIGENT INVESTOR 368 (1999). For his part, industry critic Bogle offers a different word image: "Fund directors are, to a very major extent, sort of a bad joke." Geoffrey Smith, *Why Fund Fees Are So High*, BUS. WK., Nov. 30, 1998, at 126. Bogle also observes: "Everybody knows . . . that people come on fund boards because they're friends of the CEO. So they go along with whatever he wants." Tyler Mathisen, *Bogle May Have Had a Transplant, But He Hasn't Had a Change of Heart*, MONEY, Dec. 1996, at 15. A lawyer who brought numerous cases against fund management companies once put it this way:

> I have had fourteen investment company cases and fourteen sets of depositions and/or cross examinations of the independent directors, and in not one single case did any unaffiliated director ever respond "Yes," to this type of question: When your fund grew from $100 million to $600 million, did you ever give any thought to making a comparison between your half of one percent and somebody else's fees?
>
> "No. . . ."
>
> "Did you ever once suggest that when the fund got to be over a billion dollars . . . perhaps a reduction from one-half percent to seven-sixteenths of one percent, or any other minute fraction?"
>
> "Answer: No–and I mean the uniform answer."
>
> "[T]he realities are . . . that you can't count on the unaffiliated director[s]."

Statement of Abraham Pomerantz, *supra* note 24, at 753-54.

> The power to say no is a significant power. It is the duty of the directors serving on [an independent committee] to approve only a transaction that is in the best interests of the public shareholders, *to say no to any transaction that is not fair to those shareholders and is not the best transaction available.*[31]

In practice, while independent fund directors have the right to demand advisory or distribution fee cuts or to fire the fund's advisor or underwriter, those rights are virtually never exercised.[32] Indeed, in the leading fund industry management fee case of *Gartenberg v. Merrill Lynch Asset Management, Inc.*,[33] the Second Circuit expressly called attention to "the existence in most cases of an unseverable relationship between the advisor-manager and the fund it services."[34]

The fund advisor's *de facto* control over the fund's board can lead to high profit margins[35] and a high price for the advisory office should the advisor wish to sell out at some point. The conflict also leads to the risk that well-understood obligations owed by

---

31. Kahn v. Lynch Communications Sys., Inc., 638 A.2d 1110, 1119 (Del. 1994) (brackets in original) (emphasis added) (quoting *In re* First Boston, Inc. Shareholder Litig., C.A. 10338, 1990 WL 78836, at *15-*16 (Del. Ch. June 7, 1990)).

32. *See, e.g.*, Werner Renberg, *Sixth Men or Fifth Wheels: Do Fund Directors Earn Their Paychecks?*, BARRON'S, Aug. 12, 1991, at M13 ("[Fund] directors have seldom booted an investment advisor, no matter how lousy a fund's performance.").

33. 694 F.2d 923 (2d Cir. 1982).

34. *Id.* at 929; *see also* Peter Tufano & Matthew Sevick, *Board Structure and Fee Setting in the U.S. Mutual Fund Industry*, 32 J. FIN. ECON. 321, 325 (1997) (citing only three instances in which a fund board replaced the fund manager against the manager's wishes and noting that the "board virtually never selects a sponsor other than the initial firm who established the fund and selected its initial board"). The dynamics of one fee negotiation were explained as follows:

> [I]n 1993, the directors of $87 million American Heritage asked shareholders to approve a pay package that would raise the annual management fee by two-thirds to 1.25% and authorize the fund (that is, the shareholders) to pick up an additional $40,000 in office rent previously paid by management. In the proxy statement sent to the shareholders, the directors explained that American Heritage Management Co., the fund's investment advisor, had threatened that without the increase it "could not assure that Board it would [continue to serve] as the Fund's investment advisor . . . ."

Simon, *supra* note 10, at 130. *Kahn*, 638 A.2d at 1110, reports on a similar form of negotiation between a dominant party and independent directors:

> [I]n this case the coercion was extant and directed to a specific price offer which was, in effect, presented in the form of a "take it or leave it" ultimatum by a controlling shareholder with the capability of following through on its threat. . . .[A]ny semblance of arm's length bargaining ended when the Independent Committee surrendered to the ultimatum that accompanied [the] final offer.

*Id.* at 1120-21. In *Kahn*, the court held that coercive conduct exerted on independent directors by those in control will nullify a shift in the burden of proving a transaction's fairness to those challenging the transaction. The court expressly held that burden-shifting can only occur when the group of independent directors negotiating with a controlling party "was truly independent, fully informed, and had the freedom to negotiate at arm's length." *Id.* A like ruling in fund fee litigation—that coercive behavior by a fund manager saddles the manager with the burden of proving the transaction's entire fairness—would be both warranted and revolutionary.

35. *See infra* notes 165-69 and accompanying text(describing pre-tax profit margins ranging over time from 57 to 77% for one money market fund advisory whose fee levels were among the lowest in the money market advisory industry).

board members may not be fulfilled. Eminent authority has explained that the chief oversight function performed by a normal board of directors in this country is "overseeing management's dedication to the polestar of profit maximization."[36] In essence, fund industry critics contend that many fund managers have been allowed to view life looking through the other end of the telescope, with "dedication to the polestar of profit maximization" working in favor of maximizing profits for the funds' hired managers at the expense of fund shareholders. One such critic is fund industry pioneer John Bogle. He has complained that "asset gathering has superceded fiduciary duty as the industry's hallmark."[37] From Bogle's perspective, "the spirit of fiduciary duty has not vanished. Rather, it has moved from the front seat to the back seat, subservient to the [fund advisors'] worship of market share."[38] According to Bogle, "[s]omewhere along the road, the industry has lost its way."[39] This is half the story. As we shall see, to a considerable extent, the industry has lost its way and gotten its way at the same time.

### *B. The Exception to the Rule: Internal Management at the Vanguard Group*

The Vanguard Group of mutual funds offers a management structure running counter to the fund industry's general rule of external management. Vanguard Group funds are internally managed, meaning that the funds receive administrative and distribution services at cost. Advisory fees are either virtually nonexistent in the case of the complex's index funds, or are used to pay for services supplied by third parties. Director-run fund boards, motivated purely by their desire to secure for Vanguard's shareholders the best quality services at the lowest possible prices, hire these third parties. Vanguard funds, in other words, are managed like regular companies operating elsewhere in the economy: the entities' managers are driven to generate the best bottom-line returns possible. At the Vanguard funds, directors' eyes are indeed focused on the polestar of profit maximization for the Vanguard funds' shareholders. The Vanguard Group appeals to the price-conscious segment of the fund marketplace.[40] That segment has been growing; between 1974 and 1998, the Vanguard Group's assets soared from $1.3 billion to $450 billion.[41]

Vanguard's Bogle claims that Vanguard's shareholder-oriented management structure, distinctly rare in the fund industry but common throughout the rest of the economy, generated $3 billion in savings for Vanguard shareholders in 1998 alone.[42] If Bogle is even close to being correct, then fund shareholders are paying an onerous tax to compensate for the conflict of interest inherent in the fund industry's near-universal

---

36. Ira M. Millstein, *The Responsible Board*, 52 BUS. LAW. 407, 409 (1997).

37. BOGLE, *supra* note 18, at 298.

38. *Id.*

39. *Id.* at x.

40. In the words of its managing director, the Vanguard Group "has sought to differentiate itself from its competition in large measure by keeping costs low." *Improving Price Competition for Mutual Funds and Bonds: Hearing Before the House Subcomm. on Fin. & Hazardous Materials Subcomm. of the Comm. on Commerce*, 105th Cong. 72 (1998) (statement of F. William McNabb III, Managing Director, The Vanguard Group), *available at* http://www.ici.org/issues/fee_hearing.html [hereinafter *Improving Price Competition*].

41. BOGLE, *supra* note 30, at 407. This is an annual growth rate of over 27%, significantly outpacing the fund industry's 20% annual gain over roughly the same period. See *supra* note 7 and accompanying text.

42. BOGLE, *supra* note 30, at 431.

embrace of the external management model. The following section explores the available evidence that the industry's reliance on external management as a source for professional investment advice subjects fund shareholders to excessive costs.

