UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| STEVEN G. WICKS, <br> GERALD A. KALBFLEISCH, <br> MICHAEL and MYRTLE HATHAWAY <br> and JOHN J. VAUGHN <br><br> Plaintiffs, <br><br> v. <br><br> PUTNAM INVESTMENT <br> MANAGEMENT, LLC and <br> PUTNAM RETAIL <br> MANAGEMENT, LLP, <br><br> Defendants. | Civil Action No: 04-CV-10988 <br><br><br><br><br><br><br><br> **SECOND AMENDED COMPLAINT** |

Plaintiffs, Steven G. Wicks, Gerald A. Kalbfleisch, Michael Hathaway, Myrtle Hathaway and John J. Vaughn file this Second Amended Complaint against Defendants, Putnam Investment Management, LLC and Putnam Retail Management, LLP (collectively "Putnam" or the "Defendants"), and allege as follows:

### I.  INTRODUCTION

1. Section 36(b) of the Investment Company Act of 1940 (the "ICA") imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to their receipt of compensation. Defendants provide investment management and other services to the Putnam family of mutual funds for compensation and have breached their fiduciary (and other) duties to those funds by receiving excessive fees.

2. The Plaintiffs are or were shareholders in several mutual funds (technically known as open-end registered investment companies) as identified on Exhibit 1 (the "Funds").[1] The Funds were formed, and are distributed, advised and managed, by the Defendants. Plaintiffs seek to recover all damages available pursuant to Section 36(b) of the ICA, including all compensation received by the Defendants, directly or indirectly, from the Funds for the period beginning one year prior to the filing of the original Complaint through the date of trial.

3. The present case does not seek class action status and is not subject to transfer to any multidistrict litigation proceedings currently pending, including those in the District of Maryland captioned In Re Mutual Funds Investment Litigation, MDL-1586. The Judicial Panel's basis for coordinating and consolidating the various individual actions that comprise MDL-1586 is that they "involve common questions of fact concerning allegations of market timing and/or late trading in the mutual fund industry." By contrast, this action does not involve allegations that Defendants or their affiliates have engaged in unlawful market timing, late trading, manipulation of closing net asset values, or similar conduct. This matter is brought solely under Section 36(b) of the ICA, and addresses Defendants' breach of their fiduciary duties imposed by that Section through their receipt of excessive fees.

4. Defendant Putnam Investment Management ("PIM") manages the Funds pursuant to a management agreement and receives substantial fees. Both in dollar terms and in comparison to fees received by Putnam for managing other virtually identical institutional portfolios, the fees received from the Funds are staggering and excessive.

---

[1] All Exhibits referred to in this Second Amended Complaint are attached to the Amended Complaint, filed with the Court on April 4, 2005, and are incorporated herein by reference.

5.  PIM's management activities include selecting and trading securities for the Funds to buy, sell or hold (the "Portfolio Selection Services") and providing administrative services. It receives a management fee from the Funds for these activities that is calculated as a percentage of total assets under management. That portion of the management fee attributable solely to Portfolio Selection Services is referred to herein as the "Portfolio Selection Fee."

6.  All mutual funds, including the Funds, create economies of scale as assets under management increase. All of the Funds are large, with none smaller than $1 billion in assets under management (see Exhibit 1). Some of the Funds are among the largest in the country, such as the Putnam Voyager Fund (with over $17 billion in assets)[2] and the Fund for Growth and Income (with almost $20 billion in assets). The larger a portfolio, the greater the cost savings and benefits from economies of scale. It costs less to provide investment advisory services for each additional dollar of assets under management. Eventually, when portfolios become as large as the Funds, the cost of providing Portfolio Selection Services for each additional dollar of assets under management approaches zero.

7.  Defendants (directly or through their affiliates) also provide Portfolio Selection Services to other institutional portfolios. The contracts for those services confirm the excessive nature of the fees received by PIM from the Funds. The Portfolio Selection Services that PIM provides to the Funds are identical to the portfolio selection services provided to other institutional clients by the Defendants, including through their affiliate "Putnam Advisory Company" or "PAC". However, unlike the advisory contracts between PIM and the Funds, the

---

[2] The figures in this Second Amended Complaint are stated as of the date of the original Complaint because the Second Amended Complaint relates back to the date of the original Complaint.

