UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------x
STEVEN G. WICKS, GERALD A.
KALBFLEISCH, and MICHAEL and       :
MYRTLE HATHAWAY
                                   :
              Plaintiffs,             Civil Action
                                   :  No. 04-10988-GAO
      - against -
                                   :  ORAL ARGUMENT
PUTNAM INVESTMENT MANAGEMENT,         REQUESTED
LLC and PUTNAM RETAIL              :
MANAGEMENT, LP
                                   :
              Defendants.
------------------------------x

**PUTNAM INVESTMENT MANAGEMENT, LLC'S AND
PUTNAM RETAIL MANAGEMENT, LP'S REPLY IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT AND TO STAY DISCOVERY**

Defendants make the following brief reply points in support of their motion for summary judgment (Section I below) and motion to stay discovery (Section II below):

I.  **ON THE UNDISPUTED FACTS
    HERE, IT IS CLEAR THAT WICKS'
    CLAIM DOES NOT SATISFY ARTICLE III; PLAINTIFFS'
    ARGUMENTS TO THE CONTRARY ARE WITHOUT MERIT**

   A.   **Plaintiffs' Emphasis On Standing vs. Mootness Is Misplaced**

   Plaintiffs argue that Wicks' shares were sold during this lawsuit, not before its commencement, and that the proper Article III concept is therefore mootness, not standing.[1] Whether it is described in terms of standing or mootness, however, the underlying issue here -- which subsumes both concepts -- is whether Wicks satisfies Article III's fundamental requirement

---

[1] Plaintiffs' Response to Defendants' Motion for Summary Judgment On Claims of Steven G. Wicks and Opposition to Motion to Stay, filed July 18, 2005, at 4 ("Opp.").

that he maintain a financial stake in the outcome of this lawsuit throughout its course. Under the cases cited in defendants' opening summary judgment brief, including Gollust, he does not.

As such, the twin Article III concepts of standing and mootness need not be disentangled here. Nonetheless, on this point, defendants note that plaintiffs oversimplify the law and the facts, and, in any event, purport to identify a practical difference between the two Article III concepts that, in the particular situation here, does not exist:

1.  As to the law, the two Article III concepts are tightly intertwined (mootness has been referred to as "the doctrine of standing set in a time frame"), and in the context here -- i.e., a plaintiff's post-complaint loss of shares in the entity on whose behalf he purports to sue -- courts have referred to the Article III issue as one of standing, not mootness. In Gollust, for example, the Supreme Court referred to the Article III continuing-financial-stake requirement as one of "standing": "[t]his case . . . requires us to address a plaintiff's standing under § 16(b) and, in particular, the requirements for *continued standing* after the institution of an action." Gollust v. Mendell, 501 U.S. 115, 117-18 (1991) (emphasis added.) The same is true of iXL and Batra.[2] Defendants refer the Court to the additional cases in the below footnote.[3]

---

[2] iXL: "[U]nder Gollust, if a plaintiff has standing at the commencement of the suit, an involuntary change in his status as a security holder resulting from a restructuring will not affect his standing to maintain the suit so long as minimal constitutional requirements are satisfied through the presence of some financial interest in the outcome of the litigation." iXL Enter., Inc. v. GE Capital Corp., No. 301-CV-2051-CFD, 2005 WL 736820, at *6 (D. Conn. Mar. 31, 2005) (emphasis added). Batra: "The court [in Gollust] concluded that where the plaintiff's interest in the issuer had been replaced by an interest in the issuer's parent company [after the complaint was filed], the plaintiff had sufficient standing to bring the action." Batra v. Investors Research Corp., No. 89-0528-CV-W-6, 1992 WL 278688, at *3 (W.D. Mo. Oct. 4, 1991) (emphasis added).

[3] Johnson v. U.S., 317 F.3d 1331, 1334 (Fed. Cir. 2003) ("Here, Johnson was a shareholder when he filed in the Court of Federal Claims in the spring of 2000. However, Johnson's shares were cancelled under the plan of reorganization in bankruptcy on September 15, 2000. Johnson therefore did not maintain his shareholder status through the litigation and as such his standing to bring the takings claim terminated.") (emphasis added); Lichtenberg v. Bessicorp Group, 43 F. Supp. 2d 376, 391 (S.D.N.Y. 1999) (In case challenging proposed merger, stating that "[a]s a

