UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____
                                            )
JOHN J. VAUGHN,                             )       Civil Action No: 04-CV-10988
GERALD A. KALBFLEISCH, and                  )
MICHAEL and MYRTLE HATHAWAY,                )
                                            )       Hon. George A. O'Toole
        Plaintiffs,                         )
                                            )
        v.                                  )
                                            )
PUTNAM INVESTMENT                           )
        MANAGEMENT, LLC and                 )       **SECOND AMENDED COMPLAINT**
                                            )
PUTNAM RETAIL                               )
MANAGEMENT, LLP,                            )
                                            )
        Defendants.                         )
_____     )

        Plaintiffs, John J. Vaughn, Gerald A. Kalbfleisch, and Michael and Myrtle Hathaway file

this Second Amended Complaint against Defendants, Putnam Investment Management, LLC and

Putnam Retail Management, LLP (collectively "Putnam" or the "Defendants"), and allege as

follows:

## I.    <u>INTRODUCTION</u>

        1.      Section 36(b) of the Investment Company Act of 1940 (the "ICA") imposes a

fiduciary duty on mutual fund investment managers (and their affiliates) with respect to their

receipt of compensation.  Defendants provide investment management and other services to the

Putnam family of mutual funds for compensation and have breached their fiduciary (and other)

duties to those funds by receiving excessive fees.

        2.      The Plaintiffs are shareholders in several mutual funds (technically known as

open-end registered investment companies) as identified on Exhibit 1 (the "Funds").  The Funds

were formed, and are distributed, advised and managed, by the Defendants. Plaintiffs seek to recover all damages available pursuant to Section 36(b) of the ICA, including all compensation received by the Defendants, directly or indirectly, from the Funds for the period beginning one year prior to the filing of the original Complaint through the date of trial.

3.      The present case does not seek class action status and is not subject to transfer to any multidistrict litigation proceedings currently pending, including those in the District of Maryland captioned In Re Mutual Funds Investment Litigation, MDL-1586. The Judicial Panel's basis for coordinating and consolidating the various individual actions that comprise MDL-1586 is that they "involve common questions of fact concerning allegations of market timing and/or late trading in the mutual fund industry." By contrast, this action does not involve allegations that Defendants or their affiliates have engaged in unlawful market timing, late trading, manipulation of closing net asset values, or similar conduct. This matter is brought solely under Section 36(b) of the ICA, and addresses Defendants' breach of their fiduciary duties imposed by that Section through their receipt of excessive fees.

4.      Defendant Putnam Investment Management ("PIM") manages the Funds pursuant to a management agreement and receives substantial fees. Both in dollar terms and in comparison to fees received by Putnam for managing other virtually identical institutional portfolios, the fees received from the Funds are staggering and excessive.

5.      PIM's management activities include selecting and trading securities for the Funds to buy, sell or hold (the "Portfolio Selection Services") and providing administrative services. It receives a management fee from the Funds for these activities that is calculated as a

percentage of total assets under management. That portion of the management fee attributable

solely to Portfolio Selection Services is referred to herein as the "Portfolio Selection Fee."

6.      All mutual funds, including the Funds, create economies of scale as assets under

management increase. All of the Funds are large, with none smaller than $1 billion in assets

under management (see Exhibit 1). Some of the Funds are among the largest in the country,

such as the Putnam Voyager Fund (with over $17 billion in assets)[1] and the Fund for Growth and

Income (with almost $20 billion in assets). The larger a portfolio, the greater the cost savings

and benefits from economies of scale. It costs less to provide investment advisory services for

each additional dollar of assets under management. Eventually, when portfolios become as large

as the Funds, the cost of providing Portfolio Selection Services for each additional dollar of

assets under management approaches zero.

7.      Defendants (directly or through their affiliates) also provide Portfolio Selection

Services to other institutional portfolios. The contracts for those services confirm the excessive

nature of the fees received by PIM from the Funds. The Portfolio Selection Services that PIM

provides to the Funds are identical to the portfolio selection services provided to other

institutional clients by the Defendants, including through their affiliate "Putnam Advisory

Company" or "PAC". However, unlike the advisory contracts between PIM and the Funds, the

contracts that PAC negotiates with other institutional clients are the product of arms' length

negotiations.

---

[1] The figures in this Second Amended Complaint are stated as of the date of the original Complaint
because the Second Amended Complaint relates back to the date of the original Complaint.

8.      The fees received from the Funds by Defendants for Portfolio Selection Services are several times larger on a percentage basis and up to hundreds of times larger in total dollars than the fees received from the other institutional clients for the same services, even though the portfolios of other institutional clients are much smaller and do not offer the same economies of scale as the Funds.  The much higher Portfolio Selection Fees that PIM receives from the Funds have not, and could not have, resulted from arms' length negotiations.

9.      In addition to the management fees received by PIM, the Defendants (including through their affiliate Putnam Retail Management ("PRM")) also receive fees ("Distribution Fees") pursuant to share distribution plans adopted under Rule 12b-1, 17 C.F.R. § 270.12b-1 ("Distribution Plans").  Like the Portfolio Selection Fees, the 12b-1 Distribution Fees are based on a percentage of the net assets of the funds in the Putnam Fund Complex, including the Funds.

10.      A large portion of 12b-1 Distribution Fees received by Defendants are properly payable only if the Funds' boards of directors find that there is a reasonable likelihood that the Plaintiffs and other holders of Fund shares would benefit from economies of scale through reduced advisory fees.  These fees (the challenged portion of total Distribution Fees) shall be referred to as "Promotional Distribution Fees"  (some portion of 12b-1 Distribution Fees are used for other purposes, such as paying contingent deferred sales commissions to broker-dealers who sell Putnam funds).

11.      Although assets held by the Funds have indeed increased significantly over time, Defendants have failed to share the resulting economies of scale with Plaintiffs or other shareholders of the Funds.  Instead, as assets increased, Defendants simply continued to receive from the Funds ever greater fees.

12.     The receipt by Defendants of the Portfolio Selection Fees from the Funds constitutes a breach of their fiduciary and other duties to the Funds.  The receipt by Defendants of the Promotional Distribution Fees also constitutes a breach of their fiduciary and other duties to the Funds.

13.     Plaintiffs seek to (a) recover all fees and compensation received by the Defendants and their affiliates from the Funds in violation of Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b), including all Portfolio Selection Fees and all Promotional Distribution Fees, (b) recover all other or further benefits resulting from the economies of scale created by the Funds but wrongfully retained by the Defendants, (c) rescind the management agreements between Defendants and the Funds and, finally, (d) rescind the Distribution Plan because it was not approved as required by the ICA and receipt by Defendants of payments pursuant to that plan also breaches Section 36(b).

## II.     PARTIES

14.     Plaintiff Gerald A. Kalbfleisch ("Kalbfleisch") is a resident of Belleville, St. Clair County, Illinois and is a shareholder in the Putnam Classic Equity Fund.  Kalbfleisch continuously owned shares in this fund from before the original Complaint was filed through the present date.

15.     Plaintiffs Michael and Myrtle Hathaway are residents of Ellis Grove, Randolph County, Illinois and are joint shareholders in the Putnam Fund for Growth and Income and the Putnam Investors Fund.  The Hathaways continuously owned shares in these funds from before the original Complaint was filed through the present date.

