# EXHIBIT C

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 2370 / March 23, 2005

INVESTMENT COMPANY ACT OF 1940
Release No. 26788 / March 23, 2005

ADMINISTRATIVE PROCEEDING
File No. 3-11868

| | |
|---|---|
| In the Matter of<br><br>PUTNAM INVESTMENT MANAGEMENT, LLC,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940 AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940 |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Putnam Investment Management, LLC ("Putnam" or "Respondent").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, the Respondent consents to the entry of this Order

Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Order") as set forth below.

## III.

On the basis of this Order and Putnam's Offer, the Commission finds[1] that:

### Respondent

1.    Putnam is the registered investment adviser to the over 100 registered investment companies in the Putnam Fund Complex, which include retail mutual funds, registered closed-end funds and open-end mutual funds that underlie variable annuities ("Putnam Funds"). Since 1971, Putnam has been registered with the Commission pursuant to Section 203(c) of the Advisers Act. Putnam is owned by Putnam Investment Management Trust, a wholly owned subsidiary of Putnam LLC ("Putnam Investments"), a Delaware limited liability company that conducts business as Putnam Investments. Putnam Investments is in turn owned by Putnam Investments Trust, a Massachusetts business trust. Putnam Investments Trust is a subsidiary of Marsh & McLennan Companies, Inc., which is a publicly owned holding company traded on the New York Stock Exchange, whose operating subsidiaries are international insurance brokers, investment managers and management consultants. Putnam Investments is also the parent of Putnam Retail Management Limited Partnership ("PRM"), the Putnam Funds' distributor. As of September 30, 2004, Putnam and its affiliates managed approximately $209 billion, of which $140 billion represented mutual fund assets under management and $69 billion represented assets under management for institutional clients. Putnam's principal offices are located in Boston, Massachusetts.

2.    During 2000 through November 2003, the chief executive officer of Putnam Investments was also the president of Putnam. Putnam also had separate individuals who served as the "head" or "co-heads" of Putnam's operations, one of which was referred to within the Putnam organization as the Investment Division. Putnam Investments had numerous direct and indirect subsidiaries, which included PRM, which was responsible for retail marketing of the Putnam Funds, the Putnam Fiduciary Trust Company, the transfer agent for the funds, as well as Putnam or the Investment Division, which performed the investment advisory functions for the Putnam Funds. The operational heads of Putnam, PRM and the other affiliated companies reported to the chief executive officer of Putnam Investments. The financial statements of the subsidiaries were included in consolidated financial statements of Putnam Investments Trust, the parent of Putnam Investments. The various subsidiaries also shared administrative, finance and legal functions.

---

[1]    The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

## Overview

3.      This matter involves the failure of Putnam to fully and effectively disclose material facts, including the conflicts of interests that arose from PRM's arrangements with broker-dealers for increased visibility within the broker-dealers' distribution systems.  Since at least January 1, 2000 through December 31, 2003, Putnam directed brokerage commissions on the Putnam Funds' portfolio transactions to broker-dealers for "shelf space" or heightened visibility within their distribution systems.  PRM, the Putnam Funds' distributor and an affiliate of Putnam, had entered into arrangements ("Preferred Marketing Arrangements") with over 80 broker-dealers whereby the broker-dealers provided services designed to promote the sale of the Putnam Funds.  Approximately twenty of those broker-dealers were paid in cash, while over sixty broker-dealers received directed brokerage commissions from the Putnam Funds' portfolio transactions.  All of these arrangements were based primarily upon negotiated formulas relating to gross or net fund sales and/or the retention of fund assets.

4.      When Putnam directed fund brokerage commissions to broker-dealers in connection with the Preferred Marketing Arrangements, its affiliate, PRM, did not use its own assets to pay for the services obtained under these arrangements.  Because the financial results of these entities along with other affiliates were combined within consolidated financial statements, the entire Putnam organization benefited from the use of fund assets to defray such expenses.  Putnam did not fully and effectively communicate this potential conflict of interest to the Putnam Funds' Board of Trustees (the "Putnam Board" or "Trustees").  Putnam also did not fully and effectively communicate the potential conflict of interest presented for its Equity Trading group, which was faced with directing trades to specific broker-dealers designated by PRM while at the same time satisfying its best execution obligations.

