UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x
JOHN J. VAUGHN, GERALD A.
KALBFLEISCH, MICHAEL HATHAWAY    :
and MYRTLE HATHAWAY,
                                 :
        Plaintiffs,                      Civil Action
                                 :       No. 04-10988-GAO
        v.
                                 :
PUTNAM INVESTMENT                        ORAL ARGUMENT REQUESTED
MANAGEMENT, LLC and              :
PUTNAM RETAIL MANAGEMENT, LLP,
                                 :
        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x
```

**DEFENDANTS PUTNAM INVESTMENT MANAGEMENT,
LLC'S AND PUTNAM RETAIL MANAGEMENT LIMITED
PARTNERSHIP'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

James R. Carroll
David S. Clancy
Scott T. Lashway
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

Counsel for Defendants Putnam
Investment Management, LLC and
Putnam Retail Management Limited Partnership

Dated: May 11, 2006

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  DEFENDANTS ARE IN THE MIDST OF A MASSIVE DOCUMENT
    PRODUCTION; THEY HAVE PRODUCED 90,000 PAGES ALREADY . . . . . . . . . . . . . . . 2

II. PLAINTIFFS HAVE REFUSED TO WORK WITH DEFENDANTS
    ON SPECIFYING REASONABLE ADDITIONAL CATEGORIES, AND
    STUBBORNLY PRESS THEIR 141 VAGUE REQUESTS, AS WRITTEN  . . . . . . . . . . . . . 4

III. CONSISTENT WITH THEIR APPROACH TO DATE,
     PLAINTIFFS' MOTION DEALS IN MISLEADING AND UNHELPFUL
     GENERALITIES; THIS VIOLATES LOCAL RULE 37.1, WHICH REQUIRES
     THE MOVING PARTY TO JUSTIFY RELIEF ON A REQUEST-SPECIFIC BASIS . . . . . . . 6

IV. UPON EXAMINATION OF THE RELEVANT FACTS (CONSISTENT
    WITH LR 37.1), IT IS CLEAR THAT PLAINTIFFS' MOTION IS WITHOUT MERIT  . . . . . 7

    A.  Requests 8, 21, 22, 65, 66, 67, 69, 70, 71, 78, 79, 80, 81, 82, 86, 92, 94, 128, and 138 . . 7

    B.  Requests 6, 7, 9, 10, 11, 13, 18, 54, 102, 107, 116, and 124 . . . . . . . . . . . . . . . . . . . . . . 9

    C.  Requests 5, 34, 48, 50, 55, 56, 58, 75, 76, and 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    D.  Plaintiffs' Demand For "Full And Complete Financial Information" . . . . . . . . . . . . . . . 10

    E.  Eighteen Additional Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.  Subsection C.1 of Plaintiffs' Memorandum (Requests 42, 112, 113) . . . . . . . . . . . . 12

        2.  Subsection C.2 of Plaintiffs' Memorandum (Requests 59, 98, 110, 106) . . . . . . . . . 12

        3.  Subsection C.3 of Plaintiffs' Memorandum (Requests
            35, 44, 45, 68, 101, 136, 104, 108, 118, 129, 132, 137) . . . . . . . . . . . . . . . . . . . . . 13

V.  PLAINTIFFS' DEMANDS AS TO TIME PERIOD ARE UNREASONABLE . . . . . . . . . . . . 15

    A.  Plaintiffs' Demand That Discovery Extend Back To
        1995 On A Default Basis Is Unreasonable, And Should Be Rejected . . . . . . . . . . . . . . 15

    B.  Plaintiffs' "Through The Present" Proposal Is Also Unreasonable . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

i

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

In re AllianceBernstein Mut. Fund Excessive Fee Litig., No. 04 Civ. 4885 (SWK),
    2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Brever v. Federated Equity Mgmt. Co. of Pa., 233 F.R.D. 429 (W.D. Pa. 2005) . . . . . . . . . . . 17-18

Daily Income Fund, Inc. v. Fox, 464 U.S. 523 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Doricent v. American Airlines, Inc., 1993 U.S. Dist. LEXIS 15143 (D. Mass. Oct. 19,
    1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Forsythe v. Sun Life Financial, 417 F. Supp 2d 100 (D. Mass. 2006) . . . . . . . . . . . . . . . . . . . . . . 18

Fox v. Reich & Tang, Inc., 692 F.2d 250 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

Green v. Nuveen Advisory Corp., 295 F.3d 738 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Grossman v. Johnson, 89 F.R.D. 656 (D. Mass. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Jones v. Harris Assocs. LP, No. 04-8305 (N.D. Ill. Dec. 19, 2005) (transcript) . . . . . . . . . . . . . . 18

King v. Douglass, 973 F. Supp. 707 (S.D. Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Krasner v. Dreyfus Corp., 90 F.R.D. 665 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Krinsk v. Fund Asset Mgmt., Inc., No. 85 Civ. 8428 (JMW), 1986 WL 205 (S.D.N.Y.
    May 9, 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18


STATUTES & OTHER AUTHORITIES

D. Mass. Local R. Civ. P. 37.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7, 9

Fed. R. Civ. P. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15 U.S.C. § 80a-35(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

### Preliminary Statement

Plaintiffs' motion violates LR 37.1(B), which requires that their brief address issues "with particularity," on a request-specific basis. Little wonder: plaintiffs' brief seeks relief as to <u>100</u> of their <u>141</u> document requests, without quoting the request, or Defendants' response, as to even <u>one</u> of them. And it is replete with misstatement and mischaracterization, <u>e.g.</u>, "with few exceptions Putnam improperly refuses to produce any internal documents." As the next three pages show, that is not true.

These issues are a basis for denial of plaintiffs' motion on their own, but they also reflect a deeper problem: plaintiffs are using Rule 34 in this case not as a tool for development of needed evidence, but instead in support of an unfocused discovery assault. Their 141 document requests are of the following type: "all documents . . . that concern, refer or relate to profits or profit margins realized by any entity with respect to Management Fees, Portfolio Selection Fees, and/or 12b-1 Fees." (Request 27.) "All" documents that "refer" to profits? That "relate to" profits? This kind of request is the stuff of plaintiffs' motion -- despite Defendants' commitments to produce category after <u>intelligible</u> category of relevant documents, amounting, so far, to more than <u>90,000</u> pages of documents.[1]

There is no reason that plaintiffs, who are presumably aided by experts, cannot work with Defendants responsibly to settle on intelligible and reasonable document production commitments. A plaintiff's evaluation of the straightforward <u>Gartenberg</u> factors -- <u>e.g.</u>, trustee diligence, profitability, nature and quality of services to shareholders -- can and should be based on targeted fact-gathering, not gratuitous imposition on the Defendants of pressure and burden, in the guise of "discovery."

