UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

JOHN J. VAUGHN, GERALD A.
KALBFLEISCH, MICHAEL HATHAWAY          :
and MYRTLE HATHAWAY,

                                                                        :

     Plaintiffs,                                         :          Civil Action

                                                                        :          No. 04-10988-GAO

     v.

                                                                        :

PUTNAM INVESTMENT                                          **ORAL ARGUMENT REQUESTED**

MANAGEMENT, LLC and                                     :

PUTNAM RETAIL MANAGEMENT, LLP,

                                                                        :

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

**DEFENDANTS PUTNAM INVESTMENT MANAGEMENT,
LLC'S AND PUTNAM RETAIL MANAGEMENT LIMITED
PARTNERSHIP'S OPPOSITION TO PLAINTIFFS' REVISED MOTION TO COMPEL**

 

James R. Carroll
David S. Clancy
Scott T. Lashway
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts  02108
(617) 573-4800

Counsel for Defendants Putnam
Investment Management, LLC and
Putnam Retail Management Limited Partnership

Dated:  September 18, 2006

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    PLAINTIFFS IDENTIFY CERTAIN REQUESTS ON WHICH
      THEY SEEK EXPANSION OF THE CATEGORIES OF DOCUMENTS
      DEFENDANTS HAVE ALREADY COMMITTED TO PRODUCE; PLAINTIFFS
      ARE NOT ENTITLED TO RELIEF WITH RESPECT TO ANY OF THOSE REQUESTS . . . . 1

II.   PLAINTIFFS' PROPOSALS AS TO TIME PERIOD ARE NOT REASONABLE . . . . . . . . . . 5

      A.    Plaintiffs' Demand For Production Of Documents "Through Trial" . . . . . . . . . . . . . . . . 5

      B.    Plaintiffs' Demand For Additional 1995-2001 Documents . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    Plaintiffs' Demand For Additional 2000-2002 Documents . . . . . . . . . . . . . . . . . . . . . . 10

III.  PLAINTIFFS ARE NOT ENTITLED TO ANY RELIEF WITH RESPECT TO E-MAIL
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Defendants Are Engaged In Extensive, Substantively Appropriate E-Mail Review . . . . 12

      B.    As They Have Done For Months, Plaintiffs Criticize
            Defendants' Plan, But Offer No Concrete, Reasonable Counterproposal . . . . . . . . . . . . 14

IV.   SECTION 36(b) LIMITS RECOVERY TO "EXCESS" FEES PAID
      DURING THE ONE-YEAR PERIOD PRECEDING THE LAWSUIT . . . . . . . . . . . . . . . . . . 15

      A.    Section 36(b) Limits Recovery To "Excess" Fees
            Paid During The One-Year Period Preceding The Lawsuit . . . . . . . . . . . . . . . . . . . . . . . 15

      B.    Practical Considerations Further Support the Natural
            Reading of Section 36(b), and Undermine Plaintiffs' Alternate Reading . . . . . . . . . . . . 18

      C.    At Most, This Court Should Permit Recovery of Post-Suit Advisory Fees
            Paid In Connection With Advisory Contracts Approved Prior To The Lawsuit . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

In re AllianceBernstein Mut. Fund Excessive Fee Litig., No. 04 Civ. 4885, 2006 WL
    74439 (S.D.N.Y. Jan. 11, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Brever v. Federated Equity Mgmt. Co. of Pa., 233 F.R.D. 429 (W.D. Pa. 2005) . . . . . . . . . . . 17-18

County of Orange v. Air Cal., 799 F.2d 535, 538-39 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . 17

Daily Income Fund, Inc. v. Fox, 464 U.S. 523 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Doricent v. American Airlines, Inc., 1993 U.S. Dist. LEXIS 15143 (D. Mass. Oct. 19,
    1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Forsythe v. Sun Life Financial Inc., 417 F. Supp. 2d 100 (D. Mass. 2006) . . . . . . . . . . . . . . . . . . 18

Fox v. Reich & Tang, Inc., 692 F.2d 250 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

Gallus v. American Express Financial Corp., et al., Civ. No. 04-4498  slip op. (DWF/SRN) (D.
    Minn. July 27, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Gartenberg v. Merrill Lynch Asset Management, Inc., 694 F.2d 923 (2d Cir. 1982) . . . . . . . . . . . . 8

Green v. Nuveen Advisory Corp., 295 F.3d 738 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Grossman v. Johnson, 89 F.R.D. 656 (D. Mass. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Hunt v. Invesco Funds Group, Inc., et al., 2006 WL 1751900 (S.D. Tex. June 22, 2006) . . . . . . . 17

Jones v. Harris Assocs. L.P., No. 04-8305 (N.D. Ill. Dec. 19, 2005) (transcript) . . . . . . . . . . . . . . 18

King v. Douglass, 973 F. Supp. 707 (S.D. Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Krasner v. Dreyfus Corp., 90 F.R.D. 665 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Krinsk v. Fund Asset Mgmt., Inc., No. 85 Civ. 8428, 1986 WL 205 (S.D.N.Y. May 9,
    1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Lawlor v. Loewe, 235 U.S. 522, 536 (1915) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Leinoff v. Milona, 726 F.2d 734, 741 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

STATUTES & OTHER AUTHORITIES

15 U.S.C.A. § 80a-35(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. § 80a-35(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

116 Cong. Rec. 39 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

D. Mass. L. R. Civ. P. 37.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7, 9

Fed. R. Civ. P. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Federal Trial Handbook: Civil (4th Ed. 2005), § 67:1 ("General Rules Relating to Damages") . . . . 20

H.R. Rep. No. 91-1382 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Investment Company Act Amendments of 1967: Hearing on H.R. 9510 Before the Subcommittee on
    Commerce and Finance of the Committee on Interstate and Foreign Commerce, 90th Cong.
    (1967) (supplementary statement of Hon. Manuel F. Cohen, Chairman, Securities and
    Exchange Commission) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Order Approving Proposed Rule Change and Related Interpretation under Section 36 of the
    Investment Company Act, Investment Company Act Release No. 11662 (March 4, 1981)
    [46 FR 16012 (March 10, 1981)] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Prohibition On The Use of Brokerage Commissions To Finance Distribution; Proposed Rule, 69
    Fed. Reg. 9726 (March 1, 2004) (codified at 17 CFR pt. 270) . . . . . . . . . . . . . . . . . . . . . . 2

S. Rep. No. 91-184 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Defendants hereby respond to plaintiffs' September 11, 2006 revised motion to compel (Docket 65.)  As to each of the issues that plaintiffs identify therein, Defendants set forth their position below.  For the Court's reference, and for context, a non-exhaustive list of the categories of documents that Defendants have already committed to produce is attached to this submission as Exhibit A.

