**EXHIBIT D**



Monday,
March 1, 2004

Part IV

# Securities and Exchange Commission

17 CFR Part 270
Prohibition on the Use of Brokerage Commissions To Finance Distribution; Proposed Rule

# SECURITIES AND EXCHANGE COMMISSION

**17 CFR Part 270**

**[Release No. IC-26356; File No. S7-09-04]**

**RIN 3235-AJ07**

## Prohibition on the Use of Brokerage Commissions To Finance Distribution

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Proposed rule.

**SUMMARY:** The Securities and Exchange Commission is publishing for comment amendments to the rule under the Investment Company Act of 1940 that governs the use of assets of open-end management investment companies ("funds") to distribute their shares. The amended rule would prohibit funds from paying for the distribution of their shares with brokerage commissions. The proposed amendments are designed to end a practice that is fraught with conflicts of interest and may be harmful to funds and fund shareholders.

**DATES:** Comments must be received on or before May 10, 2004.

**ADDRESSES:** To help us process and review your comments more efficiently, comments may be sent to us in either paper or electronic format. Comments should not be sent by both methods. Comments in paper format should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549-0609. Comments in electronic format may be submitted to the following e-mail address: *rule-comments@sec.gov*. All comment letters should refer to File No. S7-09-04; if e-mail is used, this file number should be included on the subject line. Comment letters will be available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, NW., Washington, DC 20549. Electronically submitted comment letters will also be posted on the Commission's Internet Web site (*http://www.sec.gov*).[1]

**FOR FURTHER INFORMATION CONTACT:** Hester Peirce, Senior Counsel, or Penelope W. Saltzman, Senior Counsel, at (202) 942-0690, Office of Regulatory Policy, Division of Investment Management, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549-0506.

**SUPPLEMENTARY INFORMATION:** The Securities and Exchange Commission ("SEC" or "Commission") is requesting public comment on proposed amendments to rule 12b-1 [17 CFR 270.12b-1] under the Investment Company Act of 1940 [15 U.S.C. 80a] ("Investment Company Act" or "Act").[2] The Commission is also requesting comment on whether additional amendments to rule 12b-1 are needed to address other issues that have arisen under the rule.

**Table of Contents**

I. Background
  A. Current Practices
  B. Current Regulatory Requirements
II. Discussion
  A. Proposed Ban on Directed Brokerage
  B. Policies and Procedures
III. General Request for Comment
IV. Request for Comment on Further Amendments to Rule 12b-1
V. Cost-Benefit Analysis
VI. Consideration of Promotion of Efficiency, Competition, and Capital Formation
VII. Paperwork Reduction Act
VIII. Initial Regulatory Flexibility Analysis
IX. Statutory Authority

## I. Background

Investment companies buy and sell large amounts of securities each year. In 2002 alone, mutual fund securities transactions totaled approximately $7.8 trillion.[3] Fund advisers choose which broker or dealer will effect transactions ("executing broker"), and often use commissions from these transactions to reward brokers or dealers for selling fund shares ("selling brokers"). Recently, our staff examined a number of funds and broker-dealers to obtain a better understanding of how fund brokerage commissions are used by advisers to pay for the promotion and sale of fund shares and how this practice may affect funds and fund shareholders.

Our staff found that the use of brokerage commissions to facilitate the sale of fund shares is widespread among funds that rely on broker-dealers to sell their shares. Selling brokers appear to have significant leverage over funds because the number of distribution channels is limited, and fund complexes compete to seek a prominent position in them.[4] This leverage permits selling brokers to demand additional payments from fund advisers from their own assets ("revenue sharing") or through the direction of fund brokerage. These payments can purchase prominence (or better "shelf space") in an increasingly crowded fund marketplace.[5]

In many cases, meeting the increasing compensation demands of selling brokers has caused funds' distribution-related fees (*i.e.*, sales loads[6] and rule 12b-1 fees[7]) to reach the National Association of Securities Dealers ("NASD") limits (or "caps") on such fees (which we describe below).[8] Fund advisers often use brokerage commissions to generate additional revenue to finance distribution.[9] Brokers have, in turn, based their demands for greater compensation from funds on the apparent availability of these supplemental revenues. As a result, funds have allocated, over time, an increasing share of their brokerage commissions to support distribution. Our staff estimates that brokerage commissions may compose approximately twenty percent of annual expenditures for fund distribution.

### A. Current Practices

The broker's cost of executing large, institutional brokerage transactions such as those effected for funds is often substantially less than the commission (or mark-up or mark-down)[10] that funds

---

[1] We do not edit personal or identifying information, such as names or e-mail addresses, from electronic submissions. Submit only information you wish to make publicly available.

[2] Unless otherwise noted, all references to statutory sections are to the Investment Company Act of 1940.

[3] Investment Company Institute, Mutual Fund Fact Book 83 (2003) (reporting approximately $4 trillion in total purchases and approximately $3.8 trillion in total sales of portfolio securities by equity, hybrid, and bond funds). This figure does not include purchases and sales by money market funds.

[4] *See* Rich Blake, How High Can Costs Go?, Institutional Investor, May 2001, at 56, 62 ("With thousands of funds and just a handful of national full-service brokerages, wire houses like Merrill, PaineWebber, and Smith Barney held the upper hand.").

[5] *Id.* at 62-63 ("Just as fund companies need to cut through the clutter of all the funds available for sale, they must also attract the attention of the average sales person, who might familiarize himself with just a handful of funds among hundreds in any given asset category.").

[6] Sales loads represent explicit charges paid by fund shareholders to reimburse the fund's principal underwriter and distributor for sales efforts on behalf of the fund. Investors may pay sales loads at the time of purchase (a "front-end load") or at the time of redemption (a "back-end load"). *See* section 2(a)(35) of the Act [15 U.S.C. 80a-2(a)(35)] (defining the term "sales load"); rule 22d-1 [17 CFR 270.22d-1] (exemption permitting scheduled variations in sales loads); and rule 6c-10 [17 CFR 270.6c-10] (exemption permitting sales loads to be charged after purchase, but before or at the time of redemption).

[7] "Rule 12b-1 fees" or "12b-1 fees" are fees paid out of fund assets pursuant to a distribution plan adopted under rule 12b-1 under the Act. 17 CFR 270.12b-1. *See infra* note and accompanying text.

[8] *See infra* note and accompanying text.

[9] *See* Rich Blake, Misdirected Brokerage, Institutional Investor, June 2003, at 47, 49 ("But there's another critical reason that fund companies have resisted including commission payments in a 12b-1 marketing plan. Doing so would cause them to exceed a NASD limit on how much any fund investor can be asked to pay in brokerage compensation.").

[10] Broker-dealers, at times, may execute portfolio securities transactions on a principal basis. In those cases, the firms would be compensated through mark-ups or mark-downs rather than through commissions. Nothing in this Release or our

actually pay on most of their transactions.[11] The adviser to a fund complex, which controls the allocation of fund brokerage, can use the excess of brokerage commissions paid over execution costs to purchase goods or services from the executing broker or third parties. Fund advisers often choose to use excess brokerage commissions to buy a place for the fund in the selling broker's distribution network. The use of excess commissions to pay for distribution costs has resulted in intricate business arrangements between fund advisers and securities firms that sell their shares.

Under the simplest of these arrangements, an adviser directs transactions in fund portfolio securities to a selling broker. The selling broker executes trades on behalf of the fund and credits to the fund a portion of the commission it receives to pay for distribution-related services. If the selling broker lacks the capacity to execute the fund's securities transactions, the adviser may implement a more complicated arrangement. The adviser may select another broker to execute the transaction and require the executing broker to "step out" a portion of its commission to pay the selling broker.[12] Alternatively, the executing broker may retain a portion of the commission as compensation for its execution services and set the remainder aside pending the adviser's designation of the selling brokers to which the remainder will be directed.[13] In an "introducing broker" arrangement, a clearing broker executes the transaction, forwards the entire commission to the selling broker ("introducing broker"), and periodically charges the selling broker for its execution services.[14]

Some fund advisers and selling brokers enter into an agreement that sets forth a target dollar amount of commissions to be paid over a period of time to the selling broker as compensation for distributing fund shares.[15] A typical arrangement covers all of the funds in a complex that are subject to sales or dealer agreements between the selling broker and the funds' principal underwriter.[16] If the funds do not generate the specified dollar amount of commissions during the year, the difference may be paid by the funds' adviser or carried forward into the next year. If the selling broker's overall compensation for distributing the shares of a fund complex falls below agreed-upon levels, the selling broker may reduce its selling efforts for the funds. As described below, these arrangements are covered by rule 12b-1.

B. Current Regulatory Requirements

Fund brokerage is an asset of the fund, and therefore must be used for the fund's benefit.[17] Use of fund assets to pay selling brokers or otherwise finance the sale of fund shares is regulated by rule 12b-1, which we adopted under our authority in section 12(b) of the Act.[18] Section 12(b) makes it unlawful for a fund "to act as a distributor of securities of which it is the issuer, except through an underwriter, in contravention of such rules and regulations" as we prescribe. Section 12(b) was intended to protect funds from bearing excessive sales and promotion expenses.[19] Rule 12b-1 permits funds to use their assets to pay distribution-related costs. In order to rely on rule 12b-1, a fund must adopt "a written plan describing all material aspects of the proposed financing of distribution" that is approved by fund shareholders and fund directors.[20] We included these and other conditions in the rule to address concerns about the conflicts of interest arising from allowing funds to finance distribution.[21]

Rule 12b-1 does not itself limit the amount of distribution costs that a fund can assume, nor does it explicitly address the extent to which fund brokerage can be used to reward brokers for promoting the sale of fund shares. Two NASD rules address these matters.

