**EXHIBIT F**

# INVESTMENT COMPANY ACT AMENDMENTS OF 1967

## TUESDAY, OCTOBER 24, 1967

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON COMMERCE AND FINANCE,
COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE,
*Washington, D.C.*

The subcommittee met at 10 a.m., pursuant to notice, in room 2128, Rayburn House Office Building, Hon. John E. Moss (chairman of the subcommittee) presiding.

Mr. Moss. The committee will be in order.

Before hearing our first witness, I would like to ask unanimous consent that the record be held open for the balance of this week to receive statements from those who desire to submit them to the subcommittee. Hearing no objection, that will be the order of the committee.

Our witness this morning is the Honorable Manuel F. Cohen, Chairman of the Securities and Exchange Commission, who is returning for the purposes of summarizing the views of the Commission after some 2 weeks of testimony before this subcommittee by representatives of all segments of the industry. Mr. Cohen,

## STATEMENT OF HON. MANUEL F. COHEN, CHAIRMAN, SECURITIES AND EXCHANGE COMMISSION; ACCOMPANIED BY PHILIP LOOMIS, GENERAL COUNSEL—Resumed

Mr. COHEN. Good morning, Mr. Chairman, and Mr. Watkins.

Mr. WATKINS. Good morning.

Mr. COHEN. I guess I should at the outset repeat what the reporter asked me this morning. He said, "Mr. Cohen, will you read your 44-page statement or summarize it in 80 pages?" I am afraid I am going to do the latter. But seriously, I will try to be as brief as possible, so that I can take as many of your questions as your time permits. I am available at any time.

As I say, I am very pleased to be here to answer some of the objections that have been made and to clear up certain of the misconceptions that may have been created by testimony of certain representatives of the industry.

At the outset I should emphasize that when I was here about 2 weeks ago I told you that the purpose of this bill was a rather simple one and that was to provide a fair shake to the millions of Americans who have invested in mutual funds and other types of investment companies, and for the uncounted additional millions who will invest in this medium in the future.

(671)

691

(The statement referred to follows:)

SUPPLEMENTARY STATEMENT OF HON. MANUEL F. COHEN, CHAIRMAN, SECURITIES AND EXCHANGE COMMISSION

Mr. Chairman and members of the subcommittee, I deeply appreciate your affording me the opportunity to come before this Subcommittee for a second time to answer some of the objections that have been made to H.R. 9510 and 9511 and to clear up some of the misconceptions that may have arisen in the light of the testimony of certain representatives of the industry.

Over the past two weeks, I have carefully read the statements submitted to you by representatives of the securities business, as well as the transcripts of your questions and their answers on the points that have concerned you. I must confess that I found it a rather depressing experience because the industry has been so negative and unconstructive.

When I appeared before you two weeks ago, I told you that the purpose of these bills was a simple one—it was to provide a fair shake for the millions of Americans who have invested in mutual funds and other types of investment companies and for the additional millions who will invest in these media in the future. I want to reemphasize that basic purpose, because I think it is something we must not lose sight of.

The industry, however, insists that even if Congress should take the most modest steps to attain this goal, the health of the industry would be severely impaired. This is a familiar refrain heard in each of the hearings preceding the securities laws enacted by the Congress. In fact, these laws have served only to protect the securities industry itself from the consequences of overreaching by some engaged in that business.

There has not been a single advance in the regulation concerning securities which it was claimed would not have the effect of making business less profitable—or even impossible—for some segment of the industry. Some of you may recall the forecast that, if the Securities Act of 1933 were enacted, "grass would grow in Wall Street." Every improvement in the disclosure requirements has been made over the argument that it would make it impossible for some class of issuers to tap the public securities market. Every improvement in business standards has been made over the objection that it would be impossible for ordinary business men to operate under a crushing burden of government regulation. And after all these improvements, over all these objections, the securities business is bigger, stronger, healthier and more prosperous than it has ever been before.

The securities industry is a regulated industry. It has been regulated by the Federal government for more than a third of a century. The legislation before you is not an instance of government tampering with a free enterprise system. It is an adjustment of an existing regulatory statute to meet problems which were not present or even foreseen when that statute was enacted 27 years ago.

In many respects, these problems are attributable to the unforeseen consequences of Federal regulation. A great deal has been said in the last two weeks about competition in the securities business. The plain fact of the matter is that this business has a large number of competitors and very little competition. This may sound like a paradox but it is not. There are a great many separate units in the securities business, but they are severely restricted from competing with each other by the unique industry structure tolerated by and the anti-competitive protections afforded by Federal law.

