**TAB 12**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

ROBERT L. BAKER, et al., )
)
                Plaintiffs, )   Case no. 04-4039-CV-ODS
)
vs. )
)
AMERICAN CENTURY INVESTMENT )
MANAGEMENT, INC., et al., )
)
                Defendants. /

## PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO AMERICAN CENTURY'S MOTION IN LIMINE TO PRECLUDE EVIDENCE RELATING TO SUB-ADVISED AND INSTITUTIONAL ACCOUNTS

The evidence which the Defendant seeks to exclude by its Motion in Limine is highly relevant to this case. The evidence in question demonstrates that American Century charges lower fees to its other customers than it charges to the Ultra, Growth and Select mutual funds. These three funds represent the collective investments of thousands of small investors. By pooling their money over the years, these investors have come to be American Century's oldest, largest, and best customers. However, the Ultra, Growth and Select Funds pay more for the same investment advisory services than do the smaller and newer accounts that receive these same services. The evidence should be admitted, because:

    I.     The evidence is directly relevant to the excessive fee issue in this case;

    II.    The Defendants' legal basis for arguing for the exclusion of this evidence is factually and legally distinguishable;

    III.   The sole evidence of comparative fees advocated as relevant by the Defendant – that is the fees charged by other

   mutual fund companies – has been found to be of little value by the courts, by the U.S. Senate, and by the U.S. Securities and Exchange Commission;

 IV. The American Century Mutual Funds' Board of Directors requests this very same (supposedly irrelevant) information from the Defendant as part of its fee review process; and

 V. The Defendant and its counsel have advised the Funds' Board that this very information is the focus of this case.

It is for these reasons that the Defendant's Motion in Limine should be denied.

I. **THE EVIDENCE IS RELEVANT**

Defendant, American Century Investment Management, Inc. ("American Century"), seeks to exclude evidence regarding the fees that it charges to its non-mutual fund clients for rendering substantially identical services to the mutual funds at issue in this case. This evidence is extremely relevant to this case, and it demonstrates that American Century is charging an excessive fee to the Ultra, Growth and Select Funds. It is for this reason that American Century seeks to exclude the evidence – not because it is irrelevant, but because it dramatically and graphically exposes their excessive fee charges.

American Century contends that the only relevant evidence as to comparative fees should be what other third party-mutual fund managers charge to their respective funds. Defendant cites as authority several money market cases which are factually very different than the equity funds in this case. The courts, Congress and the Securities and Exchange Commission (SEC) have all found that fee comparisons among mutual fund companies are of dubious value because all of the mutual fund fees are set in non-competitive, no-bid settings. ( See Section II of this Opposition Memorandum).

This "mutual fund versus mutual fund" comparison is further complicated in the case of American Century because of the structure of its unified fee. While this unified fee is the typical and standard fee program at American Century, it is very different from the way most mutual fund companies charge fees. Usually, the investment manager/adviser has a series of separate contracts which charge for the following services:

    A.    Portfolio advice and investment management involving the investment research and securities selection process, and the management of the portfolio.

    B.    Client service and transfer agency, which involves the preparation of monthly or quarterly client statements, mailing disclosure information, handling customers' subscription and redemption orders, maintaining a phone center and web site, and other services.

This case deals with the Plaintiffs' claim that American Century is charging an excessive fee in area "A" above – portfolio advice and investment management. This is the component of services by which American Century performs research into various securities, and makes decisions to buy, sell and hold securities for the portfolio. This portion of the fee generates large economies of scale, and this portion of American Century's service, and its fee, are directly comparable to the services provided and fees charged to its non-mutual fund clients.

American Century has a standard practice of treating the mutual fund portfolios as "policy portfolios." A policy portfolio is one which acts as a model portfolio for other accounts called "tracking portfolios." The mutual funds in this case are huge by any standard. Ultra has over $20 billion in assets under management, while Growth and

3

Select are both at or near $5 billion each. The tracking portfolios are much smaller, generally ranging in various amounts up to a few hundred million dollars.

