UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| John J. Vaughn, Gerald A. Kalbfleisch,<br>and Michael and Myrtle Hathaway,<br><br>Plaintiffs,<br><br>v.<br><br>Putnam Investment Management, LLC and<br>Putnam Retail Management, LLP,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Number 04-CV-10988 (GAO)<br>)<br>)<br>)<br>)<br>)<br>) |

## TRANSMITTAL DECLARATION OF PETER L. WELSH

I, PETER L. WELSH, hereby declare:

1.     I am a member of the bar of the Commonwealth of Massachusetts and of this Court.  I am

an associate with Ropes & Gray LLP, and counsel to the Third Party Putnam Funds and the

Third Party Independent Trustees of the Putnam Funds.  I submit this Declaration to place before

the Court documents referenced in the Putnam Funds and the Independent Trustees of the

Putnam Funds' Opposition to Plaintiffs' Motion to Compel Putnam Trustees to Respond to

Subpoenas.

3.     Attached hereto as Exhibit 1 is a true and correct copy of the December 5, 2005

Subpoena of John A. Hill.

4.     Attached hereto as Exhibit 2 is a true and correct copy of the October 6, 2006 Subpoena

and Notice of Deposition of John A. Hill.

4.     Attached hereto as Exhibit 3 is a true and correct copy of the November 2, 2006 Letter

from P. Welsh to L. Furnald.

5.      Attached hereto as Exhibit 4 is a true and correct copy of *Gallus v. Am. Express Fin.*

*Corp., et al.*, Civ. No. 04-4498 Slip Op. (DWF-SRN) (D. Minn. Nov. 10, 2005).

6.      Attached hereto as Exhibit 5 is a true and correct copy of *Gallus v. Am. Express Fin.*

*Corp., et al.*, Civ. No. 04-4498 (DWF-SRN) (D. Minn.) (Director's Br. Mot. to Quash, Oct. 11,

2005).

7.      Attached hereto as Exhibit 6 is a true and correct copy of *Gallus v. Am. Express Fin.*

*Corp., et al.*, Civ. No. 04-4498 (DWF-SRN) (D. Minn.) (Ex. 6 (Mar. 14, 2006 Letter from

Robins, Kaplan, Miller & Ciresi to G. Burns) to Director's Mem. in Opp. to Pls. Mot. to Take

More Deps. of Directors, June 9, 2006).

8.      Attached hereto as Exhibit 7 is a true and correct copy of *Gallus v. Am. Express Fin.*

*Corp., et al.*, Civ. No. 04-4498 Slip Op. (DWF-SRN) (D. Minn. June 22, 2006).

9.      I declare under penalty of perjury that the forgoing is true.


                        /s/ Peter L. Welsh
                        Peter L. Welsh


EXECUTED this 15th day of December, 2006 in Boston, Massachusetts.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| John J. Vaughn, Gerald A. Kalbfleisch, and Michael and Myrtle Hathaway, ) ) )<br><br>Plaintiffs, )<br><br>v. )<br><br>Putnam Investment Management, LLC and ) Putnam Retail Management, LLP, )<br><br>Defendants. ) | Number 04-CV-10988 (GAO) |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Transmittal Declaration of Peter L. Welsh was served upon the following persons electronically through the ECF System and by First Class Mail, postage pre-paid, this 15th day of December, 2006:

Lisa A. Furnald
Robins, Kaplan, Miller & Ciresi L.L.P.
800 Boylston Street, 25th Floor
Boston, MA 02199

/s/ Peter L. Welsh
Peter L. Welsh

**EXHIBIT 1**

Issued by the

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |
|---|---|
| STEVEN G. WICKS and GERALD A. KALBFLEISCH, <br><br> Plaintiff(s), <br><br> V. <br><br> PUTNAM INVESTMENT MANAGEMENT, LLC and PUTNAM RETAIL MANAGEMENT, LLP, <br><br> Defendant(s). | **SUBPOENA IN A CIVIL CASE** <br><br> Case Number:[1]  1:04-CV-10988 (GAO) |

TO:    **John A. Hill**
       **One Post Office Square**
       **Boston, MA  02109**

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | |
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  | |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): **See Exhibit A attached.**

| PLACE | DATE AND TIME |
|---|---|
| **Robins, Kaplan, Miller & Ciresi L.L.P.** <br> **800 Boylston, 25th Floor** <br> **Boston, MA  02199-8001** | January 5, 2006 |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _(signature)_                       , Counsel for Plaintiff | December 5, 2005 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Thomas J. Gallo, Esq., Robins, Kaplan, Miller & Ciresi L.L.P., 2600 One Atlanta Plaza, 950 East Paces Ferry
Rd. N.E., Atlanta, GA 30326-1119, (404) 760-4300
                    (See Rule 45, Federal Rules of Civil Procedure Parts C & D on reverse)

[1]  If action is pending in district other than district of issuance, state district under case number.

**Exhibit A To Subpoena To Putnam Board of Trustees**

## I.    DEFINITIONS

1.    The terms "documents" and "tangible things" as used herein shall mean each non-identical copy of any of the types of materials referenced in LR 26.5(c)(2) and Fed. R. Civ. P. 34(a), and shall specifically include emails, voice mails, instant messages, and computer data, and any electronic, magnetic, or digital media on which information can be stored, including but not limited to tapes, hard drives, discs, and any other form of computer memory.

2.    The term "non-identical copy" as used herein shall mean any document or tangible thing that, but-for markings, additions, deletions, signatures, modifications of any kind (including, but not limited to, notations on the backs or margins of pages thereof, blind carbon copy notations, attachments, alterations, amendments, or mark-ups) would otherwise be identical to other documents or tangible things responsive to any production request herein.  Each non-identical copy constitutes a distinct document or tangible thing and must be produced in response hereto.

3.    The term "meeting(s)" as used herein shall mean any assembly, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether or not planned, arranged, or scheduled in advance, whether or not occurring face-to-face or by other means including, without limitation, by telephone, videoconference or instant messaging, and whether or not the meeting was informal or formal or occurred in connection with some other activity.

4.    The term "agreement" as used herein shall mean any contract, transaction, or other arrangement of any kind, whether conditional, executed, executory, express, or implied, and whether oral or written, in which rights are granted or obligations assumed.  The term

"agreement" shall apply to completed, actual, contemplated, or attempted agreements or renewals of agreements.

5.    The term "any" shall mean "any and all." The term "all" as used herein also shall mean "any and all."

6.    The terms "and" and "or" as used herein shall be construed conjunctively or disjunctively to bring within the scope of these production requests any and all information which might otherwise be construed as outside their scope.

7.    The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun so used, and vice versa; the use of the masculine form of a pronoun also includes within its meaning the feminine form of the pronoun so used, and vice versa; and the use of any tense of any verb includes also within its meaning all other tenses of the verb so used.

8.    All entities referred to herein shall be deemed to include their parent companies, subsidiaries, affiliates, directors, officers, employees, agents, successors, assigns, and representatives thereof, including attorneys, consultants, accountants, and investment bankers.

9.    The term "PIM" as used herein shall mean the named Defendant Putnam Investment Management, LLC, and any of its agents, assigns, affiliates, predecessors in interest, representatives, employees, servants, associates, attorneys, or any other persons or entities through which Putnam Investment Management, LLC has conducted business potentially including, but not limited to, Putnam LLC; Putnam Investments; Putnam Fiduciary Trust Company; Putnam Investor Services; The Putnam Advisory Company, LLC; Putnam Advisory Company, LLP; Putnam Investments Limited; and Putnam Investments Trust.

10.    The term "PRM" as used herein shall mean the named Defendant Putnam Retail Management, LLP, and any of its agents, assigns, affiliates, predecessors in interest, representatives, employees, servants, associates, attorneys, or any other persons or entities through which Putnam Retail Management, LLP has conducted business potentially including, but not limited to, Putnam LLC; Putnam Investments; Putnam Fiduciary Trust Company; Putnam Investor Services; The Putnam Advisory Company, LLC; Putnam Advisory Company, LLP; Putnam Investments Limited; and Putnam Investments Trust.

