# EXHIBIT F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JERRY N. JONES, MARY FRANCES      )
JONES, and ARLINE WINERMAN,        )
                                   )
                    Plaintiffs,    )
                                   )
        vs.                        )          04 C 8305
                                   )
HARRIS ASSOCIATES L.P.,            )
                                   )
                    Defendant.     )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the court on cross motions for summary judgment. For
the reasons set forth below, Plaintiffs' motion for summary judgment is denied and
Harris's motion for summary judgment is granted.

## BACKGROUND

During the time relevant to Plaintiffs' complaint, Defendant Harris Associates
LP ("Harris") served as an investment adviser to three mutual funds (collectively
referred to as "the Funds"): the Oakmark Fund ("Oakmark"), the Oakmark Equity and
Income Fund ("Equity"), and the Oakmark Global Fund ("Global").[1]  Plaintiffs Jerry

---

[1]The parties have not provided any specific attributes of the Funds other than
they are each a mutual fund and a registered investment company under the Investment
Company Act.  15 U.S.C. § 80a-1 et seq.

and Mary Jones have been shareholders in Equity since December 2003 and in Global since March 2004. Plaintiff Arline Winerman has held shares in Oakmark since December 2003. The services Harris rendered to the Funds included research and stock selection.

For its services as investment advisor, Harris received a fee that was calculated according to a contractual schedule. The contracts containing the fee schedules were approved on a yearly basis by the Funds' board of trustees. Before approval, a committee of board members met several times to review information from Harris regarding the funds' performance, the services Harris provided to the Funds, comparisons with fees charged to Harris's other clients, and comparisons with fees charged by other companies managing similar funds. The committee attended presentations from the Funds' managers and made recommendations to the full board on whether to approve the contracts. For the period at issue, the applicable contracts went through this approval process and were approved by the board. The resulting fees were calculated as a percentage of a Fund's assets at the end of the preceding month.

In addition to managing the Funds, Harris also provided services to sub-advised funds (other mutual funds for which Harris was not the primary investment adviser), "separate account" clients, and limited partnerships (collectively referred to herein as "institutional clients"). The services Harris provided to institutional clients varied, but

- 2 -

in all events were more limited than those they provided to the Funds. The fee schedules applied to different types of clients also varied. For the applicable damages period for Oakmark of August 2003 to August 2004,[2] the fee was 1% of the first $2 billion of the Fund's assets, 0.9% for the next $1 billion, 0.8% for the next $2 billion, and then 0.75% for assets in excess of $5 billion. These reductions as the Fund's assets grew are referred to as "breakpoints." For institutional clients with investment strategies similar to Oakmark's, the percentages ranged from 0.75% to 0.35%, with breakpoints ranging from $15 million to $500 million. For the fiscal year ending in September 2004, Oakmark paid $50,652,178 in advisory fees for Harris's services—$13,577,704 more than the previous year. According to the Funds' expert, during the applicable damages period Oakmark paid Harris $46,698,385 in fees.

For Equity, as of November 2003, the fee schedule was 0.75% for the first $5 billion of assets, 0.7% on the next $2.5 billion, 0.675% on the next $2.5 billion, and then 0.65% for assets above the $10 billion mark. For institutional clients with similar investment strategies, the fee percentages began at 1% and went as low as 0.25%. Breakpoints varied from $10 million to $400 million. For the fiscal year ending in

---

[2]Damages in an action for breach of the fiduciary duty at issue in this case are limited to the year preceding the commencement of the action. 15 U.S.C. § 80a-35(b)(3). As the original complaint in this action was filed August 17, 2004, the applicable damages period for this case would be restricted to the year preceding that date.

September 2004, Equity paid Harris $46,997,810— $23,529,291 more than the year before. According to the Funds' expert, during the applicable damages period, Equity paid $39,622,122.

