# EXHIBIT H

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2
 3    JOHN J. VAUGHN, GERALD A.      )
      KALBFLEISCH, MICHAEL and       )
 4    MYRTLE HATHAWAY,               )
                                     )
 5         Plaintiffs,               )
                                     )
 6    vs.                            )   Civil Action
                                     )   No. 04-10988-GAO
 7    PUTNAM INVESTMENT MANAGEMENT,  )
      LLC, and PUTNAM RETAIL         )
 8    MANAGEMENT LIMITED PARTNERSHIP,)
                                     )
 9         Defendants.               )
10         DEPOSITION OF JOHN VAUGHN, produced, sworn,
11    and examined on FEBRUARY 13, 2007, between the
12    hours of eight o'clock in the forenoon and six
13    o'clock in the afternoon of that day, at the
14    offices of Bryan Cave, LLP, One Metropolitan
15    Square, 211 North Broadway, Suite 3600, St.
16    Louis, Missouri 63102 before Tammie A. Heet, a
17    Registered Professional Reporter, Certified
18    Shorthand Reporter and Notary Public within and
19    for the states of Illinois and Missouri, in a
20    certain cause now pending in the United States
21    District Court, District of Massachusetts, in re:
22    JOHN J. VAUGHN, et al. vs. PUTNAM INVESTMENT
23    MANAGEMENT, LLC, et al.; on behalf of the
24    Defendant Putnam.
25
```

Page 10

1  Q. And when you say things would be
2  taken care of, what does that mean?
3  A. Well, the problems that I read in
4  the complaint.
5  Q. Do you know where the trial's going
6  to be in this case?
7  A. You mentioned that yesterday.
8  Q. Do you know where the case is
9  pending?
10 A. Pardon me?
11 Q. Do you know where the case is
12 pending?
13 A. I don't understand what that means.
14 Q. Do you know what court the case is
15 in?
16 A. Not exactly, I don't think so.
17 Q. Did you know before yesterday where
18 the -- where the case is?
19 A. For trial?
20 Q. Yes, sir.
21 A. No.
22 Q. If this case goes to trial in
23 Boston, Massachusetts, how are you going to get
24 there?
25 A. I have no idea.

Page 11

1  Q. Do you have any medical condition
2  that will prevent you from attending trial in
3  Boston?
4  A. [redacted]
5  [redacted]
6  Q. And where do you live?
7  A. I live across that river in
8  Illinois.
9  Q. Across the Mississippi River?
10 A. (The witness indicated.)
11 Q. We're in St. Louis today, correct?
12 A. Right.
13 Q. And how far from St. Louis do you
14 live? How long a drive is it?
15 A. From here? From this point?
16 Q. Yes, sir.
17 A. It was approximately 22 miles, I
18 guess.
19 Q. Take about a half-hour to drive?
20 A. A little less.
21 Q. When was the last time that you
22 flew out of Lombard field (sic) here in
23 st. Louis?
24 A. It's been a while. I haven't -- I
25 don't know. They had the security set up and

Page 12

1  since they did that.
2  Q. What's the last trip that you've
3  taken out of the states of Illinois or Missouri?
4  A. My last trip was in Illinois and
5  Missouri.
6  Q. Have you --
7  A. To Branson.
8  Q. Have you taken any trips out of
9  Illinois or Missouri in the last couple of years?
10 A. It's been longer than that. No,
11 ain't been in the last couple of years.
12 Q. How far a drive is it to Branson,
13 Missouri?
14 A. It's a -- five hours, if you drive
15 steady. I never made it in five hours with
16 stops.
17 Q. When were you most recently in
18 Branson?
19 A. Last November.
20 Q. November of '06?
21 A. Correct.
22 Q. Did you see some shows there?
23 A. That's my wife's pride and joy.
24 That's the only reason I went, yes.
25 Q. She likes to go see shows there?

Page 13

1  A. (The witness indicated.)
2  Q. Branson is in an area known as the
3  Ozarks; is that correct?
4  A. Right.
5  Q. And there are a number of
6  entertainment venues there where they have shows
7  and things like that; is that correct?
8  A. That's what the gist of the place
9  is, yes.
