**EXHIBIT B**

1                UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
2
3   JOHN J. VAUGHN, GERALD A.         )
    KALBFLEISCH, MICHAEL and          )
4   MYRTLE HATHAWAY,                  )
                                      )
5            Plaintiffs,              )
                                      )
6   vs.                               )   Civil Action
                                      )   No. 04-10988-GAO
7   PUTNAM INVESTMENT MANAGEMENT,     )
    LLC, and PUTNAM RETAIL            )
8   MANAGEMENT LIMITED PARTNERSHIP,   )
                                      )
9            Defendants.              )
10           DEPOSITION OF JOHN VAUGHN, produced, sworn,
11   and examined on FEBRUARY 13, 2007, between the
12   hours of eight o'clock in the forenoon and six
13   o'clock in the afternoon of that day, at the
14   offices of Bryan Cave, LLP, One Metropolitan
15   Square, 211 North Broadway, Suite 3600, St.
16   Louis, Missouri 63102 before Tammie A. Heet, a
17   Registered Professional Reporter, Certified
18   Shorthand Reporter and Notary Public within and
19   for the states of Illinois and Missouri, in a
20   certain cause now pending in the United States
21   District Court, District of Massachusetts, in re:
22   JOHN J. VAUGHN, et al. vs. PUTNAM INVESTMENT
23   MANAGEMENT, LLC, et al.; on behalf of the
24   Defendant Putnam.
25

Page 42

1  regret not having done research into his
2  recommendations?
3     A.   Say that again.
4     Q.   Do you wish you had done research
5  into his recommendations?
6     A.   Yeah, I do. I wish I'd researched
7  everything I even thought of any stock.
8     Q.   If you had it to do over again,
9  what would you do differently today?
10    A.   I understand the best route is to
11 go to a library and find the -- pull up a good
12 history of the company's background. That's what
13 I would do for research on anything further I
14 would look at.
15    Q.   What were your expectations back in
16 March of 1999 as to how the Putnam mutual funds
17 that you had invested in were going to perform?
18    A.   The only expectation I had was with
19 Mr. Green's recommendation that they would do
20 much better than what I had. I didn't know -- I
21 didn't have any ballpark figure, you know.
22    Q.   And in the six or so years that you
23 owned the Putnam mutual funds, how did they
24 perform?
25    A.   The three funds started out --

Page 43

1  well, they went up good and then they went down,
2  I think in 2001. $30,000 was down to around
3  19,000 value. At the time I liquidated them, it
4  was around 24 or 25,000. It was less than what I
5  had put into them --
6     Q.   And --
7     A.   -- six years prior.
8     Q.   Were the losses that you incurred
9  in your Putnam investments a factor in your
10 decision to sue Putnam?
11    A.   Well --
12    Q.   You're pausing, so let me ask the
13 question differently.
14         If back when you first sued Putnam
15 the total amount of the holding would have been
16 $40,000, compared to your initial investment of
17 30,000, as opposed to 20 something, do you think
18 we'd be here?
19    A.   I believe we would be.
20    Q.   Why do you say that? What if it
21 had been 50 or 60,000, would we still be here?
22    A.   You're talking about at that
23 particular time when I entered into it, right?
24    Q.   Yeah, when you first sued Putnam
25 and at that time.

Page 44

1     A.   We're starting in February of '04
2  that we're talking about?
3     Q.   Yes, sir.
4     A.   When I first called the --
5     Q.   Yes, sir. When you first decided
6  to sue Putnam, at that time.
7     A.   When I first called that number, I
8  hadn't thought about suing Putnam. Just -- I
9  mean, just --
10    Q.   So --
11    A.   -- looking at what there was there.
12    Q.   And shortly, sometime after that,
13 you agreed to sue Putnam, correct?
14    A.   It was after that. It wasn't real
15 shortly. It was after that, yes.
16    Q.   You called an attorney, correct?
17    A.   Right.
18    Q.   You had seen a number somewhere?
19    A.   Right.
20    Q.   In an advertisement in the -- a
21 newspaper --
22    A.   Right.
23    Q.   -- or something?
24    A.   Right.
25    Q.   And where was that advertisement?