## III. ECONOMIES OF SCALE FOR ADVISORY SERVICES RENDERED TO EQUITY MUTUAL FUNDS

### *A. Introduction*

Mutual funds exhibit "economies of scale" when there is an inverse relationship between assets under management and their operating expense ratios.[43] Operating ratios represent operating expenses divided by average fund assets. For present purposes, this Article accepts the following operating expense formulation adopted by the fund industry's trade group, the Investment Company Institute (ICI): advisory expenses plus administrative expenses;[44] but excluding 12b-1 fees.[45]

The existence of economies of scale as fund assets under management increase has been dubbed "folklore,"[46] and an item about which "no plaintiff has been able to produce evidence."[47] Given the industry's explosive growth, one would expect that fund expenses on average would have plummeted. It is not clear from the evidence that this has happened. The average equity fund's expense ratio has more than doubled since 1950.[48] According to a study published by the ICI, the operating expense ratio[49] for all equity

---

43. John Rea et al., *Operating Expense Ratios, Assets and Economies of Scale in Equity Mutual Funds*, INVESTMENT COMPANY INSTITUTE PERSPECTIVE, Dec. 1999, at 1. The notion of economies of scale is a familiar one. Typically, the concept arises in the context of a manufacturing firm. As the number of units of output increases, total costs increase, but not as rapidly as output, so that average unit costs decrease as output increases. Such economies typically arise from spreading fixed costs among more units of production. The portfolio management process, which underpins advisory services, is characterized by high fixed costs (offices, computers, salaries, etc.) and very low variable costs. Thus, as the SEC staff recently noted: "Most observers believe that portfolio management is the fund cost with the greatest economies." REPORT ON MUTUAL FUND FEES, *supra* note 5. An earlier SEC staff report concluded that "a portfolio manager can manage $500 million nearly as easily as $100 million." 1992 PROTECTING INVESTORS REPORT, *supra* note 28, at 256 n.12. Since advisory services are subject to economies of scale, the fund's advisor may or may not pass along the largess to the fund. If economies of scale exist and fees are not lowered when assets under management increase, then the benefits of increased scale accrue to the manager in the form of increased profits. This can be especially insidious in a bull market environment. The GAO's report on price competition in the fund industry found that 64% of fund portfolio growth is due to portfolio appreciation. *See* GAO REPORT, *supra* note 12, at 9. This appreciation benefits investment advisors who garner increased fees from the general increase in market prices with no commensurate efforts on their part.

44. Rea et al., *supra* note 43, at 1, 5.

45. Rule 12b-1 fees are payments out of mutual fund assets to finance activities intended to result in the sale of fund shares or to pay for other services intended to benefit share holders. They were excluded because they are more closely associated with sales activity than post-sale administrative services. *See supra* note 12 and *infra* note 69 .

46. BAUMOL ET AL., *supra* note 2, at 87.

47. *Id.*

48. John C. Bogle, *Mutual Funds at the Millennium: Fund Directors and Fund Myths*, *at* http://www.vanguard.com/bogle_site/may152000.html (May 15, 2000). Between 1980 and 1998, the average equity fund's annual expense ratio jumped from 1.10% to 1.57%. Bogle, *Economics 101*, *supra* note 7.

49. This consists of management and administrative expenses born by shareholders divided by the fund's net assets; it does not include distribution costs, such as sales loads or 12b-1 fees.

funds, using a sales-weighted average, rose 15% from 1980 to 1997,[50] a time of tremendous asset growth for the industry.[51] A recent SEC staff study showed that funds' weighted average expense ratio rose nearly 30% between 1979 and 1999,[52] with the jump exceeding 20% for equity funds. [53] A different study found that the cost of ownership for the industry's cheapest equity funds rose by 19% between 1980 and 1997.[54]

Another report on equity fund expenses shows that between 1981 and 1997, average equity fund expenses grew from 0.97% of net assets to 1.55%, with this 50% increase occurring over a period in which fund equity assets rose from $40 billion to $2.8 trillion.[55] During the same period, annual costs paid by fund shareholders soared from $320 million to $34 billion. Assuming that economies of scale exist, it is questionable why a hundredfold increase in costs should accompany a seventyfold increase in assets.[56] Had the average expense ratio merely stayed the same, and not risen over the period, fund investors would have saved billions annually.[57]

Nonetheless, it is accepted today that economies of scale exist in the fund industry. The existence of economies of scale has been admitted in SEC filings made by fund managers[58] and is implicit in the industry's frequent use of fee rates that decrease as assets under management increase.[59] Fund industry investment managers are prone to cite economies of scale as justification for business combinations.[60] Though the ICI has

---

50. John D. Rea & Brian K. Reid, *Trends in the Ownership Cost of Equity Mutual Funds*, INV. CO. INST. PERSPECTIVE, Nov. 1998, at 12.

51. The average size of the 100 largest funds in existence in 1997 that were also in existence in 1980 blossomed from $282 million to $5.8 billion. *Id.* at 13.

52. REPORT ON MUTUAL FUND FEES, *supra* note 5, tbl. 2.

53. *Id.* at tbl. 9.

54. Rea et al., *supra* note 43, at 9. According to Vanguard's Bogle, "Given that Vanguard dominates the low end universe–and that our expense ratios have declined by 53% since 1980–I would estimate that the other 'low cost' funds in the ICI survey raised expenses by as much as 40 percent." Bogle, *Economics 101*, *supra* note 7.

55. BOGLE, *supra* note 30, at 320.

56. *Id.*

57. *Id.*

58. *See* John P. Freeman, *The Use of Mutual Fund Assets to Pay Marketing Costs*, 9 LOY. U. CHI. L.J. 533, 554-55 n.109 (1978) (noting arguments presented in SEC filings by Investors Diversified Services, Putnam Management, and the Vanguard Group).

59. The existence of fee breakpoints in the fund industry has been viewed as "[o]ne piece of evidence for the existence of economies in portfolio management." REPORT ON MUTUAL FUND FEES, *supra* note 5. The breakpoint pricing system has been explained as follows:

> Many funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase. . . . The declining rate schedule reflects the expectation that cost efficiencies or scale economies will be realized in the management and administration of the fund's portfolio and operations as the fund grows.

Rea et al., *supra* note 43 at 1, 4. On the other hand, the authors' survey of Morningstar data covering all domestic equity mutual funds in 1999 revealed that 70% operated under flat fee investment advisory contracts. *See infra* note 71.

60. *See* M. Christian Murray, *ReliaStar Buys Asset Manager*, NAT'L UNDERWRITER, Aug. 2, 1999, at 41 (reporting on a merger of two fund groups with the acquirer announcing that it "expects the acquisition will provide its asset management group with economies of scale benefits, resulting in lower unit costs and increased sales and profitability"); *Navigator Fund Changes*, NAT'L POST, July 14, 1999, at D03 (fund manager merging two funds to "benefit investors by achieving a greater economy of scale and a more diversified fund").

remained mute on the subject of economies of scale affecting advisory fees specifically, a knowledgeable industry insider has admitted that "there are *staggering* economies of scale in portfolio management and research."[61] Legal commentators likewise view economies of scale as a fact of life in the fund industry.[62] The GAO's investigators recently found a general consensus that fund operations benefit from economies of scale,[63] as well as strong evidence that economies of scale should exist.[64] The agency reported that as much as 64% of mutual fund asset growth has come from appreciation of portfolio securities,[65] which, unlike growth from share sales to new investors, is costless. Though its analysis of operating efficiencies was stymied by the lack of cost data available for fund advisors, the GAO did find that, for at least the previous five years, operating profits of eighteen publicly-held fund advisory companies had grown as a percentage of revenues.[66] The GAO also found that, among a sample of the industry's largest funds that experienced asset growth of at least 500% from 1990 to 1998, more than a quarter of the funds either raised their expense ratios or failed to reduce them.[67]

*B. Fund Industry Data Demonstrates That Economies of Scale Exist*

Studies by the ICI, though never focusing on advisory fees in isolation, generally confirm the existence of economies of scale within the industry. A 1998 ICI study found economies of scale to exist for individual equity funds.[68] A subsequent ICI study focusing on fund operating expenses "suggest[s] the presence of economies of scale as equity fund assets grow."[69] Interestingly, the ICI's operating expense study avoided calling specific attention to advisory fees. The ICI researchers bundled advisory fees and

61. BOGLE, *supra* note 30, at 321 (emphasis added).

62. *See* Schonfeld & Kerwin, *supra* note 20, at 107. ("Mutual funds increasingly are the investment vehicle of choice. . . . Mutual funds offer advantages that other investment vehicles may not, including diversification, *economies of scale*, and professional management.") (emphasis added).

63. The GAO REPORT noted:

> Industry officials we interviewed . . . generally agreed that mutual fund operations experience economies of scale. An official at a money management firm whose customers invest in mutual funds told us that mutual fund advisors' operations are subject to large economies of scale, and additional investor inflows result in little additional cost. Officials of the fund advisors we interviewed also agreed that their operations experienced economies of scale.