BN1 35024335.1

contracts that PAC negotiates with other institutional clients are the product of arms' length negotiations.

8. The fees received from the Funds by Defendants for Portfolio Selection Services are several times larger on a percentage basis and up to hundreds of times larger in total dollars than the fees received from the other institutional clients for the same services, even though the portfolios of other institutional clients are much smaller and do not offer the same economies of scale as the Funds. The much higher Portfolio Selection Fees that PIM receives from the Funds have not, could not have, resulted from arms' length negotiations.

9. In addition to the management fees received by PIM, the Defendants (including through their affiliate Putnam Retail Management ("PRM")) also receive fees ("Distribution Fees") pursuant to share distribution plans adopted under Rule 12b-1, 17 C.F.R. § 270.12b-1 ("Distribution Plans"). Like the Portfolio Selection Fees, the 12b-1 Distribution Fees are based on a percentage of the net assets of the funds in the Putnam Fund Complex, including the Funds.

10. A large portion of 12b-1 Distribution Fees received by Defendants are properly payable only if the Funds' boards of directors find that there is a reasonable likelihood that the Plaintiffs and other holders of Fund shares would benefit from economies of scale through reduced advisory fees. These fees (the challenged portion of total Distribution Fees) shall be referred to as "Promotional Distribution Fees" (some portion of 12b-1 Distribution Fees are used for other purposes, such as paying contingent deferred sales commissions to broker-dealers who sell Putnam funds).

11. Although assets held by the Funds have indeed increased significantly over time, Defendants have failed to share the resulting economies of scale with Plaintiffs or other

shareholders of the Funds. Instead, as assets increased, Defendants simply continued to receive from the Funds ever greater fees.

12. The receipt by Defendants of the Portfolio Selection Fees from the Funds constitutes a breach of their fiduciary and other duties to the Funds. The receipt by Defendants of the Promotional Distribution Fees also constitutes a breach of their fiduciary and other duties to the Funds.

13. Plaintiffs seek to (a) recover all fees and compensation received by the Defendants and their affiliates from the Funds in violation of Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b), including all Portfolio Selection Fees and all Promotional Distribution Fees, (b) recover all other or further benefits resulting from the economies of scale created by the Funds but wrongfully retained by the Defendants, (c) rescind the management agreements between Defendants and the Funds and, finally, (d) rescind the Distribution Plan because it was not approved as required by the ICA and receipt by Defendants of payments pursuant to that plan also breaches Section 36(b).

## II.    PARTIES

14. Plaintiff Steven G. Wicks is a resident of Belleville, St. Clair County, Illinois and at the time of filing the original Complaint on May 17, 2004 was a shareholder in the Putnam Discovery Growth Fund, Putnam Growth Opportunities Fund, Putnam New Opportunities Fund, Putnam New Value Fund, Putnam Vista Fund and the Putnam Voyager Fund.

15. Plaintiff Gerald A. Kalbfleisch ("Kalbfleisch") is a resident of Belleville, St. Clair County, Illinois and is a shareholder in the Putnam Classic Equity Fund. Kalbfleisch

BN1 35024335.1

continuously owned shares in this fund from before the original Complaint was filed through the present date.

16.     Plaintiffs Michael and Myrtle Hathaway are residents of Ellis Grove, Randolph County, Illinois and are joint shareholders in the Putnam Fund for Growth and Income Fund and the Putnam Investors Fund. The Hathaways continuously owned shares in these funds from before the original Complaint was filed through the present date.

17.     Plaintiff John J. Vaughn is a resident of Granite City, Madison County, Illinois and is a shareholder in the Putnam Voyager Fund and the Putnam Growth Opportunity Fund. Plaintiff Vaughn continuously owned shares in this fund from before the original Complaint was filed through the present date.

18.     Defendant PIM is a Delaware corporation with its principal place of business in Boston, Massachusetts. PIM is registered as an investment adviser in Massachusetts and under the Investment Advisers Act of 1940 and is the investment adviser to the Funds.