2

2. As to the facts, the Article III deficiency here may not have arisen before the first complaint was filed, but it certainly did arise at the very cusp of the litigation (or, put differently, during its commencement). Plaintiffs' counsel represent that Wicks sold his shares in "mid-February of 2005." (Opp. at 3.) They do not offer proof of that (e.g., an affidavit of Wicks, or account statements), but even if it is credited, the sale was before the Court's motion to dismiss ruling (March 28), and before the Answer (April 21).[4]

3. Finally on this point, even if the Article III issue here were technically "mootness" and not "standing," that has no practical consequence in this case. Plaintiffs say it would put a "heavy burden" on defendants to establish the appropriateness of an Article III-based dismissal. (Opp. at 5.) Plaintiffs support that proposition with Conservation Law Foundation v. Evans, 360 F.3d 21 (1st Cir. 2004). In Conservation and the cases it cites, however, the defendants were seeking to establish mootness based upon on their own conduct. (In Conservation, for example, the defendants cited their replacement of a challenged regulatory "framework" with a similar "stop gap" framework.)[5] In that context, it makes eminent sense to place a burden on the defendants to establish the propriety of an Article III dismissal: the Court must trust the defendant's assurances that their own challenged conduct has ceased, and will not

---

matter of law, plaintiffs would have lost standing to pursue the . . . [a]ctions immediately upon consummation of the merger . . .") (emphasis added).

[4] On plaintiffs' rigid approach to the issue here, a plaintiff could apparently automatically avoid a purportedly more rigorous standing analysis, in favor of a purportedly more lenient mootness analysis, by filing suit and then selling his shares one hour later.

[5] Conservation cites Mangual v. Rotger-Sabat, 317 F.3d 45, 61 (1st Cir. 2003), which involved the defendants' cessation of a challenged criminal prosecution, and Friends of the Earth v. Laidlaw Environmental Services, 528 U.S. 167, 189 (2000), which Conservation describes as "requiring, in cases involving voluntary cessation of challenged conduct, that [the] party claiming mootness satisfy high burden of demonstrating that allegedly wrongful behavior could not reasonably be expected to recur." Conservation, 360 F.3d at 24-26 (emphasis added).

3

recur. Here, that rationale does not exist: the Article III deficiency flows not from contested representations by defendants as to their own future conduct, but instead from the plaintiff's admitted sale of shares in the funds on whose behalf he purports to sue. In any event, in this case, it simply does not matter who bears the "burden." The one relevant fact is established (Wicks' sale of all shares in the funds on whose behalf he asserts a Section 36(b) claim), and what remains is for the Court to decide that fact's legal significance. (Instructively, there was no reference at all to the question of "burden" in Gollust, Batra, or iXL's standing analysis.)

### B. To The Extent That Plaintiffs Address The Fundamental Issue (Satisfaction Of Article III), They Fail To Distinguish Defendants' Authority, And Cite Inapposite Authority

#### 1. Plaintiffs Fail To Distinguish *Gollust*

Plaintiffs seek to explain away Gollust's ruling that a Section 16(b) plaintiff must maintain a personal financial stake in the outcome throughout the lawsuit, on the basis that, purportedly unlike Section 36(b), Congress intended to spur enforcement of Section 16(b) by giving stockholders "a personal profit motive for bringing suit." (Opp. at 8.)

That attempted distinction fails. It is true that the principal drafter of Section 16(b), Thomas G. Corcoran, stated in a pre-enactment hearing that he wanted to "put a private profit motive behind" enforcement of Section 16(b), i.e., to make "the stockholders [Section 16(b)'s] policemen." Gollust, 501 U.S. at 124-25.[6] But he went on to state that Congress was effecting that intention by providing for enforcement of Section 16(b) by stockholders, on behalf of the

---

[6] Quoting from Hearings on H.R. 7852 and H.R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 136 (1934) (testimony of Thomas G. Corcoran) (hereafter, "Hearings").

4

entity at issue, with recovery flowing to that entity (not to the suing stockholder himself).[7] And that is precisely what Congress did when it later enacted Section 36(b). Section 36(b) also provides for enforcement by stockholders, on behalf of the entity at issue, with recovery flowing to that entity, not the suing stockholder.[8] As such, Congress's intent in enacting Section 16(b) was also its intent in enacting Section 36(b). "[T]he language of the statutes that Congress enacts provides 'the most reliable evidence of its intent.'" Holloway v. United States, 526 U.S. 1, 6 (1999) (quoting United States v. Turkette, 452 U.S. 576, 593 (1981)). (Notably, plaintiffs do not identify any aspect of Section 16(b) that in fact confers a greater "private profit motive" on stockholders than does Section 36(b), and they cannot do so; if anything, 36(b) confers the greater such motive, because, unlike 16(b), it permits suit without any prior demand on the issuing entity.)[9]

---

[7]    "The fact that the stockholders, with an interest, are permitted to sue *to recover that profit for the benefit of the company*, puts anyone doing this particular thing, in the position of taking [a] risk that somebody with a profit motive will try to find out." Gollust, 501 U.S. at 125 n.7 (quoting from Hearings, at 137) (emphasis in Gollust).