16.     Plaintiff John J. Vaughn is a resident of Granite City, Madison County, Illinois and is a shareholder in the Putnam Voyager Fund and the Putnam Growth Opportunity Fund. Plaintiff Vaughn continuously owned shares in this fund from before the original Complaint was filed through the present date.

17.     Defendant PIM is a Delaware corporation with its principal place of business in Boston, Massachusetts.  PIM is registered as an investment adviser in Massachusetts and under the Investment Advisers Act of 1940 and is the investment adviser to the Funds.

18.     Defendant PRM is a Massachusetts limited liability partnership with its principal place of business in Boston, Massachusetts.  Putnam Retail Management is registered in Massachusetts as a broker/dealer and is affiliated with PIM (both are commonly owned by Putnam, LLC).  PRM also serves as a principal underwriter for the Funds.

### III.     JURISDICTION AND VENUE

19.     This action is brought pursuant to § 36(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. § 80a-35(b) and § 80a-12(b).

20.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

21.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(1) and (2).  Defendants reside in this district and routinely transact business in this district.  PIM is registered as an investment adviser in Massachusetts and Putnam Retail Management is registered in Massachusetts as a broker/dealer.  Defendants advertise and market Fund shares in Massachusetts.  Several of the Funds' trustees/directors live and work in Massachusetts.

### IV.     GENERAL ALLEGATIONS

#### The Investment Company Act of 1940

22.     In 1940, Congress enacted the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. (the "ICA").  The ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisers such as Defendants.  In the 1960s, it became clear to Congress that investment advisers to equity mutual funds were gouging those funds with excessive fees.  As a result, § 36(b) was added to the ICA in 1970 (primarily to remedy excessive fees charged by mutual funds such as those owned by Plaintiffs) and created a federal cause of action for breach of fiduciary duty by investment advisers and their affiliates such as Defendants.

23.     Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person . . . .

### The Portfolio Selection Fees

24.     PIM receives a "management" fee from each of the Funds.  The management fee compensates PIM for Portfolio Selection Services and certain limited "administrative" expenses (the bulk of administrative costs are received outside of and separately from the management fee).

25.     Although the Portfolio Selection Fees challenged may appear to be very small on a shareholder-by-shareholder basis, they are huge in absolute terms and, even on a shareholder-by-shareholder basis, cause a dramatic decrease in shareholders' investment returns over time. Arthur Levitt, past Chairman of the SEC, has observed this and is critical of what he calls the "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly small fees can, over time, create such drastic erosion in returns. . . .  In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267 (2001) [Exhibit 2].

26.     The management fees received by PIM are paid as a varying percentage of assets under management.  The fees vary based on the amount of assets under management, and are reduced as the total amount of assets under management increase.  Known as "breakpoints," this fee structure implicitly recognizes the existence of economies of scale and gives the appearance that the Funds share in those benefits. However, the initial management fee is too high, breakpoints are spaced too far apart, and the reductions made at breakpoints are far too small, thereby depriving the Plaintiffs and the Funds of the benefits of the economies of scale created by the contribution of their capital to the Funds.

27.     As Fund portfolios grow, they quickly create economies of scale and eventually the cost of servicing additional assets approaches zero.  Breakpoints recognize these economies (the current breakpoints for each Fund are shown on Exhibit 3) but, as stated, are designed by Defendants to benefit themselves rather than the Funds.

28.     For example, the first breakpoint for the Funds occurs at $500 million. Significant economies of scale are created by the Plaintiffs' and other shareholders' investments in the Funds long before this initial breakpoint, but they are not shared with the Funds.  By the time assets under management reach $1 billion, these economies of scale are tremendous yet Defendants do not allow another breakpoint until that level and retain for themselves the benefits created by economies of scale between breakpoints.

29.     A flat Portfolio Selection Fee (in dollars, not percentages) or a breakpoint approaching zero for very large portfolios such as those of the Funds would allow the Funds to capture economies of scale that belong to them under Section 36(b), while also allowing Defendants to earn a fair and competitive profit for their services.

30.     The total management fee received by Defendants from each Fund consists of a pure Portfolio Selection Fee component and a much smaller administrative services component. Subtracting the administrative services component from the total management fee for each Fund leaves the Portfolio Selection Fee for each Fund.

31.     The portion of the management fee paid by the Funds to PIM that is attributable to administrative costs is no more than 0.1% (10 basis points) of total Fund assets. Mutual funds from fund complexes other than Putnam, of comparable size and investment objectives, incur administrative costs of less than 0.1% (10 basis points). For example, the American Funds' Washington Mutual Fund reports separately (unlike the Funds) the portion of the total management fee attributable to administrative costs. Those costs are 0.089% (8.9 basis points) of total net assets.

32.     Furthermore, economies of scale also exist with respect to the administrative costs component of the management fee. For example, at the final breakpoint, the American Funds' Washington Mutual Fund pays an administrative cost fee as low as 0.04% (4 basis points) of net assets under management. Thus, the administrative costs component of a mutual funds' management fee declines as assets increase, thereby establishing by comparison that the administrative costs portion of the management fee charged by Defendants to the Funds is less than 0.1% (10 basis points) of total net assets.

33.    The chart at Exhibit 4 sets forth the Portfolio Selection Fee received by Defendants during recent reported periods allowing a (generous) 0.1% of total net assets as the administrative cost portion of the management fee.

34.    The Portfolio Selection Fees received by Defendants from the Funds are excessive.

35.    Defendants' receipt and acceptance of the Portfolio Selection Fees for pure Portfolio Selection Services was (and continues to be) in breach of its fiduciary and other duties.

### The Funds' Rule 12b-1 Distribution Plans and Fees

36.    "12b-1" Distribution Fees are named for the SEC rule that allows and regulates their payment, 17 C.F.R. § 270.12b-1.  Rule 12b-1 permits a fund to market and sell its shares with shareholder funds (Distribution Fees) out of fund assets only in strict compliance with the rule.

37.    Prior to 1980, the use of shareholder funds to market and sell fund shares was prohibited. The SEC was historically reluctant to allow fund advisers to charge their shareholders for selling shares to others:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

Statement on the Future Structure of the Securities Markets, [Feb. 1972] Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7.

38.     After intense lobbying by the mutual fund industry, the SEC agreed to consider tempering its objections to allow current fund shareholders to pay distribution expenses.  In early comment letters and in proxy statements proposing adoption of plans of distribution, the mutual fund industry argued (correctly) that adding assets in an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.

39.     Accepting the mutual fund industry's argument that a growth in assets would lead to a quid pro quo reduction in advisory fees and other expenses, the SEC tentatively approved Rule 12b-1, 17 C.F.R. § 270.12b-1. However, numerous conditions were attached to the use of shareholder funds to pay distribution expenses. For example, the SEC wanted to be certain that investment advisers would not "extract additional compensation for advisory services by excessive distributions under a 12b-1 plan." Meyer v. Oppenheimer Management Corporation, 895 F.2d 861, 866 (2d Cir. 1990).

40.     Defendants have done just what the SEC feared: extracted additional compensation for their retail advisory services by causing Plaintiffs and other shareholders to pay Defendants' marketing expenses to retain and acquire new shareholders so that these shareholders will pay additional advisory fees that benefit them rather than the Plaintiffs and the Funds.