5.      Nor did Putnam fully and effectively communicate the specific terms and details of those Preferred Marketing Arrangements that were being paid for with brokerage commissions to the Putnam Board or the Putnam Funds' shareholders ("Putnam Shareholders").  Instead, Putnam informed the Trustees, and the Statements of Additional Information ("SAIs") and prospectuses for the funds disclosed, that Putnam had a policy of considering the sale of fund shares as a factor in selecting broker-dealers to execute fund portfolio trades.  Putnam did not fully and effectively advise the Trustees and the Putnam Funds' SAIs  and prospectuses did not fully and effectively disclose that PRM, its affiliate, had arrangements with those broker-dealers to direct fund brokerage commissions for marketing and distribution services pursuant to negotiated formulas with the broker-dealers.

## PRM Had Preferred Marketing Arrangements with Broker-Dealers

6.      Since at least January 2000 through December 2003, PRM had over 80 relationships with certain broker-dealers pursuant to which the Putnam Funds received heightened visibility within the broker-dealers' distribution or sales systems.  The Putnam Funds' distributor, PRM, negotiated the Preferred Marketing Arrangements

on behalf of itself and Putnam.  At all times, PRM entered into these arrangements with the knowledge and approval of Putnam and Putnam Investments.

       7.     The broker-dealers provided various types of distribution services in connection with these arrangements:  participation in meetings with registered representatives, primarily for the purpose of providing education and training regarding the Putnam Funds; the opportunity for the Putnam Funds to be mentioned in communications with a broker-dealer's customers such as on a broker-dealer's website; and often, placement on a "preferred list" at a broker-dealer.

       8.     Various financial terms existed for participation in the broker-dealers' Preferred Marketing programs based upon the formulas that PRM had individually negotiated.  Typically, broker-dealers were paid anywhere from 10 to 35 basis points ("bps") on mutual fund gross or net sales and/or 1.5 to 15 bps on aged assets. These payments were in addition to existing payments, including dealer concessions, shareholder servicing payments, and payments for services that Putnam or an affiliate otherwise would provide.

### Putnam Directed Brokerage Commissions to Pay
### for Preferred Marketing Arrangements

       9.     Although many broker-dealers sought Preferred Marketing payments in the form of cash or "hard dollars", PRM generally negotiated to direct brokerage commissions on the Putnam Funds' portfolio transactions.  Putnam and PRM referred to these directed fund brokerage commissions as "soft dollars," "fund sales," or "commissions for sales."  In the ordinary course, to conduct portfolio transactions in connection with the Putnam Funds' investment program, the Funds pay substantial amounts in brokerage commissions for execution services.  In addition to the execution services, Putnam and its affiliates at times also receive soft dollar and other benefits from such commissions, including research and the payment of fund custody expenses.  During the relevant period, Putnam directed some commissions to broker-dealers to pay for Preferred Marketing Arrangements.

      10.    Although PRM or Putnam Investments in some instances used its own cash, Putnam, PRM, and Putnam Investments preferred to direct fund brokerage commissions to pay for these arrangements.  Putnam's use of brokerage commissions directly benefited Putnam Investments and PRM by reducing their out-of-pocket expenses.  It was also in Putnam's financial interest to defray the expenses of an affiliate because of the positive impact on the Putnam organization's operating income.  This preference was reflected in an internal presentation PRM created on revenue sharing that stated that PRM was "always pushing toward a soft dollar deal" when negotiating these arrangements.  The impact of this preference was that PRM had substantially more Preferred Marketing Arrangements in soft dollars than in hard dollars.

      11.    From at least January 1, 2000 through December 31, 2003, Putnam directed fund brokerage commissions to over 60 broker-dealers for the Preferred

Marketing Arrangements.[2]  When PRM negotiated to direct brokerage commissions to pay for these arrangements, it sometimes negotiated to direct brokerage commissions of 1.5 times (or some other negotiated multiple or conversion rate) the amounts requested by the broker-dealers in hard dollars.