Plaintiffs' motion should be denied, and the Court should order plaintiffs to confer reasonably with Defendants before again seeking Court intervention.

---

[1]    "The phrase 'relating to' is, of course, the darling of . . . those lawyers who abuse the discovery and trial process by substituting harassment for thought . . . . one of the basic problems with discovery is that too little effort is made to serve properly drafted and well-thought-out requests . . . ." <u>Doricent v. American Airlines, Inc.</u>, 1993 U.S. Dist. LEXIS 15143, at *22 n.5 (D. Mass. Oct. 19, 1993) (Young, D.J.).

**I.    DEFENDANTS ARE IN THE MIDST OF A MASSIVE DOCUMENT
PRODUCTION; THEY HAVE PRODUCED 90,000 PAGES ALREADY**

Plaintiffs suggest that Defendants are providing only nominal discovery, and state that
"[w]ith few exceptions, Putnam improperly refuses to produce any internal documents." (Pl. Mem., at
11.)  Yet Defendants are making a massive production of non-public documents, which includes:

**1.    Fee-related communications with the trustees for January 1, 2002-June 30,
2005** (see, e.g., "Response to Request No. 6" in Defendants' written document-request response, which is
Exhibit 1 to the Appendix in support of this opposition.)  This category of documents includes the
materials provided to the trustees in connection with their evaluation of management and 12b-1 fees,
which include, each year:  (i) three voluminous binders of detailed information (the "black books"); (ii)
supplemental materials, i.e., additional materials provided pursuant to special requests of the trustees
(e.g., concerning economies of scale); (iii) 12b-1 reports, the quarterly reports to the trustees containing
detailed information concerning the prior quarter's expenditures of 12b-1 fees; and (iv) "blue books,"
which are binders provided to the trustees each month on an array of issues, including fees.[2]

**2.    Back-up to the black books, also for the period January 1, 2002-June 30,
2005** (again, see, e.g., "Response to Request No. 6," Appendix Ex. 1.)  The black books are prepared by
Defendants' "Operations Finance Department," and Defendants are producing its back-up to the black
books, which is a massive commitment.  For example, part of this back-up is electronic files, which, for
2002 to 2005, amount to more than 30,000 pages.

These two categories are themselves core documentary record with respect to fee
evaluation.  But, as shown in "Chart A" and in "Chart B" below, Defendants' production goes much,
much further:

---

[2]    Defendants are moving for permission to file a "Confidential Appendix" containing certain confidential
materials which, while not necessary for resolution of this motion, would be helpful to the Court.  Exhibit A of
that Confidential Appendix contain sample tables of contents for the black books, to give the Court a sense of the
substance of the materials.

"Chart A" shows certain additional categories of documents Defendants have committed to produce for January 1, 2002-June 30, 2005 (it is not exhaustive). "Chart B" shows categories of documents Defendants have committed to produce for January 1995-June 30, 2005. (Exhibit A to this brief has versions of each chart with references to the associated document request responses.)[3]

---

**CHART A**
**(Documents That Defendants Are Producing For January 1, 2002-June 30, 2005)**

- Minutes of trustee meetings concerning evaluation of management fees and 12b-1 fees.

- Trial balances. For each year, the trial balance shows each expense item, and each revenue item, for each Putnam entity (i.e., not just Defendants PIM and PRM). (Printed in 12-point font, the 2004 trial balance exceeds 160 pages.) There is no "deeper"-level such document: beneath each of its hundreds of entries is entry-specific data and documents, leading down ultimately to -- for example -- invoices from vendors. This document underlies Putnam's audited financial statements, and it has been produced in hard-copy form, and in electronic form.

- Reports provided to the trustees concerning fund performance. This constitutes more than three years of monthly reports concerning the performance of all of Putnam's more than 70 mutual funds.

- Additional reports provided to the trustees' "Investment Oversight Committee" concerning that committee's periodic additional evaluation of the performance of the particular funds at issue.

- Training manuals and guidelines relating to portfolio management personnel, to Operations Finance Department personnel, and (to the extent they relate to marketing) to PRM personnel. This category has already resulted in the production of approximately 15,000 pages of documents.

- For each of the five funds at issue, management contracts, distribution plans, distributor's contracts, and custodian agreements (the key contracts for each fund).

- Organizational charts for Defendants PIM and PRM (as an example, Putnam has produced a December 2003 organizational chart the 1,055 pages of which show corporate structure, and individual names and job titles.)

- If there are any, any shareholder complaints concerning management and/or 12b-1 fees.

- Putnam has also committed to search diligently for documents within certain broad categories, which will entail searching the e-mails of key individuals pursuant to a plan that has been presented to plaintiffs (Appendix Ex. 39), as well as follow-up inquiry as to those and certain other individuals who Defendants believe have meaningful involvement in the fee-evaluation process. Those categories include:

  – Documents addressing the impact of 12b-1 fees on the interests of mutual fund shareholders.

  – Documents addressing the benefits of 12b-1 fees to the Defendants.

---

[3]    Charts A and B exclude public filings that Defendants have produced, given plaintiffs' focus on alleged refusal to produce "internal documents." But Defendants note that their production includes sets of key public filings, organized by fund, and, within fund, chronologically (for 1/1/02-6/30/05); this aspect of the production represents an effort to ensure that the record includes complete and organized sets of these important materials. (For example, the annual Form 485 for each fund contains a wealth of important information, including detailed information concerning the fees, investment strategies, risks, fund holdings, performance, and relevant investment personnel. Appendix Exhibit 44 contains a sample Form 485; see "contents" at page 0010504.)

– Documents addressing the impact of 12b-1 fees on expense ratios and/or flow volatility.

– Documents addressing whether management and/or 12b-1 fees on Putnam funds are excessive.