## I.    PLAINTIFFS IDENTIFY CERTAIN REQUESTS ON WHICH THEY SEEK EXPANSION OF THE CATEGORIES OF DOCUMENTS DEFENDANTS HAVE ALREADY COMMITTED TO PRODUCE; PLAINTIFFS ARE NOT ENTITLED TO RELIEF WITH RESPECT TO ANY OF THOSE REQUESTS

As to many of plaintiffs' 141 requests, Defendants have committed to produce responsive categories of documents the scope of which is now satisfactory to plaintiffs.  However, as to five requests, plaintiffs are not satisfied with the categories of responsive documents that Defendants have committed to produce.  (See Pl. Mem. at 4-7.)  Plaintiffs are not entitled to relief as to those requests:

**Request 35.**[1]  Investment management is Putnam's business, and consequently "[a]ll documents . . . that constitute, reflect, concern or refer to any explanations, characterizations, or descriptions of the [investment management teams'] activities" is a category that, to the extent Defendants understand it, encompasses a vast and uncertain array of documents.  For example, ad hoc, day-to-day communications between Putnam personnel concerning possible investment decisions and strategies may "reflect" (and/or "concern" or "refer to") investment management teams' "activities."  As such, this request apparently seeks -- in part -- all such communications, for a more than six-year period of time.[2]

Further, plaintiffs have offered no justification for that document collection effort, and they disregard two factors:  (1) as Defendants have pointed out to plaintiffs, description of the activities of investment management teams is contained in public filings that Defendants have produced, on a

---

[1]    This request reads:  "All documents . . . that constitute, reflect, concern, or refer to any explanations, characterizations, or descriptions of the activities that each of the Investment Management Teams perform for each of The Funds in connection with furnishing them with investment programs and/or making investment decisions for them about what securities shall be purchased, held, sold, or exchanged."

[2]    See Plaintiffs' "Appendix 2" (listing requests on which plaintiffs demand 2000-to-present production).

fund-by-fund and year-by-year basis (see excerpt of sample Form 485 at Exhibit B hereto); and (2) during depositions, plaintiffs can ask investment management team members for further detail concerning the nature of their activities, which is a much more direct and sensible way of obtaining this information than asking for "all documents" describing those activities.

**Request 56**.[3]  As of December 31, 2003, Putnam ceased the practice of directed brokerage.[4]  Until, and even after, that time, directed brokerage was expressly permitted by the SEC and NASD,[5] and it was not until 2004 that the regulatory authorities reversed their position and disallowed the practice.[6]  Plaintiffs now demand all documents that "reflect, concern, or refer to" Putnam's decision to end the practice, in advance of the regulators' actions.  That category seems to sweep in, among other documents, all documents that so much as reference the decision to cease directed brokerage.  Further, plaintiffs do not provide a justification for this sweeping demand, beyond an opaque statement that it "is directed to Putnam's fall-out benefits."  (Pl. Mem. at 5.)  Plaintiffs may mean that the practice of directed brokerage benefitted Putnam in a way that they want to attempt to quantify.  If so, then there is surely a way for plaintiffs to pursue that issue in a more reasonable and tailored way, particularly given that Defendants are already providing plaintiffs with core documents in this area, which plaintiffs can assess, and follow up on, as they deem appropriate -- specifically, communications with the trustees about the decision to cease directed brokerage, the periodic Putnam reports to the trustees' Brokerage & Custody

---

[3]     This request reads:  "All documents . . . that reflect, concern or refer to any decision or agreement made by PIM and/or PRM effective as of January 1, 2004 to cease directing brokerage to broker-dealers . . .."

[4]     I.e., considering, in choosing among brokers who consistent with best execution could execute portfolio transactions, whether the broker had promoted the sale of mutual funds.

[5]     See Order Approving Proposed Rule Change and Related Interpretation under Section 36 of the Investment Company Act, Investment Company Act Release No. 11662 (March 4, 1981) [46 FR 16012 (March 10, 1981)]. (Exhibit C hereto).

[6]     That prohibition was not even proposed until March 2004.  See "Prohibition On The Use of Brokerage Commissions To Finance Distribution; Proposed Rule," 69 Fed. Reg. 9726 (March 1, 2004) (codified at 17 CFR pt. 270) (Exhibit D hereto).

Committee (which contain extensive information concerning commission payments to broker-dealers), the annual "black books" (the multiple volumes provided to the trustees in connection with their annual fee review, which contain -- among many other things -- a detailed report each year assessing possible "fall out benefits"), and back-up to the black books.[7]

**Request 102.**[8]  At an in-person discovery meeting on August 22, plaintiffs' counsel stated that this vague request does not seek documents relating to the historical <u>origination</u> of the basic fee schedules, but Defendants still do not know what it <u>does</u> seek.  To the extent that it seeks documents concerning Putnam's annual black book review (in which the trustees review the management contracts and 12b-1 plans), Defendants have already agreed to produce an array of concrete and coherent categories of documents, which together fully cover this area.  Those categories include the black books for 1995-2006, and the back-up to the 2002, 2003, 2004, and 2005 black books (in both hard copy and electronic format).  (Defendants otherwise refer the Court to Exhibit A.)  In this context, there is no basis for the Court to order Defendants to produce all documents within this vague and uncertain category.

**Request 112**.[9]  As to this request, Defendants have agreed to produce communications with regulators in any investigation about mutual fund fees.  In concrete terms, this means that Defendants will produce:  (1) communications with the SEC's Fort Worth office in connection with that office's inquiry into the performance component of the investment management fee for the Putnam

---

[7]        Defendants note that the directed brokerage practice was in effect for only the <u>first six months</u> of this suit's recovery period, which Plaintiffs contend runs for the multi-year period from May 17, 2003 through trial.  For this reason as well, discovery in this area should be appropriately modulated.

[8]        This request reads:  "All documents . . . that concern or refer to the development or formulation of each of the fee schedules for Management Fees and/or for 12b-1 Fees that PIM, PRM, or other affiliated Putnam entities have proposed or furnished to each of The Funds."