First, NASD Conduct Rule 2830(d) prohibits NASD members (i.e., broker-dealers) from selling shares of funds that impose excessive sales charges.[22] The rule deems a sales charge to be excessive if it exceeds the rule's caps. A

---

concept release, Request for Comments on Measures to Improve Disclosure of Mutual Fund Transaction Costs, Investment Company Act Release No. 26313 (Dec. 18, 2003), is intended to modify our views expressed in a recent SEC Interpretation, Commission Guidance on the Scope of Section 28(e) of the Exchange Act, Exchange Act Release No. 45194 (Dec. 27, 2001).

[11] See, e.g., Miles Livingston and Edward S. O'Neal, *Mutual Fund Brokerage Commissions*, 19 J. Fin. Res. 273, 290 (1996) ("Fund managers on average pay substantially more than the commissions available to large traders. * * * Assuming an average attainable rate of 2 cents per share, two-thirds of the median commission per trade * * * is payment for services other than trade execution."). See also Jennifer S. Conrad et al., *Institutional Trading and Soft Dollars*, 56 J. Fin. 397, 406 n.11 (2001).

[12] Although the selling broker might not perform any execution services in connection with the portfolio transactions, it typically is responsible for the confirmation of a specified portion of the trade (i.e., a particular amount of securities). The excess of the selling broker's compensation over the value of its confirmation services in connection with the trade is compensation for the selling broker's distribution efforts.

[13] The adviser designates the recipient selling brokers periodically (e.g., quarterly). The selling brokers typically provide no services in connection with the fund's portfolio securities transactions.

[14] There are several variants on these arrangements for compensating the selling broker for distribution with commissions from a transaction that is executed primarily or exclusively by another broker.

[15] See, e.g., Misdirected Brokerage, supra note, at 50 (explaining that typically an executive of the adviser enters into an "almost invariably oral agreement[]" with an executive of the broker to trade a combination of cash, revenue sharing payments, and fund brokerage commissions "for a precious commodity: privileged access to the brokerage's sales force").

[16] These arrangements may raise issues under section 17(d) [15 U.S.C. 80a-17(d)] of the Act and rule 17d-1 [17 CFR 270.17d-1] thereunder. Section 17(d) of the Act and rule 17d-1, prohibit funds from, among other things, entering into a joint enterprise or other joint arrangement or profit-sharing plan with any affiliated person, unless prior approval has been granted by Commission order. A fund may be an "affiliated person" of another fund if, for example, the funds are under the common control of the same investment adviser. See section 2(a)(3)(C) of the Investment Company Act [15 U.S.C. 80a-2(a)(3)(C)]. Pursuant to rule 17d-1 under the Investment Company Act, affiliated funds may apply for an order from the Commission permitting the use of a joint arrangement to finance the distribution of their shares. See, e.g., College Retirement Equities Fund, Inc., Investment Company Act Release Nos. 19591 (July 23, 1993) (notice) [58 FR 40681 (July 29, 1993)] and 19645 (Aug. 19, 1993) (order). Absent such an order, an arrangement to compensate a selling broker for distribution on a complex-wide basis may constitute a prohibited joint distribution arrangement pursuant to which the brokerage commissions paid by one fund are used to finance the distribution of the shares of another fund in the same fund complex. See generally Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431 (June 13, 1988) [53 FR 23258 (June 21, 1988)].

[17] See Electronic Filing by Investment Advisers; Proposed Amendments to Form ADV, Investment Advisers Act Release No. 1862 (Apr. 5, 2000) [65 FR 20524 (Apr. 17, 2000)], at text following n. 166 ("Client brokerage, however, is an asset of the client, not the adviser."). See also American Bar Association, Fund Director's Guidebook, 59 Bus. Law. 201, 243 (2003) ("Brokerage commissions are assets of the fund, and the fund's directors are ultimately responsible for determining policies governing brokerage practices."). But see Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters, Exchange Act Release No. 23170 (Apr. 23, 1986) [51 FR 16004 (Apr. 30, 1986)] ("Section 28(e) Interpretive Release") (noting that section 28(e) allows a money manager to consider benefits derived by other accounts he manages when determining the reasonableness of commissions an account is paying).

[18] 15 U.S.C. 80a-12(b).

[19] Investment Trusts and Investment Companies, Hearings on H.R. 10065 Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce, 76th Cong., 3d Sess. 112 (1940) (statement of David Schenker).

[20] Rule 12b-1(b).

[21] Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11414 (Oct. 28, 1980) [45 FR 73898 (Nov. 7, 1980)] ("1980 Adopting Release").

[22] NASD Conduct Rule 2830 (Investment Company Securities). Paragraph (d) (Sales Charge) prohibits members from selling the shares of a fund "if the sales charges described in the prospectus are excessive."

fund's sales load (whether charged at the time of purchase or redemption) may not exceed 8.5 percent of the offering price if the fund does not charge a rule 12b–1 fee.[23] The aggregate sales charges of a fund with a rule 12b–1 fee may not exceed 7.25 percent of the amount invested,[24] and the amount of the asset-based sales charge (the rule 12b–1 fee) may not exceed 0.75 percent per year of the fund's average annual net assets.[25] Under the cap, therefore, an increase in the fund's sales load could reduce the permissible level of payments a selling broker may receive in the form of 12b–1 fees. The NASD designed the rule so that cumulative charges for sales-related expenses, no matter how they are imposed, are subject to equivalent limitations.[26]

Second, NASD Conduct Rule 2830(k), the "Anti-Reciprocal Rule," prohibits NASD members from conditioning their efforts in distributing a fund's shares on the receipt of the fund's brokerage commissions.[27] An exception to the Anti-Reciprocal Rule permits NASD members to sell shares of funds that follow a disclosed policy "of considering sales of their shares as a factor in the selection of broker/dealers to execute portfolio transactions, subject to best execution."[28] Broker-dealers may not, however, condition their promotion or sale of fund shares on the receipt of brokerage commissions from the fund.[29]

We approved this exception to the NASD's rules in 1981, shortly after adopting rule 12b–1.[30] We concluded that, in light of the adoption of rule 12b–1, "it is not inappropriate for investment companies to seek to promote the sale of their shares through the placement of brokerage without the incurring of any additional expense."[31] We recognized the conflicts of interest and stated that we expected fund boards, before adopting a policy permitting the "consider[ation] of the sale of an investment company's shares as a factor in the selection of broker-dealers to execute portfolio transactions, subject to the requirements of best execution," to "carefully weigh the possible advantages to the investment company and its shareholders and the possible abuses that may stem from the adviser's use of portfolio brokerage to encourage the sale of investment company shares."[32]

Because, as noted above, fund brokerage is an asset of the fund, a fund's use of its brokerage to promote the sale of its shares is generally viewed as a payment by the fund and thus subject to rule 12b–1.[33] In approving the exception to the NASD's Anti-Reciprocal Rule in 1981, however, we concluded that the practice of merely considering selling brokers' sales efforts when allocating brokerage would be addressed by the NASD rules governing broker-dealers and advisers' fiduciary obligations to seek best execution, rather than by Commission rules governing the use of fund assets for distribution.

## II. Discussion

Our decision in 1981 to approve the exception to the NASD's Anti-Reciprocal Rule was based on a view that merely factoring sales efforts into the selection of brokers, consistent with the investment adviser's fiduciary duties to the fund, was essentially benign. When a fund could choose among several brokers that could provide best execution, a decision to favor a selling broker could be made "without the incurring of any additional expense."[34] Moreover, the "mere allocation" of brokerage to promote the sale of fund shares could benefit existing shareholders of funds that were in "net redemption," that is, fund assets were shrinking and the ratio of fund expenses to fund assets was rising.

Our review of current practices, however, suggests that many arrangements that direct brokerage to reward selling brokers for distribution constitute more than mere allocation of brokerage, and are not consistent with our 1981 rationale for approving the exception to the NASD's Anti-Reciprocal Rule. The use of multiple broker-dealers for execution, step-outs, and other arrangements described above explicitly quantify the value of the distribution component of fund brokerage commissions and belie the notion that fund advisers are merely "considering" the selling efforts of the broker(s) involved. Rather, these arrangements bear all the hallmarks of barter arrangements in which the fund advisers trade brokerage (a fund asset) for sales efforts. Moreover, that brokerage commissions could instead be used to offset other fund costs rebuts the notion that the use of fund brokerage to finance distribution imposes no additional costs on the fund. Foregoing an opportunity to seek lower commission rates, to use brokerage to pay custodial, transfer agency and other fund expenses,[35] or to obtain any available cash rebates, is a real and meaningful cost to fund shareholders.

While the benefits to funds and their shareholders of using fund brokerage to promote the sale of fund shares are unclear, the benefits to fund advisers are clear. Fund advisers' compensation is based on a percentage of assets under management. A larger fund typically generates more advisory fees. Fund advisers have an incentive to use fund assets to increase the size of the fund and therefore promote the growth of

---

[23] NASD Conduct Rule 2830(d)(1)(A). If the fund also charges a service fee, the maximum aggregate sales charge may not exceed 7.25% of the offering price. NASD Conduct Rule 2830(d)(1)(D).