In fact, the mutual fund industry does not compete on the basis of price for investor favor. There is little effort to offer a better price to the investor. The primary effort is to offer a better deal to the dealer and the salesman, so that they will push the shares of a particular fund to investors who have no effective way of evaluating different funds or of determining whether mutual funds are an appropriate investment for them at all.

This type of competition bears no relation to the classical free enterprise system. It is a "perverse" or "upside down" competition, which can exist only because the present scheme of Federal regulation of this industry makes it possible. It is a system of competition which brings enormous benefits to the industry, but not price benefits to the investor. It is a system under which the Federal government authorizes the industry to operate outside of the controls of the anti-trust laws, outside the controls provided by disclosure of compensation for management services, and outside the controls provided by a competitive free

700

demanding than the common law rules as they apply to fiduciaries, would impose on the plaintiff the burden of proving unreasonableness; there would be no personal liability attaching to the directors; only the adviser would be liable and then only for the portion of any fees paid within two years of the commencement of a suit found to be excessive.

**10. THE INDUSTRY'S CHARGE THAT THE COMMISSION WILL BE IN A POSITION TO CONTROL ADVISORY FEES DEFIES THE PLAIN LANGUAGE OF THE BILL**

The plain fact is that under the provisions of the Bill, the courts, not the Commission, would determine whether fees are reasonable. Nevertheless, it is charged that the Bill would give the Commission the power to "control" the fees.[1] Such a charge only reflects the industry's posture of seeking to avoid any kind of independent scrutiny of the reasonableness of their fees. When actions by stockholders are suggested as a means of enforcing the standard of reasonableness the industry complained that this will produce "strike suits" and a multiplicity of litigation. If Commission action is suggested as a means of avoiding shareholder litigation, it is argued that the Commission may "coerce" the advisory firms.

If the industry is satisfied, as it asserts, that the independent directors and other controls have kept fees at reasonable levels, they have nothing to fear from court review. The statutory proposal, which in a number of respects is less demanding than the common law rules as they apply to fiduciaries, would impose on the plaintiff the burden of proving unreasonableness; there would be no personal liability attaching to the directors; only the adviser would be liable and then only for the portion of any fees paid within two years of the commencement of a suit found to be excessive.

Even though the courts, not the Commission, would determine whether fees are reasonable, it is suggested that, without recourse to the courts, the Commission will blackmail the adviser by requiring it to state in a proxy statement, or a prospectus, the opinion of the Commission or that of the staff, that the fee may be unreasonable although no litigation has been commenced, or is even contemplated. This implication of misconduct on the part of the Commission is totally unwarranted. If litigation with respect to a fee has been instituted, Commission rules require disclosure of the existence of such litigation to the extent that it is material. Those rules do not—and we would not—require disclosure with respect to the opinions of anyone associated with the Commission concerning the reasonableness of a fee at any other time. It would seem to be to the advantage of the fund advisers to discuss any substantial questions which may arise with the Commission before suit is instituted. It may be assumed that the industry does not want the Commission to sue first and ask questions later, yet they turn even this opportunity into one of coercive portent. This is nonsense.

Any possibility of litigation is, of course, in a sense coercive. In that sense a minority stockholder, whether or not our proposal is enacted, could "coerce" a mutual fund management by telling them the fee was too large and if they did not reduce it, he would file suit. In other areas, under existing legislation, the Commission has the power to initiate, and in many situations has initiated, litigation designed to halt violations of law. All such actions are also, of course, coercive in a sense. The industry position on this question comes down to the argument that no agency should be empowered to enforce the law because it might "coerce" people by telling them that it thought they were violating the law and if they didn't stop, it would be forced to take action. This possibility, which is inherent in the very existence of law enforcement agencies is not an adequate basis for declining to permit enforcement of the well-established fiduciary standard of reasonableness as to investment advisory fees.

**II. THE INDUSTRY HAS PRODUCED NO MEANINGFUL ALTERNATIVES**

Since publication of the Commission's Report in May, 1966, both the Commission and members of Congress have repeatedly asked industry representatives to come forth with workable alternatives to the proposals that have been set forth in the Bill. It has been made clear to all that careful consideration would

---

[1] ICI Statement, 31.