American Century sells its services to manage these substantially identical but much smaller tracking portfolios based upon a much lower fee schedule than that charged for managing the larger mutual funds' identical policy portfolio.[1] It is the fees charged to these tracking portfolios, called sub-advised and/or separate accounts, which American Century seeks to exclude from evidence in this case. The reason they seek to exclude this evidence is that the fees charged to these tracking portfolios are far less than those charged to the mutual fund – thereby clearly demonstrating there is an excessive fee being charged to the mutual fund for these substantially identical services. If the mutual funds received the benefit of the tracking portfolios' fee schedule, it would reduce the total fee charged to those funds by approximately one-third. This amounts to about $100 million per year in excess fees. What could be more relevant to an excessive fee claim than a comparison of American Century's own fees charged to other customers for performing substantially identical services? This is the economic equivalent of a customer who buys 1000 pounds of potatoes being charged $1 per pound, while the customer who pays 100 pounds pays 66 cents (or one-third less) per pound.

The fact that identical and simultaneous services are rendered to both the mutual fund policy portfolios and the tracking portfolios is apparent from the testimony of Bruce Wimberly, who, until this past week, was the manager of American Century's Ultra

---

[1] See Exhibit 1 – December 1, 2003 Mutual Fund fee schedule; Exhibit 2 - May 24, 2004 Mutual Fund fee schedule; Exhibit 3 – June 3, 2005 Mutual Fund fee schedule; Exhibit 4 – January 2004 subadvised fee schedule; Exhibit 5 – April 30, 2003 Separate Institutional fee schedule. (The exhibits referred to in this Opposition have been filed under seal pursuant to Court Order.)

4

Fund. The following question and answer comes from page 38 lines 14-21 of Mr. Wimberly's deposition:

> Q. When you're performing your research services, on a particular company, do you consider yourself, at that moment, to be working on behalf of Ultra, as opposed to VP Ultra, as opposed to SunAmerica growth?
>
> A. I am working for all of our shareholders. I don't distinguish between the three. We're one team, and we manage one pool of money.

As an example, if a particular portfolio contains approximately 100 stocks, it makes little difference whether the portfolio has $1,000,000 or $10,000,000,000. The manager will still research the same number of securities and will still buy the same 100 securities for the portfolio. The only difference will be that ten times more shares will be purchased for the $10,000,000,000 policy portfolio than will be purchased for the smaller tracking portfolio. The time, effort and expense associated with rendering the investment advisory services to the larger portfolio are not materially different, and should cost the same. In fact, American Century's own securities allocation policy requires that purchases and sales for these policy and tracking portfolios be handled in a common and collective fashion.[2]

American Century has steadfastly contended that it cannot (or will not) disaggregate its unified fee into component charges of portfolio management and stockholder (transfer agency) services. It is in the area of portfolio management where large economies of scale and profits are generated. According to the testimony of both Plaintiffs' and Defendants' experts, those economies of scale belong to the mutual fund shareholders. American Century's own expert on corporate governance issues, a New

---

[2] See Exhibit 6.

York-based lawyer named Thomas Smith, testified as follows at his February 15, 2006 deposition, at page 122, lines 6-10:

> Q. Do the economies of scale belong to the shareholders in the mutual fund? [Objection by American Century's counsel.]
>
> A. Again, depending on – well, generally, yes.

These economies of scale are passed along by American Century to its sub-advised and separate accounts by large and early break point fee reductions (see Exhibits 4 and 5). However, the Ultra, Growth and Select Mutual Funds receive either little or no break point relief under their fee schedules.

The Defendants produced a confidential e-mail from Mary Ann Roepke (see Exhibit 7) which allocates 62 basis points to the "pure" advisory fee. If the sub-advised fee schedule was substituted for this 62 basis point fee, the mutual funds in this case (Ultra, Growth and Select) would have paid approximately $300 million less in fees since March of 2003.