11.    The term "PAC" as used herein shall mean Putnam Advisory Company, LLC, and any of its agents, assigns, affiliates, predecessors in interest, representatives, employees, servants, associates, attorneys, or any other persons or entities through which Putnam Advisory Company, LLC has conducted business.

12.    The term "Management Fees" as used herein shall mean the aggregate of all types of fees that an investment advisor charges and receives pursuant to any particular Management Contract.

13.    The term "Portfolio Selection Fees" as used herein shall mean that portion of its Management Fees that an investment advisor charges and/or receives under any particular Management Contract in exchange for furnishing an investment program, and for making investment decisions about what securities shall be purchased, held, sold, or exchanged, and/or what portions of client assets shall be held uninvested.  As such, the term "Portfolio Selection Fees" is meant to *exclude*, for example, those fees that an investment advisor charges and receives under any particular Management Contract for managing, supervising, and conducting a client's other affairs and business, for furnishing office space and equipment, for providing

bookkeeping and clerical services, and for placing orders for purchase and sale of a client's portfolio securities.

14.    The term "The Funds" as used herein shall mean, collectively, the following Putnam mutual funds, including any mutual funds with different names by which any of these funds were formerly known:  Classic Equity Fund; Discovery Growth Fund; Fund for Growth and Income; Growth Opportunities Fund; Investors Fund; New Opportunities Fund; New Value Fund; Vista Fund; and Voyager Fund.

15.    The term "Putnam Mutual Funds" as used herein shall mean, collectively, the entire family of open-end registered investment companies managed or operated by any Putnam entity including, without limitation, The Funds.

16.    The term "Distribution Plan" as used herein shall mean any plan adopted by a mutual fund, and/or by any class of shares of a mutual fund, pursuant to Rule 12b-1 of the Investment Company Act of 1940, 15 U.S.C. § 80a-12(b); 17 C.F.R. § 270.12b-1.

17.    The term "12b-1 Fees" as used herein shall mean the aggregate of all types of fees that an investment advisor and/or any affiliated entity charges and/or receives from a mutual fund under or pursuant to a Distribution Plan.

18.    The term "Board of Trustees" as used herein shall mean the entire board for any of The Funds -- including their independent staff, auditors, and legal counsel -- as well as any committees, subcommittees, groups, or other portions of such boards.

19.    The term "Board of Trustees Committees" as used herein shall mean, collectively, all committees existing under any particular Board of Trustees for any of The Funds including, but not limited to, the Audit and Pricing Committee; the Board Policy and Nominating Committee; the Brokerage and Custody Committee; the Communication, Service, and Marketing

Committee; the Contract Committee; the Executive Committee; the Investment Oversight Committees; and any other committees with different names by which any of these committees were formerly known.

20.     The term "Fall-Out Benefits" as used herein shall mean the aggregate of direct and indirect benefits that providers of services in connection with a Management Contract and/or a Distribution Plan may receive over and above their collection of Management Fees and/or 12b-1 Fees.  As such, the term "Fall-Out Benefits" is meant to include, for example, brokerage and/or research services received from broker-dealers; soft-dollar allocations; transfer agency fees; custodian fees; attraction of new customers to other funds and products offered by said providers of services; and/or any other benefits.

21.     Unless otherwise stated, the time period applicable to these document requests shall be the years 2003 to the present.

## II.     **REQUESTED DOCUMENTS AND TANGIBLE THINGS**

1.     All documents prepared or compiled by the Trustees or staff of the Board of Trustees relating to its review and approval of the Management Contract of PIM for any of The Funds.

2.     All documents and tangible things in your possession, custody, or control that constitute or reflect any information or materials provided to, and/or reviewed by you, or the Board of Trustees in connection with its approval of any actual or proposed Management Contract for any of The Funds.

3.     All documents prepared by, or on behalf of the Board of Trustees, requesting documents and information from PIM, PRM, and any employee, agent, parent, subsidiary or

affiliate of PIM and PRM, concerning or relating to the Board of Trustees review and approval of the Management Contract for PIM for any of the Funds.

4.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any consideration given by you, or the Board of Trustees, to the issue of whether or not to approve any actual or proposed Management Contract for any of The Funds.

5.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any changes, modifications, revisions or proposals by the Board of Trustees to any Management Contract proposed by PIM for any of The Funds.

6.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any criteria or policies used by the Board of Trustees in connection with its consideration of whether or not to approve any actual or proposed Management Contract for any of The Funds.

7.    All documents prepared or compiled by the Trustees or staff of the Board of Trustees relating to its review and approval of the Distribution Plan for any of The Funds.

8.    All documents and tangible things in your possession, custody, or control that constitute or reflect any information or materials provided to, and/or reviewed by you, or the Board of Trustees in connection with its approval of the Distribution Plan for any of The Funds.

9.    All documents prepared by, or on behalf of the Board of Trustees, requesting documents and information from PIM, PRM, and any employee, agent, parent, subsidiary or

affiliate of PIM and PRM, concerning or relating to the Board of Trustees review and approval of the Distribution Plan for any of the Funds.

10.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any consideration given by you, or the Board of Trustees, to the issue of whether or not to approve any actual or proposed Distribution Plan for any of The Funds.

11.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any changes, modifications, revisions, or proposals by the Board of Trustees to any Distribution Plan proposed by PRM for any of the Funds.

12.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any criteria or policies used by the Board of Trustees in connection with its consideration of whether or not to approve the Distribution Plan for any of The Funds.

13.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any suggestion, opinion, conclusion, or proposal about potentially withholding approval of any Distribution Plan and/or Management Contract for any of the Funds by the Board of Trustees.

14.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any consideration given by the Board of Trustees to terminating any Distribution Plan and/or Management Contract existing between any of the Funds and PIM or PRM.

15.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to the requirements or standards imposed by Section 36(b) of the Investment Company Act of 1940 or Rule 12b-1 promulgated thereunder, and/or to the issues of whether PIM, PRM, or other affiliated Putnam entities have acted in compliance therewith in relation to any Management Contract and/or Distribution Plan for any of The Funds.

16.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any consideration given by the Board of Trustees, or the Board of Trustees Committees, in deciding whether or not to approve any actual or proposed Management Contract for any of The Funds to the factors for assessing the reasonableness of Management Fees established in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982) and its progeny.   These factors include the following: (i) sharing of economics of scale benefit; (ii) comparisons to other relevant fee structures; (iii) the nature and quality of services provided; (iv) the profitability of The Funds to PIM and its affiliates; (v) the receipt of other Fall-Out Benefits or indirect profits; and (vi) the independence and conscientiousness of the Trustees.

17.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any and all Management Fees, Portfolio Selection Fees, and/or 12b-1 Fees that are paid by any of The Funds to PIM, PRM, or any other affiliated Putnam entities.

18.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to the dispositions or uses PIM, PRM, or other affiliated

Putnam entities have made of the Management Fees and/or 12b-1 Fees that they have received from any of The Funds.

19.     All documents and tangible things in your possession, custody, or control concerning, referring or relating to the issues of if, whether, how, or to what degree any existing mutual fund shareholder benefits from paying 12b-1 Fees and/or Management Fees.

20.     All documents and tangible things in your possession, custody, or control concerning, referring or relating to the issues of whether paying 12b-1 Fees and/or Management Fees is unfair, harmful, detrimental, disadvantageous, or contrary to the interests or welfare of any existing mutual fund shareholder.

21.     All documents and tangible things in your possession, custody, or control concerning, referring or relating to the issue of whether the Management Fees and/or 12b-1 Fees paid to PIM, PRM, or other affiliated Putnam entities by any of The Funds have been excessive.