For Global, again as of November 2003, the fee schedule began as for Oakmark, at 1% of the first $2 billion. It then decreased to 0.95% for the next $2 billion and then to 0.9% for assets in excess of $4 billion. For institutional clients with similar investment strategies, the corresponding percentages began at 0.85% and progressed down to 0.5%, with breakpoints from $25 million to $100 million. For the fiscal year ending in September 2004, Global paid $12,245,761 in advisory fees, $9,263,669 more than the year before. According to the Funds' expert, Global paid $7,391,044 during the applicable damages period.

During the relevant time period, the Funds' board of trustees was comprised of nine or ten members: Victor Morgenstern, Gary Wilner, Burton Ruder, Marvin Rotter, Michael Friduss, Allan Reich, Thomas Hayden, Christine Maki, Peter Voss, and, beginning in July 2003, John Raitt. Morgenstern retired from Harris in 2001 after working there for many years. He has social and business relationships with people who continued to work for Harris after his departure. Rotter and Reich also have social and business relationships with Harris employees. Morgenstern, Wilner, and Ruder are neighbors; they have vacationed together, and their children are contemporaries.

Morgenstern, Wilner, Ruder, and Rotter have been partners in different business ventures, some of which Morgenstern introduced to the others. Morgenstern and Friduss are longtime friends. Voss was the CEO and president of Harris's parent company; Raitt became CEO and President of Harris on July 16, 2003.

On August 17, 2004, Plaintiffs filed suit in the Western District of Missouri.[3] Plaintiffs brought this action derivatively on behalf of the Funds, alleging that Harris violated § 36(b) of the Investment Company Act of 1940, codified at 15 U.S.C. § 80a-35(b). In pertinent part, § 36(b) provides that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid...to such investment adviser or any affiliated person of such investment adviser." Subsection (b)(1) states that "[i]t shall not be necessary to...prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty."

The complaint consisted of two counts. The first alleged that the advisory fees paid to Harris were so disproportionate to the value of its services that it breached its

---

[3] The original complaint was brought by the Joneses and another plaintiff named Olga Menyhart, who owned shares in Oakmark and another fund called the Oakmark International Fund. Thereafter, Menyhart sold her shares in both funds, and Plaintiffs amended the complaint to drop Menyhart and add Winerman, as well as removing any mention of the Oakmark International Fund.

fiduciary duty under § 36(b) by receiving them. The second contended that Harris impermissibly retained savings it realized from economies of scale as the Funds grew, thereby making its effective compensation even higher than the fees listed above.

In November 2004, Harris moved to dismiss the complaint for failure to state a claim. While the motion was pending, the suit was transferred to our district. The following April, we denied the motion and the parties engaged in fact and expert discovery. After that process was completed, the parties briefed and orally argued the instant cross motions for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. Proc. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact ." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. Proc. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the movant has met this burden,

the non-moving party cannot simply rest on the allegations in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Proc. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant." Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994). When reviewing the record we must draw all reasonable inferences in favor of the non-movant; however, "we are not required to draw every conceivable inference from the record–only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

When parties file cross motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other. M. Snower & Co. v. United States, 140 F.2d 367, 369 (7th Cir. 1944). Rather, each motion evidences only that the movant believes it is entitled to judgment as a matter of law on the issues within its motion and that trial is the appropriate course of action if the court disagrees with that assessment. Miller v. LeSea Broadcasting, Inc., 87 F.3d 224, 230 (7th Cir. 1996). With these principles in mind, we turn to the parties' motions.

## DISCUSSION

The legal term for a mutual fund such as those involved in this case is an "open-end management company." See 15 U.S.C. §§ 80a-4, 80a-5. The company operates by combining money from many separate investors and then invests the whole in a portfolio consisting of stocks, bonds, and the like.    See http://www.sec.gov/investor/pubs/inwsmf.htm.  Shareholders are removed from the actual investment process, creating potential for self-dealing and abuse by investment advisors.  To protect investors' interests and avert some of the abuses that were inherent in the industry, Congress passed the Investment Company Act ("ICA").  15 U.S.C. § 80a-1 et seq.; see Green v. Nuveen Advisory Corp., 295 F.3d 738, 742 (7th Cir. 2002).