10 Q. Did you stay at a hotel there?
11 A. Right.
12 Q. How many nights?
13 A. It was three nights.
14 Q. Did you have to get doctor's
15 permission to go there?
16 A. No. Not for that, to drive.
17 Q. Okay. Do you own any Putnam mutual
18 funds today?
19 A. I do. Two.
20 Q. And which two do you own?
21 A. It's Growth Opportunity and
22 Voyager.
23 Q. Now, you sold the overwhelming
24 majority of your interest in those funds in 2005,
25 correct?

Page 86

1  or no question, sir.
2       MR. GRADY: You've been instructed
3  not to answer, Mr. Vaughn.
4       THE WITNESS: I don't know that,
5  no.
6       MR. GRADY: When I instruct you not
7  to answer, it means don't answer.
8       It's been an hour plus. Do you
9  want a break?
10      THE WITNESS: Sounds good.
11      MR. GRADY: Okay.
12      (A short break was taken.)
13  Q.  (BY MR. SIMSHAUSER) Mr. Vaughn,
14  just picking up on a couple things that we spoke
15  about earlier today. We looked at some news
16  clippings that you said that, when you had
17  initially clipped the articles, you had written
18  notes on them about the date and the time and the
19  publication.
20      And that's -- that's something that
21  you began doing back in 1999 or 2000, correct?
22  A.  Correct.
23  Q.  And -- and that was long before you
24  ever thought about suing Putnam, correct?
25  A.  Right.

Page 87

1  Q.  And the reason you did that was
2  that was your custom and practice when you
3  clipped articles, correct?
4  A.  Not just Putnam, but any -- any
5  holding I had.
6  Q.  Yes, sir. And when did you first
7  think about suing Putnam?
8  A.  It would have had to have been May
9  of -- I guess this thing.
10  Q.  May of 2004?
11  A.  Yeah, 2004, yeah.
12  Q.  So to the extent that you were
13  clipping articles even before -- shortly before
14  or shortly after that time, the reason that you
15  put the publication and the date on there was
16  because that was your custom and practice so you
17  could remember where the article came from,
18  correct?
19  A.  That was necessary because I didn't
20  keep the whole page of that newspaper. I cut the
21  article out, yeah.
22  Q.  Now, has any medical doctor told
23  you that you couldn't go to Boston,
24  Massachusetts, for trial in this case?
25  A.  That I could not go to Boston?

Page 88

1  Q.  Yeah.
2  A.  No medical doctor's specifically
3  said not to go to Boston, no.
4  Q.  Has any medical doctor told you
5  specifically that you can't go anywhere?
6  A.  I have not been told not to go
7  anywhere. No, I mean.
8  Q.  You mentioned Jonathan Mutch. How
9  many times have you spoken with Mr. Mutch?
10  A.  I don't know really how many.
11  Q.  What's your best recollection?
12  More than a handful?
13  A.  Maybe eight times.
14  Q.  All right. When did you most
15  recently speak with him?
16  A.  When?
17  Q.  Yes, sir.
18  A.  It might have been a couple weeks
19  ago. I dialed his number in error.
20  Q.  Was it a short conversation?
21  A.  It was a short conversation.
22      MR. GRADY: I guess you got right
23  through, huh?
24      THE WITNESS: Got right through the
25  first time.

Page 89

1  Q.  (BY MR. SIMSHAUSER) Have you ever
2  telephoned Mr. Grady?
3  A.  No, I don't -- I can't say that I
4  have. Not that I can remember.
5  Q.  Have you ever spoken with Jennifer
6  Adler about anything other than logistical
7  arrangements for today's deposition?
8      Don't tell me what it was. Just
9  asking if you ever spoke with her about anything
10  other than logistical arrangements.
11  A.  Nothing.
12  Q.  Have you ever spoken with any other
13  attorneys at the Robins, Kaplan firm?
14  A.  No one that I can remember.
15      (Exhibit 14 was marked for
16  identification by the reporter.)
17  Q.  (BY MR. SIMSHAUSER) Showing you
18  Exhibit 14, that's a document and it's filed in
19  this litigation entitled Certification Pursuant
20  to Local Rule 26.2(B).
21      Do you see that, sir? Do you see
22  Exhibit 14?
23  A.  Oh, okay.
24  Q.  Is that your signature on the
25  bottom of the page there?