Page 45

1     A.   Belleville News Democrat.
2     Q.   And -- and you called and talked to
3  some lawyers, right?
4     A.   Correct.
5     Q.   And they were looking for
6  plaintiffs to sue Putnam, correct?
7         MR. GRADY: Objection. Don't
8  answer any question asking what lawyers told you.
9     Q.   (BY MR. SIMSHAUSER) I'm not asking
10 what the lawyers told you. You formed an
11 understanding, sir, did you not, that they were
12 looking for people to sue Putnam?
13    A.   I did not know anything about
14 suing, no.
15    Q.   You ultimately agreed to sue
16 Putnam, right?
17    A.   I ultimately agreed. At what point
18 in time are you talking about?
19    Q.   Before filing suit in Madison
20 County, Illinois. You sued Putnam in Madison
21 County, Illinois; is that true? Or do you not
22 know whether or not you did that?
23    A.   Yeah, there's -- you're right
24 there.
25        MR. GRADY: We've been going about

12 (Pages 42 to 45)

Page 78

```
 1    Q.  And then there's a name of an
 2  attorney in Chicago, George Zelcs.  Have you ever
 3  spoken with him?
 4    A.  Not that I'm aware of.
 5    Q.  Have you ever heard of him?
 6    A.  I do not know any of those folks
 7  except --
 8    Q.  And then on the next page there's
 9  the same names of some attorneys from Phoenix,
10  Arizona.  Have you ever heard of any of those
11  people: Andrew Friedman or Frank Balint or the
12  Bonnett, Fairbourn, Friedman & Balint firm?
13    A.  I know none of those folks.
14    Q.  Do you know how those people got
15  involved in suing Putnam for you?
16        MR. GRADY:  Objection.  Form.
17  Presumes facts not in evidence.
18        THE WITNESS:  It would have to be
19  through the phone call I made February of '04.
20    Q.  (BY MR. SIMSHAUSER)  Did you ever
21  speak with anybody in Phoenix about suing Putnam?
22    A.  Phoenix?
23    Q.  Yes, sir.
24    A.  No one that I -- no.
25    Q.  Do you see any indication in the
```

Page 80

```
 1    A.  That's a hard one.  I first met him
 2  in person Sunday, I guess.  I met him.
 3    Q.  Two days ago?
 4    A.  Two days ago.
 5    Q.  Did -- did you meet up with him
 6  at -- and the Hathaways at the McDonald's down in
 7  Columbia?
 8    A.  No, I didn't.
 9    Q.  Had you ever met the Hathaways
10  before yesterday?
11    A.  No, I hadn't.
12    Q.  Where did you meet with Mr. Grady
13  on Sunday?
14    A.  By the airport, St. Louis
15  International Airport.
16    Q.  That called Lombard Field?
17    A.  Lambert.
18    Q.  Lambert.
19    A.  L-A-M-B-E-R-T.  Lambert Field.
20  St. Louis International.
21    Q.  I asked you this earlier but I
22  might have used the wrong term.
23        When did you last fly into or out
24  of Lambert field?
25    A.  When?  I told you before the
```

Page 79

```
 1  complaint that was filed on your behalf in
 2  Madison County that Mr. Grady was involved with
 3  that lawsuit?
 4        (Mr. Gerald Kalbfleisch has exited
 5  the deposition proceeding.)
 6        THE WITNESS:  I see no indication
 7  that Mr. Tom Grady was connected with this suit,
 8  no, sir.
 9    Q.  (BY MR. SIMSHAUSER)  Independent of
10  this document, do you have any reason to believe
11  that Mr. Grady was involved with the Madison
12  County lawsuit that you brought against Putnam?
13    A.  I cannot say that he was or wasn't
14  or I would -- right at the time, I do not know.
15    Q.  When -- when did you first speak
16  with Mr. Grady?  Was it before or after -- after
17  the Madison County lawsuit was dropped?
18    A.  I don't remember when I did, if I
19  did talk to him.  I don't remember that I did.
20    Q.  When did you first?
21    A.  If I did, I don't remember.
22    Q.  When did you first meet Mr. Grady
23  in person?
24    A.  In person?
25    Q.  Yes, sir.
```

Page 81

```
 1  security things went into effect.  I have not
 2  been through there since.  Was that '01?  It was
 3  before '01.
 4    Q.  It was before 2001?
 5    A.  Correct.
 6    Q.  And -- and would it also have been
 7  the last time that you were in an airplane was
 8  before 2001?
 9    A.  It would be the only place that I
10  would board an airplane would be.  I don't go to
11  any other location.
12    Q.  Had you ever spoken to Mr. Grady
13  before you met him in person on Sunday?
14    A.  Not knowingly, I haven't, no.
15    Q.  Okay.  When did you first speak
16  with Jonathan Mutch?
17    A.  When?  I don't know.  Sometime in
18  19- -- or in 2004 or '5.
19    Q.  It was after the Madison County
20  case was dropped, correct?
21    A.  Oh, yeah.  After that.
22    Q.  And I take it that Mr. Mutch called
23  you as opposed to you calling him, correct?
24    A.  I -- I never introduced any phone
25  call to Mr. Mutch, no.  It was him, him
```