GAO REPORT, *supra* note 12, at 34.

64. *Id.* at 9.

65. *Id.*

66. *Id.* at 9-11.

67. The GAO found that among the industry's 77 largest funds, of the 51 that experienced asset growth of at least 500% from 1990 to 1998, 38 reduced their expense ratios by at least 10%; of the remaining 13 funds, 7 reduced their expense ratios by less than 10%, and 6 either had not changed their fees or had raised them. GAO REPORT, *supra* note 12, at 11-12.

68. Rea & Reid, *supra* note 50, at 12-13.

69. Rea et al., *supra* note 43, at 2. Excluded from the definition of "operating expenses" were 12b-1 fees paid by many fund shareholders. The omission was justified by the study's authors on the basis that the payments are mainly used "to compensate sales professionals for advice and assistance given to buyers of fund shares." *Id.* at 1. In litigation, the payments have been justified on the ground that they are assessed "not only to encourage growth, but also to stimulate improved shareholder service." Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472, 490 n.37 (S.D.N.Y. 1988). Included as operating expenses for purposes of the study were such items as custodial and transfer agent fees. Rea et al., *supra* note 43, at 5.

administrative fees (such as custodial fees, legal and accounting fees, and transfer agent fees, but excluding 12b-1 fees). The ICI study observed that the ratio of bundled costs to fund assets, the "operating expense ratio," did indeed decline as fund size rose.[70]

### C. *Testing the ICI's Findings: Verification and Unbundling*

To verify the ICI's analysis, the authors screened the Morningstar Principia Pro database for domestic equity funds.[71] After adjusting for missing and unusable data,[72] the final sample consisted of a total of 2161 actively managed, noninstitutional funds. Of these, 1090 were single class funds and 1071 were multiclass funds representing a consolidation of 3302 sub-funds. This approximated the ICI sample of 2260 funds.

The ICI analysis used simple average operating expense ratios to aggregate multiclass funds within ranges of fund size. For comparison purposes, the authors initially used simple averages. However, weighted averages are superior[73] and hence supply the principal data used in the authors' analyses.[74] Comparison of ICI results with the current study are presented in Table 1.

---

70. Rea et al., *supra* note 43, at 2, 15.

71. Morningstar's Principia Pro compilation for October 1999 was the principal source of data for the authors' study. This date was chosen as corresponding most closely to pension fund data presented in the next section. The Morningstar material contained data as of the end of September 1999, reflecting expenses for most funds as of the end of June 1999. Initially, the authors' total database was screened to include only domestic equity funds—a total of 5238 were obtained. The sample included index, specialty, balanced, asset allocation, and a few convertible bond funds. Next, funds with zero assets and missing data were eliminated. This reduced the sample to 4943 funds. At this point, multiclass funds were aggregated into single funds. Such funds are an aggregation of sub-funds, each with different distribution channels. For instance, there may be a front-load fund (with or without 12b-1 fees), a back-load fund (with 12b-1 fees), a level-load fund (with 12b-1 fees), and an institutional fund with no 12b-1 fees and lower administrative fees. Portfolio expenses and most administrative expenses are incurred at the fund level and prorated to share classes based upon share class assets. Funds assets were totaled, and averages of expense ratios, operating expense ratios, management fees and administrative fee ratios were obtained using simple and weighted averages where the sub-fund assets were used as weights. Initially, an analysis was conducted corresponding to the ICI Table 1. Results were nearly identical to those presented in the body of the paper. Subsequently, all index and single class institutional funds were excluded from consideration, and these results, corresponding to ICI Table 6, are presented in Table 1. Although they are subject to minor inaccuracies, management fees from Morningstar were used as a proxy for advisory fees. *See infra* note 100 and accompanying text.

72. Funds were excluded from consideration if they reported bundled administrative costs or if advisory or administrative fees were zero. The latter occurs frequently when the investment advisor temporarily waives all or part of such fees as a means of subsidizing the fund, typically during the start-up period. The majority of excluded funds were small (total assets less than $100 million) and the balance of excluded funds were spread uniformly among different-sized funds. An analysis of the total sample revealed no significant differences, with the exception of the very small funds, where fee waivers caused average advisory and administrative fees to be lower than some larger funds.

73. Using simple averages, the expenses of a $1 million fund would be of equal importance to a $100 billion fund.

74. The authors' simple average numbers are presented in the text to demonstrate that the authors' data generate results similar to those presented in the ICI study.

**Table 1**
**Comparison of Operating Expense Ratios with ICI Expense Study**

| ICI Study | | | Current Study | | |
|---|---|---|---|---|---|
| Fund Size | Number of Funds | Simple Average Operating Expense Ratios (Basis Points) | Number of funds | Simple Average Operating Expense Ratios (Basis Points) | Weighted Average Operating Expense Ratios (Basis Points) |
| <$250 mm | 1,451 | 147 | 1,295 | 129 | 114 |
| $250-$500 mm | 261 | 116 | 272 | 103 | 104 |
| $500-$1,000 mm | 204 | 109 | 228 | 98 | 98 |
| $1,000-$5,000 mm | 265 | 94 | 274 | 89 | 85 |
| >$5,000 mm | 79 | 72 | 92 | 68 | 63 |
| Overall | 2,260 | | 2,161 | 114 | 75 |

The left-hand column in Table 1 is the ICI breakdown by the size of fund. It is expected that economies of scale will cause average operating expense ratios to decline as fund size increases, and this is indeed the case. The ICI study shows the operating expense ratio declining from 147 basis points to 72 basis points as fund assets increase from under $250 million to greater than $5 billion. Operating expense ratios obtained from Morningstar exhibited a similar decline from 129 to 68 basis points, although the operating expense ratio averaged about 10 basis points less than the ICI study.[75]

The right-hand column of Table 1 presents the weighted average operating expense ratios. These also decline as asset size increases, although the decline is not as dramatic as occurs with the simple average numbers. Unfortunately, the degree and source of lower expenses is not adequately explored in the ICI study which, by bundling different costs into one overall "operating ratio," failed to examine the differences between advisory and administrative expenses.

---

75. There are several reasons for the slightly lower average operating expense ratios. First, the ICI study contained over 150 additional smaller funds, presumably because such funds are more likely to report to a trade association than Morningstar. Second, the authors' study had larger funds. This occurred because of the combined effects of a rising stock market and a slightly later period of analysis, which caused fund size to appreciate, and perhaps caused lower expenses due to economies of scale. In addition, the ICI simple average methodology allowed for the exclusion of all institutional funds. The current study was able to exclude only single class institutional funds and maintain the weighted average methodology. Finally, an ICI staff member suggested to us that Morningstar sometimes reports 12b-1 fees at the maximum rather than the actual level. Telephone Interview with Brian K. Reid, Senior Economist, Investment Company Institute (Aug 23, 2000). The authors were unable to confirm this.

Having confirmed the essential equivalence of the Morningstar and ICI results, operating expense ratios were decomposed into advisory and administrative expense ratios. The ICI asset groupings and categories were maintained. The results of this analysis are presented in Table 2.

**Table 2**
**Comparison of Weighted Average Operating, Advisory, and Administrative Expense Ratios**

| Fund Size | Number of Funds | Average Fund Size ($mm) | Weighted Average Operating Expense Ratios (Basis Points) | Weighted Average Advisory Expense Ratios (Basis Points) | Weighted Average Administrative Expense Ratios (Basis Points) |
|---|---|---|---|---|---|
| <$250 mm | 1,295 | $77 | 114 | 71 | 43 |
| $250-$500 mm | 272 | $355 | 104 | 71 | 33 |
| $500-$1,000 mm | 228 | $715 | 98 | 67 | 30 |
| $1,000-$5,000 mm | 274 | $2,163 | 85 | 61 | 24 |
| >$5,000 mm | 92 | $14,520 | 63 | 46 | 17 |
| Overall | 2,161 | $1,058 | 75 | 54 | 21 |

The third column of Table 2 shows the average size of the fund in each group. Note that there are large numbers (1295) of relatively small funds, with an average fund in the less than $250 million range having $77 million in assets. On the other hand, there are relatively small numbers (92) of very large funds (average assets of $14.5 billion). Thus, the distribution of fund size exhibits an extremely negative skew. The largest funds (greater than $5 billion) average more than $14 billion, almost seven times larger than the next largest grouping ($1 to $5 billion) and almost 200 times the average fund in the less than $250 million range.