19.     Defendant PRM is a Massachusetts limited liability partnership with its principal place of business in Boston, Massachusetts. Putnam Retail Management is registered in Massachusetts as a broker/dealer and is affiliated with PIM (both are commonly owned by Putnam, LLC). PRM also serves as a principal underwriter for the Funds.

### III. JURISDICTION AND VENUE

20. This action is brought pursuant to § 36(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. § 80a-35(b) and § 80a-12(b).

21. This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

22. Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(1) and (2). Defendants reside in this district and routinely transact business in this district. PIM is registered as an investment adviser in Massachusetts and Putnam Retail Management is registered in Massachusetts as a broker/dealer. Defendants advertise and market Fund shares in Massachusetts. Several of the Funds' trustees/directors live and work in Massachusetts.

### IV. GENERAL ALLEGATIONS

#### The Investment Company Act of 1940

23. In 1940, Congress enacted the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. (the "ICA"). The ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisers such as Defendants. In the 1960s, it became clear to Congress that investment advisers to equity mutual funds were gouging those funds with excessive fees. As a result, § 36(b) was added to the ICA in 1970 (primarily to remedy excessive fees charged by mutual funds such as those owned by Plaintiffs) and created a federal cause of action for breach of fiduciary duty by investment advisers and their affiliates such as Defendants.

BN1 35024335.1

24. Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person . . . .

### The Portfolio Selection Fees

25. PIM receives a "management" fee from each of the Funds. The management fee compensates PIM for Portfolio Selection Services and certain limited "administrative" expenses (the bulk of administrative costs are received outside of and separately from the management fee.)

26. Although the Portfolio Selection Fees challenged may appear to be very small on a shareholder-by-shareholder basis, they are huge in absolute terms and, even on a shareholder-by-shareholder basis, cause a dramatic decrease in shareholders' investment returns over time. Arthur Levitt, past Chairman of the SEC, has observed this and is critical of what he calls the "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly small fees can, over time, create such drastic erosion in returns. . . . In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

BN1 35024335.1

Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267 (2001) [Exhibit 2].

27.  The management fees received by PIM are paid as a varying percentage of assets under management. The fees vary based on the amount of assets under management, and are reduced as the total amount of assets under management increase. Known as "breakpoints," this fee structure implicitly recognizes the existence of economies of scale and gives the appearance that the Funds share in those benefits. However, the initial management fee is too high, breakpoints are spaced too far apart, and the reductions made at breakpoints are far too small, thereby depriving the Plaintiffs and the Funds of the benefits of the economies of scale created by the contribution of their capital to the Funds.

28.  As Fund portfolios grow, they quickly create economies of scale and eventually the cost of servicing additional assets approaches zero. Breakpoints recognize these economies (the current breakpoints for each Fund are shown on Exhibit 3) but, as stated, are designed by Defendants to benefit themselves rather than the Funds.

29.  For example, the first breakpoint for the Funds occurs at $500 million. Significant economies of scale are created by the Plaintiffs' and other shareholders' investments in the Funds long before this initial breakpoint, but they are not shared with the Funds. By the time assets under management reach $1 billion, these economies of scale are tremendous yet Defendants do not allow another breakpoint until that level and retain for themselves the benefits created by economies of scale between breakpoints.

30. A flat Portfolio Selection Fee (in dollars, not percentages) or a breakpoint approaching zero for very large portfolios such as those of the Funds would allow the Funds to capture economies of scale that belong to them under Section 36(b), while also allowing Defendants to earn a fair and competitive profit for their services.

31. The total management fee received by Defendants from each Fund consists of a pure Portfolio Selection Fee component and a much smaller administrative services component. Subtracting the administrative services component from the total management fee for each Fund leaves the Portfolio Selection Fee for each Fund.

32. The portion of the management fee paid by the Funds to PIM that is attributable to administrative costs is no more than 0.1% (10 basis points) of total Fund assets. Mutual funds from fund complexes other than Putnam, of comparable size and investment objectives, incur administrative costs of less than 0.1% (10 basis points). For example, the American Funds' Washington Mutual Fund reports separately (unlike the Funds) the portion of the total management fee attributable to administrative costs. Those costs are 0.089% (8.9 basis points) of total net assets.