[8]    Both Section 16(b) and Section 36(b) permit suit by a "security holder"/"owner of a security" "on behalf of" the issuer of the security (see 15 U.S.C. § 78(p)(b) as to Section 16(b), and 15 U.S.C. § 80a-35(b) as to Section 36(b)), and both statutes provide for any recovery to flow to the issuer, not to the suing shareholder. See Gollust, 501 U.S. at 125 n.7 as to Section 16(b), and, as to Section 36(b), Daily Income Fund v. Fox, 464 U.S. 523, 535 n.11 (1980). (Also, Section 36(b) was enacted after Section 16(b): Section 16(b) was enacted as part of the Securities Exchange Act of 1934, Securities Exchange Act of 1934, Pub. L. No. 291, 48 Stat. 896 (codified at 15 U.S.C. § 78p(b)), whereas Section 36(b) was enacted in 1970, as an amendment to the Investment Company Act of 1940, Investment Company Amendments Act of 1970, Pub. L. No. 91-547, 84 Stat. 1428 (codified at 15 U.S.C. § 80a-35(b).)

[9]    Defendants note the Supreme Court's sharp reaction to the notion that a shareholder might sue on behalf of an issuer and then sell his shares while attempting to maintain the suit: after quoting Corcoran's description of the Section 16(b) enforcement scheme (which is materially identical to Section 36(b)'s), the Supreme Court stated: "Corcoran's analysis . . . demonstrate[s] the statute's reliance for its enforcement on the profit motive in an issuer's security holders, a dependence that could hardly cease the moment after suit was filed." Id. at 125 n.7 (emphasis added).

5

### 2. Plaintiffs' Citation To Class Action Cases Is Also Unavailing

Plaintiffs also cite to Sosna v. Iowa, 419 U.S. 393 (1975) and Franks v. Bowman Transport Company, 424 U.S. 747 (1976) (Opp. at 7). Both of those cases addressed mootness in the context of certified class actions, a context obviously not present here, and in both cases the Court made clear that its holding was based on considerations unique to that context. See, e.g., Sosna, 419 U.S. at 399 ("When the District Court certified the propriety of the class action, the class of unnamed persons . . . acquired a legal status separate from the interest asserted by appellant.") (emphasis added).[10]

Plaintiffs also rely on U.S. Parole Commission v. Geraghty, 445 U.S. 390 (1980). That case stands for a sharply "limited" proposition (id. at 404) that is inapplicable here: that a proposed class representative whose motion for class certification is denied and whose claim then becomes moot may press an appeal of the class certification denial (id.), because in that procedural context, given the unique nature of the class action device and its unique associated considerations (id. at 402-03), the "question whether class certification is appropriate remains as a concrete, sharply presented issue." Id. at 403-404. Here, Wicks is not appealing a class certification denial "on behalf of a class" (id. at 394), implicating Rule 23 and unique associated considerations. He is asserting a non-class Section 36(b) claim "on behalf of" six funds in which, remarkably, he does not own shares.

---

[10] See also Franks, 424 U.S. at 753 (In Sosna, "[w]e held that '[w]hen the District Court certifies the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interests asserted by the (named representative).") (emphasis added).

6

II. **PLAINTIFFS' ARGUMENTS AS TO THE MOTION TO STAY DISCOVERY ARE ALSO WITHOUT MERIT**

Defendants' motion to stay discovery is eminently reasonable:

1. It has not been established who the plaintiffs are, or what funds are at issue. These are the most basic matters imaginable in this case. Section 36(b) is not a litigation tool for attorneys interested in suing fund complexes; it is a device for shareholders seeking restitution to particular funds.[11] Beginning discovery now would be confusing, inefficient, and, in defendants' view, inappropriate. (Plaintiffs make the throwaway proposal that defendants respond to all requests that are not "fund-specific." It is telling that plaintiffs do not undertake to identify which of their 141 confusing requests fit that description.)