41.     12b-1 Distribution Plans must be reviewed annually by the Funds' board of trustees. In particular, the board must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued." 17 C.F.R. § 270.12b-1(d). Defendants are required to furnish this information.  17

C.F.R. § 270-12b-1(d).  In addition, minutes must be maintained to record all aspects of the boards' deliberation.  On an annual basis, the board must conclude "in light of their fiduciary duties under state law and under Sections 36(a) and (b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e).

42.     The Funds' Distribution Plans have not been adopted in accordance with these rules.  The board did not find that the Distribution Plans in general or the Promotional Distribution Fees in particular benefit the Funds or its shareholders by generating savings from economies of scale in excess of the cost of the plan.  In fact, despite the dramatic growth in total assets held by the Funds, both the management fee (including the Portfolio Selection Fee) and total 12b-1 Distribution Fees (including Promotional Distribution Fees) received by Defendants have grown over time, thus depriving the Funds of the benefit of these economies of scale in breach of Defendants' fiduciary and other duties.

43.     For example, for the first full fiscal year the Putnam Voyager's 12b-1 plan was in effect (ending July 31, 1991), its shareholders paid less than $2 million in 12b-1 Distribution Fees.  12b-1 Distribution Fees grew to over $60 million as of Voyager's last reported fiscal year, and remain at similar excessive levels to the present date.

44.     Over that same time, total management fees for the Putnam Voyager Fund soared from $4.6 million (or approximately $0.04 per share) to nearly $84 million (or over $0.08 per share) as of Voyager's last reported fiscal year, of which nearly $66 million is for pure Portfolio Selection Services.  Total management fees, and the Portfolio Selection Fees, remain at similar excessive levels to the present date.

45.    Similarly, for the first full fiscal year the Putnam Fund for Growth and Income's 12b-1 Distribution Plan was in effect (ending July 31, 1991), its shareholders paid $4.5 million in 12b-1 Distribution Fees.  As of the most recent reporting, those fees had grown to approximately $75 million and remain at similar excessive levels to the present date.

46.    Over that same time, total management fees for the Fund for Growth and Income soared from just over $11 million (or approximately $0.054 per share) to over $84 million (or $0.073 per share), of which nearly $66 million was for pure Portfolio Selection Services.  Total management fees, and the Portfolio Selection Fees, remain at similar excessive levels to the present date.

47.    The Promotional Distribution Fee portion of these fees increased along with total 12b-1 Distribution Fees.  These fees have produced no benefits to Fund shareholders; rather, they have served only Defendants, just as the SEC feared when it found that:

> the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted.

Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977).  As such, the Funds' Distribution Plans violate the intent and purpose of Rule 12b-1, the Distribution Fees are entirely a waste of fund assets and their receipt by Defendants violates Section 36(b).

48.    The Distribution Plan itself underscores the absence of any benefit to the Plaintiffs or holders of shares in the Funds other than Y Class shareholders.  The Funds issue a class of institutional shares (called "Y Shares") the holders of which pay no 12b-1 Distribution Fees (including Promotional Distribution Fees).  This class of shares was created to meet the

demands of institutional investors who refused to purchase mutual fund shares obligating them to

pay 12b-1 Distribution Fees because they and Defendants, unlike Plaintiffs and the holders of

shares in other share classes, clearly understand that the payment of such fees benefits only

Defendants.

49.    The existence of this "12b-1 fee free" class of shares demonstrates that the Funds'

Distribution Plans should never have been adopted or continued year after year.  If the

economies of scale created by additional assets (including those prompted by the Promotional

Distribution Fees) were shared with the Funds (as required by the enabling rule), then the

institutional holders of the "12b-1 free" Y Shares would be eager to pay them and obtain their

benefit.  The benefits created by economies of scale were not shared with the Plaintiffs or the

Funds, the adoption and continuation of the Promotional Distribution Fees is contrary to Rule

12b-1 and their receipt by Defendants violates Section 36(b).

50.    Furthermore, as the purpose of Promotional Distribution Fees is to increase the

assets held by the Funds, as assets have increased, the Promotional Distribution Fees should

decline as assets increase, especially when caused by a generally rising market.  This has not

happened.  In fact, much of the increase in Promotional Distribution Fees is due to a rising equity

market, and not due to any promotional activities of Defendants.  The Dow Jones Industrial

Average (the "Dow") rose from 2753 in 1990 to approximately 10,000 today, even after the

recent years of market turmoil.  This market expansion alone greatly increased 12b-1

Promotional Distribution Fees with no additional work or effort on behalf of Defendants.

51.    Despite the fact that Plaintiffs and the other Fund shareholders have enjoyed no

benefits from the Promotional Distribution Fees, and despite the fact that the Funds' Distribution

Plan allowed Defendants to extract additional and excessive compensation from the Funds, the directors of the Funds approved, year after year, continuation of the Plan in violation of both Rule 12b-1 and § 36(b).

52.    Plaintiffs, on behalf of the Funds, are entitled to recover the Promotional Distribution Fees received (and continuing to be received) by Defendants.

## The Gartenberg Test

53.    As set forth in Gartenberg v. Merrill Lynch Asset Management, Inc., 694 F.2d 923 (2d Cir. 1982) (decided long before today's computer and internet capabilities existed and before the in-depth studies by the GAO and SEC), the test for determining whether compensation paid to Defendants violates § 36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." Id. at 928.  Stated differently, "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  Id.

54.    The Defendants' receipt of fees from the Funds for Portfolio Selection Services breaches their fiduciary duties under § 36(b) because they are excessive.  The Portfolio Selection Fees negotiated with other institutional clients (i.e., clients other than the Funds or other Putnam funds) for managing smaller portfolios are substantially less than the Portfolio Selection Fees received from the Funds.  That is because the Funds' fee schedule does not "represent[] a charge within the range of what would have been negotiated at arms-length."  In fact, the fees charged to the Funds have never been within or near such a range.  Moreover, this information has either

been withheld by Defendants from the Funds' board of trustees (and also from the shareholders), or the board has failed to properly consider the information.

55.    Similarly, the Promotional Distribution Fees do not "represent[] a charge within the range of what would have been negotiated at arm's-length." Indeed, when an arms length negotiation takes place, the result is that no 12b-1 Distribution Fees are paid. When institutional investors wish to retain Defendants to manage their assets, they either purchase shares in Putnam funds (including the Funds) through Y Shares (which pay no 12b-1 Distribution Fees) or through separate accounts (that pay no Distribution Fees and have significantly lower Portfolio Selection Fees).

56.    In applying the Gartenberg test, all pertinent facts must be weighed in determining whether a fund manager's fee or other compensation violates § 36(b). The Gartenberg court specifically identified six factors (a portion of "all pertinent facts") to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been negotiated at arms' length. Here, each factor demonstrates that receipt of the Portfolio Selection and Promotional Distribution Fees by the Defendants violated (and continues to violate) § 36(b):

**(1)    Economies of Scale**

57.    Significant economies of scale exist in the investment advisory industry, especially in the area of providing investment advisory services (including Portfolio Selection Services) to clients such as the Funds. Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets. At some point (a point exceeded by the Funds), the additional cost to advise each additional dollar

in the Funds (whether added by a rise in the value of the Funds' securities or additional contributions by current or new shareholders) approaches zero.