12.     In order for Putnam to properly direct fund brokerage commissions for the arrangements, PRM communicated the commission amounts, but not the details of the basis point arrangements, for each of the broker-dealers to the Head of Putnam's Equity Trading ("Equity Trading").  These amounts, referred to as commission targets ("targets"), were primarily based upon the formulas negotiated with the broker-dealers. Equity Trading used the targets, subject to its own guidelines, including the requirement for the traders to seek best execution, to direct fund brokerage commissions to the broker-dealers.

13.     Periodically, PRM communicated modified commission target amounts for individual brokers to Equity Trading based upon the priorities PRM set for these broker-dealers.  These modifications for individual brokers were sometimes increases and sometimes decreases to the targets.[3]  At times, PRM requested that Equity Trading increase trading with specific broker-dealers in order to more quickly meet target commission amounts with broker-dealers and provided suggested priority status among the various broker-dealers.  Equity Trading accepted the modifications, subject to Putnam's best execution policies.

14.     The management of Equity Trading periodically circulated to the traders a list prepared by PRM reflecting the directed brokerage target amounts for each broker-dealer, commission amounts paid to each broker-dealer during that year, the current balance of the target remaining, and the percentage of completion toward the target.  Thus, Putnam's traders were made aware of the targets and placed trades with the fund-selling broker-dealers subject to the firm's best execution policies.  In addition to the fund sales targets, the traders were also made aware of other brokerage commission targets, including those for research.

15.     Putnam had a computerized system that categorized trades based upon the percentage of completion of the target.  Six such categories existed, including research, proprietary research, fund sales, custody, execution and client-directed.  For example, if Putnam placed a trade with a broker-dealer that had both fund sales and research targets, the computer would automatically assign the brokerage commission to the category for which the target was farthest away from completion.  If a trade or a certain portion of a trade was assigned to fund sales, the associated commission was used

---

[2]     Based upon the Putnam Board's direction, Putnam ceased directing brokerage to broker-dealers in connection with the sale of fund shares as of January 1, 2004.

[3]     Due to declining overall commissions, between 2000 and 2003, the amount of commissions directed to fund-selling brokers declined each year and was never more than 12.5% of total available brokerage commissions.  In particular, PRM modified the targets substantially downward in 2002 and 2003, and the Equity Trading department was not able to meet many of the individual targets during that time.

to pay for a Preferred Marketing arrangement.  In addition to assigning the trades on Putnam's internal records, Putnam's trading system also electronically communicated this information to the trading desks at the broker-dealers that executed the trades.

16.    Putnam used two methods to direct brokerage commissions for Preferred Marketing Arrangements:  by forwarding portfolio transactions directly to a broker-dealer with which it had such an arrangement ("distributing broker"); and through "step-out" or correspondent arrangements.  Putnam used the latter method in its effort to achieve best execution in circumstances in which the distributing broker's execution capability did not satisfy Putnam's trading department's standards.

### PRM's Preferred Marketing Practices Were Not Always Consistent With Firm Guidelines

17.    Putnam had a policy relating to placing portfolio transactions with broker-dealers who sold Putnam Funds in recognition of their sales of Putnam Funds' shares.  Its policy, as stated in the SAIs, and later the prospectuses, was that "Consistent with the Conduct Rules of the National Association of Securities Dealers, Inc. and subject to seeking the most favorable price and execution available and such other policies as the Trustees may determine, Putnam Management may consider sales of shares of the fund (and, if permitted by law, of the other Putnam funds) as a factor in the selection of broker dealers to execute portfolio transactions for the fund."

18.    Internally, PRM's policy was that amounts directed to broker-dealers in consideration of fund sales were not obligations and therefore, directed brokerage arrangements should not be put into writing.  Also, within Putnam, guidance was given that agreements for the allocation of commissions could not be made.  Putnam conveyed this understanding to the Putnam Board and repeatedly assured the Putnam Board that there were no agreements for commissions for sales and no firm amounts of commissions were promised to broker-dealers, but only that targets were set.

19.    PRM did not follow some of this guidance.  For instance, PRM signed an agreement, entitled a "letter of understanding", along with a side letter with a broker-dealer regarding PRM's participation in the broker-dealer's preferred sales program.  Although the side letter stated that each transaction that generated such commissions would be carried out on a best execution basis and that the letter did not create any binding legal obligations, through this letter PRM nevertheless agreed to pay for its participation in the program with brokerage commissions.  Despite the firm's policy, Putnam approved PRM's signing of this letter of understanding.