– Documents comparing management and/or 12b-1 fees on mutual funds with fees for institutional accounts.

– Documents comparing services provided to Putnam mutual funds to services provided to Putnam institutional accounts.

– Documents comparing profits in connection with Putnam mutual funds to those in connection with Putnam institutional accounts.

– Documents comparing the portfolio holdings and/or portfolio turnover rates of the funds at issue with institutional accounts.

– Documents comparing the performance of any of the funds at issue with the performance of any institutional account.

– Any contracts between PIM and/or PIM, on the one hand, and Putnam Advisory Company, on the other hand ('PAC'). (PAC manages institutional accounts, whose fees Plaintiffs claim should be a guide to fees on the mutual funds.)

– Documents addressing the requirements of § 36(b).

– Documents addressing the requirements of Rule 12b-1.

---

**CHART B**
**(Documents That Defendants Are Producing Back to 1995)**

- The black books (as explained on page 2, the fee evaluation-related volumes provided to the trustees each year)

- The 12b-1 reports (as explained on page 2, the quarterly reports to the trustees concerning 12b-1 fees)

- The trial balances (as explained on page 2, showing all revenue and expense items for all Putnam entities)

---

\*     \*     \*

Defendants have now produced more than 90,000 pages of documents, and their production is ongoing. Defendants are continuing to canvas employees for responsive documents, and Defendants' counsel are beginning the extremely expensive process of reviewing years of e-mails.

## II.  PLAINTIFFS HAVE REFUSED TO WORK WITH DEFENDANTS ON SPECIFYING REASONABLE ADDITIONAL CATEGORIES, AND STUBBORNLY PRESS THEIR 141 VAGUE REQUESTS, AS WRITTEN

Plaintiffs' 141 requests include requests like the following (Request 5):

All documents and tangible things in your possession, custody, or control relevant to establishing the total amounts of Management Fees, Portfolio Selection Fees, and 12b-1 Fees that PIM, PRM, or other affiliated Putnam entities have received from each of The Funds at any and all times during the Damages Period.

Because documents "relevant to establishing the total amounts of" the fees is a vague and subjective category, Defendants' response to this request (Appendix Ex. 1, at 7) articulated concrete categories of responsive documents, including the black books, which specify the management fees and the 12b-1 fees on the funds at issue, and the Form 485s, in which Defendants publicly report those fees.

To the extent that plaintiffs want to "test" the data in the above documents, Defendants have otherwise committed to produce the back-up to the black books (the voluminous electronic files underlying the black books), and the trial balances (in hard-copy and electronic form). (See Chart A.)

In committing to produce such categories of documents, Defendants understood that plaintiffs might want more, but Defendants expected that, if so, plaintiffs would engage Defendants in reasonable and concrete terms -- for example, by identifying what other category or categories of documents they need to satisfy Request 5's demand for documents "relevant to establishing" the fees. And Defendants repeatedly asked plaintiffs to proceed in that manner.[4]

Plaintiffs refused to do so and instead move to compel, without specifying what else they need, much less explaining why it is necessary. They want this Court to order that, with respect to this vague request and the many, many others at issue on this motion, Defendants simply produce "more."

The example above (Request 5) is by no means unrepresentative. Plaintiffs' requests are generally far more unreasonable than Request 5. Request 27, for example, asks for "[a]ll documents . . .

---

[4]    Defendants' first written response to plaintiffs' request for documents identified many of the categories of documents in Charts A and B. (See Appendix Ex. 3.) Plaintiffs were dissatisfied, and after a November 10, 2005 discovery conference and a November 16, 2005 letter that explained why Defendants could not simply accept plaintiffs' 141 vague categories as written (Appendix Ex. 6), Defendants provided a December 5, 2005 amended written response broadening their commitments in multiple ways, e.g., by committing to produce the back-up to the black books as to all of Putnam's 78 funds. (Appendix Ex. 1.) Defendants expected that, at some point, plaintiffs would engage in similar concrete, request-specific efforts. Instead, Defendants heard nothing from plaintiffs about the amended document request response for more than four months, when plaintiffs began setting up their motion to compel with a March 16, 2006 letter asking if Defendants "intend to make any further amendments." (Appendix Ex. 25.) Even then -- in vain -- Defendants renewed their request that plaintiffs engage in a meaningful process of conferral. (See March 21 letter, Appendix Ex. 27.)

that concern, refer, or relate to profits or profit margins realized by any entity with respect to Management Fees, Portfolio Selection Fees, and/or 12b-1 Fees." Every form of revenue and expense "relates to" Putnam's profits (or losses), and this request would therefore include (at least) virtually every document, hard-copy or electronic, generated by any finance personnel going back more than ten years.

### III. CONSISTENT WITH THEIR APPROACH TO DATE, PLAINTIFFS' MOTION DEALS IN MISLEADING AND UNHELPFUL GENERALITIES; THIS VIOLATES LOCAL RULE 37.1, WHICH REQUIRES THE MOVING PARTY TO JUSTIFY RELIEF ON A REQUEST-SPECIFIC BASIS

LR 37.1(B) states that on a motion to compel, "the memorandum shall state with particularity the following . . .

. . . (4) Each . . . request for production . . . raising an issue to be decided by the Court, and the response thereto; and (5) A statement of the moving party's position as to each contested issue, with supporting legal authority, which statement shall be set forth separately immediately following each contested item."

Plaintiffs' memorandum lists various document request <u>numbers</u> on which they want an undefined order, sometimes -- but not always -- including a parenthetical summarizing the general <u>topic</u> of the request. The memorandum never quotes the actual request, sets forth Defendants' actual response, or fully acknowledges the documents that have <u>already</u> been produced. As a necessary byproduct of its rule violations, the memorandum never -- for any request -- includes any meaningful statement of what residual open issue actually needs to be resolved, much less of <u>why</u> that open issue should result in a court order in plaintiffs' favor.