[9]        This request reads:  "All documents . . . that concern or refer to any investigation by any governmental, administrative, or self-regulatory body regarding the propriety or amount of any fees charged to any of the Putnam Mutual Funds including, but not limited to, all documents produced in such investigations, all transcripts of testimony, and all communications with such governmental, administrative, or self-regulatory bodies concerning such investigations."

Research Fund (which is not at issue in this case); and (2) communications with the New York Attorney General regarding its limited oral inquiry regarding institutional vs. mutual fund management fees.[10]

Defendants do not see a basis for the significantly broader set of documents plaintiffs seek, i.e., "all" documents concerning items (1) and (2), which would seemingly sweep in each and every incidental communication about them, and also day-to-day internal communications concerning the Putnam legal department's handling of them.  Item (1) did not involve any of the funds at issue, and focused on a performance-fee issue that has no conceivable relevance to this case.  (There is no performance fee on any of the five funds at issue in this case.)  Item (2) was so limited in nature that the most sensible approach is for plaintiffs to review the documentation that Defendants will produce, and consider whether they desire some focused follow-up.

**Request 113**.[11]  Putnam has been unable to identify any arbitrations or mediations concerning any "excessive fee" allegations, but if Putnam's continuing internal research does uncover one, Putnam has already committed to produce all "documents filed in any such matter."[12]  That would provide a basis for some reasonable negotiation about what additional documents plaintiffs might want, short of "all" documents concerning the mediation or arbitration.  That leaves litigation concerning excessive fees, and a request for all documents in this area is wholly unreasonable.  Reading the request literally, that would mean the gathering and production of all documents so much as referencing:  (1) this lawsuit and the various Illinois lawsuits that preceded it, and (2) the pending Multi-District Litigation proceeding in the District of Maryland, which also involves a Section 36(b) claim.  In part, that would

---

[10]      Defendants do not believe this was an "investigation" at all, but will nonetheless consider it one for purposes of this request.

[11]      This request reads:  "All documents . . . that concern or refer to any litigation, arbitration, or mediation proceedings involving PIM and/or PRM as parties that contained any allegation concerning excessive fees charged to any of the Putnam Mutual Funds including, but not limited to, complaints, orders, judgments and settlement agreements."

[12]      See August 31, 2006 letter from Defendants' counsel to plaintiffs' counsel, at 10 (Exhibit E hereto).

require a massive effort with respect to the documents of Putnam's legal department, which -- of course -- has been centrally involved in communications and analysis concerning these pending lawsuits. As to all such documents, it would also require painstaking privilege review.[13] Further, this extensive effort would be wasteful: plaintiffs do not explain <u>why</u> they need this category of documents, which would principally comprise day-to-day litigation communications concerning such matters as brief writing, fact-gathering, and document-gathering.

## II.    PLAINTIFFS' PROPOSALS AS TO TIME PERIOD ARE NOT REASONABLE

### A.    Plaintiffs' Demand For Production Of Documents "Through Trial"

As to 33 categories of documents, plaintiffs demand production of documents "through trial." (Pl. Mem. at 7-14.) That request is unreasonable, and should be rejected.[14] Fact discovery currently <u>closes</u> on December 31 of this year, a fundamental point which Plaintiffs (oddly) ignore. In any lawsuit, there is a specified period for fact discovery, including collection of documents, which eventually <u>ends</u> for sound case-management reasons. It is simply unmanageable -- and prejudicial to the producing party -- for document discovery to be ongoing even while expert reports are being prepared, experts are being deposed, summary judgment motions are being briefed and argued, and so on.[15]

The existence of a fact discovery deadline is in and of itself dispositive on this point, but Defendants note an additional important issue. Plaintiffs' stated basis for "through trial" production of documents is that "damages" purportedly "accrue through the time of trial." (Pl. Mem. at 8.) That is

---

[13]    Non-privileged documents within this category are theoretically possible, but they would be needles in a haystack.

[14]    Defendants are producing the documents in these 33 categories, but for specified time periods that do not extend "through trial." If the Court agrees with Defendants that plaintiffs' "through trial" proposal is unreasonable, that would be the end of the matter (at least on this motion), because plaintiffs do not specify (or support) any alternative time-period proposal.

[15]    In an effort to bolster their demand for "through trial" production, plaintiffs have filed a new complaint, and they have moved to consolidate that new case with this one. Defendants will oppose consolidation, but even if the Court were to grant plaintiffs' consolidation motion, that would not change the December 31, 2006 discovery deadline.

wrong, for the reasons set forth separately in Section IV of this brief. But even if that were <u>true</u>, it would not matter with respect to this discovery issue.

The management contracts and distribution plans that are currently in place have been in effect since July 1, 2006, following a review process that took place during the first six months of 2006. As a practical matter, that is the last fee-review process that could conceivably be examined in this case, given that discovery closes in December, and the parties will then turn to expert discovery, summary judgment, and (if necessary) trial.

Even if plaintiffs were entitled to adjudicate that 2006 fee-review process and seek "damages" in relation to it, plaintiffs' need for documents generated subsequent to that now-ended fee review process would be very limited. As an example, in that circumstance plaintiffs might credibly argue that they are entitled to documents sufficient to <u>calculate</u> "damages" during the post-June 30, 2006 time period -- but that would presumably be some narrow and concrete set of documents, <u>i.e.</u>, documents sufficient to quantify those fees, such that plaintiffs could at some point make their own calculation, on some theory, of what portion of those fees were "excessive."

The 33 "through trial" categories at issue are not tailored to any such issue. For example, the "through trial" requests would sweep in the voluminous documentation to be prepared in connection with the trustees' 200<u>7</u> black book process, which will result in management and 12b-1 fees collected during the July 1, 200<u>7</u>-to-June 30, 200<u>8</u> time period -- a period of time that may well not even begin until after this case is resolved. (Pl. Mem. at 13.) Those categories would also sweep in Putnam's <u>back-up</u> for that documentation (and would require that Putnam produce that backup as it is <u>being</u> prepared). (<u>Id.</u> at 13-14.) Putnam is at loss to understand how such document production demands can be justified given the particular posture of this case, and they are typical.[16]

---

[16]    <u>See</u> Pl. Mem. at 13-14 and Plaintiffs' Appendix 1, which list category after category seeking "through trial" production of documents such as "trustee meeting minutes," and "fee-related communications with trustees."