[24] NASD Conduct Rule 2830(d)(2)(B). If the fund also charges a service fee, the maximum aggregate sales charge may not exceed 6.25% of the amount invested. NASD Conduct Rule 2830(d)(2)(A).

[25] NASD Conduct Rule 2830(d)(2)(E)(i).

[26] The NASD, when it amended the sales charge rule to encompass asset-based sales charges (rule 12b–1 fees), explained its intention to "assure a level playing field":

[Asset-based sales charges] are the only type of mutual fund sales compensation that currently is not subject to NASD regulation. With the advent of these new methods of assessing sales charges on mutual funds, the NASD believed the Rules of Fair Practice should be amended specifically to encompass all sales charges. The NASD desired to take steps to assure a level playing field among all members selling mutual fund shares. Moreover, it believed additional amendments were necessary to prevent circumvention of the existing maximum sales charge rule because it had become possible for funds to use 12b–1 plans, either separately or in combination with initial or deferred sales loads, to charge investors more for distribution than could have been charged as an initial sales load under the existing maximum sales charge rule.

Order Approving Proposed Rule Change Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, Exchange Act Release No. 30897 (July 7, 1992) [57 FR 30985 (July 13, 1992)], at text accompanying n. 9.

[27] NASD Conduct Rule 2830(k) (Execution of Investment Company Portfolio Transactions).

[28] NASD Conduct Rule 2830(k)(7)(B).

[29] See, e.g., infra note 42 (describing SEC and NASD actions relating to Morgan Stanley's program for giving marketing preferences to funds in exchange for cash and brokerage commissions).

[30] Order Approving Proposed Rule Change and Related Interpretation under Section 36 of the Investment Company Act, Investment Company Act Release No. 11662 (Mar. 4, 1981) [46 FR 16012 (Mar. 10, 1981)] ("1981 Release").

[31] Id. (emphasis added). Nonetheless, we emphasized that the directors of a fund have a "continuing duty to assure that the company's brokerage allocation practices are designed to obtain best price and execution and to avoid any unnecessary trading." Id.

[32] Id. The exception to the Anti-Reciprocal Rule is conditioned on the fund disclosing its practice of considering distribution of its shares in selecting executing brokers. NASD Conduct Rule 2830(k)(7)(B).

[33] Rule 12b–1 applies to both "direct" and "indirect" financing activity that is primarily intended to result in the sale of fund shares. Rule 12b–1(a)(2). When we adopted the rule, we noted that "there can be no precise definition of what types of expenditures constitute indirect use of fund assets." 1980 Adopting Release, supra note.

[34] 1981 Release, supra note 30.

[35] See Payment for Investment Company Services with Brokerage Commissions, Investment Company Act Release No. 21221 (July 21, 1995) [60 FR 38918 (July 28, 1995)] (requiring funds, in calculating the cost of various services, to account for amounts paid with commission dollars).

their advisory fees.[36] An adviser that uses fund assets to promote the sale of fund shares may be able to avoid having to pay fees out of its own pocket ("revenue sharing"). Although fund advisers have similar conflicts with respect to the use of other fund assets that flow through a rule 12b–1 plan, the use of fund brokerage exacerbates the conflicts and complicates efforts to control them because of the practical limitations on the ability of fund directors to monitor and evaluate the motivations behind the selection of brokers to effect portfolio securities transactions.[37]

We believe that the way brokerage has been used to pay for distribution involves unmanageable conflicts of interest that may harm funds and fund shareholders.[38] The intense competition we observe among fund advisers to secure a prominent position in the selling brokers' distribution systems ("shelf space") creates powerful incentives for fund advisers to direct brokerage based on distribution considerations rather than quality and price considerations. These incentives may adversely affect decisions about how and where to effect portfolio securities transactions, and thus affect the quality of portfolio transactions.[39]

Pressures to generate brokerage commissions may also lead to an increase in portfolio turnover rates, which may drive up fund costs and harm performance.[40] At a minimum, this practice disadvantages funds that, because of investment considerations, do not actively trade their portfolios.[41]

We are also concerned about the effect of this practice on the relationship between broker-dealers and their customers.[42] Receipt of brokerage commissions by a broker-dealer in exchange for shelf space creates an incentive for the broker to recommend funds that best compensate the broker rather than ones that meet the customer's investment needs.[43] Because of the lack of transparency of brokerage transactions and their value to a broker-dealer, customers may not have appreciated the extent of this conflict.

Finally, the direction of valuable fund brokerage to compensate brokers for the sale of fund shares may permit brokers to circumvent the NASD's rules against excessive sales charges,[44] thus undermining the protections afforded fund shareholders by those rules and by section 22(b) of the Act, which authorized them.[45]

### A. Proposed Ban on Directed Brokerage

In light of these concerns, we are proposing amendments to rule 12b–1 under the Act to prohibit funds from compensating a broker-dealer for promoting or selling fund shares by directing brokerage transactions to that broker.[46] The rule would also prohibit step-out and similar arrangements designed to compensate selling brokers for selling fund shares.[47]

We request comment on the proposed ban on the use of brokerage commissions to pay brokers for selling fund shares.[48]

---

[36] Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 10252 (May 23, 1978) [43 FR 23589 (May 31, 1978)], at text following n.5 ("The fact that mutual fund advisers are paid fees based on a percentage of the fund's assets causes the growth of the fund through the sale of additional shares generally to be in the adviser's interest.").

[37] See, e.g., Letter from Matthew P. Fink, President, Investment Company Institute, to William H. Donaldson, Chairman, SEC (Dec. 16, 2003) (http://www.ici.org/statements/cmltr/03_sec_soft_com.html#P37_12572) ("ICI Letter") (noting that the use of brokerage commissions to finance distribution "can give rise to the appearance of a conflict of interest, as well as the potential for actual conflicts, given the fact-specific nature of the best execution determination").

[38] We came to a similar conclusion in 1966 when we examined similar reciprocal brokerage practices in a report to Congress discussing the public policy implications of investment company growth. Securities and Exchange Commission, Report on the Public Policy Implications of Investment Company Growth, H.R. Rep. No. 89–2337, at 186 (1966) ("PPI Report") (the use of brokerage commissions for sales of fund shares has "an adverse effect on mutual funds and their shareholders"). At the time, the Commission believed that such practices could be addressed through reform of commission rate schedules by the securities exchanges to permit volume discounts on large trades. Id. at 187. See also Wharton School of Finance and Commerce, A Study of Mutual Funds, H.R. Rep. No. 87–2274, at 539 (1962). Even after the elimination of fixed commission rates, the problems identified in 1966 persist.

[39] See, e.g., Kent Knudson, Mutual Fund Distribution Payments: Navigating the Conflicts, 3 J. of Investment Compliance 25, 26 (Winter 2002–2003) (noting that while any type of distribution payment gives rise to conflicts, "it would seem that soft-dollar arrangements using fund commissions to incentivize or support dealers that sell fund shares pose heightened concerns, especially when such arrangements may encourage an adviser to pay more than going market rates for trading commissions"). See also In re Kingsley, Jennison, McNulty & Morse Inc., Investment Advisers Act Release No. 1396 (Dec. 23, 1993) [51 SEC 904] (finding conflict of interest in adviser's soft dollar arrangement with a broker even though the arrangement did not result in adviser's client paying higher than the market commission rate for transactions executed by the broker; conflict existed because by selecting that broker, the adviser avoided having to pay for the soft dollar benefits out of its own assets).

[40] PPI Report, supra note 38, at 174 ("A high portfolio turnover rate may result from a bona fide judgment that a policy of active trading is most likely to lead to optimum investment performance, especially during periods of great volatility. But it may also result from the managers' decision to generate a substantial volume of brokerage commissions for the purpose of stimulating the sale of new shares."). See also Note, The Use of Brokerage Commissions to Promote Mutual Fund Sales: Time to Give Up the "Give-Up", 68 Colum. L. Rev. 334, 339 (1968) ("But even where true churning does not exist, the pressure to create give-ups may push a doubtful transaction over the line into execution.") (footnote omitted).

[41] See PPI Report, supra note 38, at 17, 174, and 180.

[42] See, e.g., In re Morgan Stanley, Inc., Securities Act Release No. 8339 (Nov. 17, 2003) (finding broker-dealer had willfully violated section 17(a)(2) of the Securities Act [15 U.S.C. 77q(a)(2)], rule 10b–10 [17 CFR 240.10b–10] under the Securities Exchange Act of 1934 ("Exchange Act"), and NASD Conduct Rule 2830(k) by failing to disclose to its clients who purchased fund shares that it was being paid by certain fund companies, with a combination of cash and brokerage commissions, to make special efforts to market those funds); NASD Charges Morgan Stanley with Giving Preferential Treatment to Certain Mutual Funds in Exchange for Brokerage Commission Payments, NASD News Release (Nov. 17, 2003) (announcing companion NASD action for violation of NASD Conduct Rule 2830(k) by, among other things, favoring the distribution of shares of particular funds on the basis of brokerage commissions to be paid by the funds). See also Laura Johannes and John Hechinger, Conflicting Interests: Why a Brokerage Giant Pushes Some Mediocre Mutual Funds, Wall St. J., Jan. 9, 2004, at A1.

[43] See Ruth Simon, Why Good Brokers Sell Bad Funds, Money, July 1991, at 94.

[44] See supra notes 22 through 26 and accompanying text.