It is clear that these sub-advised and separate institutional accounts, and the fees charged to them are extremely relevant to this case, and the Court should hear evidence about those comparative fees.

## II. THE DEFENDANT'S LEGAL BASIS FOR ARGUING FOR THE EXCLUSIION OF THIS EVIDENCE IS FACTUALLY AND LEGALLY DISTINGUISAHBLE

In support of its proposition that this Court should exclude evidence of American Century's own fee charges to its non-mutual fund clients, Defendants cite *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2nd Cir. 1982); *Krinsk v. Fund Asset Management, Inc.*, 715 F.Supp. 472 (S.D. N.Y. 1988), aff'd 875 F.2d 404 (2nd Cir. 1989); and *Strougo v. BEA Assoc.*, 188 F.S.2d 384 (S.D. N.Y. 2002). Each of these

6

cases involved money market mutual funds. The *Gartenberg* court (cited by *Krinsk* and *Strougo*) found that the unique and frequently short holding periods for money market investors made the comparison to the fees charged to large pension funds inappropriate. The reasoning for this holding is articulated by the *Gartenberg* court on p. 930, n. 3 of its opinion:

> [3] Appellants' argument that the lower fees charged by investment advisors to large pension funds should be used as a criterion for determining fair advisory fees for money market funds must be rejected. The nature and extent of the services required by each type of fund differ sharply. As the district court recognized, the pension fund does not face the myriad of daily purchased and redemptions throughout the nation which must be handled by the Fund, in which a purchaser may invest for only a few days.

In this case, American Century's Ultra, Growth and Select Mutual Funds are each growth-style equity funds, primarily invested in U.S. based large cap stocks. These funds are sold and marketed as long term investment – not ones in which "a purchaser may invest for only a few days" as was the case in *Gartenberg*, and the other money market cases.

As evidence of the difference between these money market cases and American Century's Ultra, Growth and Select Mutual Funds, we need only to look at American Century's own internal documents, such as the "Direct Channel Presentation" dated January 8-10, 2003 (See Exhibit 8). On page 5 of that document, American Century acknowledges that the tenure of its average customer is 10 years, with accounts over $20,000 having an average time of 11.6 years (p. 7), and accounts under $20,000 having an average tenure of 9.4 years (p. 6). These are hardly investors whose investment horizon and activity is measured in "a few days."

7

The reason for distinguishing money market funds from other types of funds is that significantly more time is spent in processing redemptions in the money market setting. This could cause the portfolio manager to spend a large amount of time constantly balancing and rebalancing the portfolios to accommodate these cash flows. Bruce Wimberly, the former manager for the Ultra Fund, testified about the time spent on the cash fluctuations in the Ultra portfolio. He states in his deposition, at page 40, lines 9-22:

> A.   Every day before the market opens, I check our cash position. That takes maybe three seconds.
>
> Q.   (By Ms. Ferrell-Anton) And what are you looking for when you check it?
>
> A.   Generally, Ultra maintains about one percent in cash.
>
> Q.   So, if it's over one percent, what action do you take?
>
> A.   I said "generally." It's approximately one percent. There may or may not be an action taken. We invest when we can find securities that we think offer sufficient expected returns to warrant an investment. So, we are not market timers.

What Mr. Wimberly describes is hardly the rapid cash fluctuations that are found in a money market mutual fund. In Mr. Wimberly's prior quoted testimony, he spoke about the monolithic fashion in which he and his staff manage the Ultra policy portfolio along with the other accounts under his supervision. The clear link between these common services makes the fee comparison to the sub-advised and separate accounts relevant.