22.     All documents and tangible things in your possession, custody, or control concerning, referring or relating to the issues of whether it is advisable, legal, appropriate, proper, fair, justified, or warranted to directly or indirectly charge 12b-1 Fees and/or Management Fees to any existing mutual fund shareholder.

23.     All documents and tangible things in your possession, custody, or control concerning, referring or relating to the issues of whether there have been, should be, or may be any increases, reductions, curtailments, or eliminations of any portion of the Management Fees and/or 12b-1 Fees charged to any of The Funds by PIM, PRM, or other affiliated Putnam entities.

24.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to the issues of if, whether, how, or in what amounts PRM or other affiliated Putnam entities profit, benefit, or save on expenses by virtue of receiving 12b-1 Fees and/or Management Fees from any of The Funds.

25.    All documents and tangible things in your possession, custody or control concerning, reflecting, or relating to the decision of the Board of Trustees in July 2003 to discontinue the practice no later than December 2003 of allocating brokerage to reward firms that sell shares of any of The Funds, including, but not limited to, any documents reflecting, referring, or relating to the SEC Administrative Proceeding File No. 3-11868.

26.    All documents and tangible things in your possession, custody or control concerning, referring or relating to any contracts or agreements between you and PIM, PRM and any employee, agent, parent, subsidiary, or affiliate of PIM and PRM.

27.    All documents and tangible things in your possession, custody or control concerning, referring or relating to any funds paid to you, or anything of value given to you, by PIM, PRM, and any employee, agent, parent, subsidiary, or affiliate of PIM and PRM.

28.    All documents and tangible things in your possession, custody or control concerning, referring or relating to the receipt by you of funds or anything of value from PIM, PRM, and any employee, agent, parent, subsidiary, or affiliate of PIM and PRM, including but not limited to any fees, gifts or any services at a discount.

29.    All minutes of meetings of the Board of Trustees, and all committees thereof, including, but not limited to, all drafts, versions and proposals thereof.

30.    All documents and tangible things in your possession, custody, or control that constitute materials shown or provided to, and/or considered by the Board of Trustees, or its

Committees, relating to any of The Funds in connection with any meetings held by the Board of Trustees.

31.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any consideration given by the Board of Trustees or the Board of Trustees Committees for any of The Funds, to articles written by critics of the alleged disparity between retail and institutional fee schedules, to articles by the ICI or others defending such fee differences, and/or to decisions of the courts providing guidance with respect to such issues.

32.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to the issues of if, whether, how, or to what extent PIM, PRM, and/or other affiliated Putnam entities realize economies of scale benefits and/or Fall-Out Benefits in connection with their provision of any services to any of The Funds.

33.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to the issues of if, whether, how, or to what extent PIM, PRM, and/or other affiliated Putnam entities share with any of The Funds any economies of scale benefits and/or Fall-Out Benefits they realize in connection with their provision of any services to any of the Putnam Mutual Funds.

34.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any model schedules for Management Fees developed by, or on behalf of, PIM, PRM, and/or the Board of Trustees, or the Board of Trustees Committees, for any of The Funds, including any versions, drafts, or proposals of or for such model fee schedules.

35.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to each of the fee schedules for Management Fees and/or for 12b-1 Fees that PIM, PRM, or other affiliated Putnam entities have proposed or furnished to any of The Funds.

36.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any charters that have been or are applicable to the Board of Trustees, or the Board of Trustees Committees, for any of The Funds.

37.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to the drafting, revising, and/or inclusion of: (i) the new passage entitled "Management fee considerations" that recently appeared on Putnam's Internet web site; and/or (ii) the new standard passages entitled "Trustee approval of management contracts" that recently began to appear in, *inter alia*, the semiannual reports published on behalf of some or all of the Putnam Mutual Funds.

38.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to the issues of if, how, whether, or to what extent any conflicts of interests do or may exist between PIM, PRM, or other affiliated Putnam entities on the one hand, and any of The Funds and/or their shareholders on the other hand.

39.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to any policies, practices, or procedures that have been, were required to be or may be followed by PIM, PRM, or other affiliated Putnam entities with regard to making disclosures to shareholders and/or to the public regarding any Management Fees and/or 12b-1 Fees charged to any of The Funds.

40.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to the issues of if, how, whether, or to what extent the Management Fees and/or the 12b-1 Fees charged by PIM, PRM, or other affiliated Putnam entities have been or should be made transparent to actual or potential shareholders in any of The Funds.

41.    All documents and tangible things in your possession, custody, or control concerning, referring or relating to communications to or from shareholders of any of The Funds concerning Management Fees and/or 12b-1 Fees charged to any of The Funds.

42.    Copies of your resumes, curriculum vitae or other documents containing your professional and working history.

**EXHIBIT 2**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

JOHN J. VAUGHN, GERALD A.
KALBFLEISCH, MICHAEL HATHAWAY, and
MYRTLE HATHAWAY,

          Plaintiffs,

    v.

PUTNAM INVESTMENT MANAGEMENT,
LLC and PUTNAM RETAIL MANAGEMENT
LIMITED PARTNERSHIP,

          Defendants.

Civil Action No.  04-10988 (GAO)

**NOTICE OF TAKING DEPOSITION
OF JOHN A. HILL**

PLEASE TAKE NOTICE that, pursuant to Federal Rules of Civil Procedure 26, 30 and

45, the plaintiffs, by their attorneys, will take the deposition of **John A. Hill**, by stenographic or

videographic means beginning at **9:30 a.m.** on **November 1, 2006**, at the offices of Robins,

Kaplan, Miller & Ciresi L.L.P., 800 Boylston Street, 25th Floor, Boston, Massachusetts, before a

Notary Public or any other person authorized to administer oaths.  The deposition shall continue

from day to day, Saturdays, Sundays, and legal holidays excepted, until completed.  A copy of

the subpoena is attached hereto.

Respectfully submitted,

ROBINS, KAPLAN, MILLER & CIRESI LLP

David E. Marder (BBO #552485)
Marc N. Henschke (BBO #636146)
Lisa A. Furnald (BBO #631059)
Jonathan D. Mutch (BBO #634543)
Meghan E. Walt (BBO #658971)
800 Boylston Street, 25th Floor
Boston, MA 02199
E-mail: lafurnald@rkmc.com
(617) 267-2300

Dated: October 6, 2006

BN1 35034601.1

Of Counsel:

Thomas R. Grady (admitted *pro hac vice*)
Ackerman, Link, & Sartory, P.A.
222 Lakeview Avenue, Suite 1250, Esperante
West Palm Beach, FL  33401

## CERTIFICATE OF SERVICE

I, Lisa A. Furnald, hereby certify that on October 6, 2006, I caused a true and correct

copy of the attached *Notice of Taking Deposition* to be served first class mail upon Defendants'

counsel of record at the following address:


David S. Clancy, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, MA  02108-3194


_____
Lisa A. Furnald, Esquire

Issued by the

# UNITED STATES DISTRICT COURT

### FOR THE    DISTRICT OF    MASSACHUSETTS

| | |
|---|---|
| John J. Vaughn, Gerald A. Kalbfleisch, Michael Hathaway and Myrtle Hathaway,<br><br>        Plaintiffs,<br><br><br>                        V.<br><br><br>Putnam Investment Management, LLC, and<br>Putnam Retail Management Limited Partnership,<br>        Defendants. | **SUBPOENA IN A CIVIL CASE**<br><br>Case Number:[1]  1:04-CV-10988 (GAO) |

TO:    John A. Hill
        One Post Office Square
        Boston, MA  02109

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

**X**    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION:<br>**Robins, Kaplan, Miller & Ciresi L.L.P.**<br>**800 Boylston Street, 25th Floor**<br>**Boston, MA 02199** | DATE AND TIME:<br><br>**November 1, 2006**<br>**9:30 a.m.** |
|---|---|

**X**    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below.  **SEE EXHIBIT A attached hereto.**

| PLACE:<br>**Robins, Kaplan, Miller & Ciresi L.L.P.**<br>**800 Boylston Street, 25th Floor**<br>**Boston, MA  02199** | DATE AND TIME:<br><br>**October 26, 2006**<br>**9:30 a.m.** |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br><br>, Counsel for Plaintiffs | DATE<br>October 6, 2006 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Lisa A. Furnald, Esquire, Robins, Kaplan, Miller & Ciresi, LLP,
800 Boylston Street, 25th Floor, Boston, MA 02199 617-859-2790

(See Rule 45, Federal Rules of Civil Procedure Parts C & D on reverse)

[1]  If action is pending in district other than district of issuance, state district under case number.