The ICA is a complex statutory scheme.  One of its protections is the requirement that investment companies be governed by boards of trustees, 40% of whom are not "interested persons" as defined by the ICA. See 15 U.S.C. §§ 80a-2(19), 80a-10, 80a-15(c).  The board, on behalf of the shareholders and in their best interests, negotiates the compensation to be paid to the advisers, who actually run the fund.  15 U.S.C. § 80a-15(c).  As part of this process, the board must request information that will allow it to evaluate the terms of the advisory contract, and the adviser must supply the requested information.  Id.  Once the contracts are approved, as stated above, §

36(b) imposes a fiduciary duty on advisers with respect to the compensation they receive. 15 U.S.C. § 80a-35(b). The statute does not delineate the specific boundaries of the fiduciary duty it imposes on investment advisors, but both the legislative history and the prevailing case law agree that it is significantly more circumscribed than the duty that a common-law fiduciary would owe to a beneficiary. See, e.g., Green, 295 F.3d at 742-43; Green v. Fund Asset Management, 286 F.3d 682, 685 (3d Cir. 2002); Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 329 (4th Cir. 2001).

## A. Plaintiffs' Motion for Summary Judgment

As stated above, Plaintiffs' complaint is couched exclusively in terms of alleged violations of § 36(b), predicated on the fees the Funds paid to Harris. Echoing this focus, Plaintiffs' motion for summary judgment specifically disavows any intention to bring a cause of action directly under any section of the ICA other than § 36(b). The Seventh Circuit has not considered a case of an alleged § 36(b) violation in the context of an open-end fund; the leading case involved a closed-end, tax-exempt leveraged fund that invested in tax-free municipal bonds. Green, 295 F.3d at 740. Unlike their open-end counterparts, closed-end investment companies have "fixed capitalization and may sell only the number of shares of its own stock as originally authorized." Id. at 740 n.1. Securities are not redeemed at the shareholder's option, and shares are traded on a secondary market. Id. Closed-end funds can use leverage to increase their income

- 9 -

stream by selling shares of preferred stock. Id. The compensation paid to advisers

increases as the degree of leverage increases, but the interests of the shareholders are

not always best served by increased amounts of leverage. See id. at 740-42. In Green,

the plaintiffs alleged that the mere existence of this relationship between the amount

of leverage and the advisers' compensation created an impermissible incentive for the

advisers to disregard the shareholders' interests in favor of their own, thus violating the

fiduciary duty owed under § 36(b).

    The appellate court noted that the statute does not explain the exact meaning of

the fiduciary duty beyond stating that one exists. Id. at 742. After examining the

legislative history of § 36(b) and how other circuits had interpreted it, the court

concluded that the duty was much narrower than a common-law fiduciary duty. Id. at

743. The panel did not agree with other circuits that had decided that liability would

lie under § 36(b) only if an adviser charged an excessive fee, but it took pains to

indicate that the scope of the duty was only "slightly" more broad than that. Id. at 743

n.8. To illustrate the limits of the court's circumscribed view of potential scenarios

leading to liability, the court hypothesized that a clear abuse of the potential conflict

of interest for an adviser of a closed-end fund, though "improbable," could violate the

§ 36(b) duty. Id. at 743 n.8. Looking to the situation actually set forth, however, the

court concluded that because the advisers did not put their interests above those of the

- 10 -

shareholders with respect to leveraging decisions, the mere potential for them to do so did not run afoul of § 36(b). Id. at 742, 744. Thus, though the Seventh Circuit has not specifically demarcated the outer reaches of the § 36(b) duty, there is no question that the field of behavior the section governs is small and specific. See id. at 743 n.8.