Page 82

1 corresponding with me, yes.
2   Q.  Right. So just so I have the
3 chronology or time sequence correct, you had a
4 single conversation in February 2004 after
5 reading a newspaper advertisement with an 800
6 number in it. You spoke to a lawyer at that
7 time?
8   A.  I'm not sure if I spoke to a lawyer
9 or an office person. I -- I -- I cannot tell you
10 that I spoke to a lawyer at that time. I don't
11 know.
12       (Mr. Gerald Kalbfleisch has
13 returned to the deposition proceeding.)
14       THE WITNESS: Most of the time a
15 lawyer doesn't answer the phone, you know.
16   Q.  (BY MR. SIMSHAUSER) If you ever
17 have occasion to call me, I answer my own line,
18 sir.
19   A.  Good.
20       MR. GRADY: Thank you.
21       THE WITNESS: It doesn't happen on
22 a regular basis.
23   Q.  (BY MR. SIMSHAUSER) Okay. So
24 let's go over the time sequence.
25       So February 2004 you read the

Page 83

1 newspaper advertisement and you call the 800
2 number. And you know you're calling a lawyer's
3 office of some sort, correct?
4   A.  There was a -- there was a notation
5 on the article that told me -- told me that, yes,
6 I would say.
7   Q.  And -- and then the Madison County
8 lawsuit was filed in May or so of 2004, and then
9 the case was dropped sometime after that,
10 correct?
11   A.  Those are the times you're giving
12 me. I don't know for sure.
13   Q.  Well, if you look at the top of
14 Exhibit 6, it says that the case was --
15   A.  Yeah.
16   Q.  -- May 14th, 2004.
17   A.  14th of May, 2004.
18   Q.  And you don't have any different
19 recollection than that, do you, sir?
20   A.  That would have to be probably
21 right.
22   Q.  And -- and then sometime after that
23 the case was dropped, correct?
24   A.  You're -- you're probably exactly
25 right. I think that -- you know.

Page 84

1   Q.  Do you remember how long after the
2 case was filed that it was dropped?
3   A.  I have no recollection right now.
4   Q.  And then sometime after the case
5 was dropped this lawyer from Boston, Mr. Mutch,
6 called you, correct?
7   A.  I would say that's the correct
8 chain, right.
9   Q.  And -- and between the February
10 2004 conversation and whenever it was that Mr.
11 Mutch called you from Boston, did you speak with
12 any other lawyers about suing Putnam?
13       MR. GRADY: Objection. Asked and
14 answered a dozen times.
15       THE WITNESS: I didn't speak to
16 anybody about suing Putnam.
17   Q.  (BY MR. SIMSHAUSER) And when Mr.
18 Mutch called you from Boston, without disclosing
19 to me the substance of what you discussed with
20 him, the general subject matter was the subject
21 of suing Putnam, correct?
22   A.  There would be no other reason for
23 him to call me, yes.
24   Q.  Now, how did Mr. Mutch get your
25 name?

Page 85

1   A.  We'll have to leave that one up in
2 the air. I don't -- I don't know.
3   Q.  And you understand that he's with
4 the Robins, Kaplan law firm, correct?
5   A.  Robins, Kaplan, Miller, something
6 like that.
7   Q.  Yes.
8   A.  There's four names, yes.
9   Q.  And we just looked at the Illinois
10 complaint. That firm wasn't involved in the
11 Illinois complaint, correct?
12   A.  Not that I can remember, no, sir.
13   Q.  All right. And, Mr. Grady, do you
14 know what firm he's with?
15   A.  Now, presently?
16   Q.  Yes, sir.
17   A.  I -- I'm not sure if he's with a
18 firm or Grady Associates.
19   Q.  In any event, do you know if
20 there's any arrangement between the Korein
21 Tillery firm in Illinois and either the Robins,
22 Kaplan firm or Mr. Grady or his firm?
23       MR. GRADY: Objection. Don't
24 answer that.
25   Q.  (BY MR. SIMSHAUSER) That's a yes

22 (Pages 82 to 85)