Weighted average operating expense ratios are identical to those in Table 1. These decline about 45% from the smallest to the largest funds (from 114 to 63 basis points). However, the two columns on the right reveal that the decline is not uniform for advisory and administrative fees. Advisory fees decline from 71 to 46 basis points from the smallest to the largest funds, only a 35% decline. Advisory fees are essentially flat at about 70 basis points up to about a $1 billion fund size. A twenty-fold increase in the average fund size (from $715 million to $14.5 billion) results in only a 31% decrease in advisory fees. Administrative fees, on the other hand, decrease from 43 to 17 basis points, a 60% decline. This decline is relatively smooth and linear. Thus, it is clear that, percentage-wise, greater economies of scale are being passed on to the fund shareholders

in the administrative fees than in the advisory fees. The ICI's bundling methodology, which combines the two different fee types, conceals this fact.[76] The authors' data is consistent with the ICI's in showing, unequivocally, that there are economies of scale operating in the fund industry.[77] Fund operating expenses tend to decline steadily as fund size grows. However, this decline is not uniform across administrative and advisory fee levels. The data reveals that fund advisors are reluctant to share economies with fund shareholders when negotiating the terms of advisory fee contracts. This reluctance depletes shareholder wealth.

It is useful to put the authors' analysis into a larger context. The 2161 funds in the sample represent a total market value of about $2.2 trillion. With a weighted average operating expense ratio of 75 basis points, the fund industry is charging shareholders of this subset of mutual funds about $16 billion a year to manage their funds. The 92 funds with assets greater than $5 billion represent about $1.3 trillion, and their annual management costs are about $8.5 billion. Of the $8.5 billion, about $6 billion are charged for advisory services. We have seen that advisory and administrative costs decline as fund size increases, but with administrative costs declining much more rapidly. Had advisory costs declined by the same percentage amount as administrative costs, they would average 28 basis points for the largest funds (rather than 46 basis points), yielding annual advisory costs of $3.5 billion instead of $6 billion. Thus, under the assumption that economies of scale should be realized for advisory fees and administrative fees equally, in rough numbers there are about $2.5 billion of excess advisory fees paid annually among the very largest of the actively managed equity mutual funds.

### *D. Summary*

The ICI's position is that price competition reigns in the fund industry, with economies of scale existing and being properly shared by the advisor with fund

---

76. In fairness to the ICI, there is no easy, simple way to unbundle the data since the SEC has never seen fit to define "investment advisory fees" and require separate reporting for that item. As a result, the SEC's staff embarrassingly professes not to be able to determine directly whether economies of scale exist for advisory fees. REPORT ON MUTUAL FUND FEES, *supra* note 5.

77. Other studies have likewise tended to find declines in fund expenses as assets have ballooned. One study by Kanon Bloch evaluated funds accounting for 80% of the industry's equity fund assets and found that the average equity fund's expense ratio dropped 16% between 1993 and 1999 on an asset-weighted basis. Richard J. Oppel, Jr., *Fund Expenses: They're Going Down, Down, Down; Conventional Wisdom Is Belied By the Numbers*, N.Y. TIMES, July 4, 1999, § 3, at 11. The same ICI study that showed a rise in overall operating expenses from 1980 to 1997 also showed a drop over the same period of time for the same array of equity funds in total shareholders costs, from 2.25% of net assets to 1.49%. Rea & Reid, *supra* note 50, at 11. The drop principally reflected lower distribution costs caused by investor preferences shifting from load to no-load funds, low expense ratio funds, and low-cost index funds. Bogle, *supra* note 48; *see also* Jerry Morgan, *Mutual Fund Loads Can Be a Load Over Time*, NEWSDAY, Dec. 6, 1998, at F06. The effect of the no-load option in driving down overall fund distribution costs demonstrates that in a free market, with load differences clearly disclosed, investors over time are able to migrate in the direction of low-cost providers of fund services. The choice between buying a load and no-load fund is one unhindered by any impediments save brand preference and lack of knowledge.

Another possible source of downward pressure on selling costs is cut-rate pricing offered to investors who buy load funds through 401(k) plans. "Investors may look at their 401(k) plans and start questioning why funds offered through the retirement plans have lower fees than the same funds offered outside the plans." Mindy Rosenthal, *A Loud Call to Lower Fees?*, FUND DIRECTIONS, Feb. 1999, at 1.

shareholders. This appraisal is supported by selectively presented data.[78] In reality, what has been declining is principally the cost of delivering shareholder administrative services relative to aggregate net assets.[79] Because most recent equity fund asset growth has resulted from portfolio appreciation,[80] and has thus been costless to the advisor, it should not be surprising that the ratio of shareholder administrative expenses to fund assets has tended to drop as funds have gotten bigger.

Though administrative expenses have dropped as fund size has grown, it is unclear whether there is robust price competition in the market for the most critical service

---

78. It is argued on behalf of the ICI, that funds' operating expense ratios (consisting of advisory and administrative fees lumped together) have "generally" tended to decline with significant asset growth. Rea et al., *supra* note 43. Nowhere does the ICI study attempt to focus solely on the fees charged for the single item most fund shareholders want to buy—investment advice. The authors' analysis separates out advisory fees and administrative fees. When this is done, it becomes evident that economies of scale in the rendition of advisory services are, for the most part, not being shared with fund shareholders.

Missing from the ICI operating expense study is data showing the percentage growth of revenues flowing to fund managers in comparison with the growth of fund assets. In contrast, a 1996 study reported that while fund assets grew by more than 80% between 1992 and 1996, fund managers' revenues nearly doubled, from $11.7 billion to $23 billion. Anne Kates Smith, *Why Those Fund Fees Matter*, U.S. NEWS & WORLD REP., July 8, 1996, at 73; *see also* Oppel, *supra* note 77 ("[W]hatever the fee cuts at some fund companies, they pale next to huge revenue gains, as assets under management in stock funds soared 44-fold, to $3.2 trillion, in the 15 years ended in May, according to data from the [ICI]."). The ICI's Operating Expense Ratio study is thus akin to a bikini bathing suit: it reveals the interesting and conceals the vital.

Another ICI theme is that the "total costs of fund ownership" have been dropping for fund shareholders. *See Improving Price Competition*, *supra* note 40, at 86 (statement of Matthew P. Fink, President, Investment Company Institute). This ICI policy position was subsequently backed up by a study featuring tortured results published in November of 1998. *See* Rea & Reid, *supra* note 50 (finding that the "total cost of investing" in mutual funds, or the "total cost of fund ownership" has been decreasing). Its methodology is attacked in Bogle, *supra* note 48. Bogle isolated five flaws in the ICI's study. First, the results were weighted by sales volume; unweighted expense ratios escalated 64%, from 0.96% to 1.58%. Second, the ICI failed to note that expense ratios for the lowest cost decile were up 28% from 0.71% to 0.90%. Bogle theorizes that the increase would be greater ("perhaps up 35-40%") if Vanguard were excluded from the sample. Third, the ICI data ignores the hidden cost of increased portfolio turnover among the industry's funds, which cuts performance and generates taxable gains, potentially adding another 0.50% to 1.00% in costs. Fourth, Bogle criticizes the ICI's cost data for ignoring the opportunity cost of not being fully invested in stocks. This cost Bogle estimates at 0.6%. Fifth, Bogle faults the ICI data for ignoring the fees charged to investors who buy funds through "wrap accounts." Sixth, and finally, Bogle charges the ICI with manipulating load costs by amortizing sales loads based on inaccurate assumptions which, if corrected, would increase average sales-weighted costs by an estimated 0.50% to 1.85%. *Id.* That ownership costs have dropped due to lower distribution charges is a tribute to investors' behavior at the purchase point, where the load/no load option is visible and increasingly well understood. *See* GAO REPORT, *supra* note 12, at 47. The convergence of increased consumer sophistication, indexing, institutional sales, and price sensitivity on the part of retirement plan fiduciaries are having an impact in cutting distribution expenses charged by fund sponsors.

79. That administrative costs should show economies of scale comes as no surprise. Administrative costs are a mixture of fixed costs (directors' fees, legal fees, insurance premiums, auditing, taxes, and state and federal registration fees) and variable costs (custodial and transfer agent fees, postage, printing, etc). Variable costs are dominated by transfer agent fees. The transfer agent maintains records of shareholders' accounts and transactions, disburses and receives funds from shareholder transactions, prepares and distributes account statements and tax information, handles shareholder communication, and provides shareholder transactions services. The GAO found that the bulk of stock and bond funds' recent growth has come from portfolio appreciation, a circumstance almost certain to create economies of scale. *See* GAO REPORT, *supra* note 12, at 9.