33. Furthermore, economies of scale also exist with respect to the administrative costs component of the management fee. For example, at the final breakpoint, the American Funds' Washington Mutual Fund pays an administrative cost fee as low as 0.04% (4 basis points) of net assets under management. Thus, the administrative costs component of a mutual funds' management fee declines as assets increase, thereby establishing by comparison that the administrative costs portion of the management fee charged by Defendants to the Funds is less than 0.1% (10 basis points) of total net assets.

34. The chart at Exhibit 4 sets forth the Portfolio Selection Fee received by Defendants during recent reported periods allowing a (generous) 0.1% of total net assets as the administrative cost portion of the management fee.

35. The Portfolio Selection Fees received by Defendants from the Funds are excessive.

36. Defendants' receipt and acceptance of the Portfolio Selection Fees for pure Portfolio Selection Services was (and continues to be) in breach of its fiduciary and other duties.

### The Funds' Rule 12b-1 Distribution Plans and Fees

37. "12b-1" Distribution Fees are named for the SEC rule that allows and regulates their payment, 17 C.F.R. § 270.12b-1. Rule 12b-1 permits a fund to market and sell its shares with shareholder funds (Distribution Fees) out of fund assets only in strict compliance with the rule.

38. Prior to 1980, the use of shareholder funds to market and sell fund shares was prohibited. The SEC was historically reluctant to allow fund advisers to charge their shareholders for selling shares to others:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

Statement on the Future Structure of the Securities Markets, [Feb. 1972] Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7.

11

39. After intense lobbying by the mutual fund industry, the SEC agreed to consider tempering its objections to allow current fund shareholders to pay distribution expenses. In early comment letters and in proxy statements proposing adoption of plans of distribution, the mutual fund industry argued (correctly) that adding assets in an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.

40. Accepting the mutual fund industry's argument that a growth in assets would lead to a quid pro quo reduction in advisory fees and other expenses, the SEC tentatively approved Rule 12b-1, 17 C.F.R. § 270.12b-1. However, numerous conditions were attached to the use of shareholder funds to pay distribution expenses. For example, the SEC wanted to be certain that investment advisers would not "extract additional compensation for advisory services by excessive distributions under a 12b-1 plan." Meyer v. Oppenheimer Management Corporation, 895 F.2d 861, 866 (2d Cir. 1990).

41. Defendants have done just what the SEC feared: extracted additional compensation for their retail advisory services by causing Plaintiffs and other shareholders to pay Defendants' marketing expenses to retain and acquire new shareholders so that these shareholders will pay additional advisory fees that benefit them rather than the Plaintiffs and the Funds.

42. 12b-1 Distribution Plans must be reviewed annually by the Funds' board of trustees. In particular, the board must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued." 17 C.F.R. § 270.12b-1(d). Defendants are required to furnish this information. 17

C.F.R. § 270-12b-1(d). In addition, minutes must be maintained to record all aspects of the boards' deliberation. On an annual basis, the board must conclude "in light of their fiduciary duties under state law and under Sections 36(a) and (b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e).

43. The Funds' Distribution Plans have not been adopted in accordance with these rules. The board did not find that the Distribution Plans in general or the Promotional Distribution Fees in particular benefit the Funds or its shareholders by generating savings from economies of scale in excess of the cost of the plan. In fact, despite the dramatic growth in total assets held by the Funds, both the management fee (including the Portfolio Selection Fee) and total 12b-1 Distribution Fees (including Promotional Distribution Fees) received by Defendants have grown over time, thus depriving the Funds of the benefit of these economies of scale in breach of Defendants' fiduciary and other duties.

44. For example, for the first full fiscal year the Putnam Voyager's 12b-1 plan was in effect (ending July 31, 1991), its shareholders paid less than $2 million in 12b-1 Distribution Fees. 12b-1 Distribution Fees grew to over $60 million as of Voyager's last reported fiscal year, and remain at similar excessive levels to the present date.

45. Over that same time, total management fees for the Putnam Voyager Fund soared from $4.6 million (or approximately $0.04 per share) to nearly $84 million (or over $0.08 per share) as of Voyager's last reported fiscal year, of which nearly $66 million is for pure Portfolio Selection Services. Total management fees, and the Portfolio Selection Fees, remain at similar excessive levels to the present date.