2. A temporary stay of discovery, to avoid inefficiency, will not prejudice plaintiffs. Plaintiffs' counsel proposed a discovery plan under which fact discovery ends 12 months after the plan is so-ordered by the Court, and, because that proposed discovery plan was just filed, it has not yet been so-ordered by the Court.[12]

---

[11] As this Court held in its motion to dismiss ruling, each fund is a "separate corporate entity." (March 28, 2005 Memorandum and Order at 6.)

[12] Plaintiffs served 141 document requests on defendants on May 26, but repeatedly delayed on the just-filed proposed discovery plan. They argue that this delay is "not relevant" (Opp. at 9-10 n.3), but it is not. Since the plan provides for 12 months of fact discovery after it is so-ordered by the Court, delay in filing it operated to extend the period of time available for plaintiffs to pursue discovery. And that delay was substantial. Counsel for both parties first orally conferred concerning the plan on May 6, and plaintiffs' counsel volunteered to fax a revised plan to defendants' counsel after that conversation. Plaintiffs' counsel did not do so until May 26 -- 20 days later. (They apparently used that time to draft their 141 document requests, which they served that same day.) Defendants approved a draft plan by letter dated June 8, but then did not hear back from plaintiffs' counsel until June 23. At that time defendants had moved for the stay of discovery, and promptly proposed an additional paragraph on that issue, but otherwise approved the then-current draft plan. On June 29, plaintiffs' counsel stated that they would circulate a proposed revised draft. They did not do so until July 14. Defendants' counsel approved it in a July 15 fax (with minor edits). Plaintiffs finally filed it on July 20.

7

Given these factors, plaintiffs should simply have agreed to stay discovery. That would have been a sensible, cooperative step, which would not have prejudiced them, and would have avoided the need for this motion.

Lastly, defendants address plaintiffs' discussion of account statements. (Opp. at 10.) Defendants have asked plaintiffs to produce account statements sufficient to confirm their current assertions as to their share ownership (not, as plaintiffs disingenuously imply, all account statements).[13] That is a reasonable request. The assertions in the Amended Complaint about Wicks' fund ownership were not true, and it is important for defendants -- and the Court -- to know that the current assertions in fact are true. Plaintiffs should be eager to confirm as much. Instead, plaintiffs refuse to do so, and state blithely that they are "eager to commence discovery." (Opp. at 2.) Plaintiffs miss the point: their Amended Complaint was wrong (on a factual issue squarely within Wicks' knowledge), that error raises fundamental questions about standing as to all plaintiffs (plaintiffs' counsels' due diligence as to share ownership is obviously flawed), and for obvious reasons this threshold issue should be resolved before full-blown discovery. Plaintiffs' counsel think that who the plaintiffs are is something to be sorted out as a Section 36(b) case proceeds. Defendants reject that view, and ask that the Court do so as well.

---

[13] Defendants attach all correspondence on this issue at Exhibit A to this brief. (Plaintiffs do not attach any of it.) Defendants refer the Court to the July 5, 2005 letter, which is the first letter in Exhibit A, for the very narrow subset of account statements Defendants have requested from Plaintiffs. (Putnam shares are sold through third parties, and Putnam cannot obtain definitive information about the plaintiffs' purchases and sales through its own records.)

8

## CONCLUSION

For the foregoing reasons, defendants ask that this Court grant their motion for summary judgment and their motion to stay discovery.

Dated:   July 25, 2005
        Boston, Massachusetts

Respectfully submitted,

/s/ James R. Carroll
James R. Carroll (BBO #554426)
David S. Clancy (BBO #636031)
Scott T. Lashway (BBO #655268)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

### Certificate Of Service

I, Scott T. Lashway, hereby certify that on July 25, 2005, I caused a true copy of the foregoing to be served by overnight delivery upon counsel for Plaintiffs, David E. Marder, Esq., Marc N. Henschke, Esq. and Jonathan D. Mutch, Esq., all of Robins, Kaplan, Miller & Ciresi, L.L.P., 800 Boylston Street, Suite 2500, Boston, Massachusetts 02199, and by overnight delivery upon Thomas R. Grady, Esq., Ackerman, Link & Sartory, P.A. 222 Lakeview Avenue, Suite 1250 – Esperante, West Palm Beach, Florida 33401.

Dated: July 25, 2005

/s/ Scott T. Lashway
Scott T. Lashway