58.     For example, the cost of providing Portfolio Selection Services to the Funds may be $X for the first $100 million of assets under management but the cost for providing those same services for the next $100 million is a mere fraction of $X.  This is true in part because each Fund's portfolio investment objectives are set forth in their offering documents and additional dollars contributed by shareholders are simply invested in the same core portfolio of securities.  In addition, when assets under management increase in value over time as markets rise or existing shareholders purchase additional shares (with no change in the composition of the Funds' portfolios or number of shareholders), there are no additional Portfolio Selection Service costs incurred by PIM.

59.     The benefits created by these economies of scale belong to the Funds and the Plaintiffs, not the Defendants or their affiliates.

60.     Technology has lowered the costs to Defendants of providing the Portfolio Selection Services.  For example, it has become far easier and less expensive to obtain research about potential investments, and to communicate with the Funds and their shareholders, than regulators and courts in the early days of Section 36(b) could ever have imagined. Defendants benefit from the widespread use of computers with exponentially greater computing power today than those of 20 years ago, company and stock research is readily and instantly available on the Internet, and Defendants are able to transact business with current and potential shareholders on the Internet.  All of this dramatically lowers Defendants' costs and should have resulted in significantly lower Portfolio Selection Fees over time.  Instead, those fees (in both percentage

and dollar terms) have not declined as they should have but increased because of Defendants'
violation of their fiduciary duties.

61.     These economies of scale exist at the individual fund level (including the Funds)
and at the complex or family of funds level (meaning all funds advised by the Defendants
considered together).  They also exist on a more comprehensive basis, encompassing the
Defendants' entire scope of operations, including administrative expenses and advisory services
provided to other institutional clients.

62.     Notable academic research confirms the long-standing existence of significant
economies of scale in the mutual fund industry that are not passed on to shareholders.  See, John
P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest,
26 J. Corp. L. 610 (2001) (the "Freeman & Brown Study") [Exhibit 5].

63.     Furthermore, both the Securities and Exchange Commission (the "SEC") and the
Government Accounting Office (the "GAO") also confirmed, in June of 2000, that economies of
scale exist in the provision of Portfolio Selection Services.  See SEC Report at 30-31 [Exhibit 6];
Government Accounting Office, Report on Mutual Fund Fees to the Chairman, Subcommittee on
Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House
of Representatives (June 2000) ("GAO Report"), at 9 [Exhibit 7].

64.     Courts have also found that these economies of scale exist.  Migdal v. Rowe Price
Fleming Int'l, Inc., 248 F.3d 321, 326-27 (4th Cir. 2001).  Even the mutual fund industry's
lobbying arm, the Investment Company Institute ("ICI"), admits that mutual funds exhibit
economies of scale.  Thus, it cannot be disputed that extensive and significant economies of scale

exist in the provision of investment advisory services, in particular Portfolio Selection Services, by advisers or affiliates such as Defendants to mutual funds such as the Funds.

65.     One simple example of economies of scale is when total assets under management increase due purely to market forces.  In that event, it is possible for the Defendants to service the additional assets at zero additional variable cost:  there is no change in the securities held in the portfolios or the number of shareholders in the Funds.

66.     The Defendants have benefited from economies of scale resulting from pure market appreciation.  On January 1, 1990, the Dow Jones Industrial Average was at 2753.  When the decade closed on December 31, 1999, the Dow was at 11,497 (more than a four-fold increase).  If a mutual fund merely held the stocks that comprise the Dow, and did nothing, the Portfolio Selection Fees and Promotional Distribution Fees would have nearly quadrupled absent meaningful breakpoints (an absence suffered by the funds) or unless the advisers dramatically reduced their fees (also not the case here).

67.     Today, even following three years of a turbulent market, the Dow Jones Industrial Average remains at approximately 10,000, representing a three-and-one-half times increase from the levels of 1990.  This growth has created enormous "free" economies of scale for the Funds, the benefits of which were wrongfully retained by the Defendants who incurred no additional costs in providing Portfolio Selection Services for the additional assets generated in the Funds by such market growth.

68.     Another simple example of benefits arising through no effort on the part of the Defendants yet creating considerable economies of scale occurs when the Funds' assets under management grow because of additional investments by current shareholders.  Once again, no

additional client relationship is established (or related costs incurred) and economies of scale are created by the shareholders of the Funds, the benefits of which must be shared with the Funds. Still, Defendants have failed to meaningfully reduce the Portfolio Selection Fees in either percentage or dollar terms.

69.    These facts regarding economies produced by market appreciation are confirmed by the GAO and by the Freeman and Brown Study.  See GAO Report at 9 (noting that growth from portfolio appreciation is unaccompanied by a growth in costs) [Exhibit 7]; Freeman & Brown Study.  [Exhibit 5 at p. 619-21].

70.    The assets in the Funds have grown dramatically over the past dozen years along with the growth generally in the stock market.  For example, as of 1991, total assets in Voyager and Growth and Income amounted to $3.7 billion.  Total assets in those two Funds alone is now approximately $37 billion, roughly ten times larger.  Similar growth has occurred in the other Funds.

71.    Defendants have benefited greatly from this growth in Fund assets as their receipt of fees exploded.  For example:

a.    For the fiscal year ended July 31, 1991, the Putnam Voyager Fund had approximately $1 billion in assets under management.  PIM received approximately $5 million in management fees and its affiliates received approximately $2 million in total 12b-1 fees.  By July 31, 2003, fund assets had soared to nearly $19 billion while management fees received by Defendants jumped to approximately $84 million and 12b-1 Distribution Fees soared to over $60 million.

b.    For the fiscal year ended October 31, 1991 the Putnam Fund for Growth and
Income had approximately $2.5 billion in assets under management.  Defendants
took in approximately $11 million in management fees and $4.5 million in total
12b-1 Distribution Fees.  By October 31, 2003, fund assets had increased to
nearly $21 billion, management fees received by Defendants soared to over
$84 million and 12b-1 Distribution Fees exploded to over $75 million.

72.    The other Funds have produced similarly dramatic increases in fees received by
Defendants, and for all Funds those dramatic increases continue as of the present date.

73.    While the size of the Funds has grown dramatically, the nature and quality of the
Portfolio Selection Services rendered by Defendants has not changed.  Indeed, the number of
securities held in each of the Funds' portfolios has remained fairly constant, suggesting that the
research associated with providing the Portfolio Selection Services was unchanged even as the
dollars in the Funds' portfolios grew dramatically.  For example, the Voyager Fund held 163
securities as of 1991, and only 152 as of 2003.  The Fund for Growth and Income held 248
securities as of 1992, and 209 as of 2003.  While the number of securities fluctuates over time, at
best Portfolio Selection Services should show only minor changes in total cost, as the service has
not changed significantly.

74.    Despite this, the Portfolio Selection Fees and the Promotional Distribution Fees
received by Defendants have grown dramatically, increasing in almost exact proportion with the
increase in Fund assets, capturing all benefits from economies of scale and paying no heed to the
actual cost of providing those services.

75.     The retention by Defendants of the benefits resulting from economies of scale (benefits that are owned by, and should have been paid to, the Funds) resulted in Portfolio Selection Fees that were (and remain) (a) grossly disproportionate to the Portfolio Selection Services, (b) excessive, (c) could not have been the product of an arms' length bargain, and (d) violate § 36(b).

76.     The retention by Defendants of the benefits resulting from economies of scale (benefits that are owned by, and should have been paid to, the Funds) also resulted in Promotional Distribution Fees that were (and remain) (a) grossly disproportionate to any actual or potential benefit they could have created, (b) excessive, (c) could not have been the product of an arms' length bargain, and (d) violate § 36(b).