20.    PRM also provided a few broker-dealers with letters confirming the negotiated basis point formulas for directing brokerage commissions.[4]  Again, Putnam approved the form of these letters.

---

[4]    These letters also stated that they did not create any binding legal obligations.

**Putnam Did Not Fully and Effectively Communicate its
Directed Brokerage Practices to the Trustees**

21.     Putnam did not fully and effectively communicate to the Putnam
Board that it was directing fund brokerage commissions to over 60 broker-dealers to pay
for PRM's Preferred Marketing Arrangements.  While Putnam communicated generally to
the Trustees that broker-dealers were seeking financial support, Putnam did not fully and
effectively disclose to the Trustees the existence of the arrangements with the broker-
dealers, the terms or details of the arrangements, or the preference to direct brokerage
commissions, which were fund assets, rather than using PRM's or Putnam Investments'
assets.

22.     In the process of providing the Board with information relevant to
the annual review and approval of the management contract for the Putnam Funds,
Putnam provided a memorandum to the Board describing "fall-out benefits" received by
both Putnam and its affiliates.  Among other things, the memorandum identified that
Putnam conducts trading for the Funds, and in connection with that trading, Putnam
received research related services from broker-dealers in consideration of those
commissions.  While the memorandum reiterated the policy that Putnam may consider
sales of fund shares as a factor in placing trades, it did not discuss the Preferred
Marketing Arrangements nor did it identify the distribution services received with the
Funds' brokerage commissions.

23.     Putnam told the Brokerage and Custody Committee of the Board of
Trustees, which was charged with reviewing the breakdown of the brokerage commissions
on portfolio transactions into the six categories, that Putnam "considered the sale of fund
shares" when selecting broker-dealers to execute fund portfolio transactions.  Putnam also
disclosed to the Trustees the amounts of brokerage commissions directed to the top 25
fund-selling broker-dealers in consideration of fund sales.  Putnam also told the Trustees
semi-annually that "Putnam Mutual Funds establishes commission targets to recognize the
efforts of broker dealers based on their respective sales efforts."  Putnam did not, however,
fully and effectively disclose that these amounts were actually used to pay for Preferred
Marketing Arrangements negotiated by PRM.

**Putnam Did Not Fully and Effectively Disclose To The Trustees
The Potential Conflicts Of Interest**

24.     As a fiduciary, Putnam had a duty to disclose fully and effectively to
the Putnam Board all potential conflicts of interest created by the use of fund brokerage
commissions, yet it failed to do so.

25.     The use of brokerage commissions to pay for participation in
Preferred Marketing Arrangements created two potential conflicts of interest for Putnam.
The first related to the use of fund assets to satisfy what would otherwise have been
obligations of PRM.  Because PRM and Putnam were under common control, Putnam
benefited from the use of fund assets to defray the expenses of its affiliate, PRM.  Yet,
Putnam failed to fully and effectively disclose this conflict to the Trustees.

26.    The second potential conflict was the one that Putnam's Equity Trading group faced while trying both to satisfy its best execution obligations and to direct trades to specific broker-dealers identified by PRM.  Specifically, Equity Trading had to determine:  which broker-dealers to place trades with and what commission rates to pay; whether to use single stock trades or program trading; whether to reduce the number of broker-dealers with which Putnam traded; and whether these relationships affected the transaction costs of the directed trades and Equity Trading's objectives to reduce overall transaction costs.

**Putnam Did Not Adequately Disclose its Directed
Brokerage Practices to Putnam Shareholders**

27.    Putnam was primarily responsible for ensuring that the Putnam Funds' Prospectuses and SAIs were in compliance with the requirements of Form N-1A in describing Putnam's trading practices for the Putnam Funds.[5]

28.    The information the Commission requires investment companies to disclose in prospectuses and SAIs is set forth in Form N-1A.  Specifically, Item 16(c)[6] of the Form N-1A requires a description in the SAI of "how the Fund will select brokers to effect securities transactions for the Fund" and requires that "[i]f the Fund will consider the receipt of products or services other than brokerage or research services in selecting brokers, [the Fund should] specify those products or services."