Plaintiffs' approach is substantively inconsistent with the conference requirements, and it is facially inconsistent with LR 37.1.[5]

---

[5] "Appendix 1" of plaintiffs' brief appears to be intended to create the illusion of compliance with LR 37.1(B), but it fails. <u>First</u>, LR 37.1(B)'s mandate concerns the substance of "the memorandum." (<u>Id.</u>) <u>Second</u>, even if "Appendix 1" were treated as part of the memorandum (resulting in a nearly <u>200</u> page memorandum), that would not matter. LR 37.1 demands that plaintiffs address discovery requests on a request-by-request basis, "with particularity," and "Appendix 1" does not do so. For example, Section II.A.1.b of plaintiffs' brief asks the
(continued...)

**IV.    UPON EXAMINATION OF THE RELEVANT FACTS (CONSISTENT WITH LR 37.1), IT IS CLEAR THAT PLAINTIFFS' MOTION IS WITHOUT MERIT**

### A.    Requests 8, 21, 22, 65, 66, 67, 69, 70, 71, 78, 79, 80, 81, 82, 86, 92, 94, 128, and 138

At pages 12-13, plaintiffs' memorandum seeks an order as to these nineteen requests, without identifying, for even one of them, its actual content, Defendants' actual response, or what Plaintiffs purportedly need beyond what Defendants are already providing.  (See Charts A and B, supra.) Examination of such facts shows the deficiency of plaintiffs' motion.  For example, Request 8 seeks:

> All documents and tangible things in your possession, custody, or control relevant to identifying each of the various types of services and/or resources that PIM, PRM, or other Putnam entities have provided in exchange for the Management Fees, Portfolio Selection Fees, and 12b-1 Fees that they have received from any of the Putnam Mutual Funds.

In response, Defendants first explained that the request is unworkable, because Putnam provides a host of services and resources, and "all documents relevant to identifying" them is a subjective, open-ended category.  However, Defendants committed to produce the black books, which, each year, contain a report that specifically identifies these services (a sample of which is Exhibit D to Defendants' Confidential Appendix).[6]  Plaintiffs still move to compel, seeking more -- but without identifying what that "more" is.  Surely plaintiffs do not want all documents "relating" to Putnam's services -- that would be every document in Putnam's possession.[7]

As another example, Request 21 seeks: "All documents and tangible things in your possession, custody, or control that concern, refer, or relate to the issues of whether the nature or

---

[5]    (...continued)
Court to issue a motion to compel order as to 93 document requests.  The corresponding subsection of "Appendix 1" (subsection A.1) reproduces the text of the 93 requests and responses in full, over 69 pages.  Then, at the end of the subsection, appears "plaintiffs' position" as to all of those 69 pages of requests and responses, which is two conclusory paragraphs, the second of which is a one-sentence reference to plaintiffs' brief.

[6]    Those services are also itemized on pp. 12-14 of PIM's interrogatory response (Conf. Appendix Ex. B).

[7]    A similar analysis applies to Request 128, which is materially similar to Request 8.

amounts of Management Fees that PIM has charged to any of the Putnam Mutual Funds are advisable, legal, appropriate, proper, fair, justified, or warranted." This request is inappropriate, because, as Defendants stated in their response, it demands that <u>Defendants</u> determine what documents "relate" to <u>plaintiffs'</u> allegations, within a huge and complex organization with more than 4,000 employees who generate and exchange countless hard-copy and electronic records. Here too, though, Defendants stated that they would provide all fee-related communications with the trustees (the core record on the issue of fee evaluation), and they are also producing an array of otherwise responsive documents including:

- The voluminous <u>back-up</u> to the black books;

- Categories of documents such as:

    - Documents addressing the impact of 12b-1 fees on mutual fund shareholders;

    - Documents addressing whether management and/or 12b-1 fees are excessive*;*

    - Documents addressing the requirements of § 36(b) and/or 12b-1*;*

    - Shareholder complaints concerning management and/or 12b-1 fees; <u>as well as</u>

- The <u>many</u> other categories of documents identified in Charts A and B.[8]

Maybe there are other categories of documents that plaintiffs would find helpful in evaluating whether the fees are "advisable, legal, appropriate, proper, fair, justified, or warranted." But plaintiffs should identify those documents, not ask a court to order Defendants to divine what they are.[9]

---

[8]    Some of these categories are not listed in Defendants' written response to Request 21 in particular. But what matters is what Defendants have <u>in fact</u> produced/committed to produce <u>in the aggregate</u>, not what Defendants state they will produce on any particular page of their months-old written response. For example, Defendants' commitment to produce the massive back-up to the black books is relevant to the motion to compel analysis on <u>every</u> request, not just on those where the particular written response thereto specifically references that commitment. Plaintiffs ignore this obvious fact. For example, they seek relief as to Request 5 because Putnam has "limit[ed] its production to public filings, Trustee communications, and Trustee minutes." (Pl. Mem. at 13.) As shown, Putnam's production of documents responsive to Request 5 is <u>much</u> broader than that.

[9]    The same analysis is applicable to Request 22, which is substantively duplicative of Request 21.

This section of plaintiffs' brief conclusorily lists fifteen other requests. Defendants address them in Exhibit B to this brief. (Defendants have no other choice: plaintiffs reference 100 requests in their blunderbuss motion, and Defendants cannot address all of them in 20 pages.)

**B.    Requests 6, 7, 9, 10, 11, 13, 18, 54, 102, 107, 116, and 124**

Plaintiffs purport to justify a motion to compel order as to these twelve requests in a single opaque paragraph on page 13 of their brief. Upon examination of the basic facts mandated by LR 37.1, it is again clear that plaintiffs' motion lacks merit. For example, Request 6 seeks:

> All documents . . . relevant to establishing the total profits and profit margins that PIM, PRM, or other affiliated Putnam entities have realized in connection with the Management Fees, Portfolio Selection Fees, and 12b-1 Fees that they have received from each of The Funds at any and all times during the Damages Period.

As to this request, Defendants committed to produce all fee-related communications with the trustees, including the black books, which contain, each year, extensive financial reporting including: (i) an audited financial statement for Putnam Investments Trust, which owns all Putnam entities; (ii) an audited financial statement for PIM; (iii) an audited financial statement for PRM; and (iv) fund-specific financial statements. Defendants also committed to produce the back-up to the black books, which will permit plaintiffs to test the profit data provided to the trustees, as would another key category of documents -- the trial balances, which Defendants have already produced for 2002, 2003, and 2004, and which Defendants have committed to produce going back to 1995.