In short, plaintiffs should not be permitted to obligate Putnam to engage in "through trial" document production at all, but, if the Court is to entertain that possibility, plaintiffs should be required to make narrow, concrete requests, and to satisfy the Court that each such request makes sense considering the particular posture of this case, i.e., that it cannot possibly involve adjudication of any fee-review process subsequent to the one that ended in June.  With respect to their 33 "through trial" document requests (so many that plaintiffs are forced to summarize them in an appendix to their brief, in violation of L.R. 37.1), plaintiffs do not come close to satisfying that standard.

**B.    Plaintiffs' Demand For Additional 1995-2001 Documents**

As to the below-identified categories of documents, Defendants are producing documents for specified time periods, but plaintiffs demand that those time periods be expanded to cover the seven years from 1995 through 2001.  As to each of those categories, plaintiffs' demand is unreasonable.[17]

**Requests 88-93**.  Plaintiffs demand that Defendants produce all documents "addressing economies of scale or fall-out benefits" for the 1995-2001 time period.  (Pl. Mem. at 15.)  As to that seven-year period of time, Defendants have already committed to produce the black books themselves, and any reports to the trustees, or memoranda from the trustees, concerning the issue of economies of scale and/or fall-out benefits.[18]  Executing these commitments will be a substantial undertaking, and will result in production to the plaintiffs of core historical documents (which will supplement the more comprehensive production of documents within the post-2001 time period; see Exhibit A).

Plaintiffs apparently want this Court to order that, within the 1995-through-2001 time period, Putnam produce any other document addressing economies of scale or fall-out benefits, e.g., apparently any interoffice memo or handwritten note.  This would be a massive and impractical

---

[17]    Defendants are producing certain other categories of documents for the 1995-2002 time period, so they have not imposed any categorical 2002 cutoff.  See Exhibit A.

[18]    See August 31, 2006 letter from Defendants' counsel to Plaintiffs' counsel (Exhibit E), at page 15.

undertaking, requiring identification of each person likely to have generated or received such documents during the 1995-2001 time period (including individuals no longer with Putnam), assembly of their documents for that seven year period of time (many of which would be archived), and review of all of those documents.  Further, plaintiffs offer no justification for this task, beyond the superficial assertion that Gartenberg v. Merrill Lynch Asset Management, Inc., 694 F.2d 923 (2d Cir. 1982) calls for consideration of economies of scale, and fall-out benefits.  Gartenberg did consider those factors, but that does not mean a plaintiff needs or is entitled to every piece of paper addressing those topics, much less for a more than ten-year period of time.

**Request 102**.[19]  Section I of this brief explains why the Court should not compel Defendants to respond to this request, with respect to the 2002-2005 time period.  For those same reasons (primarily the request's lack of clarity and apparent sweeping breadth), this request is even more meritless as applied to the 1995-2001 time period.  Moreover, to the extent this request focuses on the black book process, Defendants have already committed to produce the black books themselves for the 1995-2001 time period.  If by this request plaintiffs now mean to demand every document underlying or referring to those 1995-2001 black books, then they are making a request that is wholly unworkable, and patently unfair.  For example, for the 2002-2005 black books, the electronic back-up alone constituted more than 30,000 pages of documents, which had to be painstakingly reviewed (for privilege, and for concerns such as confidentiality agreements Putnam has with institutional clients).

**Request 132**.  Plaintiffs seek "annual reports of financial statements for each of the Funds and annual SAS 70 internal control audits for custody, fund accounting and transfer agency operations." (Pl. Mem. at 15.)  Defendants have already committed to produce these materials back to 2000 (six years ago), and plaintiffs offer no basis for an order requiring that Defendants produce these particular

---

[19]      This request reads:  "All documents . . . that concern or refer to the development or formulation of each of the fee schedules for Management Fees and/or for 12b-1 Fees that PIM, PRM, or other affiliated Putnam entities have proposed or furnished to each of The Funds."

documents for the 1995-2000 time period, other than the unexplained statement that they are required "to analyze economies of scale." (Pl. Mem. at 15.)  Nonetheless, in a still-further effort to reach compromise, Defendants will undertake to produce these documents (to the extent they can be located) for the 1995-2000 period of time as well.[20]

**"Financial analysts' worksheets for budget allocations."**  With a single throwaway reference ("Putnam should produce back to 1995 the financial analysts' work sheets for budget allocations . . .") (Pl. Mem. at 15.), plaintiffs seek to impose upon Defendants a document production burden that would be staggering.  Putnam has approximately 400 "cost centers" the expenses of which are allocated each year to various "business units" (e.g., the investment management business unit), based upon "allocation percentages" that are specific to each cost center (e.g., a particular cost center might allocate 10% of its expenses to the investment management business unit, while another might allocate 25% of its expenses to the investment management business unit).  Those allocation percentages are determined on an annual basis by different Putnam financial analysts.  (One such analyst could not determine the percentages for 400 cost centers, so multiple analysts do so.)

On this issue, Putnam has already committed to produce, for each of years 1997-2006, a spreadsheet showing the array of allocation percentages for each of the approximately 400 relevant cost centers.

Plaintiffs now seek, for each of the allocation percentages in each of those spreadsheets, the underlying work papers; that is, for each row of percentages, the documents generated by and/or reviewed by the financial analyst who determined the percentages in that row.  Putnam has already committed to attempt this undertaking for a four-year period:  2002-2006.  This will be a substantial

---

[20]    The same applies to another category identified in this section of plaintiffs' brief, "[t]he SAP reports that show how cost centers are rolled up into legal entities."  (Pl. Mem. at 15.)  Defendants had already committed to produce this information for the period 2002-2005, but Defendants here commit to do so for the period 1997-2002 as well.  (SAP -- Putnam's accounting system -- was put in place in 1997).

undertaking, because, as noted, in a given year the allocation percentages for the 400-or-so cost centers are determined by many different financial analysts. For each year, those analysts will need to be identified, and their allocation-related work papers will need to be searched for, collected, and reviewed.