[45] 15 U.S.C. 80a–22(b). Although we need not address the question today, the use of fund brokerage commissions to finance distribution for the economic benefit of the fund's adviser also raises troubling questions under section 17(e)(1) of the Investment Company Act. 15 U.S.C. 80a–17(e)(1) (making it unlawful for any affiliated person of a fund, "acting as agent, to accept from any source any compensation * * * for the purchase or sale of any property to or for [the fund] except in the course of such person's business as an underwriter or broker"). See, e.g., In re Duff & Phelps Investment Management Co., Inc., Investment Company Act Release No. 25200 (Sept. 28, 2001) (finding that adviser "willfully violated section 17(e)(1)" by directing a fund's brokerage transactions to a broker-dealer in return for client referrals); In re Fleet Investment Advisors Inc. (as successor to Shawmut Investment Advisers, Inc.), Investment Advisers Act Release No. 1821 (Sept. 9, 1999) (finding that affiliated adviser's receipt of client referrals in return for the direction of fund brokerage commissions was compensation in violation of section 17(e)(1)); In re Provident Management Corp., Investment Advisers Act Release No. 277 (Dec. 1, 1970) (finding that fund affiliates violated and/or aided and abetted in the violation of section 17(e)(1) by directing fund brokerage to brokers that provided commission recapture and free sales material to the fund's primary retail distributor).

[46] Proposed rule 12b–1(h)(1). The rule would prohibit funds from financing distribution of fund shares through the direction of any service related to effecting a fund brokerage transaction, including performing or arranging for the performance of any function related to the processing of that transaction (e.g., transmission of an order for execution, execution of an order, or clearance and settlement of the transaction). The prohibition would include the direction of brokerage from transactions executed by government securities brokers and dealers and municipal securities dealers.

[47] Proposed rule 12b–1(h)(2). In addition to step-outs, the rule would prohibit, for example, the use of arrangements in which a portion of a fund's brokerage commissions are "rebated" to an account maintained for the fund and later paid to a selling broker.

[48] We note that the NASD recently filed with us a proposed rule change to eliminate the exception

Continued

- Are our concerns about this practice justified?
- Are there alternative measures that we could take to address the use of brokerage commissions to finance distribution?
- Would brokerage commissions be reduced by eliminating the use of commissions to pay for distribution? Would there be greater competition in commission rates?
- If we ban this practice, would the primary effect be to increase brokers' demands on advisers to make payments out of their assets, *i.e.*, revenue sharing? Are we correct in our assumption that properly disclosed revenue sharing payments present more manageable conflicts for funds and broker-dealers?[49]
- If our assumption is incorrect, should we take additional steps to address revenue sharing concerns? If so, what steps should we take?

We also seek comment on whether we should propose instead that funds provide more complete disclosure to shareholders of the use of brokerage commissions to pay brokers for selling fund shares or otherwise modify or relocate the disclosures we currently require. Funds currently must disclose certain information relating to arrangements by which brokerage commissions are used to compensate broker-dealers for selling fund shares. A fund must disclose in the fee table in its prospectus the amounts paid pursuant to the 12b–1 plan, as a percentage of its average net assets.[50] A fund also must describe in its statement of additional information ("SAI") the material aspects of the fund's plan and any agreements related to the implementation of the plan, including the dollar amounts spent on specific kinds of distribution activities, including the compensation paid to selling broker-dealers.[51] In addition, a fund's SAI must describe how the fund selects brokers to effect securities transactions, including a description of any factors the fund will consider in selecting brokers, and identification of the products or services the fund receives that it considers in making its selection.[52] Rule 10b–10 under the Exchange Act, the general confirmation rule governing broker-dealers, requires disclosure regarding the source and extent of payments to broker-dealers in selling fund shares, including payments to broker-dealers in the form of portfolio brokerage commissions.[53] Recently, we proposed rules requiring brokers to provide improved disclosure, at the point of sale and in mutual fund confirmation statements, of the receipt of brokerage commissions and revenue sharing payments in the sale of fund shares.[54] We considered whether modifications to the disclosure requirements would adequately address the problems we describe above. Our concern with this approach, however, is that it may not be effective in preventing funds and fund shareholders from being harmed by the conflicts of interest that surround the use of fund brokerage to pay for distribution. In addition, the complicated nature of the various arrangements for using brokerage commissions may be difficult for investors to comprehend and to compare across different funds.

- Should we increase or revise the disclosure requirements concerning the use of brokerage commissions to pay brokers for selling fund shares? Instead of banning directed brokerage, is there a disclosure-based alternative that would adequately address the concerns discussed above. If so, what should be the format of these disclosures? Where should these disclosures be located—in the prospectus, the SAI, or the annual reports?
- Should the disclosures be quantitative (*e.g.*, discuss the amount of brokerage commissions) or qualitative (*e.g.*, discuss the nature of the arrangements and the potential conflicts of interest), or both? Could a single quantitative measure accurately disclose the costs under the many different arrangements through which brokerage commissions are used to pay for distribution?
- Would the disclosures enable shareholders, either directly or based on

---

[48] to the Anti-Reciprocal Rule, which, as discussed above, permits NASD members to sell shares of funds that follow a disclosed policy "of considering sales of their shares as a factor in the selection of broker/dealers to execute portfolio transactions, subject to best execution." NASD Conduct Rule 2830(k)(7)(B). The NASD's proposal also would prohibit a broker-dealer from selling a fund if the broker-dealer knows of an arrangement under which the fund directs portfolio securities transactions to pay for distribution of fund shares. Proposed Amendment to Rule Relating to Execution of Investment Company Portfolio Transactions, NASD Rule Filing 2004–027 (Feb. 10, 2004) (*http://www.nasdr.com/pdf-text/rf04_27.pdf*). Pursuant to Exchange Act Section 19(b) [15 USC. 78s(b)] and rule 19b–4 [17 CFR 240.19b–4], we will publish notice of and seek comment on the NASD's proposed rule.

[49] *See* Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds, Investment Company Act Release No. 26341 (Jan. 29, 2004) [69 FR 6438 (Feb. 10, 2004)] ("Disclosure Requirements Release").

[50] Item 3 of Form N–1A requires all funds to provide a fee table that discloses, among other things, "Distribution [and/or Service] (12b–1) Fees." This phrase is defined in instruction 3.b. to Item 3 as including "all distribution or other expenses incurred during the most recent fiscal year under a plan adopted pursuant to rule 12b–1." The information must be based upon a fund's most recent fiscal year, but the information must be restated if there have been any changes that would materially affect the information that is disclosed in the table. Instructions 3.d.(i)–(ii) to Item 3 of Form N–1A. Miscellaneous expenses paid through brokerage commissions must be reflected in the amount of expenses and expense ratio in a fund's statement of operations, which is part of its semi-annual and annual reports to shareholders and financial statements. *See* Investment Company Act Release No. 21221, *supra* note 35, and rule 6.07(g) of Regulation S–X under the 1933 Act. In addition, a fund's brokerage commissions, including the portion that is used to pay for distribution, are reflected in the fund's net asset value, and are consequently reflected in the fund's performance calculations, regardless of whether the amounts are paid pursuant to a 12b–1 plan. *See* Items 2(c)(2) and 21 of Form N–1A.

[51] Item 15(g) of Form N–1A. This item also requires the fund to disclose (i) whether the fund participates in any joint distribution activities with another fund, and (ii) whether the fund's investment adviser (or any other interested person of the fund) has a direct or indirect interest in the financial operation of the 12b–1 plan or any related agreements. *Id.* In addition, a fund's statement of operations, must disclose the total dollar amounts that the fund paid under the 12b–1 plan. *See* rule 30d–1 under the Investment Company Act (requiring certain information in a fund's semi-annual and annual reports to shareholders) and rule 6–07(f) of Regulation S–X (requiring a fund's statement of operations to provide a statement of all amounts that were paid by the fund in accordance with a 12b–1 plan).

[52] Item 16(c) of Form N–1A. This disclosure is not as specific, however, as the disclosure required concerning research services a fund receives that factor into its selection of brokers. A fund that directs brokerage to a broker because of research services provided must state the amount of the transactions and related commissions. *See* item 16(d) of Form N–1A.

[53] *See* Disclosure Requirements Release, *supra* note 49, at text accompanying nn. 35 and 36.

[54] Proposed rule 15c2–2 under the Exchange Act would require confirmation statements for fund share purchases, among other disclosures, to state: (i) The amount of any dealer concession the broker-dealer will earn in connection with the transaction, expressed in dollars and as a percentage of the net amount invested; and (ii) the amount directly or indirectly earned by the broker-dealer and any of its associated persons in connection with revenue sharing payments or brokerage commissions from the fund complex over the four most recent calendar quarters, expressed as a percentage of the total net asset value of the securities issued by the fund complex sold by the broker-dealer over that period. The rule also would require the confirmation to disclose the amount of revenue sharing or brokerage commissions the broker-dealer might receive in connection with the transaction, calculated by multiplying the percentage expressing the amount of revenue sharing or brokerage commission by the net amount invested in the transaction. *See* Disclosure Requirements Release, *supra* note 49. Proposed rule 15c–3 would require brokers, dealers, and municipal securities dealers to provide specific information to investors at the point of sale (or before they purchase fund shares), including (i) an estimate of the asset-based sales charge and service fee that, in the year following the purchase, the fund would incur in connection with the shares purchased if net asset value does not change, and (ii) whether the selling broker, dealer, or municipal securities dealer receives brokerage commissions from the fund complex. *See id.*

assessments by investment analysts, to choose between funds that engage in these types of arrangements?