As to the processing of any redemptions at the customer level, those transactions are paid for by the transfer agency (T.A.) portion of the fee, estimated by

8

Ms. Roepke to be 33 basis points out of the 100 point unified fee. It has nothing to do with the 62 basis points which she allocates to the pure advisory function. The *Gartenberg, Krinsk* and *Strougo* cases are simply not applicable to Ultra, Growth and Select, because money market accounts are very different from long term equity mutual funds.

III. **THE SOLE EVIDENCE OF COMPARATIVE FEES ADVOCATED AS RELEVANT BY THE DEFENDANT – THAT IS, FEES CHARGED BY OTHER MUTUAL FUND COMPANIES – HAS BEEN FOUND TO BE OF LITTLE VALUE BY THE COURTS, THE U.S. SENATE, AND BY THE SEC**

American Century suggests that the sole and appropriate comparison for this Court's consideration should be the fees charged by other mutual funds. While this type of evidence may be admissible, it has been found to be of little value.

The *Gartenberg* decision discussed the use of this fund versus fund comparative fee approach. In doing so, that court was mindful that Section 36b of the Investment Company Act of 1940 imposed a fiduciary duty on the investment advisor. This fiduciary duty is breached if the fee is excessive. The Court went on to cite the U.S. Senate's rationale behind this statutory §36b fiduciary standard by stating, at p. 928:

> The Senate recognized that as a practical matter the usual arm's length bargaining between strangers does not occur between an advisor and the fund, stating:
>
> "Since a typical fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter sever its relationships with the advisor. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." S.Rep. No., 91-184, *supra,* [1970] U.S. Code Cong. & Ad.News at 49901.

9

The <u>Gartenberg</u> court also cites the SEC's Report on this subject at p. 929, stating:

> However, the existence in most cases of an unseverable relationship between the adviser-manager and the fund it services tends to weaken the weight to be given to rates charged by advisers of other similar funds. <u>Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth</u>, H.R. Rep. No. 2337, 89th Cong., 2d Sess. (1966) 131, 148.2 A fund cannot move easily from one adviser-manager to another. Therefore "investment advisors seldom, if ever, compete with each other for advisory contracts with mutual funds." <u>Id</u>. at 126.

The <u>Gartenberg</u> Court went on to cite the SEC Report further, in n. 2, on page 929:

> The following statement in the Report of the Securities and Exchange Commission on The Public Policy Implications of Investment Company Growth, while directed to mutual funds, is pertinent to money market funds:
>
> "It has been the Commission's experience in the administration of the Act that in general the unaffiliated directors have not been in a position to secure changes in the level of advisory fee rates in the mutual fund industry. In most instances the adviser serves as, or is closely affiliated with, the fund's principal underwriter which maintains a distributing organization of the fund's shares. The organization that has developed over a period of years to manage the fund's portfolio and to furnish it with some, and in certain cases virtually all, of the nonadvisory services necessary to its operation belongs to the adviser and not to the fund. Indeed, in some cases all of the fund's records are maintained by the fund's adviser. Although the unaffiliated directors under State law have an unqualified right of access to these records, the adviser, as a practical matter, is in a position to seriously hamper any employment of that right which might interfere with or threaten the adviser's operation of or control over the fund.
>
> "Thus, negotiations between the unaffiliated directors and fund advisers over advisory fees would lack an essential element of arm's-length bargaining-the freedom to terminate the

10

> negotiations and to bargain with other parties for the same services. In view of the fund's dependence on its existing adviser and the fact that many shareholders may have invested in the fund on the strength of the adviser's reputation, few unaffiliated directors would feel justified in replacing the adviser with a new an untested organization simply because of difficulty in obtaining a reduction in long-established fee rates which are customary in the industry." H.R.Rep.No. 2337, 89th Cong., 2d Sess. 131 (1966).