AO 88 (Rev. 11/91) (Subpoena in a Civil Case)

## PROOF OF SERVICE

| DATE | PLACE |
|---|---|
| October 6, 2006 | Boston, MA |

**SERVED**

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| John A. Hill<br>c/o Peter L. Welsh, Esquire<br>Ropes & Gray LLP<br>One International Place<br>Boston, MA 02110 | Via First Class Mail |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Lisa A. Furnald, Esquire | Associate, Robins, Kaplan, Miller, & Ciresi LLP |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on:  October 6, 2006
DATE

_Lisa A. [signature]_

SIGNATURE OF SERVER

800 Boylston St., 25th Floor, Boston, MA 02199
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1)    A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)    (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)    (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)    fails to allow reasonable time for compliance;

(ii)    requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B)( iii) of this rule, such a person may in order to

attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii)    requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)    subjects a person to undue burden.

(B) if a subpoena

(i)    requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)    requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's's study made not at the request of any party, or

(iii)    requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d)    DUTIES IN RESPONDING TO SUBPOENA.**

(1)    A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)    When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**Exhibit A To Subpoena To Putnam Board of Trustees**

I.   **DEFINITIONS**

1.     The terms "documents" and "tangible things" as used herein shall mean each non-identical copy of any of the types of materials referenced in LR 26.5(c)(2) and Fed. R. Civ. P. 34(a), and shall specifically include emails, voice mails, instant messages, and computer data, and any electronic, magnetic, or digital media on which information can be stored, including but not limited to tapes, hard drives, discs, and any other form of computer memory.

2.     The term "non-identical copy" as used herein shall mean any document or tangible thing that, but-for markings, additions, deletions, signatures, modifications of any kind (including, but not limited to, notations on the backs or margins of pages thereof, blind carbon copy notations, attachments, alterations, amendments, or mark-ups) would otherwise be identical to other documents or tangible things responsive to any production request herein.  Each non-identical copy constitutes a distinct document or tangible thing and must be produced in response hereto.

3.     The term "meeting(s)" as used herein shall mean any assembly, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether or not planned, arranged, or scheduled in advance, whether or not occurring face-to-face or by other means including, without limitation, by telephone, videoconference or instant messaging, and whether or not the meeting was informal or formal or occurred in connection with some other activity.

4.     The term "agreement" as used herein shall mean any contract, transaction, or other arrangement of any kind, whether conditional, executed, executory, express, or implied, and whether oral or written, in which rights are granted or obligations assumed.  The term

"agreement" shall apply to completed, actual, contemplated, or attempted agreements or renewals of agreements.

5.     The term "any" shall mean "any and all." The term "all" as used herein also shall mean "any and all."

6.     The terms "and" and "or" as used herein shall be construed conjunctively or disjunctively to bring within the scope of these production requests any and all information which might otherwise be construed as outside their scope.

7.     The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun so used, and vice versa; the use of the masculine form of a pronoun also includes within its meaning the feminine form of the pronoun so used, and vice versa; and the use of any tense of any verb includes also within its meaning all other tenses of the verb so used.

8.     All entities referred to herein shall be deemed to include their parent companies, subsidiaries, affiliates, directors, officers, employees, agents, successors, assigns, and representatives thereof, including attorneys, consultants, accountants, and investment bankers.

9.     The term "PIM" as used herein shall mean the named Defendant Putnam Investment Management, LLC, and any of its agents, assigns, affiliates, predecessors in interest, representatives, employees, servants, associates, attorneys, or any other persons or entities through which Putnam Investment Management, LLC has conducted business potentially including, but not limited to, Putnam LLC; Putnam Investments; Putnam Fiduciary Trust Company; Putnam Investor Services; The Putnam Advisory Company, LLC; Putnam Advisory Company, LLP; Putnam Investments Limited; and Putnam Investments Trust.

10.    The term "PRM" as used herein shall mean the named Defendant Putnam Retail Management Limited Partnership and any of its agents, assigns, affiliates, predecessors in interest, representatives, employees, servants, associates, attorneys, or any other persons or entities through which Putnam Retail Management Limited Partnership has conducted business potentially including, but not limited to, Putnam LLC; Putnam Investments; Putnam Fiduciary Trust Company; Putnam Investor Services; The Putnam Advisory Company, LLC; Putnam Advisory Company, LLP; Putnam Investments Limited; and Putnam Investments Trust.

11.    The term "PAC" as used herein shall mean Putnam Advisory Company, LLC, and any of its agents, assigns, affiliates, predecessors in interest, representatives, employees, servants, associates, attorneys, or any other persons or entities through which Putnam Advisory Company, LLC has conducted business.

12.    The term "Management Fees" as used herein shall mean the aggregate of all types of fees that an investment advisor charges and receives pursuant to any particular Management Contract.

13.    The term "Portfolio Selection Fees" as used herein shall mean that portion of its Management Fees that an investment advisor charges and/or receives under any particular Management Contract in exchange for furnishing an investment program, and for making investment decisions about what securities shall be purchased, held, sold, or exchanged, and/or what portions of client assets shall be held uninvested.  As such, the term "Portfolio Selection Fees" is meant to *exclude*, for example, those fees that an investment advisor charges and receives under any particular Management Contract for managing, supervising, and conducting a client's other affairs and business, for furnishing office space and equipment, for providing

bookkeeping and clerical services, and for placing orders for purchase and sale of a client's portfolio securities.

14.    The term "The Funds" as used herein shall mean, collectively, the following Putnam mutual funds, including any mutual funds with different names by which any of these funds were formerly known:   Classic Equity Fund; Fund for Growth and Income; Growth Opportunities Fund; Investors Fund; and Voyager Fund.

15.    The term "Putnam Mutual Funds" as used herein shall mean, collectively, the entire family of open-end registered investment companies managed or operated by any Putnam entity including, without limitation, The Funds.

16.    The term "Distribution Plan" as used herein shall mean any plan adopted by a mutual fund, and/or by any class of shares of a mutual fund, pursuant to Rule 12b-1 of the Investment Company Act of 1940, 15 U.S.C. § 80a-12(b); 17 C.F.R. § 270.12b-1.

17.    The term "12b-1 Fees" as used herein shall mean the aggregate of all types of fees that an investment advisor and/or any affiliated entity charges and/or receives from a mutual fund under or pursuant to a Distribution Plan.

18.    The term "Board of Trustees" as used herein shall mean the entire board for any of The Funds -- including their independent staff, auditors, and legal counsel -- as well as any committees, subcommittees, groups, or other portions of such boards.

19.    The term "Board of Trustees Committees" as used herein shall mean, collectively, all committees existing under any particular Board of Trustees for any of The Funds including, but not limited to, the Audit and Compliance Committee; the Board Policy and Nominating Committee; the Brokerage Committee; the Marketing Committee; the Contract Committee; the Executive Committee; the Investment Oversight Committees; the Pricing Committee; the

Shareholder Communications and Relations Committee; the Investment Process Committee; the Distributions Committee; the Litigation Committee and any other committees with different names by which any of these committees were formerly known.

20.    The term "Fall-Out Benefits" as used herein shall mean the aggregate of direct and indirect benefits that providers of services in connection with a Management Contract and/or a Distribution Plan may receive over and above their collection of Management Fees and/or 12b-1 Fees.  As such, the term "Fall-Out Benefits" is meant to include, for example, brokerage and/or research services received from broker-dealers; soft-dollar allocations; transfer agency fees; custodian fees; attraction of new customers to other funds and products offered by said providers of services; and/or any other benefits.