Despite Plaintiffs' assertions that their motion is based only in § 36(b), the arguments they present focus on conduct of parties other than Harris or actions of Harris other than receipt of compensation. The first contends that Morgenstern received deferred compensation from Harris, rendering him an interested party in Harris and making him ineligible to vote on approval of any fee agreements. The second urges that the trustees were so enmeshed with Harris through social and professional relationships that they could not have exercised independent judgment in assessing the fees that Harris proposed. The third claims that Harris's failure to disclose Morgenstern's compensation and his relationships with other members of the board in SEC filings voids the fee agreement for the applicable time period. In other words, the motion asserts violations of portions of the ICA other than § 36(b). Whether the conduct described violates other sections of the ICA is of no moment, as those sections do not include a private right of action and Plaintiffs have asserted that they only contend that the offending actions violate § 36(b). Because the actions taken do not add up to an actual conflict of interest that manifested in the detriment of

shareholders, the behavior with which Plaintiffs take issue does not fall within the scope of the § 36(b) duty described in Green.

Even if there were some basis to consider these claims within the scope of the § 36(b) duty, Plaintiffs' argument would still not result in summary judgment in their favor. First, the ICA requires that no more than 60% of the members of the Funds' board of trustees could be parties interested in Harris. Even assuming Morgenstern's deferred compensation made him interested for purposes of the ICA, that would bring the percentage of interested board members at worst to 30%, well within the amount allowed by statute. Thus, Morgenstern's status as an interested or disinterested trustee has no effect on the statutory validity of the actions the board took in this case.

On the second point, Plaintiffs in essence contend that Wilner, Ruder, Rotter, Friduss, Reich, Hayden, or Maki were "interested" parties, rendering them "affiliated" with Harris, because they were so closely connected to Harris that Harris would have known that the agreed-upon compensation was not the product of an objective bargaining process. See Migdal, 248 F.3d at 329. There are several ways a party can be considered affiliated with an adviser, but for this case, the directors would be affiliated if they can be considered "controlled" by a person affiliated with Harris. See id. Though the statute's definition of control is couched in terms of control over a company or fund, 15 U.S.C. § 80a-2(a)(9), Plaintiffs appear to assert that Morgenstern

- 12 -

exercised "control" over other members of the board via his social and other business relationships with them.  However, other than their relationships with Morgenstern, there is no allegation that Wilner, Ruder, Rotter, Friduss, Reich, Hayden, or Maki was "affiliated" with Harris.  Even drawing all inferences in favor of the Plaintiffs, which is a more favorable consideration than that mandated for a motion of this sort, the most that Plaintiffs have described is a situation that where people who were financially dependent on Harris had the ability to influence some of the board members to subjugate the shareholders' interest to Harris's interest.  Green makes clear that the potential for a conflict of interest is not enough; only an actual conflict that resulted in an identified effect on shareholders' interests will suffice.  Green, 295 F.3d at 744. Plaintiffs have not shown that Harris attempted to exercise that influence, let alone that it would have been enough to make it impossible for the trustees to act without compromising the shareholders.

Finally, with respect to the third argument, Plaintiffs do not explain how the disclosure of Morgenstern's deferred compensation in a filing to the SEC relates to the § 36(b) fiduciary duty with respect to compensation received by Harris.  There is no evidence that any failure to disclose impacted the amount of fees Harris was paid.  To sweep this conduct into the ambit of § 36(b) would directly contradict the universal

view that the fiduciary duty it sets out is both narrow and limited. See, e.g., Green, 295 F.3d at 743 n.8; Green, 286 F.3d at 684-85; Migdal, 248 F.3d at 329.

In sum, Plaintiffs have not established any basis for us to conclude that they are entitled to judgment as a matter of law on the issues presented in their motion. As a result, Plaintiffs' cross motion for summary judgment is denied.

## B. Harris's Motion for Summary Judgment

Unlike Plaintiffs' motion, Harris's motion focuses on the assertions within the complaint, which are grounded in a contention that Harris breached its § 36(b) fiduciary duty by receiving excessive fees for the advisory services it provided to the Funds. The prevailing standard for assessing such claims was first established in Gartenberg v. Merrill Lynch Asset Management, Inc., 694 F.2d 923 (2nd Cir. 1982). Gartenberg involved an open-end company for which Merrill Lynch provided investment advice as well as administrative and other services. Id. at 925, 926. It allowed customers to order immediate purchase or redemption of shares, and 30,000 such orders were processed in an average day. Id. at 926. A combination of favorable attributes led to significant investment in the fund, boosting its size from $288 million to over $19 billion in a 52-month period. Id. at 926. The fund had over 1.1 million individual and institutional investors. Gartenberg v. Merrill Lynch Asset Management, Inc., 528 F. Supp. 1038, 1039 (S.D.N.Y. 1981). Two of the fund's investors sued,

arguing that the negotiated fee percentage had become unreasonable and that Merrill