80. As noted earlier, the GAO found that 64% of equity fund growth was due to the appreciation in value of portfolio securities. *Id.*

offered by the fund to its shareholders: professional management advice. The authors' data confirms that economies of scale in the market for advisory services are likely to exist. To the extent that they do exist, it appears they are being captured mainly by the funds' advisors, not the funds themselves. In the advisory services marketplace, price competition seems particularly weak. As Bogle argues: "Price competition is . . . defined by the actions of producers, not the actions of consumers. Thus, price competition is not 'intense' in the fund industry; it is barely alive."[81] The fiduciary-managers' seeming ability to reap large rewards by not sharing cost savings with fund shareholders brings to mind Professor Paul Samuelson's insightful testimony before the Senate Banking and Currency Committee in 1967 when it was considering fund legislation: "I decided that there was only one place to make money in the mutual fund business—as there is only one place for a temperate man to be in a saloon, behind the bar and not in front of the bar. And I invested in . . . [a] management company."[82]

## IV. EXPLORING THE TWO-TIERED STRUCTURE FOR PROFESSIONAL ADVISORY SERVICES: MUTUAL FUND FEES VS. PENSIONS FUND FEES

A fair question is how the cost of professional management advice sold to funds and their shareholders compares with the price paid for like services sold elsewhere in the economy.[83] Investment advice is essentially a commodity.[84] Outside the fund industry, it is bought and sold in a much more competitive marketplace. Active portfolio management essentially is a mental process. It principally involves deciding which securities to buy and sell in order to maximize returns.[85] The process is scalable, in that it is equally applicable to large and small portfolios. The manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio,[86] but

---

81. *Id.*

82. *Mutual Fund Legislation of 1967: Hearing on S. 1659 Before the Senate Comm. on Banking and Currency*, 90th Cong. 353 (1967). The investment paid off. *Id. See also* Simon, *supra* note 10, at 130 ("One obvious fact emerges: It is far more lucrative to own a mutual fund company than to invest in the company's products.").

83. An even fairer question is what funds *themselves* are paying now for the professional management advice they need in order to function. The answer is not clear. It has been suggested that only a small fraction of the total bill paid to the advisor by shareholders actually goes to pay for the cost of producing investment advice. Waggoner & Block, *supra* note 9, at 3B (quoting John C. Bogle for the proposition that only $3 to $5 billion of the $55 billion earned annually by fund management companies "goes to investment resources").

84.

> Two years ago, Morningstar mutual fund analysts started warning investors that the fund industry was ratcheting up fees, especially management fees, to dangerous levels forcing people to pay premium prices for what is in essence a commodity. Worse, says John Rekenthaler, the group's director of research, it has become pretty clear that over time funds with lower expense ratios outperform those with higher ratios. . . .

Longo, *supra* note 10, at 1.

85. As part of the management process, the investment advisor will need to deal with additional issues such as dividend reinvestment, cash balances and flows, trading costs, and market timing.

86. Managers differentiate themselves in various ways. There are large, mid, small, and micro cap managers, as well as value, growth, balanced, asset allocation, hybrid, and quantitative managers. However, the essential insight remains intact: portfolio management is a mental process that is applicable to all portfolio types and sizes. It follows that what is being produced by the portfolio manager is intangible. It also comes close to

the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds. The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower. Investment managers are regularly hired and fired and those doing the hiring enjoy the benefits of a competitive market. Significantly, as we shall see, some of those bidding for investment advisory work in the free market populated by pension and endowment fund managers are fund advisors or their affiliated entities.

*A. Research Shows Fund Shareholders Pay A Premium For Investment Advice*

Wildly different fee structures apply to equity portfolio investment advisory services purchased by public pension funds on the free market compared to the same form of services purchased by investor-owned mutual funds. The disparity has received scant attention to date. Nearly forty years ago, a study conducted for the SEC by the Wharton School of Finance and Commerce determined that where fund advisors had outside advisory clients, there was a "tendency for systematically higher advisory fee rates to be charged open-end [mutual fund] clients."[87] The Wharton Report's authors ascribed the disparity in fee structures to fund advisors' ability to capitalize on the conflict of interest inherent in most funds' management structures and convert it into the power to set extra-competitive prices.[88] The Wharton Report identified 54 investment advisors with both mutual fund clients and other clients.[89] Of this sample, fee rates charged the mutual fund clients were at least 50% higher in 39 out of the 54 cases, 200% higher in 24 of the cases, and 500% or more higher in 9 of the cases.[90]

---

possessing infinite scalability, just like the Internet or television. Adding additional shareholder accounts does not run up the cost of portfolio management any more than adding viewers increases the creative cost of devising a TV show or a class broadcast over the Internet. Once the investment objectives of the fund have been specified and an appropriate list of securities chosen, the size of the portfolio tends to be inconsequential. *See* STAFF OF THE NEW YORK INSTITUTE OF FINANCE, STOCKS BONDS OPTIONS FUTURES—INVESTMENTS AND THEIR MARKETS 134 (Stuart R. Veale ed., 1987) ("Generally, the larger the fund, the less the percentage the manager charges because it is almost as easy to run a $200,000 account as it is to run a $100,000 account. (You just buy and sell twice as much of whatever it is you're going to buy and sell.)"). It is true that larger funds with larger portfolios bear greater trading and shareholder administrative costs. However, these are administrative costs. Since they are not charged to the investment manager, they are irrelevant to the question of economies of scale in the pricing of investment advisory services.

87. WHARTON SCHOOL OF FINANCE & COMMERCE, 87TH CONG., A STUDY OF MUTUAL FUNDS 493 (Comm. Print 1962) [hereinafter WHARTON REPORT].

88. The price disparity was explained as follows:

> The principal reason for the differences in rates charged open-end companies and other clients appears to be that with the latter group "a normal procedure in negotiating a fee is to arrive at a fixed fee which is mutually acceptable." In the case of the fees charged open-end companies, they are typically fixed by essentially the same persons who receive the fees, although in theory the fees are established by negotiations between independent representatives of separate legal entities, and approved by democratic vote of the shareholders. This suggests that competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by mutual funds.

*Id.* at 493-94.

89. *Id.* at 489.

90. *Id.*

The existence of free market versus fund market pricing disparities for advisory services has long been known to the SEC. In its detailed report submitted to Congress in 1966, entitled *Public Policy Implications of Investment Company Growth*,[91] the SEC revisited the Wharton School's findings and determined that, "[t]he Wharton Report's conclusions correspond to those reached by the more intensive examination of selected mutual funds and mutual fund complexes made by the Commission's staff."[92] Nonetheless, over more than three decades, despite dramatic escalation in fund advisory fee levels and revenues, the SEC has ignored the subject of pricing disparities. Not everyone has been so generous as the fund industry's chief regulator. For example, one author has contended that fund shareholders "pay nearly twice as much as institutional investors for money management."[93] Other evidence that advisory fee structures are unusually lucrative in the fund industry in comparison with pension advisory business comes in the form of reports that fund advisor buy-outs are more costly than acquisitions of firms that advise pensions.[94]

---

91. H.R. REP. NO. 89-2337 (1966).

92. WHARTON REPORT, *supra* note 87, at 120.

93. Simon, *supra* note 10, at 130. The author makes a key point while overlooking another one. In truth, mutual funds are not different from institutional investors in form; a mutual fund, as an entity, actually *is* an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on "institutional status," it turns on self-dealing and conflict of interest. It is worth noting that within the universe of fund shareholders, there are some institutional investors, many of whom tend to buy shares in institutional funds. Expense ratios for institutional funds are roughly half of the expense ratios borne by retail funds. Mary Rudie Barneby, *Why Your 401(k) Plan Needs an Investment Policy and How to Establish One*, *in* PENSION PLAN INVESTMENTS, CONFRONTING TODAY'S INVESTMENT ISSUES ERISA LITIGATION: THE REGULATORY PERSPECTIVE & PRACTICAL IMPLICATIONS ON PLAN MANAGEMENT & INVESTMENTS (1997) at 79, 92 (PLI Tax Law & Practice Course, Handbook Series No. J-397, 1997). Some expenses, such as transfer agent costs, naturally will tend to shrink as a percentage of fund assets as account size rises. *See* Rea et al., *supra* note 43, at 5. ICI data reflected, as of year-end 1998, an average fund account size for retail accounts of $19,050; for institutional accounts it was $76,160. *Id.* at 5 n.17. Even in the market segment populated by supposedly sophisticated institutional fund investors, there is room to question whether robust price competition operates. *See* Elizabeth A. White, *DOL Issues Section 401(k) Fee Guide, Continues To Consider Further Requirements*, 25 PENS. & BEN. REP. (BNA) 1545 (July 6, 1998) (noting employers generally are unknowledgeable about fund expenses); *see also* Ross D. Spencer, *Disclosure Required for Fee Arrangements Between Mutual Funds and Service Providers*, EMPLOYEE BEN. PLAN REV., Jan. 1998, at 14 (noting that 401(k) sponsors have tended to ignore fund investment management fees).