BN1 35024335.1

46. Similarly, for the first full fiscal year the Putnam Fund for Growth and Income's 12b-1 Distribution Plan was in effect (ending July 31, 1991), its shareholders paid $4.5 million in 12b-1 Distribution Fees. As of the most recent reporting, those fees had grown to approximately $75 million and remain at similar excessive levels to the present date.

47. Over that same time, total management fees for the Fund for Growth and Income soared from just over $11 million (or approximately $0.054 per share) to over $84 million (or $0.073 per share), of which nearly $66 million was for pure Portfolio Selection Services. Total management fees, and the Portfolio Selection Fees, remain at similar excessive levels to the present date.

48. The Promotional Distribution Fee portion of these fees increased along with total 12b-1 Distribution Fees. These fees have produced no benefits to Fund shareholders; rather, they have served only Defendants, just as the SEC feared when it found that:

> the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted.

Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977). As such, the Funds' Distribution Plans violate the intent and purpose of Rule 12b-1, the Distribution Fees are entirely a waste of fund assets and their receipt by Defendants violates Section 36(b).

49. The Distribution Plan itself underscores the absence of any benefit to the Plaintiffs or holders of shares in the Funds other than Y Class shareholders. The Funds issue a class of institutional shares (called "Y Shares") the holders of which pay no 12b-1 Distribution Fees (including Promotional Distribution Fees). This class of shares was created to meet the

demands of institutional investors who refused to purchase mutual fund shares obligating them to pay 12b-1 Distribution Fees because they and Defendants, unlike Plaintiffs and the holders of shares in other share classes, clearly understand that the payment of such fees benefits only Defendants.

50.     The existence of this "12b-1 fee free" class of shares demonstrates that the Funds' Distribution Plans should never have been adopted or continued year after year. If the economies of scale created by additional assets (including those prompted by the Promotional Distribution Fees) were shared with the Funds (as required by the enabling rule), then the institutional holders of the "12b-1 free" Y Shares would be eager to pay them and obtain their benefit. The benefits created by economies of scale were not shared with the Plaintiffs or the Funds, the adoption and continuation of the Promotional Distribution Fees is contrary to Rule 12b-1 and their receipt by Defendants violates Section 36(b).

51.     Furthermore, as the purpose of Promotional Distribution Fees is to increase the assets held by the Funds, as assets have increased, the Promotional Distribution Fees should decline as assets increase, especially when caused by a generally rising market. This has not happened. In fact, much of the increase in Promotional Distribution Fees is due to a rising equity market, and not due to any promotional activities of Defendants. The Dow Jones Industrial Average (the "Dow") rose from 2753 in 1990 to approximately 10,000 today, even after the recent years of market turmoil. This market expansion alone greatly increased 12b-1 Promotional Distribution Fees with no additional work or effort on behalf of Defendants.

52.     Despite the fact that Plaintiffs and the other Fund shareholders have enjoyed no benefits from the Promotional Distribution Fees, and despite the fact that the Funds' Distribution

Plan allowed Defendants to extract additional and excessive compensation from the Funds, the directors of the Funds approved, year after year, continuation of the Plan in violation of both Rule 12b-1 and § 36(b).

53. Plaintiffs, on behalf of the Funds, are entitled to recover the Promotional Distribution Fees received (and continuing to be received) by Defendants.

## The Gartenberg Test

54. As set forth in Gartenberg v. Merrill Lynch Asset Management, Inc., 694 F.2d 923 (2d Cir. 1982) (decided long before today's computer and internet capabilities existed and before the in-depth studies by the GAO and SEC), the test for determining whether compensation paid to Defendants violates § 36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." Id. at 928. Stated differently, "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." Id.

55. The Defendants' receipt of fees from the Funds for Portfolio Selection Services breaches their fiduciary duties under § 36(b) because they are excessive. The Portfolio Selection Fees negotiated with other institutional clients (i.e., clients other than the Funds or other Putnam funds) for managing smaller portfolios are substantially less than the Portfolio Selection Fees received from the Funds. That is because the Funds' fee schedule does not "represent[] a charge within the range of what would have been negotiated at arms-length." In fact, the fees charged to the Funds have never been within or near such a range. Moreover, this information has either

been withheld by Defendants from the Funds' board of trustees (and also from the shareholders), or the board has failed to properly consider the information.