77.     Acceptance of the excessive Portfolio Selection Fees and the Promotional Distribution Fees by Defendants was (and remains) a breach of their fiduciary and other duties to the Funds.

**(2)     Comparative Fee Structures**

78.     A mutual fund is a single investment portfolio for Defendants, as is any other institutional portfolio.  Accordingly, with respect to the Portfolio Selection Services and the Portfolio Selection Fees, a mutual fund is no different than any other institutional investor.

79.     Other institutional investors (including Y Share investors in the Funds) do not pay Promotional Distribution Fees.  Instead, the cost of any distribution activities are paid by Defendants from the management fees received from those institutional investor.  In contrast, the Defendants receive enormous Promotional Distribution Fees from the Funds.  Therefore, the great discrepancy between the management fees that Defendants receive from other institutional

investors as compared to those received from the Funds is actually understated because the management fees received from other institutional investors includes all costs of marketing and distribution.

80.     Defendants and their affiliates provide advisory services to other institutional clients for substantially lower fees.  The fees received from other institutional clients are properly compared to those same fees received by Defendants from the Funds for Portfolio Selection Services. The Freeman & Brown Study explains:

> Strong analogies . . . can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower.  [Exhibit 5 at 653].

> * * *

> [A] mutual fund, as an entity, actually is an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." [Exhibit 5 at 629 n.93].

81.     The Freeman and Brown study accurately explains the similarity between the provision of Portfolio Selection Services to a mutual fund, like the Funds, and other institutional investors with similar investment objectives.

82.     Similarly, the respected mutual fund analyst firm Morningstar has concluded that there should be no difference between management fees charged to mutual funds (retail products) and other institutional clients:

> Fees for a firm's retail products should not be materially different from management fees for a firm's institutional offerings.  Though we appreciate the added costs of servicing small accounts, those expenses needn't show up in the management fees.

Kunal Kapoor, *The Standards That We Expect Funds to Meet*, Morningstar, December 8, 2003.

83.     Any additional administrative costs incurred by PIM from servicing small retail mutual fund accounts are recovered through separate administrative fees in addition to the Portfolio Selection Fee.  For example, in addition to the management fee, for fiscal 2003 the Funds paid separately for "investor servicing and custodian fees" (amounting to almost $35 million for the Voyager Fund and over $29 million for the Growth and Income Fund alone), compensation of trustees, other "administration" services and 12b-1 distribution fees, including Promotional Distribution Fees.  Each of the Funds also pays millions in unspecified "other" expenses, a charge that for Voyager and Growth and Income alone amounted to nearly $28 million in fiscal year 2003.  Defendants continue to receive these additional, separate administrative fees at similar (excessive) levels to the present date.

84.     Putnam Advisory Company, LLC ("PAC") is an affiliate of Defendants that enters into management contracts with other institutional clients.  The management fees received by PAC from institutional investors can be properly compared to the fees for pure Portfolio Selection Services received by Defendants from the Funds.  PAC shares office space, resources and advisory personnel with Defendants and provides identical portfolio management services.  PAC reports its securities holdings jointly with Defendants on a form prepared and signed by Defendants.

85.     PAC manages a stock portfolio for the Pennsylvania Public School Employees' Retirement System (the "Pennsylvania Retirement System"). The Pennsylvania Retirement System portfolio managed by PAC is comparably sized to the smaller Funds but is dwarfed by the larger Funds.  However, the total management fee received by PAC from the Pennsylvania Retirement System is far lower (in percentage and dollar terms) than the fee for pure Portfolio Selection Services received by Defendants from any of the Funds.  Further, the Pennsylvania

Retirement System fee includes all administrative and distribution expenses (the Pennsylvania Retirement System pays no Promotional Distribution Fees or other 12b-1 Distribution Fees). Finally, in what is clearly the result of an arms' length bargain, PAC agreed to dramatically better breakpoints than those agreed to with the Funds. The total management fees charged to the Pennsylvania Retirement System are compared to the Portfolio Selection Fees charged by Defendants to the Funds in Exhibit 8.

86. PAC also manages a stock portfolio for the State Board of Administration of Florida (the "Florida SBA"). As with the Pennsylvania Retirement System portfolio, the Florida SBA portfolio is significantly smaller than the Funds' portfolios. Once again, despite the Florida SBA's significantly smaller size, the management fee (which includes all administrative and distribution expenses) received by PAC from the Florida SBA is far lower (in percentage and dollar terms) than the fee for just the pure Portfolio Selection Services received by Defendants from the Funds. Again, the Florida SBA pays no Promotional Distribution Fees or other 12b-1 Distribution Fees. Also, like the agreement with the Pennsylvania Retirement System (in what is again clearly the result of an arms' length bargain), PAC agreed to dramatically better breakpoints than those agreed to with the Funds.

87. Because the fee received from other institutional clients includes all administrative and distribution expenses, the portion of the fee received from other institutional clients for pure Portfolio Selection Services is actually less than the amounts shown in the tables at Exhibit 8, thereby underscoring Defendants' violation of 36(b). By comparison, the total expense burden (i.e., including all administrative and 12b-1 expenses) for the Putnam Voyager Fund's Class A shares is 1.02% (102 basis points) and for the Putnam Fund for Growth and

Income A shares is 0.9% (90 basis points).  The total fee burden is even higher for the other Funds.

88.     In short, the Portfolio Selection Fees (as a percentage of assets) received by Defendants are at least double, frequently triple, and, at certain breakpoints, quadruple those received from much smaller institutional clients for the very same advisory services.  When considered in dollar terms (rather than as a percentage), the Portfolio Selection Fees received by Defendants from the Funds are up to hundreds of times larger than the fees paid by some institutional clients with much smaller portfolios invested in the same securities.

89.     There is no legitimate basis for this marked disparity in fees received by Defendants from the Funds when compared to fees received by them or their affiliates from other institutional clients.  The Defendants recover the additional administrative costs associated with large numbers of shareholders through separate administrative fees received from the Funds, and therefore the different identity of the owner of the pool of funds invested has no impact on Portfolio Selection Services or Fees.  The Freeman and Brown study explains why the identity of the portfolio owner does not justify higher Portfolio Selection Fees:

> The [fund] manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds.  The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower.

Freeman & Brown Study at 627-28 [Exhibit 5].  The "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds."  *Id.* at 671-72 [Exhibit 5].

90.    The significant economies of scale created solely by virtue of the Plaintiffs' and other shareholders' investment dollars in the Funds have been unlawfully retained by the Defendants, and Promotional Distribution Fees have been received by Defendants despite a lack of benefit to the Funds or their shareholders, in violation of Section 36(b).

### (3)    Fallout Benefits (Indirect Profits) Attributable to the Funds

91.    Defendants also indirectly profit because of "fallout benefits" attributable to the Funds.  These profits are above and beyond those received through Portfolio Selection Fees and other fees.

92.    Fallout benefits include the attraction of new customers for other funds or products offered by Defendants, cross selling Defendants' other funds and services to current Fund shareholders, and other benefits associated generally with the development of goodwill and the creation and growth of a client base for Defendants.

93.    Another profitable fallout benefit received and retained by Defendants is "soft dollar" payments.  Essentially, "soft dollars" are credits from broker-dealers and other securities industry firms in exchange for Defendants' routing securities transaction orders and other business to the broker-dealers.  While the existence of such arrangements has been known, details of the increased costs to the Funds and the concomitant benefits received and retained by Defendants have not been disclosed.