29.    From at least January 1, 2000 to December 31, 2003, Putnam Funds' SAIs[7], disclosed that Putnam may consider sales of shares of the Putnam Funds as a factor in the selection of broker-dealers to execute the Putnam Funds' portfolio transactions.  The SAIs did not make the distinction, however, between directing commissions in "consideration of fund sales" and paying for negotiated arrangements with brokerage commissions.  The SAIs did not adequately disclose to shareholders that PRM had entered into arrangements for heightened visibility within broker-dealers' distribution systems for which Putnam, subject to best execution, directed brokerage commissions, the amounts of which were primarily determined by negotiated formulas.

30.    As a result of the conduct described above, Putnam willfully[8]:

---

[5]    The Putnam Funds' SAIs are incorporated by reference into the prospectuses.

[6]    As of July 4, 2004, the relevant item of the Form N-1A has been changed from Item 16(c) to Item 15(c).

[7]    For a portion of 2003, the prospectuses also contained this disclosure.

[8]    "Willfully" as used in this Order means intentionally committing the act which constitutes the violation.  See Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965).  There is no requirement that the actor also be aware that he is violating one of the Rules or Act.

a.  Violated Section 206(2) of the Advisers Act, which provides that it is "unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

b.  Violated Section 34(b) of the Investment Company Act, which provides in pertinent part that it is "unlawful for any person to make any untrue statement of a material fact in any registration statement . . . filed or transmitted pursuant to" the Investment Company Act and to "omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading."

## **Undertakings**

31.  Putnam undertakes the following:

a.  Putnam shall, within 90 days from the date of entry of the Order, require a senior level employee to implement and maintain the following written compliance policies and procedures:

i.  Procedures designed to ensure that when the Putnam trading desk places trades with a broker-dealer that also sells fund shares, the person responsible for selecting such broker-dealer does not take into account the broker-dealer's promotion or sale of Putnam Fund shares, subject to modification only in the event that the independent members of the Putnam Board determine that such modification is in the best interest of the Putnam Funds;

ii.  Putnam will establish guidelines for entering into revenue sharing arrangements[9] between Putnam or PRM and broker-dealers and other intermediaries in

---

[9]    As used in Paragraph 31(a) herein, "revenue sharing arrangements" are arrangements by which payments are made to broker-dealers from the assets of Putnam or PRM relating to the sale of the Putnam Funds and/or assets maintained in the Putnam Funds other than (i) dealer concessions, 12b-1 fees, shareholder servicing payments, or subaccounting payments or (ii) non-cash compensation arrangements as expressly permitted by NASD Rule 2820(g)(4) or Rule 2830(l)(5) (or any successor to either such rule).

respect of the sale of fund shares, which shall not be inconsistent with the terms of the Order. The language of the guidelines must be presented to the Putnam Board and approved by Putnam's chief legal officer. The guidelines shall require PRM to use its best efforts to enter into written contracts memorializing the revenue sharing arrangements between PRM and the broker-dealer or other intermediary. The documentation of each revenue sharing arrangement in respect of fund sales will set forth the payment arrangement and the services that the broker-dealer or other intermediary will provide. The documentation of each revenue sharing arrangement shall also include a request from Putnam or PRM that the broker-dealer or other intermediary provide point of sale disclosure documents consistent with then current legal requirements;

iii.    All revenue sharing arrangements in respect of the sale of fund shares must be approved in writing by Putnam's chief legal officer, or his delegate, and the form of such arrangements, or any material deviation therefrom, presented to the Putnam Board prior to implementation;

iv.    Subject to the Putnam Board's approval, Putnam will prepare disclosures for the Putnam Funds to include in their prospectuses or SAIs information about payments made by Putnam or PRM to broker-dealers or other intermediaries in respect of the sale of fund shares in addition to dealer concessions, shareholder servicing payments, and payments for services that Putnam or an affiliate otherwise would provide, such as sub-accounting, and state that such payments are intended to compensate broker-dealers for various services, including without limitation, placement on the broker-dealers' preferred or recommended fund list, access to the broker-dealers' registered representatives, assistance in training and education of personnel, marketing support, and other specified services;

v.    At least once per year, Putnam will make presentations to the Communication, Service and Marketing Committee of the Putnam Board (or