In sum, Request 6 asks for documents "relevant to establishing" profits, and Defendants are producing specifically-identified categories of documents that specify Putnam's profits, and that support those numbers. If plaintiffs need something more in this area, they should identify it. (The same is true of Request 138, which also asks for documents "relevant to establishing" profits.)[10]

---

[10]    Exhibit C to this brief addresses the other requests in this artificial "group."

C.    **Requests 5, 34, 48, 50, 55, 56, 58, 75, 76, and 131**

Plaintiffs address these ten requests in an even shorter paragraph. (Pl. Mem. at 13-14.) This rule violation again masks the important <u>facts</u>. The first of these requests -- Request 5 -- was addressed in Section II of this brief, and, as shown there, plaintiffs' motion as to that request is baseless. Another example is Request 75, which seeks all documents that "reflect, concern, refer or relate to any negotiations, bargaining, or communications relating to any actual or proposed Management Fees, Management Contracts, 12b-1 Fees, or Distribution Plans . . . " Yet Defendants are producing all fee-related communications with the trustees, <u>as well as</u> the back-up to those communications, <u>as well as</u> an array of additional categories of documents. <u>See</u> Charts A and B, <u>supra</u>. Plaintiffs ignore all of this, and here again do not identify what else they want, much less justify an order requiring its production.[11]

D.    **Plaintiffs' Demand For "Full And Complete Financial Information"**

Conclusorily citing eleven more requests (which are addressed individually in Exhibit E to this brief), Page 14 of plaintiffs' brief demands "full and complete financial information" (which is a <u>practically</u> meaningless category). Defendants carefully responded to plaintiffs' requests in this area by <u>specifying</u> responsive information for production, including:

1.    Annual financial statements of Marsh & McLennan Companies, Inc. ("MMC"), Putnam's parent. (These have been produced.)

2.    Quarterly MMC financial statements. (These have been produced.)

3.    Annual audited financial statements for Putnam Investments Trust, which consolidate the financial results of all of that trust's subsidiaries, including Defendants PIM and PRM. (These <u>non</u>-public documents have been produced.)

4.    Annual audited financial statements for Defendant PIM. (These <u>non</u>-public documents have been produced.)

---

[11]    A similar analysis applies to Request 76, which asks for all documents that "concern, refer or relate to any consideration given" by the trustees to "whether or not to approve any actual or proposed Management Contract or Distribution Plan . . ." Exhibit D addresses the remainder of the requests in this "group."

5.    Annual audited financial statements for Defendant PRM.  (These <u>non</u>-public documents have been produced.)

6.    Annual audited financial statements for Putnam Advisory Company ("PAC"), the entity which services Putnam's institutional accounts.  (These <u>non</u>-public documents have been produced.)

7.    The trial balances (also <u>non</u>-public), which <u>underlie</u> the audited financial statements.[12] These have been produced for 2002-2004, and are being produced for 1995, 1996, 1997, 1998, 1999, 2000 and 2001.

8.    The black books, which contain multiple additional financial reports, including financial statements for each fund.  (These non-public documents have been produced).

9.    The back-up to the black books -- <u>i.e.</u>, the voluminous hardcopy and electronic materials relating to the preparation of the black books and the various financial reports those volumes contain.  (More than 30,000 pages of such information has been produced thus far.)

Further, Defendants' counsel have stated their willingness to provide <u>more</u> data:

I am open to working with you as to the financial data that you want, but I cannot go back to my client simply asking for "more" financial information than they have already provided.  Can you be more clear and specific about what you need?  (Maybe you have an expert or experts you could work with to articulate in technical terms the additional information that you think you do not have, and still need?  I could then take that clarification to Putnam, and have a concrete discussion with Putnam about what you are asking for.)

(Letter dated April 20, 2006, at page 3 (point 6), Appendix Ex. 36.)

Plaintiffs responded with the instant motion, still complaining vaguely that the information they have received is not "full and complete."  Plaintiffs should <u>identify</u> what more they want -- not much to ask, in light of the burden plaintiffs freely impose on others.[13]

---

[12]    Plaintiffs say that Defendants are producing only "limited entries" from the trial balances.  (Pl. Mem. at 14.)  Defendants have produced the trial balances <u>in their entirety</u>.  Maybe plaintiffs have not reviewed them?

[13]    Plaintiffs state that the SEC has twice found that Putnam failed to disclose material information to the trustees.  (Pl. Mem. at 12.)  Defendants disagree with plaintiffs' characterizations (<u>e.g.</u>, they did not admit the findings in question), but Defendants will not belabor this point because it is not relevant.  As Charts A and B show, Defendants are producing category after category of what plaintiffs refer to as "internal" documents (that is, documents that are not provided, at least in the ordinary course, to the trustees).  So the question is not

(continued...)

11

### E.    Eighteen Additional Requests

Plaintiffs' brief concludes with three subsections, which together superficially address eighteen more deficient requests.  (Pl. Mem. at 15-19, subsections C.1, C.2, and C.3.)

### 1.    Subsection C.1 of Plaintiffs' Memorandum (Requests 42, 112, 113)

• Request 42: "[a]ll documents" that "concern, refer to, or address" the Section 36(b) actions in Illinois that preceded this lawsuit.  This is a harassing demand that Defendants spend months gathering years worth of privileged litigation documents like draft filings and communications among counsel.  Plaintiffs should be encouraged to focus on the substance of their claim.[14]

• Request 112: "[a]ll documents" that "concern, refer or relate to" government investigations regarding "the propriety or amount of any fees."  Defendants have committed to produce communications with regulators to the extent the investigation concerned the issue in this case (an allegation of excessive management and/or 12b-1 fees).  That commitment is reasonable.

### 2.    Subsection C.2 of Plaintiffs' Memorandum (Requests 59, 98, 110, 106)[15]

• Request 59: "[a]ll documents" concerning "policies relating to the practice of simultaneously servicing multiple accounts . . . ."  Defendants do not know what this request means.  If plaintiffs will clarify, Defendants will determine if any such policies exist.

• Request 98: "[a]ll documents" that "constitute, reflect, concern, refer, or relate to" "policies, practices, or procedures" concerning "disclosures to shareholders . . . regarding" management

---

[13]    (...continued)
whether Defendants must produce such documents, but what such documents Defendants should produce in addition to what they are *already* producing -- a topic on which plaintiffs provide no specifics.