Going back in time will compound the difficulty immensely, particularly considering such matters as employee turnover, which will greatly complicate the effort to locate the information sought (e.g., spreadsheets that might have been stored on the person's computer, or kept in the person's office and later archived). Nonetheless, Defendants have agreed to go back in time to 2002, but plaintiffs want Defendants to go back in time to 1995, more than ten years ago. And plaintiffs do not offer any justification for this demand. They assert that these documents are relevant to "economies of scale," but they do not explain that opaque statement, and it is not even close to an adequate basis for a court-ordered expansion of the very significant commitment that Defendants have already made.

### C.    Plaintiffs' Demand For Additional 2000-2002 Documents

Plaintiffs identify 30 categories of documents that Putnam has already committed to produce for a three-and-one-half-year time period (January 1, 2002 through June 30, 2005), and plaintiffs demand that Putnam expand that time period by two additional years (back to 2000, six years ago).[21]

Consequently, plaintiffs' request that Putnam more than double its existing effort as to these categories of documents, and, as it stands, Putnam's effort is already substantial. For example, one of the 30 requests at issue is Request 43. As to this request, Defendants have already committed to conduct a diligent search for documents that address the requirements of Section 36(b), in the 1/1/02-6/30/05 time period. Implementing this one commitment (of Defendants' scores of other commitments)

---

[21]      Plaintiffs admit that this case does not challenge fees received by Putnam prior to May 18, 2003. (Pl. Mem. at 9 n.13.) As such, it is undisputed that this case involves subsequent fees, and the contemporaneously-provided services. Consequently, Defendants have set January 1, 2002 as the starting point for many categories of documents, to encompass the evaluation process as to the fees that were in place on May 18, 2003. (Management fee evaluation primarily occurs in the first half of each year, and the approved fee schedules are then in effect from July 1 through the next June 30.)

has been and continues to be difficult.  There is no discrete file or files for such documents, or any particular committee that would possess such documents.  In an effort to search <u>reasonably</u>, Defendants are conducting an expensive and time-consuming search of the e-mail of key individuals using search terms like "36(b)" (<u>see</u> the e-mail search plan that is at Exhibit F), and, as to hard-copy documents, Defendants have made and continue to make extensive inquiry as to those individuals and other individuals who, in Defendants' view, had meaningful involvement in the fee-evaluation process.

Yet plaintiffs now demand that Defendants more than double their existing effort as to this request and <u>29</u> others.  (Plaintiffs do not even list these requests in their brief, presumably because there are so many; plaintiffs instead list them in their brief's "Appendix 2.")

Further, plaintiffs do not justify the substantial additional document collection that they demand as to these requests.  Plaintiffs state that "an internal Putnam memorandum questioning the appropriateness of 12b-1 would be no less probative on January 1, 2000 than January 1, 2002, Putnam's proposed starting point" (Pl. Mem. at 16), but far from supporting plaintiffs' motion, this statement undermines it.  This is a case in which the plaintiffs will need to persuade the Court that the fees charged during the period in question were grossly disproportionate to the services provided.  Presumably, plaintiffs intend to premise their case upon substantive numerical analysis of some kind, not upon <u>ad</u> <u>hoc</u> expressions of opinion by Putnam personnel.  Further, plaintiffs proffer no basis to expect that discovery will yield any expression of opinion of the kind they describe (a "memorandum questioning the appropriateness of 12b-1").  The 40-page, 131-paragraph complaint does not even allege any such expression of opinion, and, after production of approximately 180,000 pages of documents, plaintiffs do not proffer any such expression of opinion (or even any <u>hint</u> of one).

In short, the type of document that plaintiffs apparently seek is not relevant, and is not even <u>alleged</u> to exist.  If there are nonetheless to be discovery efforts directed toward this type of document, those discovery efforts should be appropriately modulated.  This Court should not order

11

Putnam to search six years of e-mail and electronic files, for thirty categories of documents, on the basis of a justification as speculative as the one preferred here, particularly in a case where it is indisputable that plaintiffs are already receiving a substantial set of core documents, encompassing a period of more than ten years.  (See the chart that is attached to this brief as Exhibit A.)

## III.    PLAINTIFFS ARE NOT ENTITLED TO ANY RELIEF WITH RESPECT TO E-MAIL

### A.    Defendants Are Engaged In Extensive, Substantively Appropriate E-Mail Review

On May 1, 2006, Defendants provided plaintiffs with a plan for e-mail review (attached as Exhibit F).  After consultation with Plaintiffs, the plan now involves application of the search terms attached as Exhibit G to the e-mails of all of the below-listed individuals, for the stated time periods:

| Individual | Time Period | Basis For Time Period |
| --- | --- | --- |
| Steve Asher (former Senior Vice President, Senior Counsel) | 1/1/2002 to 3/23/2004 | Commencement of period for which Defendants will produce documents to date Mr. Asher's employment terminated. |
| David Boon (Managing Director, Divisional CFO) | 1/1/2002 to 6/30/2005 | Entire period for which Defendants will produce documents. |
| Charles Haldeman (President and CEO) | 10/24/2002 to 6/30/2005 | Commencement of Mr. Haldeman's employment to end of period for which Defendants will produce documents. |
| Jonathan Horwitz (former Managing Director, Divisional CFO) | 1/1/2002 to 5/14/2004 | Commencement of period for which Defendants will produce documents to date Mr. Horwitz's employment terminated. |
| Lawrence Lasser (former President and CEO) | 1/1/2002 to 12/31/2003 | Commencement of period for which Defendants will produce documents to date Mr. Lasser's employment terminated. |
| Robert Leveille (Managing Director, Senior Counsel) | 6/14/2004 to 6/30/2005 | Commencement of Mr. Leveille's employment to end of period for which Defendants will produce documents. |
| Beth Mazor (Managing Director, Manager of Fund Administration) | 1/1/2002 to 6/30/2005 | Entire period for which Defendants will produce documents. |
| Jeff McNeil (Assistant Vice President, Senior Financial Analyst) | 1/1/2002 to 6/30/2005 | Entire period for which Defendants will produce documents. |
| James Pappas (Managing Director, Director of Trustee Relations) | 3/22/2004 to 6/30/2005 | Commencement of Mr. Pappas's employment to end of period for which Defendants will produce documents. |

12

| Patrick Quinn (Vice President, Senior Financial Analyst) | 1/1/2002 to 6/30/2005 | Entire period for which Defendants will produce documents. |
|---|---|---|
| Richard Robie (Chief Administrative Officer) | 4/21/2003 to 6/30/2005 | Commencement of Mr. Robie's employment to end of period for which Defendants will produce documents. |

The listed individuals were selected in light of their level of involvement with the annual fee-review process. (Plaintiffs admit that these are people at Putnam's "highest corporate levels." (Pl. Mem. at 17). Further, these individuals' e-mail will of course naturally include e-mail received from, and sent to, other individuals. So, for example, if one of the individuals listed in the above chart solicited comment on a management fee matter from an individual who is not listed in the above chart, the e-mail soliciting the comment, and the response, would be within the e-mail that is being reviewed.