• What costs would a fund likely incur in making these disclosures?

• Should we revise the disclosure requirements and ban the use of brokerage commissions in the manner described above? Should we revise the disclosure requirements and ban only certain types of arrangements under which brokerage commissions are used to finance distribution?

*B. Policies and Procedures*

We are also proposing to require that any fund (or its adviser) that directs any portfolio securities transactions to a selling broker-dealer implement policies and procedures designed to ensure that its selection of brokers to effect portfolio securities transactions is not influenced by considerations about the sale of fund shares.[55] These procedures must be reasonably designed to prevent: (i) The persons responsible for selecting broker-dealers to effect transactions in fund portfolio securities (*e.g.*, trading desk personnel) from taking broker-dealers' promotional or sales efforts into account in making those decisions;[56] and (ii) the fund, its adviser or principal underwriter, from entering into any agreement under which the fund directs brokerage transactions or revenue generated by those transactions to a broker-dealer to pay for distribution of the fund's shares.[57] The fund's board of directors, including a majority of its independent directors, must approve the policies and procedures.[58]

The policies and procedures that the rule would require are more specific than those we recently required all funds and investment advisers to adopt.[59] The proposed requirement is designed to ensure the active monitoring of brokerage allocation decisions when executing brokers also distribute the fund's shares.

• Is it appropriate to require funds that execute transactions through their selling brokers to implement policies and procedures to ensure that distribution considerations do not affect execution decisions?

• Is the scope of the proposed policies and procedures appropriate? Should we include different or additional objectives?

• Would these policies and procedures be effective in preventing funds and broker-dealers from circumventing the ban on paying distribution-related expenses with brokerage commissions?

• Should we adopt other measures to help the fund monitor the use of fund brokerage? The rule would require the board of directors to approve the policies and procedures. Should we also require the board of directors to monitor the fund's adherence to the policies and procedures, or to approve the allocation of brokerage? Should we require the fund's adviser to report to the board on its decisions regarding brokerage allocation? Are there other measures we should require the board to take to ensure that brokerage decisions are not influenced by brokers' distribution efforts?

• Should we require a fund's chief trading officer (or another official of the fund or its adviser) to certify periodically that the selection of brokers to execute the fund's portfolio securities transactions was made without taking into account the brokers' promotion or sale of shares issued by the fund or any other fund?

• Should we include a safe harbor in the rule for funds that execute portfolio securities transactions with a selling broker? If so, what conditions should we include in the safe harbor? Would the absence of a safe harbor affect the ability of funds to obtain best execution?

### III. General Request for Comment

We request comment on the proposed rule amendments described above, including suggestions for additional provisions or changes, and comments on other matters that might have an effect on the proposal. We encourage commenters to provide data to support their views.

### IV. Request for Comment on Further Amendments to Rule 12b–1

We also request comment on whether we should propose additional changes to rule 12b–1 to address other issues that have arisen under the rule, or propose to rescind the rule.[60] As our staff has noted, the current practice of using 12b–1 fees as a substitute for a sales load is a substantial departure from the use of the rule envisioned by the Commission when we adopted the rule in 1980.[61] As a result, its provisions may not address a number of matters that today face funds and fund shareholders.[62] The comments we receive will help us consider whether to propose further amendments.

One approach on which we would particularly like to receive comment would refashion rule 12b–1 to provide that funds deduct distribution-related costs directly from shareholder accounts rather than from fund assets. Under this

---

[55] Proposed rule 12b–1(i). As with all other portfolio securities transactions, the fund's adviser has a fiduciary duty to seek best execution. The adviser must see that these portfolio securities transactions are executed "in such a manner that the client's total cost or proceeds in each transaction is most favorable under the circumstances." In re Kidder, Peabody & Co., Inc., Investment Advisers Act Release No. 232 (Oct. 16, 1968). *See also* Section 28(e) Interpretive Release, *supra* note 17; Applicability of the Commission's Policy Statement on the Future Structure of the Securities Markets to Selection of Brokers and Payment of Commissions by Institutional Managers, Investment Company Act Release No. 7170, [1971–72 Transfer Binder] Fed. Sec. L. Rep. (CCH) 78,776 (May 17, 1972) (advisers "must assign executions and pay for brokerage services in accordance with the reliability and quality of those services and their value and expected contribution to the performance of the account they are managing").

[56] Proposed rule 12b–1(i)(1).

[57] Proposed rule 12b–1(i)(2). The policies and procedures should be designed to reach any arrangement or other understanding, whether binding or not, between a fund and a broker-dealer, including an understanding to direct brokerage to a government securities broker or dealer or a municipal securities dealer.

[58] Proposed rule 12b–1(i).

[59] *See* Compliance Programs of Investment Companies and Investment Advisers, Investment Company Act Release No. 26299 (Dec. 17, 2003) [68 FR 74714 (Dec. 24, 2003)].

[60] When we adopted the rule, we noted: "The Commission and its staff will monitor the operation of the rules closely and will be prepared to adjust the rules in light of experience to make the restrictions on use of fund assets for distribution either more or less strict." *See* 1980 Adopting Release, *supra* note 21.

[61] Division of Investment Management, SEC, Report on Mutual Fund Fees and Expenses 81 (2000) ("Staff Fee Report"). *See also* William P. Dukes and James B. Wilcox, *The Difference Between Application and Interpretation of the Law as it Applies to SEC Rule 12b–1 Under the Investment Company Act of 1940*, 27 New Eng. L. Rev. 9 (1992).

[62] We have, however, responded to the evolution of rule 12b–1 plans in a number of ways, including, for example, approving NASD rules capping the amount of fund distribution expenses (*see supra* notes 22 through 26, and accompanying text), and adopting a rule permitting multiple classes of shares. *See* rule 18f–3 under the Investment Company Act [17 CFR 270.18f–3]. *See also* Exemption for Open-End Management Investment Companies Issuing Multiple Classes of Shares; Disclosure by Multiple Class and Master-Feeder Funds; Class Voting on Distribution Plan, Investment Company Act Release No. 20915 (Feb. 23, 1995) [60 FR 11876 (Mar. 2, 1995)]. In 2000, our staff recommended that we revisit rule 12b–1 in light of "changes in the manner in which funds are marketed and distributed and the experience gained from observing how rule 12b–1 has operated since it was adopted in 1980." Staff Fee Report, *supra* note 61. More recently, the staff has stated that it will continue to assess the issues raised by rule 12b–1 in light of the recommendations in the Staff Fee Report and changes in distribution practices since the rule's adoption. *See* Memorandum from Paul F. Roye, Director, SEC Division of Investment Management, to William H. Donaldson, Chairman, SEC (June 9, 2003) (*http://financialservices.house.gov/media/pdf/02–14–70%20memo.pdf*). Former Chairman Pitt called for a reexamination of distribution practices. Harvey L. Pitt, Chairman, SEC, Speech to the Investment Company Institute General Membership Meeting (May 24, 2002). *See also* Brooke A. Masters, *Counting the Costs of Fund Fees; Investigators' Attention Turns to Legal, Lucrative "Advertising" Charges*, Washington Post, Dec. 4, 2003, at E1; Craig A. Rubinstein, *Excessive Mutual Fund Advisory Fees: Give-Ups in Rule 12b–1 Clothing?*, 14 Ann. Rev. Banking L. 385, 404 (1995) (recommending that we consider repealing rule 12b–1).

approach, a shareholder purchasing $10,000 of fund shares with a five percent sales load could pay a $500 sales load at the time of purchase, or could pay an amount equal to some percentage of the value of his or her account each month until the $500 amount is fully paid (plus carrying interest).[63] If the shareholder redeemed before the amount was fully paid, the proceeds of the redemption would be reduced by the unpaid amount.[64] As with other sales charges, the account-based fees would be subject to NASD caps.[65]

This approach may have a number of advantages compared to current arrangements under which the fund pays fees pursuant to a rule 12b–1 plan approved by shareholders and overseen by fund directors. First, the amounts charged and their effect on shareholder value would be completely transparent to the shareholder because the amounts will appear on the shareholder's account statements. Second, existing shareholders would not pay the costs of selling to new fund shareholders' costs that often may yield them few benefits. Third, long-term shareholders would no longer, as a result of paying a share of 12b–1 fees over a lengthy period, pay amounts that exceed their fair share of distribution costs.[66]

A shareholder account-based approach to distribution payments would help to eliminate the substantial conflicts of interest presented by the use of fund assets to pay for distribution. As a result, the role of fund directors in approving methods of distribution could be eliminated (or substantially circumscribed), freeing their time to address other significant matters. Rule 12b–1's shareholder voting requirements could be eliminated, reducing fund expenses. The detailed regulatory requirements of rule 12b–1 and NASD rule 2830(d) designed to address these conflicts could be substantially reduced or eliminated, reducing related legal and compliance costs that fund shareholders have ultimately born.[67]

A shareholder account-based approach to distribution payments also could simplify investing in funds and eliminate many of the problems with fund sales practices we see today. Funds would no longer need to have separate classes of shares based on rule 12b–1 fees, which many shareholders have found very confusing.[68] Fund prospectuses would be shorter and more understandable. Sales practice abuses associated with the existence of separate classes could also be eliminated.[69]

• We request comment on these ideas, particularly from shareholders who pay 12b–1 fees and fund directors who are charged with supervising funds' 12b–1 plans. Would a shareholder account-based approach make sense?