Finally the <u>Gartenberg</u> court said that, while the fees charged by other adviser-managers may be a factor to be considered, reliance on prevailing industry advisory fees will not satisfy §36(b). At page 929 of its opinion, the court held:

> We disagree with the district court's suggestions that the principal factor to be considered in evaluating a fee's fairness is the price charged by other similar advisers to funds managed by them, that the "price charged by advisers to those funds establishes the free and open market level for fiduciary compensation," that the market price... serves as a standard to test the fairness of the investment advisory fee," and that a fee is fair if it "is in harmony with the broad and prevailing market choice available to the investor." 528 F.Supp. at 1049, 1067-68. Compensation between money market funds for shareholder business does not support an inference that competition must therefore also exist between adviser-managers for fund business. The former may be vigorous even though the latter is virtually non-existent. Each is governed by different forces. Reliance on prevailing industry advisory fees will not satisfy §36(b).

The <u>Gartenberg</u> court, the U.S. Senate, and the SEC all acknowledge and understand that mutual fund fee agreements are classic "no bid" contracts. Comparing one "no bid" contract price to another "no bid" price is not very helpful in assessing whether or not a "no bid" fee is excessive. In the unique facts of this case, comparing the fees American Century charges to its own tracking portfolio customers is much more meaningful and relevant. The Court should hear this evidence, and not limit the

11

evidence to only consider comparisons which have been so seriously criticized, and which are fundamentally suspect.

## IV. THE MUTUAL FUND'S BOARD OF DIRECTORS REQUESTS THIS VERY SAME (SUPPOSEDLY IRRELEVANT) INFORMATION FROM THE DEFENDANT AS PART OF ITS FEE REVIEW PROCESS

Each year, the independent or disinterested directors review and approve the fee agreements between American Century and the mutual funds. This process starts by Mr. Thomas Van Dyke of the Bryan Cave law firm, as counsel for the disinterested directors, writing to American Century requesting various information. Presumably, Mr. Van Dyke seeks information that he and the disinterested directors deem relevant. An example of one such letter is included under seal as Exhibit 9 (Mr. Van Dyke's February 18, 2005 letter identified as Exhibit 159 in Mr. Van Dyke's deposition). Paragraph 2(c) of Mr. Van Dyke's letter requests that American Century provide the very information it now contends is irrelevant and should be excluded from evidence and consideration. Specifically, Mr. Van Dyke's letter asks American Century to:

> c) Provide a comparison of the investment services performed and fees charged by the Adviser for the funds with those performed for the non-mutual fund accounts, along with copies of, or a summary of the relevant provisions of, the service contracts for non-mutual fund accounts and a fee schedule. Discuss this comparative information, including an explanation of any material differences.

In fact, American Century furnished information responsive to Mr. Van Dyke's request. That information is contained in the Board materials that have been stipulated into evidence as a series of joint exhibits. The Defendant now seeks to exclude from discussion and consideration information and documents which the Board received, and

12

which they have already stipulated into evidence. For this reason alone, the Defendant's motion should be denied.

## V. THE DEFENDANT AND ITS COUNSEL HAVE ADVISED THE FUND'S BOARD THAT THIS VERY INFORMATION IS THE FOCUS OF THIS CASE

Finally, Defendant wants this court to exclude from consideration evidence that its own counsel told the Board would be the "focus" of this case. On August 17, 2004, a few months after this case was filed, the mutual funds' board met with representatives of American Century including Mr. Benedict and Mr. Hendricks. Notes of that meeting were taken by Mr. Timothy Webster, an independent director. See Exhibit 10.

As recorded by Mr. Webster, he was informed at this meeting that the "focus will be on diff. between retail (mutual fund) and institutional/separate accounts and economies of scale spring 2002 process and forward."

American Century's counsel correctly states that the "focus" of this case would be on the very evidence they now seek to exclude – the comparison of those mutual fund fees, to those charged to institutional and separate accounts. This motion in limine is made, not because the evidence is properly excludable, but because the evidence provides powerful proof as to the excessive fees charged by American Century to the Ultra, Growth and Select Mutual Funds -- its largest, oldest and best customers, comprised of thousands of small investors who seek to combine their resources to achieve the same pricing as afforded to large institutional clients.