21.    Unless otherwise stated, the time period applicable to these document requests shall be January 1, 2002 through Dececmember 31, 2002 and January 1, 2006 to the present.

## II.    **REQUESTED DOCUMENTS AND TANGIBLE THINGS**

1.    All documents and tangible things in your possession, custody or control constituting contracts or agreements between and among you and any other entity or person concerning or referring to your position on the Board of Trustees for the Funds during the time period of January 1, 2002 through the present.

2.    All documents and tangible things in your possession, custody or control that addresses, identifies, describes or otherwise sets forth the compensation, benefits, or anything else of value given to you in connection with your position on the Board of Trustees for the Funds during the time period of January 1, 2002 through the present.

3.    All documents and tangible things in your possession, custody or control that addresses, identifies, describes or otherwise sets forth the Trustee Compensation Deferral Plan, the Retirement Plan for Trustees of the Putnam Funds, and the Noncontributory Defined Benefits

Plan (collectively, the "Plans") in effect during the time period of January 1, 2002 through the present, as those Plans are identified in the Funds' Statements of Additional Information and Annual Reports.

4.      All minutes of meetings of the Board of Trustees and the Board of Trustees Committees including, but not limited to, all drafts, versions and proposals thereof.

5.      All charters that have been or are applicable to the Board of Trustees and the Board of Trustees Committees for any of The Funds.

6.      All Agendas and other materials (other than the "Black Books" and the quarterly 12b-1 reports) provided to the Trustees in connection with meetings of the Board of Trustees or the Board of Trustees Committees or the review of management and 12b-1 fees.

7.      All notes taken by you in connection with the Trustees' review and approval of the Management Contract for the Funds.

8.      All notes taken by you in connection with the Trustees' review and approval of the Distribution Plan for the Funds.

9.      All written communications between PIM and PRM, on the one hand, and any Trustee, on the other hand.

10.      All written communications between the staff of the Office of the Trustees, on the one hand, and any Trustee, on the other hand.

11.      All written communications between or among members of the Board of Trustees made in connection with the Trustees review and approval of the Distribution Plan and the Management Contract for the Funds.

12.    All written communications between or among members of the Board of Trustees concerning or referring to the management fees or 12b-1 fees charged to the Funds, the services provided by PIM or PRM to the Funds, fall-out benefits or soft dollars, and economies of scale.

13.    All written communications between or among members of the Board of Trustees concerning or referring to conflicts of interest between the Putnam Mutual Funds or their shareholders on the one hand, and PIM on the other.

14.    All written communications between or among members of the Board of Trustees concerning or referring to any consideration by the Trustees of the factors for assessing the reasonableness of Management Fees established in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982) and its progeny.

15.    All engagement letters between the Trustees and Ropes & Gray effective for the time period January 1, 2002 through the present.

**EXHIBIT 3**



**ROPES & GRAY LLP**

ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624    617-951-7000    F 617-951-7050

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

November 2, 2006

Peter L. Welsh
(617) 951-7865
peter.welsh@ropesgray.com

*VIA FACSIMILE & REGULAR MAIL*

Lisa A. Furnald, Esq.
Robins, Kaplan, Miller & Ciresi LLP
800 Boylston Street
25th Floor
Boston, MA 02199

Re:    *Vaughn, et al v. Putnam Investment Management, LLC, et al.,*
       Civil Action No. 1:04-CV-10988-GAO

Dear Lisa:

We are writing to respond to your October 30, 2006 letter concerning our October 26, 2006
telephone conference regarding the subpoenas that were served on the Independent Trustees of
the Putnam Funds ("the Trustees") on or about January 4, 2006 and October 6, 2006. Although
you requested a response to your October 30, 2006 letter by October 31, 2006, we note that the
letter was evidently sent to us only via U.S. mail and not via e-mail or facsimile. We received
the letter only yesterday.

First, with respect to the Audit & Pricing and Board Policy & Nominating Committee meeting
minutes, we did not assert that the Trustees refuse to produce the minutes of the Audit & Pricing
and Board Policy & Nominating Committee meetings. At your request, the Trustees recently
produced the charters of the Audit & Pricing and Board Policy & Nominating Committee to the
Plaintiffs. We did this in order to allow you to identify possibly relevant subjects that may have
been discussed during the meetings of those Committees. During our conference call on October
26, 2006, you identified some such topics and we agreed to review the minutes to determine
whether the topics you mentioned were addressed therein. We are in the process of conducting
this review and will contact you as soon as we have determined whether any of the Audit &
Pricing or Board Policy & Nomination Committee minutes refer to the topics you identified as
relevant to the above-captioned litigation.

Second, with respect to deposition testimony by certain Trustees, I did not in any way represent,
either during our discussion on October 26 or at any other time, that the Trustees will not appear
for a deposition in the absence of a court order. Instead, we inquired as to the reasons the
Plaintiffs sought deposition testimony from Myra Drucker and W. Thomas Stephens; as we
discussed, neither served on the Contract Committee during the relevant time period, and Ms.
Drucker served as a Trustee during only a fraction of the relevant period. We further inquired as

10248978_3

to the Plaintiffs' reasons for requesting depositions of Messrs. Curtis and Mullin, as any testimony by them is likely to be substantially duplicative of the testimony of other Trustees. In response, you indicated that you needed to discuss our questions with others at your firm and that you would respond as soon as you had done so. We await your further response.

As we have previously discussed with you, we are willing to arrange with you a mutually convenient time for the taking of depositions of certain of the Trustees, provided that those Trustees are deposed for no more than one day of seven hours and provided that they are not subject to being recalled. We welcome the opportunity to discuss with you the scheduling of these depositions.

We await your response to our pending questions and remain willing to discuss a possible resolution of some or all of the outstanding discovery matters.

Very truly yours,

Peter L. Welsh

**EXHIBIT 4**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

John E. Gallus, et al.,                                     Civil No. 04-4498 (DWF/SRN)

                    Plaintiffs,

v.                                                          **ORDER**

American Express Financial
Corporation, et al.,

                    Defendants.

---

Guy M. Burns, Esq., Jonathan S. Coleman, Esq., Becky Ferrell-Anton, Esq., and Audrey B.
Rauchway, Esq., Johnson Pope Bokor Ruppell & Burns, LLP; Gretchen Freeman Cappio, Esq., Tana
Lin, Esq., Erin M. Riley, Esq., Lynn Lincoln Sarko, Esq., and Michael D. Woerner, Esq., Keller
Rohrback; James C. Bradley, Esq., Michael J. Brickman, Esq., and Nina H. Fields, Esq., Richardson
Patrick Westbrook & Brickman-Charleston; Karl L. Cambronne, Esq., Chestnut & Cambronne;
counsel for Plaintiffs.

Chanel R. Dalal, Esq., John D. Donovan, Jr., Esq., and Robert A. Skinner, Esq., Ropes & Gray LLP;
Robert L. Schnell, Jr., Esq., Faegre & Benson LLP; counsel for Defendants.

Thomas B. Hatch, Esq., Robins Kaplan Miller & Ciresi LLP; counsel for RiverSource Funds and its
Independent Directors.

---

        The above-entitled matter came before the undersigned United States District Court Judge on

November 8, 2005, pursuant to the Independent Directors of the RiverSource Funds' ("Independent

Directors") Motion to Quash Subpoenas. Plaintiffs John E. Gallus, et al., ("Plaintiffs") directed

subpoenas to Independent Directors Arne H. Carlson, Phillip J. Carroll, Jr., Anne P. Jones, Stephen R.