Lynch's continued receipt of fees calculated using that percentage violated its fiduciary

duty under § 36(b).  Gartenberg, 694 F.2d at 928.

After a bench trial, the district judge found for Merrill Lynch, relying primarily

on the fact that the fees charged to the fund were comparable to those charged to other

money market funds.  Id. at 929.  Rather than considering that fact essentially

dispositive, the Second Circuit emphasized that the district court should instead

consider all facts pertinent to the amount of fees paid had to be considered.  Id. at 929.

Only by examining all factors bearing upon whether an adviser's compensation was

within the range that could be expected to result from arm's-length bargaining needed

to be considered when assessing a claimed breach of fiduciary duty.  Id. at 928-29.  In

the specific context presented in Gartenberg, the court determined that the facts

pertinent to the question of the disproportionality of the fees included not only the

comparability of fees but also the cost to the adviser to provide services to the fund; the

nature and quality of the services that are provided, including the fund's performance

history; whether and to what extent the adviser realizes economies of scale as the

fund's assets increase; the volume of orders from the fund's investors that need to be

processed (a consideration that played heavily into the district court's decision); and

the conduct of, expertise of, and level of information possessed by the trustees charged

with approving the fee at the outset. Id. at 930. After examining the impact of each of these aspects of the parties' relationship, the Second Circuit concluded that the compensation Merrill Lynch received from the fund, though undoubtedly a sizeable amount, was not so disproportionate to the value of the services it rendered that they could not have been the product of arms-length bargaining. Id. at 933.

Plaintiffs argue that Green rejected the standard set out in Gartenberg standard and thus that it should not apply in this case. We disagree with their assessment of Green. The Seventh Circuit took the view that § 36(b) encompassed breaches of duty other than receipt of wildly disproportionate advisory fees, but the court did not state that the proper analysis when the alleged breach of duty involves excessive fees would be other than the formulation advanced in Gartenberg. See 295 F.3d at 743 n.8. Instead, Green discussed what other conduct could violate § 36(b) and how that should be treated. The different nature of the claim involved in Green counsels against a conclusion that the Seventh Circuit would not apply the Gartenberg standard in an excessive fees case such as this one. Accordingly, we accept Gartenberg as supplying the applicable framework for our analysis.

In considering this motion, then, we must examine whether there is a triable issue of fact on the question of whether the fees charged to the Funds were so disproportionately large that they could not have been the result of arm's-length

- 16 -

bargaining between Harris and the board.   See Gartenberg, 694 F.2d at 928.   In

performing this examination, our consideration is confined to the fees charged between

August 2003 and August 2004 and the advisory contracts underlying those fees.  As

Gartenberg makes clear, the fees charged in the mutual fund industry are the product

of a negotiation, wherein both sides engage in a process of taking some things while

giving up others.  Id.  Consequently, there is no single outcome that can be expected;

instead, there is a range of acceptable results.

According to Harris's motion, the fees in this case fall within an acceptable

range for four reasons.  First, the advisory fees were in line with those charged by 10

(for Oakmark) or 11 (for Equity and Global) other similar funds managed by other

companies.  Second, Harris provided information to the trustees about each Fund and

its operation, and the trustees then approved the fee schedule.   Third, the schedule

included breakpoints that applied to all or some of the fees incurred during the damages

period, and those breakpoints in part resulted from the negotiation efforts of the

trustees.  Lastly, the Funds performed well, relatively speaking, during the damages

period.