94. Control positions in pension management companies, who must compete in the free market for business and who risk getting fired, tend to sell for less.

> Because the pension fund accounts managed by Aeltus pay annual management fees that average only 10- to 30-hundredths of a percentage point, and because those accounts can easily change managers, companies like Aeltus can be difficult to sell and may fetch lower prices than the sales of management companies that advise mutual funds. The managers of pension fund assets often sell for prices equal to twice the annual management fees.

Michael Quint, *Aetna is Seen Seeking Buyer for Aeltus Investment Unit*, N.Y. TIMES, Mar. 23, 1995, at D2. Fee multiples in control purchases are higher in the fund industry. *See* Barry B. Burr, *Frontlines: A Good Deal: Asset Management Is Added Value*, PENSIONS & INV., Oct. 13, 1997, at 8 (stating that fund managers reported to sell for four or more times annual revenues); William H. Rheiner, *Acquisition of Mutual Fund Families: Corporate and Regulatory Issues*, *in* UNDERSTANDING SECURITIES PRODUCTS OF INSURANCE COMPANIES 2000, at 415, 418 (PLI Commercial Law & Practice Course, Handbook Series No. A-799, 2000) ("Stock price multiples of mutual fund advisors are often larger than those of other types of financial services companies."). According to its March 28, 2000 Form 10-K, T. Rowe Price Associates, Inc.'s revenue totaled $1.03 billion for

To verify whether the advisory fee pricing disparities found in the Wharton Report and the *Public Policy Implications* study still exist, the authors sent questionnaires[95] inquiring about portfolio management fees to the 100 largest public pension funds listed in the January 25, 1999 edition of *Pensions and Investments*. Pension fund staff were asked for information on fees paid to their fund's external portfolio investment managers during 1998. Responses were received from 53 funds and 36 of these provided usable data.[96] The 36 public pension funds represented total assets of $754 billion, averaging $21 billion. Funds were widely diversified across asset classes and most had commitments to fixed income securities (bonds), real estate, and actively and passively managed domestic and international equities.

For comparison purposes, the analysis was restricted to actively managed domestic equity portfolios. Because internally managed portfolios were excluded, each portfolio could be associated with a specific investment advisor. A total of 220 individual actively managed portfolios were identified with a total of $97.5 billion in assets. The average portfolio size was $443 million, with the range extending from $15 million to $4.8 billion.

Fee data at the individual manager level came in two forms. The majority of pension funds, representing 114 portfolios, sent only a fee schedule (*e.g.*, 50 basis points up to $100 million and 20 basis points on the balance). In these cases, the advisory fee rate for each investment manager was calculated by applying the fee schedule to the level of assets under management.[97] In sixty other cases, funds set the actual dollar amounts of fees paid during the 1998 fiscal or calendar year and this number, divided by assets under management, yielded the annual advisory fee rate for each manager. In the balance of the cases (56), funds sent both a fee schedule and the actual advisory fee paid.[98] Some funds (37, or 17%) had performance fees built into their advisory contracts. Of these, 27 provided actual fee data, and the balance indicated that no performance fees above the scheduled rates were paid. Table 3 compares investment advisory fees for public pension funds and actively managed domestic equity mutual funds.

---

its most recent year-end. The firm's market capitalization as of late July 2000 was $4.89 billion. *See* Robert McGough & Ken Brown, *T. Rowe Remains Aloof Amid Merger Dance, But Investors May End Up Disappointed*, WALL ST. J., July 31, 2000, at C2. Recently, Pioneer Group, Inc., parent of fund manager Pioneer Investment Management, was acquired for $1.2 billion. *Id.* at C2 (discussing the acquisition and characterizing Pioneer Investment Management as a firm "that has been struggling lately"). The acquisition prices were slightly less than five times Pioneer's 1999 revenues from continuing operations. *See The Pioneer Group, Inc. Reports Results for the Fourth Quarter and Year Ended December 31, 1999*, BUS. WIRE, Feb. 11, 1999, LEXIS, Curnws File. For an account of a control transfer for a fund advisor at a price exceeding 22 times the annual management fees, see BOGLE, *supra* note 30, at 327-28 (discussing how an advisor sold itself for $1 billion at a time that annualized fees were $45 million; fees were raised substantially pre- and post-control sale).

95. The questionnaires asked for voluntary cooperation but were also framed as Freedom of Information Act requests.

96. Of the seventeen remaining funds, six were internally managed, three were defined contribution plans and invested exclusively in mutual funds, two refused outright, one wanted $500 to collect the data, and the balance (five funds) had incomplete data.

97. Asset levels were typically provided as of June or December 1999, which correspond to the 1998 fiscal year and the 1999 calendar year, respectively.

98. Although there were some small differences between scheduled and actual advisory fees paid, analysis revealed no average net difference between the two approaches. In the analysis that follows, the greater of the fees calculated by the two methods was utilized in calculating overall averages.

**Table 3**
**Comparison of Public Pension and Mutual Fund Investment Advisory Fees**

| | **Public Pension Funds** | | **Mutual Funds** | |
|---|---|---|---|---|
| Decile | Average Portfolio Size $mm | Weighted Average Adv. Fee (Basis Pts) | Average Fund Size $mm | Weighted Average Adv. Fee (Basis Pts) |
| 1 | 36 | 60 | 24 | 77 |
| 2 | 79 | 57 | 47 | 77 |
| 3 | 130 | 49 | 76 | 75 |
| 4 | 194 | 42 | 121 | 74 |
| 5 | 257 | 37 | 185 | 73 |
| 6 | 327 | 42 | 284 | 71 |
| 7 | 437 | 33 | 454 | 73 |
| 8 | 579 | 28 | 759 | 69 |
| 9 | 842 | 22 | 1,527 | 66 |
| 10 | 1,550 | 20 | 9,666 | 50 |
| Overall | 443 | 28 | 1,318 | 56 |

To enable a direct comparison of advisory fees between mutual fund and pension fund portfolios, the mutual fund sample has been restricted to those funds with financial characteristics closest to those of the pension fund sample.[99] In Table 3, the bottom line, showing the overall category, reveals that investment advisory fees are twice as large for mutual funds as they are for pension funds, even though the average actively managed domestic equity mutual fund is nearly three times as large as the average actively managed equity pension portfolio.[100]

99. Initially, all mutual funds, including multiclass funds with assets less than $15 million were eliminated. This corresponded to the smallest pension portfolio. Next, all balanced, asset allocation, specialty, convertible bond, and index funds were discarded, as well as those funds classified as "domestic hybrid" by Morningstar. Finally, all funds with a commitment to bonds greater than 5% were eliminated, as well as those single class funds with inception dates after May of 1998. The above procedure generates a sample of mutual funds closely corresponding to characteristics of portfolios of public pension funds. The final sample consisted of 1,343 funds of which 659 were single class funds and 684 were multiclass funds representing a total of 2,118 sub-funds.

100. The analysis attempts to put pension and mutual fund advisory costs on a comparable basis. This process was confounded somewhat by inconsistent reporting of advisory and administrative costs among mutual funds. Specifically, the "management fee" reported in Morningstar sometimes includes not only fees for advisory services but some administrative services as well. This same problem hindered the SEC staff in its recent analysis of fund fees and expenses. *See* REPORT ON MUTUAL FUND FEES, *supra* note 5. The authors' methodology minimized the impact of such problems by excluding from the sample funds shown by Morningstar to have no administrative fees. Such funds tended to be small. Those funds that bundle some administrative costs in the management fee are also likely to be small and have minimal impact on category averages, which are calculated on an asset-weighted basis. Analysis of the Lipper data, which explicitly differentiates between management and advisory fees, revealed a weighted average difference of about three basis points. The authors consider this difference immaterial in the overall comparison of advisory fees between pension and mutual funds.