56. Similarly, the Promotional Distribution Fees do not "represent[] a charge within the range of what would have been negotiated at arm's-length." Indeed, when an arms length negotiation takes place, the result is that no 12b-1 Distribution Fees are paid. When institutional investors wish to retain Defendants to manage their assets, they either purchase shares in Putnam funds (including the Funds) through Y Shares (which pay no 12b-1 Distribution Fees) or through separate accounts (that pay no Distribution Fees and have significantly lower Portfolio Selection Fees).

57. In applying the Gartenberg test, all pertinent facts must be weighed in determining whether a fund manager's fee or other compensation violates § 36(b). The Gartenberg court specifically identified six factors (a portion of "all pertinent facts") to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been negotiated at arms' length. Here, each factor demonstrates that receipt of the Portfolio Selection and Promotional Distribution Fees by the Defendants violated (and continues to violate) § 36(b):

    (1)    **Economies of Scale**

58. Significant economies of scale exist in the investment advisory industry, especially in the area of providing investment advisory services (including Portfolio Selection Services) to clients such as the Funds. Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets. At some point (a point exceeded by the Funds), the additional cost to advise each additional dollar

in the Funds (whether added by a rise in the value of the Funds' securities or additional contributions by current or new shareholders) approaches zero.

59. For example, the cost of providing Portfolio Selection Services to the Funds may be $X for the first $100 million of assets under management but the cost for providing those same services for the next $100 million is a mere fraction of $X. This is true in part because each Fund's portfolio investment objectives are set forth in their offering documents and additional dollars contributed by shareholders are simply invested in the same core portfolio of securities. In addition, when assets under management increase in value over time as markets rise or existing shareholders purchase additional shares (with no change in the composition of the Funds' portfolios or number of shareholders), there are no additional Portfolio Selection Service costs incurred by PIM.

60. The benefits created by these economies of scale belong to the Funds and the Plaintiffs, not the Defendants or their affiliates.

61. Technology has lowered the costs to Defendants of providing the Portfolio Selection Services. For example, it has become far easier and less expensive to obtain research about potential investments, and to communicate with the Funds and their shareholders, than regulators and courts in the early days of Section 36(b) could ever have imagined. Defendants benefit from the widespread use of computers with exponentially greater computing power today than those of 20 years ago, company and stock research is readily and instantly available on the Internet, and Defendants are able to transact business with current and potential shareholders on the Internet. All of this dramatically lowers Defendants' costs and should have resulted in significantly lower Portfolio Selection Fees over time. Instead, those fees (in both percentage

and dollar terms) have not declined as they should have but increased because of Defendants' violation of their fiduciary duties.

62.  These economies of scale exist at the individual fund level (including the Funds) and at the complex or family of funds level (meaning all funds advised by the Defendants considered together). They also exist on a more comprehensive basis, encompassing the Defendants' entire scope of operations, including administrative expenses and advisory services provided to other institutional clients.

63.  Notable academic research confirms the long-standing existence of significant economies of scale in the mutual fund industry that are not passed on to shareholders. See, John P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest, 26 J. Corp. L. 610 (2001) (the "Freeman & Brown Study") [Exhibit 5].

64.  Furthermore, both the Securities and Exchange Commission (the "SEC") and the Government Accounting Office (the "GAO") also confirmed, in June of 2000, that economies of scale exist in the provision of Portfolio Selection Services. See SEC Report at 30-31 [Exhibit 6]; Government Accounting Office, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9 [Exhibit 7].

65.  Courts have also found that these economies of scale exist. Migdal v. Rowe Price Fleming Int'l, Inc., 248 F.3d 321, 326-27 (4th Cir. 2001). Even the mutual fund industry's lobbying arm, the Investment Company Institute ("ICI"), admits that mutual funds exhibit economies of scale. Thus, it cannot be disputed that extensive and significant economies of scale

BN1 35024335.1