94.    In breach of their fiduciary duties owed to the Funds, Defendants direct the payment of excessive commissions to securities broker-dealers to execute trades for the Funds in exchange for which they receives and retain soft-dollars (a form of rebate or kickback).  These

soft-dollars are paid for by the Funds and the Plaintiffs in the form of higher commissions (depriving the Funds of the best execution of trades), yet benefit Defendants.

95.     These soft-dollars can amount to payments surpassing the total Portfolio Selection Fees and 12b-1 Distribution Fees paid to the Defendants.  From 1995 to 2003, the Funds paid just under $400 million for executing trades with soft-dollar brokers.  If Defendants had sought and obtained the best execution for these trades without the soft-dollar kickbacks, the Funds and the Plaintiffs would have saved approximately $227 million - money that was improperly retained by Defendants at the Funds' expense.  Defendants continue to improperly retain the Funds' money in this manner to the present date.

96.     Soft-dollar and other fallout benefits are either not quantified and shared with the Funds' board of trustees  (even though the board cannot determine the fairness of any fee without having this information), or the board of trustees fails to properly consider fallout benefits when evaluating the fees paid to Defendants.

97.     According to the SEC, "[s]oft-dollar arrangements create incentives for fund advisers to (i) direct fund brokerage based on the research provided to the adviser rather than the quality of execution provided to the fund, (ii) forego opportunities to recapture brokerage costs for the benefit of the fund, and (iii) cause the fund to overtrade its portfolio to fulfill the adviser's soft-dollar commitments to brokers."  Memorandum from Paul F. Roye, director of the SEC Division of Investment Management, June 2003.

98.     As noted by the SEC, institutional investors other than mutual funds that negotiate at arms' length often negotiate "soft dollar" or commission recapture programs and directly participate in the benefits wrongfully retained by Defendants from the Funds and the Plaintiffs.

The Funds and their board of trustees could, but do not, negotiate such arrangements and, instead, Defendants have usurped that opportunity for their exclusive benefit.

99.     Defendants and their affiliates also receive other benefits or "kickbacks," either directly or indirectly, such as transfer agency and custodian fees.  These fees automatically increase as the assets under management and the number of shareholders in the Funds increase.  For fiscal 2003, transfer and custodian fees alone add up annually to just under 19 basis points (0.19%) for Voyager and 14 basis points (0.14%) for Growth and Income in additional revenue for Defendants and their affiliates, Putnam Fiduciary Trust Company and Putnam Investor Services.  These affiliates receive similar fees from the other Funds while comparable fees paid by other institutional investors are either included in the overall management fee negotiated at arms' length or cost far less through Defendants or competitive third party providers.  Defendants and their affiliates continue to receive these additional fees at similar (excessive) levels to the present date.

100.     Defendants also benefit from securities lending arrangements where they "loan" out securities owned by the Funds (e.g., to short sellers) for a fee.  Defendants retain those benefits even though the securities loaned belong not to them but to the Funds.

101.     These and other fallout benefits are required to be disclosed to the Funds' board of trustees as part of the total mix of information necessary to determine the reasonableness of the Portfolio Selection Fee and the reasons for a 12b-1 Distribution Plan and the related Promotional Distribution Fees.  Even without considering the fallout benefits, the Portfolio Selection and Promotional Distribution Fees are excessive in both percentage and dollar terms.

After considering the fallout benefits, these fees are obscene and their receipt by Defendants violates § 36(b) of the Investment Company Act of 1940.

**(4)      The Nature and Quality of the Services Provided to the Funds' Shareholders**

102.    The nature of the Portfolio Selection Services provided to the Funds is straightforward: Defendants select (buy, sell or hold) and trade, at its discretion, stocks, bonds, and other securities for the Funds. This is precisely the same service provided to Defendants' other institutional clients even though the Funds are charged a dramatically higher Portfolio Selection Fee as a percentage of assets under management and in dollar terms.

103.    The quality of the Portfolio Selection Services provided to the Funds by Defendants is also precisely the same (because the services are the same) as the quality of the Portfolio Selection Services provided to the other institutional clients.  However, Plaintiffs pay Defendants dramatically higher fees (in percentage and absolute dollar terms) because the Portfolio Selection Fees are not even close to the range of fees produced by the arms' length negotiations with Defendants' other institutional clients (even before considering the enormous additional fallout benefits received by Defendants).

104.    Furthermore, the Defendants' services to the Funds are even more overpriced when performance is considered.  For the three fiscal years ended July 31, 2003, investors paid management and shareholder service fees of $514 million for Voyager and Grown and Income alone, despite a loss of 33% in 2001, a loss of 32% in 2002 and a minimal gain of 1.5% in 2003 (compared to a 2003 gain of over 10% from the S&P 500 index).  In fact, over the last decade, Defendants or their affiliates received $1.3 billion in management and 12b-1 Distribution Fees

from the Voyager Fund alone, even though that Fund significantly underperformed the Standard & Poor's 500 stock index (performance that can be purchased at a significantly lower cost).

105.    Also, between 1993 and 2002, Defendants liquidated, renamed or merged 44 mutual funds, in large part due to poor performance (liquidation or merger allows Defendants to remove a fund's poor track record from their reported performance).  The nature and quality of Portfolio Selection Fees provided to the Funds totally fail to justify the cost.

106.    The nature of services provided for the Promotional Distribution Fee is also straightforward:  Defendants take money from current Fund shareholders in an effort to attract new shareholders to the Funds ostensibly so that all shareholders can enjoy cost savings from economies of scale.  The existence of Y Shares tells the story:  the use of Promotional Distribution Fees has never achieved the desired (and required) cost savings, should never have been approved or continued by the Funds' board of trustees, and violates Section 36(b) of the ICA.

### (5)    The Profitability of the Fund to the Adviser-Manager

107.    The profitability to Defendants of managing the Funds is a factor that the Court may consider.  Intuitively, it is obvious that the fees charged to others in arms' length negotiations is the best indicator of profitability to Defendants; those negotiations must result in profitable relationships or investment managers (such as Defendants) intending to stay in business would be required to charge a higher fee.  Therefore, managing the Funds (and receiving much higher Portfolio Selection Fees and Promotional Distribution Fees than from other institutional clients) is highly profitable to Defendants.

108.    For example, Defendants received approximately $84 million in management fees from Voyager Fund during its most recent fiscal year.  Of that, at least $66 million is for pure Portfolio Selection Services.  In 1990, the total management fee, including all expenses and pure Portfolio Selection Services, amounted to less than $5 million.  The receipt of such a dramatic increase in fees for pure Portfolio Selection Services (in the face of dramatic economies of scale) while Putnam manages comparable (but much smaller) portfolios for a much smaller fee is in breach of Defendants' fiduciary and other duties to the Funds.

109.    Defendants received almost $85 million in management fees from the Fund for Growth and Income during its most recent fiscal year.  Of that, as much as $65 million is for pure Portfolio Selection Services.  In 1991, the total management fee, including all expenses and pure Portfolio Selection Services, amounted to just over $11 million.  The receipt of such a dramatic increase in fees for pure Portfolio Selection Services (in the face of dramatic economies of scale) while Putnam manages comparable (but much smaller) portfolios for a much smaller fee is a breach of Defendants' fiduciary and other duties to the Funds.