10

other committee performing similar functions or designated by the Putnam Board, or to the Putnam Board), including an overview of Putnam's revenue sharing arrangements and policies, any material changes to such policies, the number and types of such arrangements, the types of services received, the identity of participating broker-dealers or other intermediaries and the total dollar amounts paid to such broker-dealers and intermediaries. Putnam shall also provide the Committee with a summary quarterly report setting forth amounts paid by Putnam for such arrangements and the broker-dealers and intermediaries that received such payments; and

vi.   At least once per year, for at least five years, Putnam shall provide the Brokerage and Custody Committee of the Putnam Board (or other committee performing similar functions) with a best execution analysis. In such analysis, Putnam shall include lists of: (a) the top ten executing broker-dealers used by Putnam; and (b) the top ten selling broker-dealers conducting business with PRM.

b.   Within 10 days of the date of entry of the Order:

i.   Putnam shall develop a Distribution Plan to distribute fairly and proportionately to the Putnam Funds the total disgorgement and penalty ordered in paragraph IV.C. below based upon the amounts of brokerage commissions in 2000 through 2003 categorized for "Fund Sales" attributed to each Putnam Fund. Putnam shall submit the Distribution Plan to the Putnam Board and the Commission staff. The Distribution Plan must be acceptable to the Commission staff.

ii.   Putnam shall provide a written certification to the Commission staff of the accuracy of the calculations relating to the Distribution Plan.

c.   Within 20 days of the date of entry of the Order, Putnam shall submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 1101 of the Commission's Rules of Practice.

d. Following a Commission order approving the final Distribution Plan, as provided in Rule 1104 of the Commission's Rules of Practice, Putnam shall take all necessary and appropriate steps to administer the final Distribution Plan, including overseeing the actual distribution of the monies to the Putnam Funds within 10 days of the Commission's approval of the Distribution Plan.

e. Within 5 days of the distribution of the monies to the Putnam Funds, Putnam shall provide a written certification to the Commission staff of the amount paid to each Putnam Fund and the date of payment.

f. In In re Putnam Investment Management, LLC, Investment Advisers Act Rel. No. 2192, 2003 WL 22683975 (Nov. 13, 2003), Putnam agreed to various undertakings including those requiring it to retain an Independent Compliance Consultant to conduct a comprehensive review of Putnam's supervisory, compliance, and other procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by Putnam and its employees. Putnam further agrees to direct the Consultant also to review the completeness of Putnam's then-current disclosures concerning revenue sharing arrangements to the Putnam Board and Putnam shareholders.

Extension of Time

g. For good cause shown, the Commission's staff may extend any of the procedural dates set forth above.

**IV.**

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions specified in the Offer submitted by Putnam.

Accordingly, it is hereby ORDERED that:

A. Putnam is censured.

B. Putnam shall cease and desist from committing or causing any violations and any future violations of Section 206(2) of the Advisers Act and Section 34(b) of the Investment Company Act.

12

C.    Putnam shall within 5 days of the entry of the Order, pay disgorgement in the amount of $1 ("Disgorgement") and a civil money penalty in the amount of $40 million ("Penalty"), for a total payment of $40,000,001.  Such payment shall be: (1) made by wire transfer, United States postal money order, certified check, bank cashier's check or bank money order; (2) made payable to the Securities and Exchange Commission; (3) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA  22312; and (4) submitted in connection with a cover letter that identifies Putnam as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and wire confirmation, money order or check shall be sent to Ari Gabinet, District Administrator, Philadelphia District Office, U.S. Securities and Exchange Commission, Mellon Independence Center, 701 Market Street, Suite 2000, Philadelphia, PA 19106.

D.    There shall be, pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund established for the funds described in Section IV.C.  Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to the Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Putnam agrees that it shall not, after offset or reduction in any Related Investor Action based on Putnam's payment of disgorgement in this action, further benefit by offset or reduction of any part of Putnam's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Putnam agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against Putnam in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Putnam by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

E.    Putnam shall comply with the undertakings enumerated in Section III.31 above.

By the Commission.

Jonathan G. Katz
Secretary

13