[14]    Request 113 is a broader version of Request 42, seeking all documents that "relate to" all "litigation, arbitration, or mediation" concerning "excessive fees."  It is deficient for the same reasons that Request 42 is deficient, except to a greater degree, in light of its greater breadth.

[15]    These numbers are out of sequence, because Defendants list them in the same order as do plaintiffs.

and 12b-1 fees. Defendants have produced prospectuses and shareholder reports for each of the funds at issue, for the 2002-June 20, 2005 time period, which contain detailed disclosure to shareholders concerning fees. But the Putnam legal department's "practices" and "procedures" as to <u>preparing</u> such disclosures are not relevant, and, even if they were, this sweeping demand for all documents "referring" or "relating" to those "practices" is unjustified.[16]

     •   <u>Request 106</u>: "[a]ll documents" that "relate to any policies, practices, or proce-dures . . . with respect to seeking and obtaining the most favorable prices and execution of trades." Defendants have produced their trading manual, which states on page 3 that its "purpose is to outline the trading strategies, processes, and systems that Putnam uses to ensure 'best execution.'" The manual then does so, over <u>211</u> pages. Defendants are identifying for production similar core documents concerning best execution. If plaintiffs have workable categories of additional best execution-related documents in mind, Defendants will confer with plaintiffs about them, as Defendants' response to this request states.[17]

### 3. Subsection C.3 of Plaintiffs' Memorandum (Requests 35, 44, 45, 68, 101, 136, 104, 108, 118, 129, 132, 137)[18]

     •   <u>Request 35</u>: "[a]ll documents" that "concern, refer, or relate to any explanations, characterizations, or descriptions of the activities that each of the Investment Management Teams perform . . . ." What does "relate to . . . descriptions of . . . activities" <u>mean</u>? In any event, Defendants are producing document after document relating to the activities of investment personnel, including the

---

[16]     Request 110 is an even more objectionable corollary to this request, demanding all documents that "relate" to "whether or to what extent" the management fees "should be made transparent" to shareholders.

[17]     "As with other areas of inquiry identified in plaintiffs' requests, Defendants would respond, as appropriate, to a more narrowly tailored, specifically-articulated request or set of requests concerning best execution." (Appendix Ex. 1, at page 69.) (That same response also explains that "[i]t is not sensible to ask PIM and PRM for, in effect, 'all documents relating to best execution,' which is a fundamental part of their day-to-day business, implicating a sweeping array of individuals and documents (even day-to-day trading records).")

[18]     Defendants address 5 of these twelve requests here, and the remainder in Exhibit F to this brief.

black books, the monthly fund-performance reports to the trustees, and the semi-annual fund-specific Form N-CSRs (which contain detailed description in this area; see, e.g., Appendix Ex. 45, which is a sample of one of these filings). Further, plaintiffs will surely depose fund investment personnel on this very issue. What more plaintiffs want as to this request is unclear.

- Requests 44 and 45: "[a]ll documents" that "concern" the "issues of if, whether, how, or to what extent PIM has complied, should comply, or may comply with any of the requirements or standards imposed by Section 36(b) . . . ." and "Rule 12b-1." These requests are inappropriate. Plaintiffs allege violation of law, and now demand that Defendants produce all documents "relating" to "whether" they complied with the law? Plaintiffs should specify what types of documents they believe bear on that ultimate legal issue, not demand that -- under Court order -- Defendants divine what they are. Nonetheless, Defendants have committed to conduct a diligent search for documents that address the requirements of Section 36(b) and Rule 12b-1 (see Chart A), itself a broad and difficult commitment.

- Request 136: "[a]ll documents" that "constitute, reflect, concern, refer, or relate to any practices, contracts, or agreements by which securities owned by or on behalf of any of The Funds are loaned to any other person or entity." Defendants have produced the lending agreements themselves, but this request seeks every document "relating to" them, which would encompass, for no proffered reason, all correspondence with the lessees, all internal documents referencing securities lending, and all records reflecting such lending. A team of individuals could spend weeks on nothing else. Plaintiffs now say, for the first time, that they are interested in knowing what "profits" Defendants realize from these loans. With that clarification, Defendants have now already produced multiple presentations showing that the funds profit from these arrangements and summarizing those profits (examples are in Exhibit F to the Confidential Appendix). If plaintiffs have reasonable and intelligible follow-up requests, Defendants are willing to satisfy them.

14

- **Request 104**: This request contains multiple sub-requests, each of which itself restates some other request or requests. For each sub-request, Defendants painstakingly referred plaintiffs, by number, to the relevant response or responses. Plaintiffs' complaint about this response is opaque. They say that Defendants must produce "responsive information" "as to each Fund (i.e., not only consolidated amounts)." (Pl. Mem. at 18.) Defendants do not understand what "information" Plaintiffs refer to, and Defendants have produced an extensive fund-specific information, including -- for example -- the fund-specific financial statements in the black books, and the back-up to the black books. What additional fund-specific "information" do plaintiffs want? Why do plaintiffs suggest that Defendants have produced only "consolidated" information, when that is not true?

## V.    PLAINTIFFS' DEMANDS AS TO TIME PERIOD ARE UNREASONABLE

### A.    Plaintiffs' Demand That Discovery Extend Back To 1995 On A Default Basis Is Unreasonable, And Should Be Rejected

Plaintiffs admit that this case does not challenge fees received by Putnam prior to May 18, 2003. (Pl. Mem. at 9 n.13.) As such, it is undisputed that this case involves subsequent fees, and the contemporaneously-provided services. Consequently, Defendants propose that as a default matter document discovery begin at January 1, 2002, to encompass the evaluation process as to the fees that were in place on May 18, 2003, and that any document discovery as to prior periods be appropriately focused.[19] As plaintiffs know, Defendants have not rigidly enforced any 2002 "cut-off," and have made reasonable commitments as to earlier time periods. See Chart B, supra.[20]

---

[19]    Management fee evaluation primarily occurs in the first half of each year, and the approved fee schedules are then in effect from July 1 through the next June 30. So the fees in place on May 18, 2003 were the result of the first-half-of-2002 fee evaluation process.