The quantity of e-mail subject to this plan is immense: the search terms were applied to approximately 2.6 million pages of e-mails, resulting in a universe of approximately 2.3 million pages of e-mails, which are currently in the costly and time-consuming process of attorney review.[22]

### B.    As They Have Done For Months, Plaintiffs Criticize Defendants' Plan, But Offer No Concrete, Reasonable Counterproposal

With respect to electronic discovery, Defendants submit that it is particularly important to address discovery issues in reasonable and concrete terms -- i.e., what particular individuals will be subject to the search, for what particular period of time, and upon what justification? Plaintiffs will not address e-mail discovery in such terms, as their brief demonstrates. It states that "Putnam must search the files of all individuals likely to have responsive e-mails." (Pl. Mem. at 19) (emphasis added.) But plaintiffs do not identify the additional individuals whose e-mail they believe should be searched, much

---

[22]    These numbers will increase, because they do not include the e-mails of one of the individuals on the above list, whose e-mail is being processed now. As to cost, to date, the firm with which Putnam has contracted to assist with respect to the technological aspects of e-mail review (Kroll) has billed approximately $150,000; this cost is increasing and it does not include any of the billing associated with attorney review of e-mail. Currently four staff attorneys are conducting an initial review of the millions of pages of e-mail thus far assembled. Thereafter, the regular attorneys on this matter will engage in a second review. To the extent that the Court would be interested in data concerning the substantial costs associated with the review of the millions of pages of e-mails at issue, Defendants would provide such data on an in camera basis.

13

less -- for each individual -- the time period and types of e-mail on which the search should focus.[23]

Further, though plaintiffs do not identify individuals, it is clear that plaintiffs have in mind an expansion of Defendants' e-mail review to include -- at a minimum -- scores of additional individuals.  For example, plaintiffs state that the e-mails of the "investment management department" must be searched (Pl. Mem. at 18), and that statement alone potentially implicates scores of additional people.  Exhibit H to this brief is a list of portfolio managers and Chief Investment Officers for the five funds at issue, during the period January 1, 2002 through June 30, 2005 -- a subset of the vague category "investment management department."  That list includes 21 individuals.  On average, application of the search terms to the e-mails of the individuals on the chart at pages 12-13 (other than Mr. Robie, whose e-mail is being processed) has resulted in approximately 230,000 pages of e-mail per person for attorney review.  Using that number as a hypothetical index, adding 21 additional individuals to the e-mail search would expand the 2.3 million-page e-mail universe now being reviewed to more than 7 million pages.[24] That is equivalent to a stack of paper more than three times the height of the Prudential Center.[25]  If a team of four attorneys were able to review 20,000 pages of that stack each day (6 feet of it), it would take them more than one year to finish their review.

And plaintiffs want more.  The " Prudential Center" example above assumes 21 additional individuals.  But those 21 individuals are part of a vague category ("investment management personnel") that plaintiffs appear to reference as an illustration of the multiple categories of individuals which "should" be encompassed by what they blithely call a "legitimately diligent search."  (Pl. Mem. at 18.)

---

[23]    With approximately 180,000 pages of core documents, plaintiffs are more than capable of making, and supporting, a concrete e-mail proposal of their own.

[24]    On average, Defendants are reviewing 230,000 pages of e-mail per individual.  31 individuals times 230,000 pages equals 7.13 million pages.

[25]    The Prudential Center is 750 feet high, or 9,000 inches.  250 pages of paper is an approximately 1-inch stack, and so 7.13 million pages of paper would be a stack approximately 28,500 inches high (more than three times 9,000 inches).

In sum, on this motion, the Court has before it Defendants' reasonable and concrete e-mail plan (which is underway), against plaintiffs' vague statement that "Putnam must search the files of all individuals likely to have responsive email." (Pl. Mem. at 19) (emphasis added.) Plaintiffs' vague statement is not a counterproposal at all, much less one that this Court could reasonably adopt; further, it hints at an e-mail review that would be staggering in terms of size, cost, and required expenditure of time. This Court should not grant plaintiffs any relief with respect to the issue of e-mail.[26]

## IV. SECTION 36(b) LIMITS RECOVERY TO "EXCESS" FEES PAID DURING THE ONE-YEAR PERIOD PRECEDING THE LAWSUIT[27]

### A. Section 36(b) Limits Recovery To "Excess" Fees Paid During The One-Year Period Preceding The Lawsuit

Section 36(b) states that "[no award of damages shall be recoverable for any period prior to one year before the action was instituted". 15 U.S.C.A. § 80a-35(b)(3) (Exhibit I hereto). This means that a Section 36(b) plaintiff may recover "excess" fees that were paid during the one-year period prior to his lawsuit. That is the natural reading of Section 36(b), which states that "an action may be brought … for breach of fiduciary duty in respect of . . . compensation or payments paid by such registered investment company" (past tense), not compensation "paid or that will be paid in the future." (Contrast

---

[26]     Plaintiffs have constantly suggested that it is critically important that the e-mails of "investment management personnel" be searched. Defendants have explained, over and over again, the following: First, the millions of e-mails that are being searched include e-mails originating and sent to all corners of the Putnam organization, and so -- for example -- if a portfolio manager sent or received an e-mail to any one of the individuals whose e-mails are being searched, that e-mail would be within the e-mails that are being searched, plaintiffs would get it in discovery, and they could follow up on it as they deem appropriate. Second, the term "investment management personnel" is not self-defining, but nonetheless clearly includes scores of individuals (see above). Third, discovery efforts with respect to individuals who focus on investment management should be designed and tailored in such a way as to take that particular role into account. But plaintiffs refuse to do so: they demand that Putnam assemble and review millions of e-mails sent and received by these scores of individuals, as if these individuals have substantively the same role and level of involvement with respect to the annual review of management and 12b-1 fees as the individuals whose e-mail Putnam is now searching. But that is simply not the situation, and so the costly exercise that plaintiffs peremptorily demand is wrongheaded, and unjustified.