Some have suggested that, instead of modifying rule 12b–1, we should rescind the rule.[70]

Critics of the rule often argue that it no longer serves the purposes for which it was intended.[71] Others contend that rescinding the rule would harm funds and fund shareholders.[72] We request comment on whether we should propose to rescind the rule.

• If we were to rescind the rule, what would be the consequences for funds, fund shareholders, fund advisers, and brokers that sell fund shares? How would elimination of the rule affect the aggregate amount of shareholder expenses? What alternate methods of financing distribution would funds and advisers use?

• Should the fund's adviser or principal underwriter pay all promotional expenses, or are there certain distribution expenses that should be paid with fund assets?

• Funds often pay for administrative services provided by third parties with asset-based fees.[73] If we were to propose to rescind rule 12b–1, should we also propose restrictions on the use of asset-based fees to ensure that distribution expenses are not improperly characterized as, e.g., shareholder account servicing expenses?

• If we were to rescind rule 12b–1, would particular types of funds, such as

---

[63] In choosing between paying a front-end load or spreading the payment of the load over time, a shareholder would have to take into consideration, among other factors, the possibility that payment of loads through periodic automatic redemptions (to the extent that the loads exceed distributions) may result in the shareholder realizing capital gains or losses.

[64] Funds today may charge account-based distribution fees. See rule 6c–10 under the Investment Company Act, and Exemption for Certain Open-end Management Investment Companies to Impose Deferred Sales Loads, Investment Company Act Release No. 22202 (Sept. 9, 1996) [61 FR 49011 (Sept. 17, 1996)] (referring to these distribution arrangements as "installment loads").

[65] See supra notes through and accompanying text.

[66] Although classes of shares carrying rule 12b–1 fees may be structured to convert to classes without rule 12b–1 fees, those conversions typically do not occur for a substantial period of time, e.g., ten years.

[67] Fund distributors could also benefit. Unlike rule 12b–1 fees, which are subject to annual renewal by fund directors, an account-based distribution fee could provide a dependable and legally certain flow of payments, that are unaffected by any shrinkage in fund assets. See John Shipman, B-ware: Shares with Back-End Loads Can Sting Investors and Fund Companies, Barron's, Jan. 6, 2003, at L10 ("[N]ow that the bear market has battered many portfolios, 12b–1 and back-end fees are being drawn from a shrinking base of assets, producing lower-than-expected cash flows."); Tom Leswing, Munder B Share Sales Continue to Sting Parent, Ignites.com, Oct. 17, 2002 (http://www.ignites.com/) (reporting Comerica's $5 million charge against third-quarter revenues as a result of a decline in its subsidiary's revenue from 12b–1 fees corresponding to a decline in assets under management).

[68] See, e.g., Timothy Middleton, Abecedarians, Take Note: Classes Multiply, N. Y. Times, Nov. 26, 1996, at 8 ("Fund companies have shown great ingenuity in creating share classes that, while legal, may leave buyers baffled."); Andrew Leckey, Understanding Shares Isn't As Easy As ABC, Chi. Trib., Aug. 7, 2001, at 7 ("Mutual fund share classes have become a confusing alphabet soup for investors who put money into so-called "load" mutual funds that require a sales charge."). See also Gregg Greenberg, Mutual Fund Class Warfare, TheStreet.com, Dec. 3, 2003 (http://www.thestreet.com/funds/gregggreenberg/10129505.html).

[69] Recently, we have instituted a number of actions against firms and registered representatives for selling Class B shares, which generated higher commissions than class A shares, to clients for whom Class A shares were more suitable. See, e.g., In re Prudential Securities, Inc., Exchange Act Release No. 48149 (July 10, 2003); In re Morgan Stanley DW Inc., Exchange Act Release No. 48789 (Nov. 17, 2003); In re Kissinger, Exchange Act Release No. 48178 (July 15, 2003). The NASD also has instituted actions for Class B sales practice abuses. See, e.g., NASD Brings Enforcement Action for Class B Mutual Fund Share Sales Abuses and Issues Investor Alert on Class B Shares, NASD News Release, June 25, 2003 ("Today's action is part of a larger, ongoing focus of NASD on the sale of Class B mutual fund shares. In the last two years NASD has brought more than a half dozen significant enforcement cases involving sales violations of Class B shares.").

[70] See, e.g., Neil Weinberg, Let the Sun Shine, Forbes, Dec. 22, 2003, at 72; Rubinstein Article, supra note 62.

[71] See, e.g., Oversight Hearing on Mutual Funds: Hidden Fees, Misgovernance and Other Practices that Harm Investors, Hearings Before the Subcommittee on Financial Management, the Budget, and International Security of the Senate Committee on Governmental Affairs 108th Cong., 2d Sess. (Jan. 27, 2004) (statement of Travis B. Plunkett, Legislative Director, Consumer Federation of America).

[72] See, e.g., Masters, Counting the Costs of Fund Fees, supra note ("Mutual fund company officials defend 12b–1 fees, saying the charge has opened up a wider range of investment options for the more than 60 percent of mutual fund investors who buy through brokers."); Stephen Schurr, False Advertising; The Truth About 12b–1 Fees, TheStreet.com, Aug. 31, 2003 (http://www.thestreet.com/_tscs/funds/stephenschurr/10107579.html) ("[T]o the Investment Company Institute, which represents the fund industry, 12b–1 fees serve a vital function to individuals and have actually helped drive fund expenses down over the past 20 years.").

[73] See, e.g., Investment Company Institute, Use of Rule 12b–1 Fees by Mutual Funds in 1999, Fundamentals, Apr. 2000, at 2 (Figure 2) (http://www.ici.org/stats/res/fm-v9n1.pdf) (finding, based on a survey of 95 fund complexes, that 32% of 12b–1 fees are used to pay for administrative services). In addition to imposing asset-based sales charges, NASD rules permit an asset-based "service fee" of up to 0.25% to cover "payments by an investment company for personal service and/or the maintenance of shareholder accounts." NASD Conduct Rules 2830(b)(9) (defining "Service fees") and 2830(d)(5) (prohibiting NASD members from selling a fund if its service fee, as disclosed in its prospectus, exceeds 0.25%).

funds with fewer net assets or newer funds, be disproportionately disadvantaged?

• How would rescission of rule 12b–1 affect distribution arrangements, *e.g.*, fund supermarkets and other arrangements that anticipate the receipt of 12b–1 fees?

• If we rescind the rule, should we propose a new rule that would prohibit the use of fund assets to pay for sales and distribution expenses?

### V. Cost-Benefit Analysis

We are sensitive to the costs and benefits that result from our rules. The proposed amendments would prohibit the use of brokerage commissions to compensate broker-dealers for the distribution of fund shares. We encourage commenters to identify, discuss, analyze, and supply relevant data regarding these or any additional costs and benefits.

#### A. Benefits

The proposed amendments would benefit funds and their shareholders. An increasing number of funds are using a limited number of distribution channels, and the broker-dealers who control these channels routinely demand supplemental payments (in addition to the compensation they receive in the form of sales charges) for access to that distribution network. We have found that one form of supplemental compensation comes from directed brokerage arrangements, pursuant to which fund advisers direct brokerage commissions from fund portfolio securities transactions to selling brokers. A prohibition on using directed brokerage to pay for distribution would reduce the ability of selling brokers to demand supplemental distribution payments, and may reduce commission rates that funds pay to the extent that these payments would be excluded from the commission rate.

Fund brokerage is a valuable fund asset and thus should be used in the manner that most benefits the fund and its shareholders. Using excess brokerage commissions to finance distribution currently imposes a cost on funds, because those brokerage commissions are unavailable to pay for other services for the fund. Because this cost is difficult to quantify, however, fund shareholders may not realize the true cost of financing distribution in this manner. The difficulty of quantifying the cost to the fund of brokerage financing makes the conflicts of interest accompanying the direction of fund brokerage particularly acute. Our staff's recent review of directed brokerage practices has raised questions about whether fund advisers and broker-dealers, rather than funds and fund shareholders, are the beneficiaries of these arrangements.

The proposed amendments, by prohibiting the practice of directing brokerage for distribution, would address this conflict of interest. The proposal would benefit fund shareholders by prohibiting the adviser from considering distribution as a factor in selecting an executing broker. Funds would be able to use the entire amount of the brokerage commission to purchase execution and other services of direct benefit to funds and their shareholders. By removing distribution as a factor in the selection of selling brokers, the proposed amendments will enhance the likelihood that advisers will select brokers based on the quality and cost of execution.

#### B. Costs

The proposed amendments might decrease the commissions received by broker-dealers and might impose new costs on investment advisers and funds. The elimination of brokerage commissions as a source of distribution financing could reduce the amount of compensation that broker-dealers receive for selling fund shares and could dissuade them from selling fund shares. Selling brokers are likely to seek to make up for any shortfall from other sources. To the extent that distribution fees do not currently exceed the NASD's caps, funds may institute or increase fees deducted from fund assets under a rule 12b–1 plan. Alternatively, advisers may increase the payments that they make to broker-dealers out of their own assets, which are likely to cause advisers' costs to rise.