## CONCLUSION

For the reasons discussed in this Memorandum in Opposition, the Defendants' Motion in Limine to Preclude Evidence Relating to Sub-advised and Institutional Accounts should be denied.

13

Dated: July 7, 2006

        *Respectfully submitted,*

By: /s/ Steven W. White
Steven W. White (26333)
WHITE, ALLINDER, GRAHAM
& BUCKLEY, LLC
19049 E. Valley View Parkway, Suite C
Independence, MO 64055
Tel: (816) 373-9080 / Fax: (816) 373-9319

Guy M. Burns, *Pro Hac Vice*
Jonathan S. Coleman, *Pro Hac Vice*
Becky Ferrell-Anton, *Pro Hac Vice*
Audrey Rauchway, *Pro Hac Vice*
JOHNSON, POPE, BOKOR, RUPPEL
& BURNS, LLP
403 East Madison Street, Suite 400
Tampa, FL 33602
Tel: (813) 225-2500 / Fax: (813) 223-7118

Wm. Dirk Vandever (24463)
THE POPHAM LAW FIRM, P.C.
323 West 8th Street, Suite 200
Kansas City, Missouri 64105
Tel: (816) 221-2288 / Fax: (816) 221-3999

Michael J. Brickman, *Pro Hac Vice*
James C. Bradley, *Pro Hac Vice*
Nina H. Fields, *Pro Hac Vice*
RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN LLC
174 East Bay Street
Charleston, SC 29401
Tel: (843) 727-6500 / Fax: (843) 727-3103

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Suggestions in Opposition to American Century's Motion in Limine was filed with the above-captioned Court via ECF and served via e-mail this 7th day of July 2006, to the following:

James Benedict
Sean Murphy
MILBANK, TWEED, HADLEY & MCCLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000 / Fax: (212) 822-5696
E-mail: jbenedict@milbank.com, smurphy@milbank.com

Randall E. Hendricks
Daniel E. Blegen
ROUSE HENDRICKS GERMAN MAY, P.C.
1010 Walnut, Suite 400
Kansas City, MO 64106
Tel: (816) 471-7700 / Fax: (816) 471-2221
E-mail: randyh@rhgm.com, danb@rhgm.com

By: /s/ Steven W. White
Steven W. White (26333)
WHITE, ALLINDER, GRAHAM
& BUCKLEY, LLC
19049 East Valley View Parkway, Suite C
Independence, MO 64055
Tel: (816) 373-9080 / Fax: (816) 373-9319
E-mail: swhite@wagblaw.com

Guy M. Burns, Pro Hac Vice
Jonathan S. Coleman, Pro Hac Vice
Becky Ferrell-Anton, Pro Hac Vice
Audrey Rauchway, Pro Hac Vice
JOHNSON, POPE, BOKOR, RUPPEL
& BURNS, L.L.P.
403 East Madison Street, Ste. 400
Tampa, FL 33602
Tel: (813) 225-2500 / Fax: (813) 223-7118
E-mail: guyb@jpfirm.com, beckyf@jpfirm.com

Wm. Dirk Vandever (24463)
THE POPHAM LAW FIRM, P.C.
323 West Eight Street, Suite 200
Kansas City, Missouri 64105
Tel: (816) 221-2288 / Fax: 816-221-3999
E-mail: dvandever@pophamlaw.com

Michael J. Brickman, Pro Hac Vice
James C. Bradley, Pro Hac Vice
Nina H. Fields, Pro Hac Vice
RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN LLC
174 East Bay Street
Charleston, SC 29401
Tel: (843) 727-6500 / Fax: (843) 727-3103
E-mail: mbrickman@rpwb.com,
jbradley@rpwb.com, nfields@rpwb.com

*Attorneys for Plaintiffs*

#104153 v3