Lewis, Jr., Alison Taunton-Rigby, Alan K. Simpson, and Livio DeSimone. Consistent with the Court's

remarks off the bench, the Court will permit Plaintiffs to depose Arne H. Carlson, Chairman of the

Boards of the Funds, and Stephen R. Lewis, Jr., Chairman of the Contracts Committee, during the first

stage of discovery. The information adduced from these two depositions should determine whether it is

appropriate to depose the remaining five Independent Directors. This order directs the parties to

determine whether the remaining five depositions should be taken.

**IT IS HEREBY ORDERED THAT:**

1.      The Independent Directors' Motion to Quash Subpoenas (Doc. No. 87) is

**GRANTED IN PART**, and **DENIED IN PART**;

        a.      The Independent Directors' Motion, with respect to the subpoenas

directed to Arne H. Carlson and Steven R. Lewis, Jr. is **DENIED**;

        b.      The Independent Directors' Motion, with respect to the subpoenas

directed to Phillip J. Carroll, Jr., Anne P. Jones, Alison Taunton-Rigby, Alan K.

Simpson, and Livio DeSimone, is **GRANTED** at this time.


Dated: November 10, 2005            s/Donovan W. Frank
                                    DONOVAN W. FRANK
                                    Judge of United States District Court

2

**EXHIBIT 5**

<div align="center">

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

</div>

|  |  |
|---|---|
| ) | **Case No. 04-CV-4498 (DWF/SRN)** |
| John E. Gallus, et al. ) | |
| ) | |
| Plaintiffs, ) | **MEMORANDUM OF LAW IN** |
| ) | **SUPPORT OF MOTION** |
| vs. ) | **TO QUASH SUBPOENAS** |
| ) | |
| American Express Financial ) | |
| Corporation, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

<div align="center">

**INTRODUCTION**

</div>

The independent directors of the RiverSource Funds, formerly known as the AXP Mutual Funds, have received subpoenas, requesting that they produce any documents relating to their activities and responsibilities as directors of the AXP New Dimensions Fund and the AXP Large Cap Equity Fund for the period January 1, 1999 to the present, and requesting that they appear for a deposition and give testimony. These subpoenas should be quashed. In light of this Court's order of March 7, 2005, "limiting Plaintiffs' ability to engage in discovery at this time," no discovery of the directors of the Funds should be allowed until plaintiffs have demonstrated to the Court that they have sufficient facts upon which to base a good faith belief that the fees charged by the investment advisor were excessive. Until that showing is made, any discovery from the directors is unduly burdensome.

## PROCEDURAL BACKGROUND

Neither the Funds nor their directors are defendants in this action, which alleges violations of Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b). Nevertheless, the directors are responsible for overseeing the management of the Funds and under state law they have a fiduciary duty to act in the best interest of the Funds' shareholders. The directors have established processes designed to assure they carry out their fiduciary duties, including employing Board Services Corporation and electing an independent officer to assist them in carrying out these duties. Declaration of Leslie L. Ogg at ¶¶ 1-3, 6. In accordance with their established processes, they have requested information from the Funds' advisor which they deemed material to the issue of the advisor's fee, and they have diligently conducted a review of the Investment Management Services Agreements each year. The proxy statement, which is a publicly filed document, describes the process of review undertaken by the directors of the Funds. *Id.* at ¶ 7. This process is designed to ensure that the Funds do not pay excessive advisor and distributor fees. The directors have a similar interest in ensuring that the Funds are not burdened by unnecessary legal fees and costs.

This action was originally filed in June 2004 in the United States District Court for the District of Arizona. The case was later transferred to this Court, and on November 15, 2004, the defendants brought a motion to dismiss. On March 7, 2005, this Court issued an order dismissing Count IV of the complaint and denying the motion to dismiss Counts I-III, which stated claims under Section 36(b). The Court noted, however, that the factual assertions in the complaint survived the motion to dismiss "by

only the narrowest of margins." *Gallus v. Am. Express Fin. Corp.*, 370 F. Supp. 2d 862, 867 (D. Minn. 2005). The Court questioned whether plaintiffs even had a good faith basis for three of their allegations, including the allegation that the investment advisor provided "virtually no information to the directors" of the Funds. This question was appropriate because, before this litigation commenced, none of the plaintiffs or their counsel contacted the Funds or Board Services Corporation to obtain any information about the Funds' processes, what information the directors requested, what information the advisor provided, or the nature of the directors' review of that information. Declaration of Leslie L. Ogg at ¶ 8.

Because of the concerns expressed in the decision on the motion to dismiss, the Court stated that it was "limiting Plaintiffs' ability to engage in discovery at this time." 370 F. Supp. 2d at 867. The Court delegated to Magistrate Judge Mayeron the parameters of the limited discovery (with the assistance of the parties, i.e., the plaintiffs and the defendants) and stated: "The circumscription by the Court of the scope of discovery is designed to create a staged discovery process, given the Court's view of the complaint. If AEFC wishes to file a request for leave to file a motion for reconsideration after the initial discovery has been completed, the Court will consider its request in light of this Order and the record as developed during discovery." *Id.*

The plaintiffs and the defendants met with Magistrate Judge Mayeron and developed a discovery plan which is set forth in an Order dated May 3, 2005. While that Order may reflect the parties' efforts to define the scope of discovery *from each other* that they deem appropriate in light of the Court's Order of March 7, 2005, the discovery

plan should not be viewed as defining the scope of discovery from the Funds and their directors. This is, in effect, a derivative action and, while Section 36(b) does not require a demand to be made on directors, directors should have a say in the process in order to protect shareholders against incurring unnecessary costs.

As set forth below, the appropriate phasing of discovery from the Funds and their directors, in light of this Court's order, is to permit the parties to take discovery from each other in whatever phases they determine are appropriate, but then only if that discovery record reveals sufficient facts upon which to base a good faith belief that excessive fees have been charged should discovery be allowed from the Funds and their directors. The discovery allowed from the directors should then be tailored to avoid cumulative or repetitive evidence.

## EFFORTS TO RESOLVE THIS DISCOVERY DISPUTE

On September 16, 2005, Mr. Leslie L. Ogg, the President of Board Services Corporation and the independent officer of the Funds, spoke with the plaintiffs' counsel and stated his belief that he had a fiduciary duty to meet with plaintiffs' counsel to ensure that counsel had complete and accurate factual information regarding the Boards' processes before counsel incurred costs to the shareholders in pursuing the claims. Declaration of Leslie L. Ogg at ¶ 10. Plaintiffs' counsel declined this invitation to meet, stating that she needed information on the record showing what the directors knew and whether they were competent, diligent and independent. Mr. Ogg offered to have the meeting on the record. Plaintiffs' counsel still declined and stated that subpoenas would be issued to the independent directors the next week. *Id.*

On September 22, 2005, counsel for the Funds and their independent directors sent a letter to plaintiffs' counsel offering the deposition of Leslie L. Ogg and describing the subject matters on which he could competently testify, including the nature of the information gathered and considered by the Boards regarding the contracts with the Funds' advisor and distributor. Counsel offered to make Mr. Ogg available on one of three dates in October and offered to produce relevant documents in less than 30 days, if the plaintiffs would agree to defer taking the depositions of the directors. On September 28, 2005, the plaintiffs' counsel responded, saying that plaintiffs were not interested in taking Mr. Ogg's deposition and they were proceeding to serve subpoenas on the seven independent directors of the Funds. *Id.*, Exs. B and C.

Seven of the Funds' directors have now received subpoenas requiring them to sit for a deposition and to produce the following documents: "Any and all documents for the period commencing January 1, 1999 to the present related to your activities and responsibilities as a director or trustee of the AXP New Dimensions Fund and the AXP Large Cap Equity Fund." *Id.*, Ex. A.