In response to Harris's first point, Plaintiffs do not dispute that Harris's fees

were comparable to those charged by other similar funds.  Instead, they insist that we

must compare Harris's fees not to those charged to funds run by managers other than

Harris but rather to those charged to institutional clients. According to Plaintiffs, that comparison is the more meaningful because institutional clients received the same research and investment services that the Funds did. We cannot, for purposes of this motion, disregard this comparison, as Defendants urge us. However, making all inferences in favor of the Plaintiffs does not mean we must ignore the undisputed fact that shareholders in at least nine other mutual funds investors were paying fees at the same level that the Funds were. Even assuming for the mere sake of comparison that the services Harris's institutional clients received were indistinguishable from those the Funds received, the amounts paid by different parties establish a range of prices that investors were willing to pay. The range extended from a low-end figure below what the institutional clients were paying and a high-end figure beyond the fees that other mutual fund clients paid. Harris's fees fell within this range, thus preventing a conclusion that the amount of fees indicates that self-dealing was afoot.

With regard to the fact that the fee agreement went through a process of review that ultimately led to its approval by the board, Plaintiffs contend that the board members were hopelessly conflicted, rendering their review meaningless. For the reasons set forth in our consideration of Plaintiffs' cross motion, we disagree with their conclusions on this point. Consequently, we have no reason to discount the notion that the shareholders' interests were represented at the negotiating table by a group of

people who were capable of giving those interests primacy. Whether they were able to negotiate the best possible arrangement does not factor into our analysis; the only question we need consider is whether they could have agreed to the fee schedule in the advisory contracts after engaging in good-faith bargaining. The evidence the parties have provided indicate that the board as a whole was operating without any conflict that would prevent it from engaging in arm's-length negotiations with Harris.

Moving to the third of Harris's points, Plaintiffs contend that the breakpoints were not set in relation to any analysis of the savings achieved from economies of scale. Instead, they claim, Harris set the points at a level so high that little if any savings would be passed on to shareholders. Interestingly, Plaintiffs do not provide any evidence of what savings were gained from economies of scale. There can be no doubt that, if breakpoints had been set at a lower level, Plaintiffs could have paid lower fees. However, as was true for the second of Harris's points, discussed above, whether breakpoints could have been set at a lower level is not the issue. The issue is whether the board could have agreed to the breakpoints being set at those levels after engaging in good-faith negotiations. There is no indication that they could not, and the fact that the level of breakpoints was comparable to what shareholders in other mutual funds had accepted indicates that they could result from arm's-length negotiation.

On the point of performance, Plaintiffs do not dispute the contentions Harris makes about the returns the Funds produced up until March 2004. Instead, they insist that we should look instead at the performance levels that took place after that point in time. However, how the Funds performed after the damages period is not relevant to the quality of services rendered before that time.

To counter the effect of the points Harris have raised, Plaintiffs must demonstrate that the flaws they find in what transpired would have made a legally significant difference. Rather than doing so, Plaintiffs tell an elaborate story of what they believe should have transpired between the Funds and Harris in order to produce a deal that would ultimately be more advantageous to the Plaintiffs than the arrangement that was reached. However, the evidence they have adduced establishes at most that others paid different amounts for similar services. It does not allow a reasonable inference that the difference was enough to put the amount charged outside of the range that could be expected to result from arm's-length bargaining. Section 36(b) does not create a duty that advisers receive the lowest possible fee amount of compensation for the services they provide. Whether the Funds could have gotten more for their money from Harris is irrelevant. What matters is whether there is a fundamental disconnect between what the Funds paid and what the services were worth; on this score Plaintiffs have not set forth an issue of fact that, if resolved in their

favor, could lead to a finding that Harris had breached its § 36(b) duty.  As a result,

Harris is entitled to summary judgment in its favor with respect to the fees the Funds

paid from August 2003 to August 2004.

## CONCLUSION

Based on the foregoing, Plaintiffs' motion for summary judgment is denied.

Harris's motion for summary judgment is granted on the entirety of Plaintiffs'

complaint.

_____
Charles P. Kocoras
United States District Judge


Dated:  February 27, 2007

- 21 -