Decile comparisons were achieved by ranking the respective samples by asset size and then splitting the sample into ten segments with the same number of portfolios/funds in each respective segment. In the first decile of funds, advisory fees are roughly similar, with pension funds paying 60 basis points for an average portfolio of $36 million and mutual fund owners paying 77 basis points for an average fund size of $24 million.[101] From that starting point, pension fund advisory fees decrease in an essentially linear fashion as portfolio size increases. Fees decline from 60 basis points for the smallest portfolios ($36 million on average) to 20 basis points for the largest ($1.55 billion on average). The competitive nature of the market for investment advisory services to public pension funds forces fees to decline as asset size increases, essentially reflecting economies of scale in the money management business.

The pattern is very different for mutual funds. The average fee charged is essentially flat through the first seven deciles, and the fee is consistently greater than 70 basis points. Fees decline when fund size increases above about $750 million, but the decline is not as steep as it is for pension portfolios. The top decile has an average fund size of almost $10 billion, but weighted average advisory fees decline to only 50 basis points.

The full impact of differential advisory fees is illustrated graphically in Figure 1, a bar chart showing the average pension and mutual fund advisory fee in each decile.[102]

**Figure 1**




101. There are respectively 22 portfolios in each pension fund decile, 135 mutual funds in the first three mutual fund deciles, and 134 funds in the remaining deciles.

102. The chart is somewhat misleading in that the size of the average fund is different for public pension and mutual funds in each decile.

Comparison of pension and mutual fund investment advisory fees is confounded somewhat by portfolio/fund size differentials and the extreme negative skew of the fund size distribution for both pension and mutual fund portfolios. These issues will be addressed in turn.

The average pension portfolio is $443 million and the average mutual fund portfolio is $1.3 billion, roughly three times greater. Moreover, in the largest deciles of portfolios/funds, the average mutual fund portfolio is about six times larger than the average pension portfolio. An ad hoc comparison of pension and mutual fund portfolios on a comparable size basis reveals an even greater differential in investment advisory fees between pension and mutual funds. For comparison purposes, the largest mutual funds were removed from consideration, and the size of the average mutual fund was calibrated to be $443 million, identical to the average pension portfolio. On a size-standardized basis, weighted average mutual fund advisory fees were 67 basis points as compared to 28 basis points for pension portfolios.

Regression analysis is a more rigorous approach to comparing differential fees, and it also provides the means of controlling for the extreme negative skew in the distribution of fund size.[103] The standard technique used in studies of economies of scale is to use a log transformation on the nonlinear (skewed) variable.[104] This technique was applied to compare the differential responsiveness of pension and mutual fund advisory fees to increases in fund size. Regressions of the following form were run on both the pension and mutual fund data: Advisory Fee = a + b (Ln Size), where the advisory fees are scaled in whole basis points, and size is scaled in millions of dollars under management. The analysis yielded the following data:

| Type | Degrees of Freedom | **a** Intercept (t stat) | **b** Ln Size (t stat) | Explained Variance |
|---|---|---|---|---|
| Mutual Funds | 1,342 | 91 (41.8) | **-3.5** (-9.3) | .06 |
| Public Pension Funds | 219 | 103 (14.2) | **-11.4** (-9.1) | .27 |

The negative slope coefficient of both regressions indicates that advisory fees decline as the log of assets under management increases. Both slope coefficients are statistically significant. However, the slope coefficient for the pension fund regression is three times greater than the mutual fund regression. This reflects that pension fund fees are three times more sensitive to assets under management than mutual fund fees. The level of explained variance is more than four times greater for pension funds than mutual funds. This means that equity portfolio size explains only 6% of the variation of mutual fund advisory fees but 27% of pension advisory fee. Clearly there are variables other than fund size that impact advisory fees for both pension and mutual funds, and there is much more unexplained variance in the case of mutual funds than pension funds.

103. From Table 1, funds with greater than $5 billion in assets represented less than 5% of the total number of funds (92 out of 2161) but controlled 60% of the total assets under management.

104. *See* David A. Latzko, *Economies of Scale in Mutual Fund Administration*, 22 J. FIN. RES. 331 (1999).

It is clear that public pension fund portfolio managers are willing to accept lower fees for a greater commitment of funds under management. There is no evidence that managers of public pension fund equity portfolios are paid less than equity fund managers because they do less work or perform at a lower level. There are no well-known cost differences for the advisory function between managing an equity portfolio for a pension fund or a mutual fund. To the extent that fund shareholders require special attention, those added cost differences are absorbed by the fund as administrative costs. They do not serve to inflate advisory fees unless, of course, such costs are bundled with advisory fees in the particular fund's management contract. The authors conclude that the chief reason for substantial advisory fee level differences between equity pension fund portfolio managers and equity mutual fund portfolio managers is that advisory fees in the pension field are subject to a marketplace where arm's-length bargaining occurs. As a rule, fund shareholders neither benefit from arm's-length bargaining nor from prices that approximate those that arm's-length bargaining would yield were it the norm.

### *B. Portfolio Company Size and Investment Advisory Fees*

It is common in the investment management business to characterize portfolios or funds by the market capitalization of the companies whose stock is held in the equity mutual fund portfolio. Company size is measured by the firm's market capitalization, defined as the product of the number of shares outstanding and the current market price per share. Generally, portfolios are labeled large, mid, or small cap (capitalization) portfolios. Definitions vary, but typically large cap companies/stocks have a total market value in excess of $10 billion, mid caps range from $1 to $10 billion, and small cap stocks are generally defined as having a market capitalization of less than $1 billion.

The pension and mutual fund samples were analyzed for fee differences based on market capitalization.[105] Of the 220 portfolios in the pension sample, 177 named large, mid, or small cap in their titles. Morningstar explicitly labels all funds for market capitalization. The results of the analysis are presented in Table 4.

105. It is generally recognized that investment managers charge higher fees for managing small and mid cap portfolios, although the explanation for this is not immediately obvious. One reason could be that information about large cap stocks is widely available, and the market for such stocks is generally viewed as highly efficient.

**Table 4**
**Comparison of Public Pension and Mutual Fund Investment Advisory Fees for Portfolio Management of Large, Mid, and Small Capitalization Firms**

| | Public Pension Funds | | | Mutual Funds | | |
|---|---|---|---|---|---|---|
| | Average Portfolio Size ($mm) | Number of Portfolios | Advisory Fees (Basis Pts) | Average Fund Size ($mm) | Number of Funds | Advisory Fees (Basis Pts) |
| **Large-Cap** | $555 | 92 | 21 | $2,068 | 700 | 52 |
| **Mid-Cap** | $421 | 17 | 42 | $636 | 309 | 71 |
| **Small-Cap** | $194 | 68 | 58 | $374 | 334 | 71 |

Table 4 reveals that managers do indeed charge higher fees for managing small and mid cap portfolios. This pattern is observed for both pension fund portfolios and mutual fund portfolios. However, there are significant differences between the two samples. Mutual funds charge far higher fees in relation to pension fund portfolios for managing large cap portfolios. The weighted average large cap advisory fee of mutual funds is 52 basis points as compared to 21 basis points for pension fund portfolios (about 150% higher). Moreover, the average large cap mutual fund is almost four times larger than the average pension fund portfolio ($2 billion versus $555 million).

Mid and small cap portfolios exhibit similar, although attenuated, patterns. The weighted average mutual fund advisory fee for mid cap portfolios is about 70% higher than the pension advisory fee (71 versus 42 basis points) and about 20% higher (71 versus 58 basis points) for small mid cap portfolios. Thus, the most conspicuous example of high prices caused by the absence of market forces affecting equity mutual fund advisory fees is found in the large cap stocks sector. This is an important category. It dominates among the largest funds by asset size. Of the 100 largest mutual funds, 85 are large cap portfolios, and they represent 93% of the total assets of the 100 largest funds.

There are many ramifications of advisory fee rate disparities of 100% or more between those charged to mutual fund and non-fund clients by the same advisor. They are analyzed in the following section.

*C. Individual Managers' Pricing: Fund Management vs. Pension Management*

There were a total of 110 different money managers in the 220 pension portfolios examined. Thus, some portfolio managers were represented several times in the sample. In addition, many of the pension fund portfolio managers were also entities managing money for mutual funds. Table 5 presents data for a representative sample of the investment managers with multiple pension portfolios that also managed mutual fund portfolios. The table shows total pension assets, the number of pension portfolios, and the weighted average pension investment advisory fee. In addition, those mutual fund assets of the corresponding managers that met the screens for direct comparison with pension

funds are presented. The table shows total assets, the number of funds and sub-funds, and the weighted average investment advisory fees.