110.    The total Portfolio Selection Fee received by Defendants from each Fund is shown on the attached Exhibit 4.

111.    Furthermore, each dollar of Promotional Distribution Fees received by Defendants directly increases Defendants' profitability in an equal amount.  These fees, by definition, are received by Defendants to cover their expenses, not those of the Funds (under the theory that those expenses would ultimately save the Plaintiffs and the Funds money).  The amount of these fees has been steadily increasing.  For 1991, the Voyager Fund paid less than $2 million in 12b-1 Distribution Fees.  For the year ending July 31, 2003, that fund paid 12b-1

Distribution Fees of $65 million.  Similarly, in 1991, the Fund for Growth and Income paid $4.5 million in 12b-1 fees.  For the year ending October 31, 2003, that fund paid 12b-1 Distribution Fees of over $75 million.  The amount of Promotional Distribution Fees increased proportionately with total 12b-1 Distribution Fees for these and all of the Funds.

112.    As discussed above under "comparative fee structures," Defendants and their affiliates have entered into advisory agreements with other institutional clients where Defendants accept total management fees (including both Portfolio Selection Fees and payment of all administrative, distribution and other costs) that quickly step down to as low as 15 basis points (0.15%) to manage portfolios that are typically much smaller than those of the Funds.  Even on the conservative assumption that all of the other institutional clients' fee was for Portfolio Selection Services, it is still dramatically smaller in percentage terms (and obscenely so in dollar terms) than the same fees received from the comparably sized or significantly larger Funds, and is not within the range established by Defendants with its other customers when negotiating at arms' length.  Defendants would not agree to provide advisory services for a fee of as low as 15 basis points (or less) if it were not profitable to do so.  Therefore, the immense profitability of the Funds' management for the same services is self-evident.

113.    Furthermore, the availability of Y Shares for institutional clients (shares free from all 12b-1 distribution fees) further establishes that the Promotional Distribution Fees received by PRM constitute pure profit to Defendants.

**(6)    The Independence and Conscientiousness of the Trustees (or Directors)**

114.    As the GAO Report noted, the "external management" structure of most mutual funds (including the Funds) creates a potential conflict of interest between a fund's shareholders

and its adviser.  [Exhibit 7].  The United States Supreme Court has stated that the disinterested director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest. Burks v. Lasker, 441 U.S. 471 (1979).

115.    The disinterested directors (or trustees) are supposed to serve as "watchdogs" for the shareholders of the Funds.  As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all agreements with Defendants and reviewing the reasonableness of the Portfolio Selection Fees and Promotional Distribution Fees received by Defendants.  Accordingly, as noted by the GAO, the directors are expected to review, among other things, the adviser's costs, whether fees have been reduced when the Funds' assets have grown, and the fees charged for similar services.  See GAO Report at 14 [Exhibit 7]. These responsibilities necessarily require the directors to rely on information provided by Defendants.  Defendants, in turn, have a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations.

116.    In considering whether to approve advisory agreements between the Defendants and the Funds, the trustees are required to review and consider specific factors, and to make certain comparisons, to ensure that any agreement is in the best interests of the Fund and its shareholders (rather than just the Defendants).  The SEC has recognized that this inquiry includes the following specific factors:

> (1) the nature, extent, and quality of the services to be provided by the investment adviser; (2) the investment performance of the fund and the investment adviser; (3) the costs of the services to be provided and profits to be realized by the investment adviser and its affiliates from the relationship with the fund; (4) the extent to which economies of scale would be realized as the fund grows; and (5) whether fee levels reflect these economies of scale for the benefit of fund investors.

117.    In addition, the SEC has recognized that a fund's trustees must compare the fees and services to be provided by the adviser in any proposed contract with a fund with those in other investment advisory contracts, such as contracts between the same (and other) investment advisers with other investment companies (*i.e.*, mutual funds) or other types of clients (*e.g.*, pension funds and other institutional investors). On information and belief, Defendants failed to provide this information to the Funds' trustees who in turn failed to make or consider this comparison.

118.    A majority of the Funds' directors must be "disinterested" as defined in § 10 of the Investment Company Act.  The ICA contains a presumption that the disinterested directors are in fact disinterested. However, even in connection with so-called disinterested directors, the lack of conscientiousness in reviewing the fees paid to the Defendants, and/or lack of adequate information provided by the Defendants to the directors in connection with their approvals of the advisory agreements, and the control of management over the board in reviewing the fees are not presumed.  Rather, they are all relevant factors in determining whether the Defendants have breached their fiduciary duties to the Funds and to the Plaintiffs.

119.    Despite the structural protections of independent directors envisioned by the Investment Company Act, the Funds' trustees have been subverted by Defendants and no longer serve in their "watchdog" role.

120.    Either the Defendants have failed to satisfy their fiduciary duty under the Investment Company Act to provide the Funds' directors with all information reasonably necessary for them to do their jobs, including determining the fairness of the Portfolio Selection

Fee and the Promotional Distribution Fee, or that information has not been properly considered by the directors.

121.    Jack Bogle, founder of the Vanguard Group, one of the largest mutual fund complexes in the world, commented during an interview on the failure of mutual fund boards of directors to meet their duties under the Act:

> Q:  We've talked about how the [mutual fund] industry could do a better job.  How about the fund directors?
>
> A:  Well, fund directors are, or at least to a very major extent, sort of a bad joke.  They've watched industry fees go up year after year, they've added 12b-1 fees.  I think they've forgotten, maybe they've never been told, that the law, the Investment Company Act, says they're required to put the interest of the fund shareholders ahead of the interest of the fund adviser.  It's simply impossible for me to see how they could have ever measured up to that mandate, or are measuring up to it.

*Morningstar Interviews…Jack Bogle, Founder of the Vanguard Group,* Kathryn Haines and Russ Kinnel, www.morningstar.net, posted June 5, 1998.

122.    Similarly, a United States District Court Judge recently quoted Warren Buffet, the "legendary investor and chairman of the Berkshire Hathaway Group," on the lack of independence and diligence of mutual fund boards of directors:

> I think independent directors have been anything but independent.  The Investment Company Act, in 1940, made these provisions for independent directors on the theory that they would be the watchdogs for all these people pooling their money.  The behavior of independent directors in aggregate since 1940 has been to rubber stamp every deal that's come along from management – whether management was good, bad or indifferent.  Not negotiate for fee reductions and so on.  A long time ago, an attorney said that in selecting directors, the management companies were looking for Cocker Spaniels and not Dobermans.  I'd say they found a lot of Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F.Supp.2d 373, 383 (S.D.N.Y. 2002)(citation omitted).