[20]    Plaintiffs refer to the pre-2002 commitments as "a limited number of financial documents." (Pl. Mem. at 8 n.12.) That is misleading. For example, plaintiffs well know that each year the black books comprise three volumes of varied and substantive information, ranging from detailed financial reports to memoranda addressing the trustee's responsibilities, memoranda describing the services provided to the funds, memoranda describing

(continued...)

If plaintiffs would articulate additional intelligible, reasonable categories of documents from the 1995-2001 period of time, Defendants would discuss them.  But plaintiffs refuse to do so, and rigidly demand that Defendants "comply" with their existing requests, without any modification or modulation, for a period of time spanning more than one <u>decade</u>.

An order to that effect would be crippling.  For example, in response to Request 43, Defendants committed to conduct a diligent search for documents that address the requirements of Section 36(b).   For the 1/1/02-6/30/05 time period, implementing this <u>one</u> commitment (of the many others in Charts A and B) will be difficult.  There is no discrete file or files for such documents, or any particular committee that would possess such documents.  In an effort to search <u>reasonably</u>, Defendants will conduct an expensive and time-consuming search of the e-mail of key individuals over a multi-year period using search terms like "36(b)" (<u>see</u> the e-mail search plan that is at Appendix Ex. 39), and as to hard-copy documents Defendants will also make follow-up inquiry as to those individuals and other individuals who, in Defendants' view, had meaningful involvement in the fee-evaluation process.

Plaintiffs demand that Defendants <u>expand</u> this commitment so that the category in question is all documents that "concern, refer to, or address any of the requirements or standards imposed by" Section 36(b) (whatever all of that <u>means</u>), so that the undefined search encompasses -- apparently -- the e-mail, hard drives, and hard-copy documents of <u>scores</u> of individuals (or more) (<u>see</u> Appendix Ex. 41 -- letter criticizing Defendants' proposed e-mail search plan as "grossly deficient"), and so that the time period covers more than <u>ten</u> years.  <u>And plaintiffs ask for the same nearly-boundless undertaking as to *fifty-two other* vague and sweeping document requests</u> (<u>See</u> Pl. Mem. at 10) -- including, for example, Request 21, which baldly demands "[a]ll documents" that "concern, refer, or

---

[20]      (...continued)
potential "fall-out benefits," analyses comparing mutual fund fees to institutional-account fees, and so on.

relate to the issues of whether the nature or amounts of Management Fees . . . are advisable, legal, appropriate, proper, fair, justified, or warranted."

    In support of these demands, plaintiffs explain that they "must examine the fees charged, the assets under management, the costs and expenses, and Putnam's profits over a period of years." (Pl. Mem. at 9.) But all of that -- and much more -- is <u>in</u> the black books, 12b-1 reports, and trial balances, which Defendants are already producing for 1995-2005.

    Plaintiffs also state that Putnam is "giving Plaintiffs less temporal access than the Trustees have in their annual review of the management and the 12b-1 plans." (Pl. Mem. at 9.) How so? As to the fees at issue in this case, plaintiffs are receiving the black books <u>and the back-up to the black books</u>. Further, as to <u>eight</u> prior years, plaintiffs will receive the black books and 12b-1 reports, and -- in addition to those trustee materials -- Defendants' trial balances.

    Defendants' proposal is sensible. Plaintiffs' is not, and should be rejected.

### B. <u>Plaintiffs' "Through The Present" Proposal Is Also Unreasonable</u>

    Defendants have proposed, as a default matter, document production through June 30, 2005, more than one year after this suit was filed. That is reasonable, for these reasons:

    <u>First</u>, Defendants' proposal extends discovery <u>well</u> beyond the date of suit (May 17, 2004), even though, as a legal matter, that is when discovery <u>should</u> end. In <u>Daily Income Fund, Inc. v. Fox</u>, 464 U.S. 523, 526 n.2 (1984), the Supreme Court stated that under Section 36(b) "<u>recovery is limited to actual damages for a period of one year prior to suit</u>." (emphasis added.) Court after court has held the same.[21] The rationale is that a "shareholder's ability to police and challenge any such agreement

---

[21]  <u>See</u>, <u>e.g.</u>, <u>Green v. Nuveen Advisory Corp.</u>, 295 F.3d 738, 743 (7th Cir. 2002) ("Congress enacted § 36(b) to provide a narrow federal remedy . . . damages are recoverable only for the one-year period before the filing of the action."); <u>Fox v. Reich & Tang, Inc.</u>, 692 F.2d 250, 261 (2d Cir. 1982) ("Section 36(b) expressly limits recovery to excessive fees paid up to one year prior to the commencement of suit."); <u>In re AllianceBernstein Mut. Fund Excessive Fee Litig.</u>, No. 04 Civ. 4885 (SWK), 2006 WL 74439, at *2 n.3 (S.D.N.Y. Jan. 11, 2006)

(continued...)

through an award of damages is specifically limited to one year by operation of the statute [because]

Congress sought to advance the twin goals of providing an appropriate check on potential conflicts of

interest in setting fee arrangements and limiting the potential for increased costs of litigation and the

abusive use of lawsuits." Brever v. Federated Equity Mgmt. Co. of Pa.,233 F.R.D. 429, 433 (W.D. Pa.

Nov. 7, 2005).[22]  Moreover, the United States District Court for the Northern District of Illinois recently

ordered that discovery end as of the date of suit.  Transcript of Jones v. Harris Assocs. LP, No. 04-8305,

at 4:13-16 (N.D. Ill. Dec. 19, 2005) (Appendix Ex. 46).[23]

       Second, Defendants' proposal ends the default period for document discovery at a

meaningful point in time: June 30, 2005, when the trustees completed the review process in connection

with the currently operative fees, which remain in effect until June 30, 2006.  And, in so doing, that

proposal avoids intrusion into Defendants' and the trustees' ongoing fee-review.