[27]     As stated at the August 1, 2006 conference, and as shown in Exhibit A, Defendants have not categorically imposed any time-period cut-off tied to Section 36(b)'s one-year recovery period. The document production time periods vary by request, and Defendants have agreed to produce certain categories of documents back to 1995, and certain categories of documents for time periods extending well after the date this suit was filed (May 17, 2004). Nonetheless, Plaintiffs argue that Section 36(b) does not provide for a one-year recovery period, and Defendants therefore address that argument here.

Section 36(a), which gives the SEC a cause of action if the defendant "has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct . . ." 15 U.S.C.A. § 80a-35(a) (emphasis added).)

Courts, including the Supreme Court, have unanimously given Section 36(b) its natural reading in regard to the one-year recovery period.[28]  Two federal district courts have recently made the same ruling in the very same context here (i.e., a motion to compel discovery).[29]

Courts have also explained the rationale for this rule.   For example, in Brever v. Federated Equity Mgmt. Co., 233 F.R.D. 429, 433 (W.D. Pa. 2005), the Court held that "A shareholder's ability to police and challenge any such agreement through an award of damages is specifically limited to one year by operation of the statute [because] Congress sought to advance the twin goals of providing an appropriate check on potential conflicts of interest in setting fee arrangements and limiting the potential for increased costs of litigation and the abusive use of lawsuits." Id. at 433.[30]

---

[28]    Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 526 n.2 (1984) ("[R]ecovery is limited to actual damages for a period of one year prior to suit, § 80a-35(b)(3)."); Green v. Nuveen Advisory Corp., 295 F.3d 738, 743 (7th Cir. 2002) ("Congress enacted § 36(b) to provide a narrow federal remedy . . . damages are recoverable only for the one-year period before the filing of the action."); Grossman v. Johnson, 674 F.2d 115, 122 (1st Cir. 1982) ("Lastly, plaintiff invokes the short one-year limitation period on damages as sufficient reason for exempting 36(b) cases from the demand provision of Rule 23.1 ... The truth is, however, that ordinarily the demand requirement could change the particular one-year period for which recovery was allowable but would not reduce the one-year recovery period." (emphasis added); Fox v. Reich & Tang, Inc., 692 F.2d 250, 261 (2d Cir. 1982) (delay in making demand might preclude recovery since "Section 36(b) expressly limits recovery to excessive fees paid up to one year prior to the commencement of suit"); King v. Douglass, 973 F. Supp. 707, 710 n.4 (S.D. Tex. 1996) ("Recovery is limited to actual damages for a period of one year prior to suit. § 80a-35(b)(3)."); Grossman v. Johnson, 89 F.R.D. 656, 661 n.13 (D. Mass. 1981) ("[T]he statute . . . limits damages to 'actual damages', recoverable only for the period one year prior to the initiation of action.").

[29]    In Jones v. Harris Assocs. LP, No. 04-8305 (N.D. Ill.), Chief Judge Kocoras denied plaintiffs' request for post-complaint discovery in part on the basis that, due to the statute's one-year look-back limit on damage, "any discovery beyond what the statute would afford would not be relevant."  Transcript of Jones v. Harris Assocs. LP, No. 04-8305, at 4:13-16 (N.D. Ill. Dec. 19, 2005) (Exhibit J hereto).  In Gallus v. American Express Financial Corp., et al., District Judge Donovan W. Frank also ruled that Section 36(b) limits recovery to the one-year period prior to suit.  Gallus v. American Express Financial Corp., et al., Civ. No. 04-4498, slip op. (DWF/SRN) at 3 (D. Minn. July 27, 2006) (Exhibit K hereto).

[30]    See also In re Alliance Bernstein Mut. Fund Excessive Fee Litig., 2006 WL 74439, at *2 n.3 (S.D.N.Y. Jan. 11, 2006) ("In contrast to the five-year period set forth in Section 36(a) for SEC enforcement, Congress sharply limited recovery under Section 36(b) to a one-year time period because it wanted to create a limited mechanism with which to test and rectify advisory fees . . . . Legislative insistence in restricting the applicable time period disinclines the Court to make factual extrapolations or speculative inferences in Plaintiffs' favor.") (citation omitted); Krinsk v. Fund Asset Mgmt., Inc., 1986 WL 205, at *4 (S.D.N.Y. May 9, 1986) ("Congress chose to limit recovery of damages by a shareholder to a short one-year

(continued...)

Plaintiffs cite cases that do not support their alternate reading of Section 36(b):

•    Forsythe v. SunLife Financial, Inc., et al., 417 F. Supp. 100, 117 (D. Mass. Jan. 19,
      2006).  Defendants read this Court's decision in Forsythe to address the beginning date for
      recovery, not the end date:  "Therefore, this lawsuit having been filed on March 25, 2004,
      the damages period applicable to the 36(b) claim thus begins on March 25, 2003."

•    Krinsk v. Fund Asset Management, Inc., 715 F. Supp. 472 (S.D.N.Y.), aff'd 875 F.2d 404
      (2d Cir. 1989).  The complaint in Krinsk was filed on May 16, 1985, and the district court
      in that case merely noted that, at trial, it "heard evidence on the plaintiff's remaining
      claims: (1) that for the period May 17, 1984 to December 31, 1986, fees were paid to the
      investment advisor in violation of Section 36(b) . . . ."  Id. at 476 (emphasis added).
      Nothing in the decision indicates any ruling that, if plaintiffs were to prevail, they could
      actually obtain restitution for the May 17, 1985 to December 31, 1986 period (i.e., the
      post-suit period for which plaintiffs "claim[ed]" a legal violation), and there was no reason
      for the trial court to reach that issue -- on the issue of liability, it found "for the defendants
      . . . and dismisse[d] the complaint."  Id.