We assume that a great majority of, if not all, funds are likely to find that, for some portfolio transactions, the broker-dealer who can provide best execution also distributes the fund's shares. Thus, we assume that all funds will incur costs in order to comply with the requirement for policies and procedures contained in the proposed amendments. Specifically, they or their advisers would be required to institute policies and procedures reasonably designed to prevent: (i) The persons responsible for selecting broker-dealers to effect transactions in fund portfolio securities (*e.g.*, trading desk personnel) from taking broker-dealers' promotional or sales efforts into account in making those decisions; and (ii) the fund, its adviser or principal underwriter, from entering into any agreement under which the fund directs brokerage transactions or revenue generated by those transactions to a broker-dealer to pay for distribution of the fund's shares. We do not anticipate that drafting or implementing these policies and procedures will be costly.

By narrowing the options for financing distribution of fund shares, the proposed amendments could impose costs on funds and their advisers. If the remaining methods of financing distribution are not adequate, funds may not grow as quickly as they otherwise would have. Advisers, whose compensation is generally tied to net assets, may experience slower growth in their advisory fees, and fund shareholders may not benefit from the economies of scale that accompany asset growth.[74]

#### C. Request for Comment

We request comment on the potential costs and benefits identified in the proposal and any other costs and benefits that may result from the proposed amendments. For purposes of the Small Business Regulatory Enforcement Fairness Act of 1996, the Commission also requests information regarding the impact of the proposed rule on the economy on an annual basis. Commenters are requested to provide data to support their views.

### VI. Consideration of Promotion of Efficiency, Competition, and Capital Formation

Section 2(c) of the Investment Company Act mandates the Commission, when engaging in rulemaking that requires it to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.[75]

As discussed above, the proposed amendments would prohibit funds from compensating selling brokers with commissions generated from fund portfolio securities transactions. This new prohibition could promote efficiency by eliminating brokers' selling efforts, which are not indicative of their execution capabilities, as a factor that fund advisers use in selecting an executing broker. Efficiency also would be enhanced because, if commissions are not used to finance the distribution of a fund's shares, lower commission rates may be available or the fund may be able to obtain other services more directly beneficial to it and its shareholders.

---

[74] Historically, however, fund shareholders have not always enjoyed lower expenses as a result of increased assets.

[75] 15 U.S.C. 80a–2(c).

We do not anticipate that these proposed amendments would harm competition. All funds would be precluded from using this form of compensation. In addition, the amendments should reduce incentives that broker-dealers currently have to base their fund recommendations to customers on payment for distribution. The amendments also could foster greater competition in brokerage commission rates by unbundling distribution from execution. Thus, the proposed amendments are designed to enhance competition.

The proposed amendments would prohibit a fund from relying on its selling brokers to effect fund portfolio securities transactions unless the fund has policies and procedures in place designed to ensure the active monitoring of brokerage allocation decisions when executing brokers also distribute the fund's shares. Thus, funds would not be unnecessarily limited in their choice of executing brokers, and the proposed amendments would not have adverse effects on competition in the provision of brokerage services. We do not anticipate that the proposed amendments would affect capital formation.

We request comment on whether the proposed amendments will affect efficiency, competition, or capital formation. Would the proposed amendments materially affect the efficiency, competition, and capital formation of funds, advisers, or broker-dealers? Comments will be considered by the Commission in satisfying its responsibilities under section 2(c) of the Investment Company Act. Commenters are requested to provide empirical data and other factual support for their views to the extent possible.

**VII. Paperwork Reduction Act**

The proposed amendments contain a "collection of information" requirement within the meaning of the Paperwork Reduction Act of 1995.[76] We are submitting this proposal to the Office of Management and Budget ("OMB") for review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. The proposed amendments would add "collection of information requirements" to the existing collection of information requirements under rule 12b–1 of the Investment Company Act of 1940. The title for the collection of information requirements associated with the proposed amendments is "Rule 12b–1 under the Investment Company Act, 'Distribution of Shares by Registered Open-End Management Investment Company.'" An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number. The approved collection of information associated with rule 12b–1, which would be revised by the proposed amendments, displays OMB control number 3235–0212.

Rule 12b–1 permits funds to use their assets to pay distribution-related costs. In order to rely on rule 12b–1, a fund must adopt "a written plan describing all material aspects of the proposed financing of distribution" that is approved by fund shareholders and fund directors. Any material amendments to the rule 12b–1 plan similarly must be approved by fund directors, and any material increase in the amount to be spent under the plan must be approved by fund shareholders. In considering a rule 12b–1 plan, the fund board must request and evaluate information reasonably necessary to make an informed decision. Rule 12b–1 also requires the fund to preserve for six years copies of the plan, any related agreements and reports, as well as minutes of board meetings that describe the factors considered and the basis for implementing or continuing a rule 12b–1 plan.

To eliminate a practice that is fraught with conflicts of interest and may be harmful to funds and fund shareholders, we propose to amend rule 12b–1 to prohibit funds from paying for the distribution of their shares with brokerage commissions. The proposed amendments would require funds that use their selling brokers to execute securities transactions to implement, and their boards of directors (including a majority of independent directors) to approve, policies and procedures. The policies and procedures would have to be reasonably designed to prevent: (i) The persons responsible for selecting broker-dealers to effect transactions in fund portfolio securities from taking broker-dealers' promotional or sales efforts into account in making those decisions; and (ii) the fund, its adviser or principal underwriter, from entering into any agreement under which the fund directs brokerage transactions or revenue generated by those transactions to a broker-dealer to pay for distribution of the fund's shares. This requirement includes the following new information collections: (i) A fund's documentation of its policies and procedures, and (ii) the approval by the board of directors of those policies and procedures.

The new information collection requirements would be mandatory. Responses provided to the Commission in the context of its examination and oversight program are generally kept confidential.[77]

The current annual information collection burden for rule 12b–1 is 621,700 hours. We estimate that, if the proposed amendments are adopted, the burden will increase to 628,833 hours. Our staff estimates that there are approximately 6,185 mutual fund portfolios with rule 12b–1 plans.[78] We anticipate that, if the proposed amendments are adopted, all of the approximately 3,100 active open-end funds will implement the policies and procedures required to use their selling brokers to execute portfolio securities transactions.[79]

Based on conversations with fund representatives, Commission staff estimates that for each of the 6,185 mutual fund portfolios that currently have a rule 12b–1 plan, the average annual burden of complying with the rule is 100 hours to maintain the plan and the total burden hours per year for all fund portfolios is 618,500 hours.[80] In the first year after adoption of the proposed amendments, we estimate that each fund will spend 10 hours to comply with the new information collection requirement, for a total of 31,000 additional burden hours in the first year.[81] The aggregate burden for all funds in the first year after adoption, therefore, is estimated to be 649,500 hours.[82] We estimate that the average weighted annual burden for all funds over the three-year period for which we are requesting approval of the information collection burden will be approximately 628,833 hours.[83]

If a currently operating fund seeks to adopt a new rule 12b–1 plan or materially increase the amount it spends for distribution under its rule 12b–1

---

[76] 44 U.S.C. 3501 to 3520.

[77] *See* section 31(c) of the Investment Company Act [15 U.S.C. 80a–30(c)].

[78] This estimate, which is based on information filed with the Commission by funds, reflects an adjustment from our previous estimate of 6,217.

[79] We have estimated the information collection burdens associated with the policies and procedures required by the proposed amendments at the fund level, rather than the fund portfolio level, because we anticipate that one set of policies and procedures will cover a fund consisting of multiple portfolios.

[80] 6,185 fund portfolios × 100 hours per fund portfolio = 618,500 hours. This estimate takes into account the time needed to prepare quarterly reports to the board of directors, the board's consideration of those reports, and the board's annual consideration of the plan's continuation.

[81] 3,100 funds × 10 hours per fund = 31,000 hours.

[82] 618,500 hours to comply with existing requirements + 31,000 hours to comply with the new requirements = 649,500.

[83] 649,500 hours in year 1 + 618,500 hours in year 2 + 618,500 hours in year 3/3 years = 628,833 hours/year.

plan, existing rule 12b–1 requires that the fund obtain shareholder approval. As a consequence, the fund will incur the cost of a proxy. Based on conversations with fund representatives, Commission staff estimates that three funds per year prepare a proxy in connection with the adoption or material amendment of a rule 12b–1 plan. We do not anticipate that the proposed amendments would result in an increase in the number of proxies prepared. The staff further estimates that the cost of each fund's proxy is $30,000.[84] Thus, the total aggregate annual cost burden of rule 12b–1 for funds is $90,000.

We request comment on whether these estimates are reasonable. Pursuant to 44 U.S.C. 3506(c)(2)(B), we solicit comments in order to: (i) Evaluate whether the proposed collections of information are necessary for the proper performance of the functions of the Commission, including whether the information will have practical utility; (ii) evaluate the accuracy of the Commission's estimate of the burden of the proposed collections of information; (iii) determine whether there are ways to enhance the quality, utility, and clarity of the information to be collected; and (iv) minimize the burden of the collections of information on those who respond, including through the use of automated collection techniques or other forms of information technology.

Persons wishing to submit comments on the collection of information requirements of the proposed amendments should direct them to the Office of Management and Budget, Attention Desk Officer of the Securities and Exchange Commission, Office of Information and Regulatory Affairs, Room 10102, New Executive Office Building, Washington, DC 20503, and should send a copy to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0609, with reference to File No. S7–09–04. OMB is required to make a decision concerning the collection of information between 30 and 60 days after publication of this Release; therefore a comment to OMB is best assured of having its full effect if OMB receives it within 30 days after publication of this Release. Requests for materials submitted to OMB by the Commission with regard to this collection of information should be in writing, refer to File No. S7–09–04, and be submitted to the Securities and Exchange Commission, Records Management, Office of Filings and Information Services.