## ARGUMENT

To establish their claim under Section 36(b), the plaintiffs must show that the defendants charge a fee "that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2nd Cir. 1982). As the Court noted in its Order of March 7, 2005, *Gartenberg* is the seminal case on Section 36(b) claims and sets forth the factors that should be considered in making the

determination whether an excessive fee has been charged. The factors are as follows: (1) the nature and quality of the services provided by the adviser to the shareholders; (2) the profitability of the mutual fund to the adviser; (3) "fall-out" benefits; (4) the economies of scale realized by the adviser; (5) comparative fee structures with similar funds; and (6) the independence and conscientiousness of the independent trustees. *Gallus*, 370 F. Supp. 2d at 865; *Krinsk v. Fund Asset Management, Inc.*, 875 F.2d 404, 409 (2nd Cir. 1989).

The information relevant to each of the first five factors is all available from the investment advisor. The advisor can describe the nature and quality of the services provided, the profitability of the relationship with the mutual fund, the "fall-out" benefits it receives, the economies of scale it realizes, and the comparative fee structures with similar funds. There is no reason to burden the Funds and their directors with the cost of responding to discovery relating to these five issues.

The only factor that requires discovery from the directors is the sixth factor—the independence and conscientiousness of the independent trustees. But if information relating to the first five factors does not show a factual basis for the excessive fee claims, then the independence and conscientiousness of the independent trustees becomes irrelevant. Information relating to the Boards' deliberations—what materials they considered and how they negotiated with the advisor on this issue—only becomes relevant if the plaintiffs can show that the fee was unusually high. In that event, then the advisor might want to establish that even though the fee appears to be high, it was the result of hard bargaining with the directors. But even then, as the court in *Gartenberg*

noted: "[E]ven if the trustees of a fund endeavored to act in a responsible fashion, an adviser-manager's fee could be so disproportionately large as to amount to a breach of fiduciary duty in violation of § 36(b)." 694 F.2d at 930.

Accordingly, the appropriate staging of discovery in this case, at least as it relates to discovery from the Funds and their directors, is to permit discovery between the plaintiffs and the defendants on the first five of the *Gartenberg* factors. If the discovery record does not establish that excessive fees were charged by the defendants, then, presumably, the defendants will take up the Court's invitation to request leave to file a motion for reconsideration. If the Court reconsiders the motion to dismiss and still denies the motion, then discovery from the independent directors might be appropriate.

In the event that discovery is permitted from the Funds and its directors, that discovery should be limited to avoid cumulative and repetitive evidence. The Funds' Boards include seven independent directors, but there is no reason to have all seven of those directors testify and describe, over and over, what materials they reviewed, what discussions they had, and what vote was taken. The discovery should be limited to two depositions—one from the Chairman of the Boards, and one from the Chairman of the Contracts committee. The Contracts Committee is charged with gathering the information deemed relevant to considering the fees to be charged by the investment advisor. In addition, the documents requested from the Funds should be limited to the contract years at issue in this case, i.e., 2003, 2004 and 2005, and should be limited to the documents relating to the Boards' fact-gathering process, negotiations with the advisor, and deliberations regarding the contracts with the advisor.

## CONCLUSION

The plaintiffs' complaint survived a motion to dismiss by a narrow margin. The Court directed that discovery be limited and staged and invited the defendants to request leave to file a motion for reconsideration at the end of the initial period of discovery. That initial period of discovery should focus on the first five factors described in *Gartenberg*, and all of the information relevant to those factors can be obtained from the defendants. There is no need to involve the Funds and the directors in the discovery relating to those five factors. Only after discovery on those five factors has been completed, and only if the plaintiffs have shown that the advisor charged an excessive fee, should the Funds and its directors be burdened with any discovery. The plaintiffs brought this action to relieve the Funds' shareholders from the burden of excessive fees. The Funds' shareholders should also be relieved from the burden of unnecessary discovery and its attendant fees and costs. The motion to quash should be granted.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Dated:  October 11, 2005

By:  _s/Thomas B. Hatch_____
          Thomas B. Hatch (#150939)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402-2015
(612) 349-8500

ATTORNEYS FOR RIVERSOURCE FUNDS and
THEIR INDEPENDENT DIRECTORS

## CERTIFICATE OF COMPLIANCE

This brief complies with the word count-limitations of Rule 132.01.  The brief

contains 2,089 words according to the word processing software used, which is

Microsoft's Word 2003.  The brief is printed in 13 point font.


By:  _s/Thomas B. Hatch_____
     Thomas B. Hatch

**EXHIBIT 6**

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

ATTORNEYS AT LAW

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel: 612-349-8500 Fax: 612-339-4181
www.rkmc.com

Thomas B. Hatch
612-349-8206

March 14, 2006

**Via Facsimile and U.S. Mail**

Guy M. Burns, Esq.
Johnson, Pope, Bokor, Ruppel & Burns LLP
403 East Madison Street, Suite 400
Tampa, FL 33602

Re:    Gallus v. American Express Financial Corporation
       Court File No. 04-4498
       Our File No. 026694-0010

Dear Mr. Burns:

I have your letter of March 13, 2006, in which you state that you should be entitled to take the depositions of five more Board members because they have "relevant and discoverable information about the approval of the advisory and distribution contracts that are the central element of this case." That vague, general statement gets us nowhere. What discoverable information do they have? What do you want to know from them?

As I recall, during our telephone conversation on March 8, 2006, I specifically asked you whether there were any questions left unanswered by Mr. Carlson or Mr. Lewis. You did not identify any areas that were left unanswered, and in your letter of March 13, 2006, you do not identify any areas left unanswered. I did not hear you say on March 8, 2006, and I did not read in your letter of March 13, 2006, that you lacked information regarding the Boards' process in reviewing contracts, the information received by the Boards, the factors considered by the Boards in establishing contract rates, and the pricing policy of the Boards. I also did not hear you say on March 8, 2006, and I did not read in your letter of March 13, 2006, that you have any questions or concerns about the independence of any of the Boards' members.

All you have ever said is that you want to examine the other Board members as to their conscientiousness—"their duties" as you say in the letter. In other words, you want to ask them whether they read, understood, and considered the material provided to them by the advisor. You have already seen from the depositions of Mr. Carlson and Mr. Lewis that they read, understood and considered the material provided to them, and you cite nothing from the depositions of Mr. Carlson and Mr. Lewis which causes you to suspect that other Board members were not conscientious. If Judge Frank had believed that you were entitled to question all seven of the directors on their conscientiousness, regardless of the testimony of Mr. Carlson

Guy M. Burns, Esq.
March 14, 2006
Page 2

and Mr. Lewis, he would have denied our motion to quash and not limited your discovery to Mr. Carlson and Mr. Lewis, with the right to take further depositions dependent on the outcome of those two depositions. You want to take the depositions of the other board members, as you explicitly state in your letter, "notwithstanding the testimony of Mr. Carlson and Mr. Lewis."

Please, if you have something specific that you want to know from the other Board members, just let me know and we will reconsider your request. But if you just want to inquire generally about their conscientiousness, then we stand by the objection to further depositions.

I find it hard to believe that you would ask me to make Mr. Carlson and Mr. Lewis available so that you can question them about the 1998 to 2001 documents before you have even reviewed the documents. Wasn't this precisely the issue that Magistrate Judge Nelson ruled on? You asked that the depositions be continued because you didn't get 1998-2001 documents; I opposed that request; and she ruled that the depositions would go forward. If after reviewing the documents, there is really some legitimate area of inquiry raised by those documents, then of course, we will reconsider our position. But why don't you wait until you review the documents, see if they really raise any new issues, and, if so, we can discuss it. We are not trying to prevent you from getting legitimate information. We are only trying to prevent a waste of time and a waste of shareholder money.

Finally, Ms. Dalal informs me that most of the 14,000 additional pages of documents produced to you are the Bates-numbered copies of the Truscott board materials previously produced to you without numbers. The rest of the documents are subadvisory contracts, institutional contracts and monthly profit and loss statements internal to the advisor and not considered by the Boards. It is unlikely that these documents will give you any reason to depose the Boards' members but, if they do, I'm quite willing to talk about it.