**Table 5**
**Comparison of Individual Manager Fees For Pension Portfolios and Mutual Funds**

| | Public Pension Portfolios | | | Mutual Funds | | | |
|---|---|---|---|---|---|---|---|
| | Total Assets ($mm) | Number of Portfolios | Weighted Average Advisory Fee | Total Assets ($mm) | Number of Portfolios | Number of Sub-Classes | Weighted Average Advisory Fee |
| Alliance Capital Mgt. | 7,817 | 5 | 0.18% | 24,577 | 4 | 16 | 0.84% |
| Ark Asset Mgt. | 2,442 | 7 | 0.45% | 929 | 4 | 11 | 0.77% |
| Brinson Partners | 4,597 | 7 | 0.22% | 644 | 3 | 5 | 0.72% |
| Loomis Sayles | 1,178 | 3 | 0.20% | 583 | 5 | 9 | 0.49% |
| Oppenheimer | 2,780 | 3 | 0.17% | 26,518 | 10 | 38 | 0.55% |
| Putnam Investments | 2,113 | 6 | 0.31% | 122,459 | 14 | 48 | 0.47% |
| Overall | 20,927 | | 0.23% | 178,369 | | | 0.54% |

Table 5 reveals that different investment managers apparently have widely different pricing policies.[106] Alliance Capital Management charged its mutual fund customers, on average, more than 350% more than its pension customer (84 basis points versus 18 for pension portfolios). Ark Asset Management, on the other hand, charged its mutual fund customers about 70% more, but with only about a third of the level of assets under management. Putnam Investment charged about 50% more, and Oppenheimer charged almost 300% more. Large cap portfolios tend to dominate the sample presented. This is reflected in the overall averages. The overall, weighted average pension advisory fee for these managers was 23 basis points, slightly less than the weighted average for all pension managers. The overall, weighted average investment advisory fee for mutual funds was 54 basis points, 2 basis points lower than the overall average.

106. Care must be taken in interpreting these data because the numbers for some managers include a mixture of investment styles and are thus not strictly comparable. For instance, Putnam manages six pension portfolios, comprised of two large and four small cap funds. Of the fourteen Putnam mutual funds, nine are large cap, three are mid cap and two are small cap. Moreover, where Putnam is concerned, there is a far higher level of mutual fund than pension fund assets under management. On the other hand, all of the Alliance Capital portfolios (pension and mutual funds) are large cap portfolios.

*D. Externally Managed Vanguard Equity Fund Advisory Fees vs. the Fund Industry*

It was noted earlier that the Vanguard Group of mutual funds tends to present lower expense ratios than the rest of the mutual fund industry. This is because Vanguard funds are run on the same basis as most companies in the economy: boards are unswervingly devoted to making as much money as possible—within legal constraints—for shareholders. Stated differently, the Vanguard funds are uncontaminated by the conflict of interest that affects most of the rest of the fund industry. Shareholders of Vanguard's externally managed equity funds thus benefit directly from their boards' ability and willingness to perform a task rarely undertaken in the fund industry—namely, to negotiate at arm's-length for lower investment management fees. This point is illustrated below in Table 6, which shows investment management fees for the ten actively managed domestic equity funds offered by the Vanguard Group as of the end of 1999.[107]

107. These data were obtained from the annual reports of the funds as of the dates shown in the right-hand column.

**Table 6**
**Vanguard Investment Advisory Fees for Actively Managed Domestic Equity Funds**

| Fund | Investment Advisor | Base Fee (Basis Pts) | Actual Fee (Basis Pts) | Asset Size (billions) | Date |
|---|---|---|---|---|---|
| Capital Opportunity | PrimeCap Management | 40 | 40 | $5.4 | 10/99 |
| Equity Income | Newell Associates<br>Spare, Kaplan, Bischel & Assoc.<br>John A. Levin & Co. | 16 | 14 | $2.4 | 9/99 |
| Explorer | Granahan Investment Mgt.<br>Wellington Management<br>Chartwell Investment Ptrs | 22 | 22 | $4.1 | 10/99 |
| Growth & Income | Franklin Portfolio Assoc. | 9 | 8 | $9.3 | 12/99 |
| Morgan Growth | Wellington Management<br>Franklin Portfolio Assoc. | 11 | 11.5 | $5.7 | 12/99 |
| PRIMECAP | PrimeCap Management | 19 | 19 | $23.2 | 12/99 |
| Selected Value | Barrow, Hanley, Mewhinney & Strauss | 38 | 19 | $0.2 | 10/99 |
| US Growth | Lincoln Capital Mgt. | 12 | 12 | $19.7 | 8/99 |
| Windsor | Wellington Management<br>Sanford C. Bernstein & Co. | 12 | 4 | $23.2 | 10/99 |
| Windsor II | Barrow, Hanley, Mewhinney & Strauss<br>Equinox Capital Mgt.<br>Tukman Capital Mgt. | 12 | 11.5 | $22.9 | 10/99 |
| Weighted (Simple) Average | | 14.9 | 13.2 | ($11.6) | |

Table 6 reveals that Vanguard is able to purchase investment advisory services for prices far lower than the industry as a whole. The weighted average base fee for the ten funds is 14.9 basis points: The base fee of the ten funds' average portfolio size is $11.6 billion. This is roughly in line with fees paid by pension funds for large portfolios. Table 3 reflects that the largest pension fund portfolios average 20 basis points for an average portfolio size of $1.5 billion (decile 10 in Table 3). Large mutual funds, on the other hand, pay 50 basis points on an average portfolio size of $9.7 billion (also decile 10 in Table 3), more than double the advisory fees pension funds pay and more than three times greater than the fees paid by the Vanguard Group.

The Vanguard Group aggressively negotiates performance fees as part of its investment advisory contracts. This practice causes the weighted average of actual fees paid to the Vanguard external managers, 13.2 basis points, to fall below the weighted average base fee. The chief reason for the difference between the weighted average base fee for the managers and the actual fees paid is due to the penalty assessed against the Windsor fund's managers for their under-performance. In all, five of the ten funds experienced investment advisory fee reductions as a result of unfavorable performance, and one fund, Morgan Growth, enjoyed a fee increase because of favorable results.

The Table 6 data vividly illustrates how cost benefits can be reaped by unconflicted boards. In round numbers, the actively managed Vanguard funds in the sample, holding aggregate assets of $11.6 billion, paid about $150 million in investment advisory fees. Had their advisory fees been subject to standard industry quality negotiations, the subject funds would have paid about $580 million in advisory fees at the prevailing fund industry rate of 50 basis points for large, externally managed equity portfolios. The Vanguard boards' aggressive, shareholder-oriented approach to buying advisory services on the free market thus generated a direct savings exceeding $425 million for the funds' shareholders in 1999 alone.

### *E. Further Evidence of Questionable Fund Industry Behavior: Charging High Advisory Fees for Passive Equity Portfolio Management*

When a portfolio/fund is passively managed, there is no stock picking (active management) involved. Rather, the fund attempts to mimic the returns of some market index, such as the S&P 500 or the Wilshire 5000. Funds using this approach are called "index funds," and the process is called indexing.[108] Pension funds and mutual funds normally pay investment advisory fees for passive management, although in a sense the term is a misnomer. An indexed portfolio is much simpler to manage than an actively managed portfolio. The securities in the portfolio are fixed (except when changed by the index sponsor), and the manager's job is to minimize the tracking error with the index. This sometimes involves sampling a large subset of the index or the use of futures to deploy cash, but the basic process is essentially mechanical. Thus, little if any creativity is called for and personnel costs are kept to a minimum. For these reasons, investment advisory fees for passive management are typically much lower than for active management.[109]

To test whether the fee disparities previously found for external equity portfolio managers hold for index funds, the authors collected data on passive investment advisory fees for mutual funds, pension funds, and the Vanguard S&P 500 Fund.[110] The results are presented in Table 7.

---

108. *See, e.g.*, Jonathan Clements, *Getting Started: Index Funds Are Hot—But Which One?*, WALL ST. J., June 6, 1990, at C1.

109. *See, e.g.*, James A. White, *Investing Lessons of the Eighties: The Decade of Phenomenal Growth for Institutions*, WALL ST. J., Dec. 26, 1989, at C1, C17.

110. The analysis is limited to plain vanilla S&P 500 indexed portfolios. It is also common to find portfolios indexed to other indexes, such as the Russell 2000 or the Wilshire 5000 stock indexes. In addition, enhanced index funds are sometimes seen where there is a small active component on top of a basic passive approach.