123.    The dependence of the Funds' disinterested directors on the Defendants, and the

domination and undue influence exerted on the directors by the Defendants, is evidenced by the

following facts:

a.    Each of the Funds is governed by a common and interlocking board of directors

initially selected (and constantly dominated by) the Defendants.

b.    All 101 different Putnam mutual funds are "overseen" by *one common board* of

12 directors, 10 of whom are considered "disinterested."  The directors are paid

from $203,000 to $388,000 for approximately 24 days of board meetings each

year.  The Funds have also adopted (and pay for) a non-contributory, defined

benefit pension plan for each director serving more than five years.  The

Defendants have *de facto* control over directors' compensation and the nature and

duration of director meetings and other aspects of the Funds' corporate

governance, thereby depriving the Funds of the independence owed to them by

the trustees.

c.    Each of the Funds, and all funds within the Putnam Fund Complex, share

common fiduciary advisers (*i.e.,* the Defendants or their affiliates).  The

Defendants created these relationships and continue to dominate in their

execution.

d.    Each of the Funds, and all funds within the Putnam Fund Complex, share a

common distributor affiliated with the Defendants (*i.e.*, the Funds' shares are sold

by an affiliate of the Defendants).

e.      Trustees in the mutual fund industry almost without exception rely wholly on the fund manager to provide them with what is known in the industry as a "15c Report" (also called a "Lipper Package").  The 15c Report includes information about what other mutual fund investment advisors charge their mutual fund clients but does not include data about Defendants' or other advisors' other institutional clients (as that data is withheld by fund managers from the trustees). Fund managers use the data in the 15c Report to ensure that their fees fall within the range of fees charged by their "competitors," an industry of price gougers, rather than to ensure that the Portfolio Selection Fees received by Defendants are independently fair to the Funds.  Here, either Defendants have followed this industry practice and failed to provide the correct information to the trustees, or the trustees have failed to consider properly the information provided.

f.      Each of the Funds, and all funds within the Putnam Fund Complex, have access to a common line of credit arranged by the Defendants to assist in managing money flows in the Funds (*e.g*., to meet shareholder redemptions).  The fees pertaining to such credit facility are shared equally by the Funds and all other funds within the Putnam Fund Complex (thereby also again demonstrating benefits from economies of scale).

### COUNT I
### ICA § 36(b) BREACH OF FIDUCIARY DUTY
### (Excessive Fees from Economies of Scale)

124.    The Plaintiffs repeat and reallege paragraphs 1 through 123, inclusive, of this complaint.

125.    Defendants have received, and continue to receive, excessive Portfolio Selection Fees attributable to the extraordinary economies of scale created by the Plaintiffs and the Funds.

126.    Defendants have breached, and continue to breach, their ICA § 36(b) fiduciary duty to the Funds by receiving and retaining these excessive fees.

127.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, including the "amount of compensation or payments received from" the Funds.

## COUNT II
## ICA § 36(b) BREACH OF FIDUCIARY DUTY
### (Excessive Investment Advisory Fees)

128.    Plaintiffs repeat and reallege paragraphs 1 through 123, inclusive, of this complaint.

129.    The Portfolio Selection Fees received by PIM are and continue to be disproportionate to the services rendered and not within the range of what would have been negotiated at arms' length in light of all the surrounding circumstances (or the range of what has been negotiated at arms' length with the Defendants' other institutional clients).  Instead, they are dramatically higher than those negotiated or that would be negotiated in any arms' length negotiation.

130.    In receiving excessive advisory fees, and failing to put the interests of the Funds, the Plaintiffs, and the Funds' other shareholders ahead of their own interests, PIM breached its statutory fiduciary duties to the Funds and the Plaintiffs.

131.    Defendants have breached, and continue to breach, those statutory ICA § 36(b) fiduciary duties to the Funds by accepting excessive and inappropriate compensation.  Plaintiffs and the Funds seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, "the amount of compensation or payments received from" the Funds.

## COUNT III

### ICA § 36(b) BREACH OF FIDUCIARY DUTY
(Excessive Rule 12b-1 Promotional Distribution Fees and Extraction
of Additional Excessive Compensation)

132.    Plaintiffs repeat and reallege paragraphs 1 through 123, inclusive, of this complaint.

133.    The Promotional Distribution Fee extracts additional compensation for advisory services in violation of Defendants' fiduciary duty under § 36(b).  Although the assets of the Funds have grown considerably, the resulting economies of scale benefited only Defendants, and not Plaintiffs or the Funds, precisely as feared by the SEC.

134.    In failing to pass along economy of scale benefits from the Promotional Distribution Fees, and in continuing to authorize, assess and collect Promotional Distribution Fees pursuant to the Funds' 12b-1 Distribution Plan, despite the fact that no benefits inured to Plaintiffs or the Funds, Defendants violated their ICA § 36(b) fiduciary duty by receiving excessive and inappropriate compensation.  Plaintiffs seek, pursuant to § 36(b) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, including all Promotional Distribution Fees and any further "amount of payments received from" the Funds.

**WHEREFORE,** Plaintiffs and the Funds demand judgment as follows:

a.     Declaring that the Defendants violated and continue to violate § 36(b) of the ICA and that any advisory agreements and Distribution Plans entered into between them and the Funds are void *ab initio*;

b.     Preliminarily and permanently enjoining the Defendants from further violations of the ICA;

c.     Awarding damages against the Defendants in an amount including all Portfolio Selection Fees and Promotional Distribution Fees paid to them by Plaintiffs and the Funds for all periods not precluded by any applicable statutes of limitation and continuing through the trial of this case;

d.     Awarding any further "actual damages resulting from [Defendants'] breach of fiduciary duty," including any further "amount of payments received from" the Funds;

e.     Awarding interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law;

f.     Awarding prospective relief in the form of reduced Portfolio Selection Fees and Promotional Distribution Fees in the future based not simply upon a percentage of assets formula, but also based upon the reasonableness of those fees in absolute dollar terms when considering the assets under management in the Funds;  and

g.      Such other and further relief as may be proper and just.


Dated: February 7, 2006

                                    Respectfully submitted,

                                    JOHN J. VAUGHN
                                    GERALD A. KALBFLEISCH
                                    MICHAEL and MYRTLE HATHAWAY

                                    By their counsel,


                                    /s/ Jonathan D. Mutch
                                    David E. Marder (BBO #552485)
                                    Marc N. Henschke (BBO #636146)
                                    Jonathan D. Mutch (BBO # 634543)
                                    ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
                                    800 Boylston Street, 25th Floor
                                    Boston, MA 02199
                                    (617) 267-2300


                                    Thomas J. Gallo (admitted pro hac vice)
                                    ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
                                    2600 One Atlanta Plaza
                                    950 E. Paces Ferry Rd., N.E.
                                    Atlanta, GA  30326-1119
                                    (404) 760-4300


                                    Thomas R. Grady (admitted pro hac vice)
                                    ACKERMAN, LINK & SARTORY, P.A.
                                    222 Lakeview Avenue, Suite 1250, Esperante
                                    West Palm Beach, FL 33401

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| _____ )<br>JOHN J. VAUGHN, )<br>GERALD A. KALBFLEISCH, and )<br>MICHAEL and MYRTLE HATHAWAY, )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>PUTNAM INVESTMENT )<br>        MANAGEMENT, LLC and )<br> )<br>PUTNAM RETAIL )<br>MANAGEMENT, LLP, )<br> )<br>Defendants. )<br>_____ ) | Civil Action No: 04-CV-10988<br><br>Hon. George A. O'Toole |

CERTIFICATE OF SERVICE

I hereby that a true and accurate copy of the foregoing was filed with the Clerk of the

Court using the CM/ECF system, and I hereby certify that I sent the same via regular mail, this

7th day of February, 2006 to:

    Seth M. Schwartz, Esq.
    Skadden, Arps, Slate, Meagher & Flom LLP
    Four Times Square
    New York, NY 10036

                /s/ Jonathan D. Mutch
                Jonathan D. Mutch (BBO # 634543)
                ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
                800 Boylston Street, 25th Floor
                Boston, MA 02199
                (617) 267-2300