---

[21]      (...continued)

("Congress sharply limited recovery under Section 36(b) to a one year time period"); King v. Douglass, 973 F. Supp. 707, 710 n.4 (S.D. Tex. 1996) ("Recovery is limited to actual damages for a period of one year prior to suit.  Section 80a-35(b)(3)."); Krinsk v. Fund Asset Mgmt., Inc., No. 85 Civ. 8428 (JMW), 1986 WL 205, at *4 (S.D.N.Y. May 9, 1986) ("Congress chose to limit recovery of damages by a shareholder to a short one-year period"); Grossman v. Johnson, 89 F.R.D. 656, 661 n.13 (D. Mass. 1981) ("the statute . . . limits damages to 'actual damages', recoverable only for the period one year prior to the initiation of the action").

[22]      See also AllianceBernstein, 2006 WL 74439, at *2 n.3 ("In contrast to the five-year period set forth in Section 36(a) for SEC enforcement, Congress sharply limited recovery under Section 36(b) to a one year time period because it wanted to create a limited mechanism with which to test and rectify advisory fees in the mutual fund industry. . . . Legislative insistence in restricting the applicable time period disinclines the Court to make factual extrapolations or speculative inferences in Plaintiffs' favor.") (citation omitted); Krinsk, 1986 WL 205, at *4 ("Equally significant is the fact that Congress chose to limit recovery of damages by a shareholder to a short one-year period. . .  It is evident that Congress was not intending to create a broad remedy under Section 36(b) but rather a mechanism whereby the current level of management fees would be policed, tested and, if necessary, rectified.") (citing S. Rep. No. 184, 91st Cong., 1st Sess. at 5 (1970); H. Rep. No. 1382, 91st Cong., 2d Sess. 201 (1970); 116 Cong. Rec. 39, 344 (1970)).

[23]      Plaintiffs cite this Court's decision Forsythe v. Sun Life Financial, 417 F. supp. 2d 100 (D. Mass. 2006), but, as Defendants read it, that decision adjudicated only the beginning-date for recovery as to the Section 36(b) claim, not the ending date.  Id. at 116-117.  Nor did Krasner v. Dreyfus Corp., 90 F.R.D. 665, 672 (S.D.N.Y. 1981): that decision analyzed the terms of a settlement.

Third, as in any other area, Defendants are open to working reasonably with plaintiffs as to discrete, identifiable categories of documents. For example, when the current fee-evaluation process is over (June 30, 2005), Defendants will produce to plaintiffs the 2006 black books and related materials. And there are likely other categories of documents upon which the parties can reach agreement, if plaintiffs would proceed in a reasonable and focused manner.

Plaintiffs' very different proposal is patently unreasonable. They demand that a formless net of vague requests -- 95 in total -- be "periodically" cast across Putnam's ongoing business activities, and that, after each cast, all resulting documents be produced. (Pl. Mem. at 7-8.) Further, plaintiffs do not justify that demand. Even if plaintiffs could recover post-complaint fees, they would still bear a burden of justifying any particular post-complaint discovery demand. In other words, purported legal entitlement to recover post-complaint fees is not itself a justification for any particular discovery demand. Here, though, that is plaintiffs' only proffered basis for 95 discovery demands.

Reproduced below is plaintiffs' summary of the 95 requests on which they demand "through-the-present" production (from pages 7 and 8 of plaintiffs' brief). Defendants ask the Court to consider how Defendants would actually implement a commitment to "periodically" gather and produce all newly-created documents in the below-listed categories, and whether plaintiffs have justified their demand that Defendants attempt to do so:

> Accordingly, Plaintiffs request that Putnam be compelled to provide responsive documents through the present as to the following requests: 5-7, 10-13, 65-67, 104, and 138 (fees, profits and expenses), 8, 9 and 128 (concerning Putnam's fees and services provided therefore), 20 (benefits of 12b-1 fees to Putnam), 18 and 54 (addressing changes in fees), 21-22 and 109 (addressing excessiveness of fees and impact of fees on shareholders), 34 and 59 (concerning management teams), 29-32, 64, 120-123 and 140 (financial reports and sources of financial information), 59 (activities of investment teams), 42 (concerning Plaintiffs' 36(b)
>
> 7

19

actions), 43-45 (addressing requirements of and compliance with Section 36(b) and Rule 12(b)-1), 48 (Fund portfolio holdings), 50 (performance of the Funds), 55 (Trustee compensation), 56 (relating to Putnam's brokerage), 58 (investment policies), 60 (trade allocation policies), 68-71 (other fees, services and costs to Funds), 72 (Trustee minutes), 73 (materials provided to Trustees), 75-87 (addressing Trustees' considerations in reviewing management and 12(b)-1 fees), 88-93 (concerning economies of scale and fall-out benefits), 94 (model fee schedules), 95 (investment performance and investment process), 98 (policies about making fee disclosures), 101-102 (concerning Putnam's fee schedules), 103 (fees to Putnam from entities other than Putnam funds), 106 (PIM's policy to obtain favorable prices on trades), 107 (certain statements by Putnam with respect to management contracts and fees), 108 (conflicts of interest between Putnam and its funds), 110 (transparency of fees), 111 (concerning breakpoints and profits), 112 and 113 (government investigations and litigation about fees), 116 (concerning Lipper peer groups of the Funds), 117 (training manuals), 118 (resumes of investment management team members), 124 (impact to Funds of using PIM as investment advisor), 125 (agreements between Trustees and Putnam), 127 (contracts between Putnam and the Funds), 129 (securities clearing relationships), 130 (Putnam policies concerning calculation of fees, investment programs and marketing of funds), 131 (records of daily purchases and sales on behalf of Funds), 132 (audits relating to the Funds), 136 (securities lending agreements), 137 (communications with shareholders concerning fees), and 139 (marketing plans for the Funds).

*   *   *

8

Plaintiffs' unrealistic proposal on this issue should be rejected. As to this area (and all others), this Court should order plaintiffs to make reasonable and concrete discovery requests, and confer about them with Defendants meaningfully, before again seeking judicial intervention.

## CONCLUSION

For the foregoing reasons, Defendants ask that this Court deny plaintiffs' motion.

Dated:  May 11, 2006
       Boston, Massachusetts

Respectfully submitted,

/s/ James R. Carroll
James R. Carroll (BBO #554426)
David S. Clancy (BBO #636031)
Scott T. Lashway (BBO #655268)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts  02108
(617) 573-4800

### Certificate of Service

I, Scott T. Lashway, hereby certify that on May 11, 2006, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those as non registered participants.

May 11, 2006       /s/ Scott T. Lashway