•    Krasner v. Dreyfus Corp., 500 F. Supp. 36 (S.D.N.Y. 1980).  Krasner was decided before
      the many decisions cited above, including the Supreme Court's decision in Fox.  Further, it
      is merely a court's ruling on a privately-negotiated settlement agreement, and therefore it is
      not binding precedent on the issue.[31]

•    Hunt v. Invesco Funds Group, Inc., et al., 2006 WL 1751900, at *1 n.1 (S. D. Tex. June
      22, 2006). Plaintiffs seem to imply that this case adopted their view of Section 36(b)'s
      recovery period, but in fact the Court stated that "it did not intend to rule on this issue in
      its June 5 Order, nor does it intend to do so at this time."  (The Court merely expressed a
      view -- apparently preliminary -- that the language of Section 36(b) does not resolve the
      issue. Id.)

•    Leinoff v. Milona, 726 F.2d 734, 741 (Fed. Cir. 1984).  This is a case about patent law.
      As shown, there is an array of cases addressing the particular statute at issue here.

**B.    Practical Considerations Further Support the Natural**
**Reading of Section 36(b), and Undermine Plaintiffs' Alternate Reading**

---

[30]    (...continued)
period.  This provision exists in sharp contrast to Section 36(a) of the Act fixing a five-year limitation period for SEC
enforcement actions . . . . Congress was not intending to create a broad remedy under Section 36(b) but rather a mechanism
whereby the current level of management fees would be policed, tested and, if necessary, rectified.  This testing mechanism
was expressly referred to as such by Rep. Staggers, the bill's manager, who stated that '[b]oth the Senate and the House
versions contain important provisions for testing the level of management fees.'" (citing S. Rep. No. 91-184, at 5 (1970); H.R.
Rep. No. 91-1382, at 201 (1970); 116 Cong. Rec. 39, 344 (1970)).

[31]    See, e.g., County of Orange v. Air Cal., 799 F.2d 535, 538-39 (9th Cir. 1986) ("There is no stare decisis effect . . .
because the product of the litigation at bar was a Stipulated Judgment . . . ").

Under plaintiffs' proposal, a Section 36(b) suit would serve as a platform for challenging not only advisory contracts approved prior to suit, but also advisory contracts approved post-suit -- as many as happen to be approved during the period of time between complaint and summary judgment (or trial). Since post-suit contracts are by definition being deliberated during the pendency of the lawsuit, plaintiffs' proposal would bring with it an unworkable state of affairs: Plaintiffs' counsel in effect monitoring ongoing fee deliberations, in doing so intruding upon, and imposing great burden and distraction upon, the work of the advisory company as well as the work of the trustees.

By contrast, there is nothing impractical or inefficient about Defendants' neutral reading of Section 36(b). Plaintiffs argue that it would require successive lawsuits, leading to inefficient results, but that is wrong. First, there is no need for serial lawsuits. If a Section 36(b) plaintiff were to file a single Section 36(b) lawsuit and lose, that would constitute a judgment that the current level of management fees is appropriate, and the plaintiff would have no reason to wish he had filed a second suit. If on the other hand the plaintiff were to win his suit (something that has never happened), he would be able to obtain restitution to the relevant fund(s) of one year of all fees deemed to have been "excessive," and the fact of the judgment would inherently have appropriate prospective impact, in that the trustees and the defendant advisory company would plainly evaluate the significance of the judgment with respect to their overall activities and duties (including fee negotiations), and act accordingly.

Second, to the extent a Section 36(b) plaintiff firmly believes that he will win his suit and is committed to maximizing potential restitution, that plaintiff is of course free to file a second lawsuit prior to the trial of his first, and an appropriate approach in that situation would be for the Court to stay the second action pending the outcome of the first. Being a year old already, the first action will likely be resolved shortly thereafter, and, practically, its outcome would likely have a significant impact on the second suit: if the first suit is dismissed, it may well be that the plaintiff drops the second suit; if on the other hand the first suit results in a judgment for the plaintiff, it may well be that the judgment narrows

18

the issues in the second suit, or results in a settlement. And either way, if the plaintiff chooses to litigate the no-longer-stayed second suit, so be it -- the plaintiff will not have "lost" any potential recovery, and neither of the two suits will involve the situation that plaintiffs advocate here, <u>i.e.</u>, an effort to adjudicate the propriety of management contracts being evaluated <u>during</u> the pending of the lawsuit.

> C.     **At <u>Most</u>, This Court Should Permit Recovery of Post-Suit Advisory Fees Paid In Connection With <u>Advisory Contracts Approved Prior To The Lawsuit</u>**

Defendants identify a potential "compromise" approach, which they do not advocate but which makes more sense than plaintiffs' approach. If a plaintiff files a Section 36(b) suit six months after approval of an advisory contract ("Contract 1"), then a <u>new</u> contract would be approved six months after the lawsuit was filed ("Contract 2"). In that circumstance, a court could theoretically permit recovery of any "excess" fees paid pursuant to Contract 1 (during the twelve month period straddling the suit's filing date), but bar plaintiffs from seeking recovery in connection with Contract 2 (or any subsequent contract).

Defendants do not believe that such a "compromise" approach is consistent with Section 36(b)'s text and purposes, but it is certainly <u>more</u> in line with them than the approach that plaintiffs propose (permitting a 36(b) suit to be used as a platform for adjudication of the appropriateness of advisory contracts that, at the time of suit, did not yet even <u>exist</u>), and would also be consistent with general principles of recovery (to which a court might look if it were to decide that there is no 36(b)-specific rule already). <u>See</u> <u>Lawlor v. Loewe</u>, 235 U.S. 522, 536 (1915): "Damages accruing since the action began were allowed, but only such as were the consequence of acts done before and constituting part of the cause of action declared on. This was correct." <u>See also</u> Federal Trial Handbook: Civil (4th Ed. 2005), § 67:1 ("General Rules Relating to Damages") ("Damages are limited to the date of the filing of the complaint and may be recovered beyond that date only where it is shown that they have resulted from the original illegal acts that were the subject of the complaint").

## CONCLUSION

For the foregoing reasons, Defendants ask that this Court deny plaintiffs' motion.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Defendants respectfully request a hearing on this motion.

Dated: September 18, 2006
        Boston, Massachusetts

Respectfully submitted,

/s/ James R. Carroll
James R. Carroll (BBO #554426)
David S. Clancy (BBO #636031)
Scott T. Lashway (BBO #655268)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts  02108
(617) 573-4800

JCarroll@skadden.com
DClancy@skadden.com
SLashway@skadden.com

## Certificate of Service

I, Scott T. Lashway, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on September 18, 2006.

September 18, 2006

/s/ Scott T. Lashway

20