## VIII. Initial Regulatory Flexibility Analysis

This Initial Regulatory Flexibility Analysis ("IRFA") has been prepared in accordance with 5 U.S.C. 603. It relates to the proposed amendments to rule 12b–1, which governs the use of fund assets to finance the distribution of fund shares.

### A. Reasons for the Proposed Action

As described more fully in Section I of this Release, the proposed amendments are necessary to address the practice of directing brokerage commissions to particular broker-dealers in order to compensate them for selling fund shares, a practice we believe is fraught with conflicts of interests and may be harmful to funds and fund shareholders.

### B. Objectives of the Proposed Action

As described more fully in Section II of this Release, the objectives of the proposed amendments, which would apply to all funds, are to prohibit funds from paying for distribution of fund shares with brokerage commissions and to ensure the active monitoring of brokerage allocation decisions when executing brokers also distribute the fund's shares.

### C. Legal Basis

The amendments to rule 12b–1 are being proposed pursuant to the authority set forth in sections 12(b) [15 U.S.C. 80a–12(b)] and 38(a) [15 U.S.C. 80a–37(a)] of the Investment Company Act.

### D. Small Entities Subject to the Rule and Proposed Amendments

A small business or small organization (collectively, "small entity"), for purposes of the Regulatory Flexibility Act, is a fund that, together with other funds in the same group of related investment companies, has net assets of $50 million or less as of the end of its most recent fiscal year.[85] Of approximately 5,124 registered investment companies, approximately 204 are small entities.[86] As discussed above, the proposed amendments would prohibit all funds, regardless of size, from using portfolio brokerage commissions to finance distribution. All funds that use selling brokers to execute portfolio transactions would be required to implement policies and procedures. We have no reason to expect that small entities would be disproportionately affected by the proposed amendments. We request comment on the effects and costs of the proposed amendments on small entities.

### E. Reporting, Recordkeeping, and Other Compliance Requirements

The proposed amendments do not include any new reporting or recordkeeping requirements. The proposed amendments would introduce a new prohibition, applicable to all funds, including small entities, on the use of fund brokerage commissions to compensate selling brokers. In addition, all funds, including small entities, would be prohibited from using selling brokers to execute portfolio transactions unless they have implemented policies and procedures reasonably designed to prevent: (i) the persons responsible for selecting broker-dealers to effect transactions in fund portfolio securities from taking broker-dealers' promotional or sales efforts into account in making those decisions; and (ii) the fund, its adviser or principal underwriter, from entering into any agreement under which the fund directs brokerage transactions or revenue generated by those transactions to a broker-dealer to pay for distribution of the fund's shares. The board of directors would have to approve these policies and procedures.

### F. Duplicative, Overlapping, or Conflicting Federal Rules

We have not identified any federal rules that duplicate, overlap, or conflict with the proposed amendments. The requirement that funds that use their selling brokers to execute portfolio securities transactions implement policies and procedures is encompassed by the more general requirement for compliance policies and procedures contained in rule 38a–1 under the Investment Company Act.[87] The policies and procedures that the proposed amendments would require are more specific than those we recently required all funds and investment advisers to adopt and are designed to ensure the active monitoring of brokerage allocation decisions when a fund's executing brokers also distribute the fund's shares. If a fund has implemented policies and procedures under the proposed amendments, it would be able to incorporate those policies and procedures into the

---

[84] This estimate, which is based on staff conversations with representatives of funds, reflects an adjustment from our previous estimate of $15,000 per proxy.

[85] 17 CFR 270.0–10.

[86] Some or all of these entities may contain multiple series or portfolios. If a registered investment company is a small entity, the portfolios or series it contains are also small entities.

[87] 17 CFR 270.38a–1.

policies and procedures it maintains pursuant to rule 38a–1.

*G. Significant Alternatives*

The Regulatory Flexibility Act directs us to consider significant alternatives that would accomplish the stated objective, while minimizing any significant adverse impact on small entities. Alternatives in this category would include: (i) Establishing different compliance or reporting standards that take into account the resources available to small entities; (ii) clarifying, consolidating, or simplifying the compliance requirements under the rule for small entities; (iii) using performance rather than design standards; and (iv) exempting small entities from coverage of the rule, or any part of the rule.

Establishing different standards for small entities is not feasible because we believe that a complete ban on the use of brokerage commissions to finance distribution is necessary in light of the intensity of the conflicts of interest that surround the practice. It would be inappropriate to apply a different standard for small entities, whose advisers may face even greater pressure than advisers to larger funds to take all measures to enhance distribution. Shareholders of small funds should receive the same protection as shareholders in large funds. Nevertheless, we request comment on whether we should modify the proposed amendments in any way to reduce the burden on small entities.

We do not believe that clarification, consolidation, or simplification of the compliance requirements is feasible. The proposed amendments contain a straightforward ban on the use of brokerage commissions to finance distribution. The special requirements applicable to a fund that uses a selling broker to execute its portfolio securities transactions are likewise clear. We request comment on ways to clarify, consolidate, or simplify any part of the proposed amendments.

We do not believe that the use of performance rather than design standards is feasible. The proposed amendments would prohibit the use of brokerage commissions to finance distribution because the experience of our staff, including a recent staff review of brokerage commission practices, has led us to believe that the conflicts surrounding this practice are unmanageable. The requirement in the proposed amendments that funds that rely on selling brokers to execute transactions must have in place policies and procedures to prevent the persons making brokerage allocation decisions from taking fund sales into account and to prohibit directed brokerage agreements is a performance standard, because it permits funds or their advisers to implement policies and procedures tailored to their organizations.

We believe that it would be impracticable to exempt small entities from the proposed ban. Doing so would deny to small funds and their shareholders the protection that we believe they are due. We request comment on whether small entities and their shareholders could be afforded equal protection other than through a ban on the use of brokerage to finance fund sales. We also believe that it would be impracticable to exempt small entities that effect fund portfolio transactions through a selling broker from the requirement that they implement policies and procedures.

*H. Solicitation of Comments*

We encourage the submission of comments with respect to any aspect of this IRFA. Comment is specifically requested on the number of small entities that would be affected by the proposed amendments, and the likely impact of the proposals on small entities. Commenters are asked to describe the nature of any impact and provide empirical data supporting the extent of the impact. These comments will be considered in connection with the adoption of the proposed amendments and will be reflected in the Final Regulatory Flexibility Analysis.

Comments should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0609. Comments also may be submitted electronically to the following E-mail address: *rule-comment@sec.gov*. All comment letters should refer to File No. S7–09–04.; this file number should be included in the subject line if E-mail is used.[88]

**IX. Statutory Authority**

The Commission is proposing amendments to rule 12b–1 under the Investment Company Act pursuant to the authority set forth in sections 12(b) [15 U.S.C. 80a-12(b)] and 38(a) [15 U.S.C. 80a-37(a)] of the Investment Company Act.

**Text of Proposed Rules**

For reasons set forth in the preamble, Title 17, Chapter II of the Code of Federal Regulations is proposed to be amended as follows:

---

[88] Comments on the IRFA will be placed in the same public file that contains comments on the proposed amendments themselves.

**PART 270—RULES AND REGULATIONS, INVESTMENT COMPANY ACT OF 1940**

1. The authority citation for Part 270 continues to read in part as follows:

   **Authority:** 15 U.S.C. 80a–1 *et seq.*, 80a–34(d), 80a–37, and 80a–39, unless otherwise noted.

   \* \* \* \* \*

2. Section 270.12b–1 is amended by adding new paragraphs (h) and (i) to read as follows:

**§ 270.12b–1  Distribution of shares by registered open-end management investment company.**

\* \* \* \* \*

(h) Notwithstanding any other provision of this section, a company may not compensate a broker or dealer for any promotion or sale of shares issued by that company by directing to the broker or dealer:

(1) The company's portfolio securities transactions; or

(2) Any remuneration, including but not limited to any commission, mark-up, mark-down, or other fee (or portion thereof) received or to be received from the company's portfolio transactions effected through any other broker (including a government securities broker) or dealer (including a municipal securities dealer or a government securities dealer); and

(i) Notwithstanding any other provision of this section, a company may not direct its portfolio securities transactions to a broker or dealer that promotes or sells shares issued by the company, unless the company (or its investment adviser) has implemented, and the company's board of directors (including a majority of directors who are not interested persons of the company) has approved, policies and procedures reasonably designed to prevent:

(1) The persons responsible for selecting brokers and dealers to effect the company's portfolio securities transactions, from taking into account the brokers' and dealers' promotion or sale of shares issued by the company or any other registered investment company; and

(2) The company, and any investment adviser and principal underwriter of the company, from entering into any agreement (whether oral or written) or other understanding under which the company directs, or is expected to direct, portfolio securities transactions, or any remuneration described in paragraph (h)(2) of this section, to a broker (including a government securities broker) or dealer (including a municipal securities dealer or a government securities dealer) in

consideration for the promotion or sale of shares issued by the company or any other registered investment company.

By the Commission.

Dated: February 24, 2004.

**Margaret H. McFarland,**

*Deputy Secretary.*

[FR Doc. 04-4426 Filed 2-27-04; 8:45 am]

**BILLING CODE 8010-01-P**