All we are asking is that you be specific about why you need depositions from five other Board members when you have heard from the Chairman of the Boards and the Chair of the Contracts Committee. They have told you how the Boards are organized, how Board members are selected, how often they meet, how many committees they have, when the committees meet. They have told you about the nature and quality of the services provided by the advisor. They have told you about the information they receive from the advisor regarding its profitability, including the annual profitability report, which contains a discussion of "fall-out" benefits. They have also told you about the "deep dive" exercises that the Board conducts from time to time to get more information about profitability, including comparisons with the fees paid by pension and institutional accounts. They have explained why they do not believe that those fees are useful to them in analyzing what is reasonable to pay the advisor to manage a mutual fund that is sold through large numbers of financial advisors. They have told you about how they account for potential economies of scale. They have discussed the annual report provided by Lipper and the rationale for comparing the fees paid by the RiverSource funds with the funds that Lipper shows as comparable. They have described the pricing policy, which is essentially to be at or below the median cost of other comparable funds. What else do you need? If you just want to ask another Board member if he or she was conscientious, then I think you are wasting our time,

Guy M. Burns, Esq.
March 14, 2006
Page 3

and we will oppose the motion.  But if there is some legitimate information that you could not
get from Mr. Carlson or Mr. Lewis, just tell me what it is, and we will reconsider our position.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Thomas B. Hatch

TBH/lw
cc:    Leslie L. Ogg, Esq.

**EXHIBIT 7**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

John E. Gallus, D. Elaine Gallus, and
Alexandria Ione Faller (a/k/a Alexandria Ione
Griffin), for the use and benefit of
AXP New Dimensions Fund, AXP Strategy
Aggressive Fund, AXP Mutual Fund, AXP
Precious Metals Fund, AXP Equity Select Fund,
AXP Small Cap Advantage Fund, AXP Partners
Small Cap Value Fund, AXP Mid Cap Value
Fund, AXP Small Company Index Fund,
AXP High Yield Bond Fund, AXP Managed
Allocation Fund, and AXP Large Cap Equity
Fund (Successor by merger to AXP Blue Chip
Advantage Fund),

Civil No. 04-4498 (DWF/SRN)

       Plaintiffs,

**MEMORANDUM
OPINION AND ORDER**

v.

American Express Financial Corporation and
American Express Financial Advisors Inc.,

       Defendants.

Guy M. Burns, Esq., Jonathan S. Coleman, Esq., Becky Ferrell-Anton, Esq., and
Audrey B. Rauchway, Esq., Johnson Pope Bokor Ruppell & Burns, LLP; Gretchen
Freeman Cappio, Esq., Tana Lin, Esq., Erin M. Riley, Esq., Lynn Lincoln Sarko, Esq.,
Michael D. Woerner, Esq., and Laura R. Gerber, Esq., Keller Rohrback LLP; James C.
Bradley, Esq., Michael J. Brickman, Esq., and Nina H. Fields, Esq., Richardson Patrick
Westbrook & Brickman-Charleston; Karl L. Cambronne, Esq., Chestnut & Cambronne;
counsel for Plaintiffs.

Chanel R. Dalal, Esq., John D. Donovan, Jr., Esq., and Robert A. Skinner, Esq., Ropes &
Gray LLP; Robert L. Schnell, Jr., Esq., Faegre & Benson LLP; counsel for Defendants.

Thomas B. Hatch, Esq., Robins Kaplan Miller & Ciresi LLP; counsel for RiverSource
Funds and its Independent Directors.

## Introduction

This matter is before the Court pursuant to a Motion for Leave to Continue the Depositions of Arne Carlson and Steven Lewis and to Take Five Additional Disinterested Director Depositions brought by Plaintiffs John E. Gallus, et al., ("Plaintiffs"). For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part.

## Background

On November 10, 2005, the Court entered an order (the "Order") permitting Plaintiffs to take the depositions of Arne Carlson and Steven Lewis, two Independent Directors of the RiverSource Funds. The Court denied Plaintiffs' request to depose five other Independent Directors (the "Independent Directors"). In the Order, the Court stated that "[t]he information adduced from these two depositions should determine whether it is appropriate to depose the remaining five Independent Directors." Plaintiffs subsequently deposed Carlson and Lewis on February 8 and 9, 2006, respectively.

Plaintiffs now seek leave to continue the depositions of Carlson and Lewis for the limited purpose of questioning them regarding documents that were produced after their depositions were taken. Additionally, Plaintiffs seek leave to depose five other Independent Directors.[1]

---

[1] These directors include: Phillip Carroll, Anne Jones, Alison Taunton-Rigby, Alan Simpson, and Livio DeSimone.

2

## Discussion

Plaintiffs first assert that Carlson's and Lewis' depositions should be continued because the Independent Directors produced numerous documents after the depositions had been taken. Plaintiffs contend that on April 4, 2006, and on May 5, 2006, counsel for the Independent Directors produced over 21,000 and over 7,000 pages, respectively, of additional documents. Plaintiffs assert that had they reviewed these documents before deposing Carlson and Lewis, Plaintiffs would have employed a different strategy and asked different questions during the depositions. Thus, Plaintiffs maintain that they should be able to continue the depositions of Carlson and Lewis for the limited purpose of questioning Carlson and Lewis regarding these additional documents. The Independent Directors contend that the documents they produced on April 4 and May 5, 2006, had already been produced by Defendants prior to the depositions—just not in an organized fashion. Furthermore, the Independent Directors maintain that Plaintiffs have not identified any particular documents about which they have questions.

Although the Court agrees that Plaintiffs have not identified any specific documents that have generated additional questions, the Court finds that Plaintiffs should be permitted to continue Carlson's and Lewis' depositions in light of the numerous documents produced after the depositions were taken. The Court's Order contemplated full depositions of Carlson and Lewis during phase-one discovery. Although the Court finds that the parties have acted in good faith, the Court finds that both parties could have

3

been more proactive in ensuring that the depositions were not taken until after all
documents were produced.  In light of these considerations and because the Court finds
that continuing Carlson's and Lewis' depositions would cause little or no prejudice, the
Court grants Plaintiffs' request to continue Carlson's and Lewis' depositions.

Plaintiffs next assert that they should be allowed to depose five additional
Independent Directors because their testimony is relevant to Plaintiffs' claims in this case.
Further, Plaintiffs contend that the entire Board of Directors is routinely deposed in such
cases.  Plaintiffs also contend that their request to depose five additional Independent
Directors is narrowly tailored because Plaintiffs seek to depose only five out of 18
potential directors at this time.  Finally, Plaintiffs assert that the depositions of Carlson
and Lewis are not sufficient to enable Plaintiffs to complete phase-one discovery.

The Court finds that Plaintiffs should not be allowed to depose the five additional
directors at this time.  Plaintiffs have not stated what they learned or did not learn from
the depositions of Carlson and Lewis that warrants taking further Independent Director
depositions.  Instead, Plaintiffs repeat the arguments that the Court rejected in October
and November 2005.  Although Plaintiffs assert that they could have requested to take
more than five depositions, this argument still does not explain why the five depositions
that Plaintiffs requested are necessary.  Thus, until Plaintiffs establish foundation for
taking further depositions, the Court will not permit Plaintiffs to depose additional
Independent Directors.

**IT IS HEREBY ORDERED THAT:**

1.    Plaintiffs' Motion for Leave to Continue Depositions of Arne Carlson and

Steven Lewis and to Take Five Additional Disinterested Director Depositions (Doc.

No. 135) is **GRANTED IN PART**, and **DENIED IN PART** as follows;

      a.    Plaintiffs' Motion to continue the depositions of Arne Carlson

and Steven Lewis is **GRANTED**;

      b.    Plaintiffs' Motion to depose Phillip Carroll, Anne Jones,

Alison Taunton-Rigby, Alan Simpson, and Livio DeSimone, is **DENIED**.


Dated:  June 21, 2006        s/Donovan W. Frank
                                DONOVAN W. FRANK
                                Judge of United States District Court